## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## PIKEVILLE

| | |
|---|---|
| IN RE: ) | |
| ) | |
| BLACK DIAMOND MINING COMPANY, ) | |
| LLC, *et al*., ) | |
| ) | Civil No. 7:13-cv-125-ART |
| Debtors, ) | |
| _____ ) | ***Electronically Filed*** |
| ) | |
| TAFT A. MCKINSTRY, AS TRUSTEE ) | |
| OF THE BD UNSECURED CREDITORS ) | |
| TRUST, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| IRA J. GENSER, LARRY TATE, AND ) | |
| ALVAREZ & MARSAL NORTH AMERICA, ) | |
| LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT ALVAREZ & MARSAL NORTH AMERICA, LLC'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR A DETERMINATION THAT ALL CLAIMS ARE "INDEMNIFIABLE CLAIMS" UNDER THE SETTLEMENT AGREEMENT

Defendant Alvarez & Marsal North America, LLC ("A&M"), by its undersigned counsel, hereby submits this memorandum in support of its Motion for Summary Judgment or, in the alternative, Motion for a Determination that all claims asserted against A&M are "Indemnifiable Claims" under the July 22, 2009 Settlement Agreement.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................... 1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS .................................... 3

    A.   A&M Was Engaged as a Consultant by Black Diamond Before the
Bankruptcy; Tate Was the Primary Consultant on That Engagement ................. 3

    B.   A&M Was Engaged as a Consultant by Black Diamond Again in January
2008, Before the Bankruptcy; Genser Led That Engagement ............................. 5

    C.   When the Involuntary Bankruptcy Was Filed, Genser Was Chosen to Be
CRO as a Compromise Between Black Diamond's Founder and Its
Primary Secured Lender; the Bankruptcy Court Overruled Objections and
Approved the Appointment; Genser Appointed Tate as CRO ............................ 7

    D.   Both the Bankruptcy Court and the Committee Were Pleased with
Genser's and Tate's Performance ...................................................................... 11

    E.   After the Restructuring Effort Failed and the Committee Began to
Scapegoat Genser, the Parties Made an Agreement That the Trust Cannot
Collect from A&M Unless It Can Prove That Its Claims Are "Non-
Indemnifiable" Under A&M's Engagement Letter ........................................... 14

III.    PROCEDURAL POSTURE AND NATURE OF THE TRUST'S CLAIMS ................. 16

IV.     A&M IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS .................... 17

    A.   The Trust Cannot Establish That There Are Any Disputes of Material Fact
as to Its Claims for Negligent Hiring and Retention, Negligent
Supervision, and Its Assertion of Vicarious Liability on the Basis of
Respondeat Superior ........................................................................................ 17

    B.   The Negligent Hiring and Retention Claim Fails Because There Is No
Underlying Tort, A&M Did Not Appoint Genser or Tate, and They Were
Qualified for Their Respective Positions in Any Event..................................... 19

        1.   A&M Did Not Appoint Genser or Tate.................................................... 20

        2.   The Trust Cannot Prove That A&M Knew or Should Have Known
That Genser's or Tate's Continued Retention Created a Risk of
Harm to the Debtors' Bankruptcy Estates. .............................................. 21

    C.   The Negligent Supervision Claim Against A&M Fails Because There Is
No Underlying Tort and the Trust Cannot Show That A&M Had a Duty to
Supervise Either Genser or Tate ....................................................................... 23

    D.   A&M Is Not Vicariously Liable Under a Theory of Respondeat Superior
Because Genser and Tate Did Not Commit an Underlying Tort ........................ 26

V.      IF THIS COURT DOES NOT GRANT SUMMARY JUDGMENT, IT SHOULD
FIND UNDER RULE 16 THAT ALL CLAIMS AGAINST A&M ARE
INDEMNIFIABLE CLAIMS ........................................................................................ 29

# TABLE OF CONTENTS
(continued)

**Page**

A.  The Trust Cannot Collect Unless It Can Prove That A&M's Gross Negligence or Willful Misconduct Primarily and Directly Caused the Trust's Harm ................................................................................................ 29

B.  The Nature of the Trust's Claims Against A&M Precludes a Finding That A&M "Primarily and Directly" Caused the Trust's Alleged Harm .................... 31

VI.  CONCLUSION ............................................................................................. 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Airdrie Stud, Inc. v. Reed*,
2003 WL 22796469 (Ky. Ct. App. Nov. 26, 2003) ................................................19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................18

*Asher v. Unarco Material Handling, Inc.*,
737 F. Supp.2d 662 (E.D. Ky. 2010) .....................................................................18

*Blue v. United Air Lines*, 98 N.Y.S.2d 272,
(N.Y. Sup. Ct. 1950) ..............................................................................................32

*Booker v. GTE.Net LLC*,
350 F.3d 515 (6th Cir. 2003) ...........................................................................23, 24

*Brown v. Plata*,
131 S. Ct. 1910 (2011)............................................................................................32

*Buckminster v. Arnold*,
2008 WL 2168882 (W.D. Ky. May 23, 2008).......................................................24

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................................17

*Cohen v. Alliant Enterprises, Inc.*,
60 S.W.3d 536 (Ky. 2001).......................................................................................27

*Coleman v. Schwarzenegger*,
922 F. Supp. 2d 882 (E.D. Cal. and N.D. Cal. 2009) ......................................32, 33

*Copeland v. Humana of Kentucky, Inc.*,
769 S.W.2d 67 (Ky. Ct. App. 1989) ...........................................................26, 27, 28

*Cummins v. City of Augusta*,
2013 WL 5436657 (Ky. Ct. App. Sept. 27, 2013) .................................................24

*Davidson v. Department of Health and Human Services*,
2007 WL 3120666 (E.D. Ky. Oct. 19, 2007)....................................................24, 25

*Davies Flying Service v. United States*,
216 F.2d 104 (6th Cir. 1954) ............................................................................31, 33

*Dishman v. Corrections Corp. of America*,
   2010 WL 3294679 (E.D. Ky. Aug. 20, 2010)........................................................28

*Divita v. Ziegler*,
   2007 WL 29390 (Ky. Ct. App. Jan. 5, 2007).......................................................25

*Dortch v. Fowler*,
   588 F.3d 396 (6th Cir. 2009) .............................................................................23, 33

*Fenley v. Kamp Kaintuck, Inc.*,
   2011 WL 5443440 (Ky. Ct. App. Nov. 10, 2011) ...............................................28

*Floyd v. Humana of Virginia.*,
   787 S.W.2d 267 (Ky. Ct. App. 1990) ...............................................................27, 28

*Ford Motor Credit Co. v. Weaver*,
   680 F.2d 451 (6th Cir. 1982) ..............................................................................29

*Foster v. Leggett*,
   484 S.W.2d 827 (Ky. 1972) ...............................................................................18

*Gaff v. Federal Deposit Insurance Corp.*,
   814 F.2d 311 (6th Cir. 1987) ..............................................................................29

*G. Heileman Brewing Co. v. Joseph Oat Corp.*,
   871 F.2d 648 (7th Cir. 1989) ..............................................................................31

*Grand Realty Corp. v. Goose Creek Energy, Inc.*,
   656 F. Supp. 2d 707 (E.D. Ky. 2009) .............................................................28, 29

*Grego v. Meijer, Inc.*,
   187 F. Supp. 2d 689 (W.D. Ky. 2001)..............................................................23, 33

*Harris Technology Sales, Inc. v. Eagle Test Systems, Inc.*,
   2008 WL 343260 (D. Ariz. Feb. 5, 2008).........................................................31

*Honican v. Stonebridge Life Insurance Co.*,
   455 F. Supp. 2d 662 (E.D. Ky. 2006) .............................................................32, 33

*In re Baker*,
   744 F.2d 1438 (10th Cir. 1984) ..........................................................................30

*In re NLO, Inc.*,
   5 F.3d 154 (6th Cir. 1993) ..................................................................................31

*In re Thompson Boat Co.*,
   252 F.3d 852 (6th Cir. 2001) ..............................................................................28

*In re Wallace's Bookstores, Inc.*,
   317 B.R. 709 (Bankr. E.D. Ky. 2004) ..................................................................18

*Jones v. Helm*,
   2011 WL 1979165 (W.D. Ky. May 20, 2011) ......................................................27

*Kohler Co. v. Oasis Industries, Inc.*,
   1987 WL 7250 (N.D. Ill. Feb. 26, 1987) ........................................................30, 31

*Limor v. Weinstein & Sutton (In re SMEC, Inc.)*,
   160 B.R. 86 (M.D. Tenn. 1993) ..........................................................................18

*Maki v. Laakko*,
   88 F.3d 361 (6th Cir. 1996) ................................................................................18

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ............................................................................................18

*North Jackson Pharmacy, Inc. v. Caremark RX, Inc.*,
   385 F. Supp. 2d 740 (N.D. Ill. 2005) ..................................................................31

*Newton v. A.C. & S., Inc.*,
   918 F.2d 1121 (3d Cir. 1990) ..............................................................................30

*Oakley v. Flor-Shin, Inc.*,
   964 S.W.2d 438 (Ky. Ct. App. 1998) ..................................................................19

*Ohuche v. Merck & Co., Inc.*,
   903 F. Supp. 2d 143 (S.D.N.Y. 2012) .................................................................33

*Papa John's International, Inc. v. McCoy*,
   244 S.W.3d 44 (Ky. 2008) ..................................................................................26

*Patterson v. Blair*,
   172 S.W.3d 361 (Ky. 2005) ....................................................................26, 27, 28

*Perry v. Creech Coal Co.*,
   55 F. Supp. 998 (E.D. Ky. 1944) ........................................................................30

*Roth v. City of Newport*,
   2008 WL 5264314 (Ky. Ct. App. Dec. 19, 2008) ....................................19, 23, 33

*Saleba v. Schrand*,
   300 S.W.3d 177 (Ky. 2009) ................................................................................18

*Sankarathil v. EF Products, Inc.*,
   2009 WL 2046160 (E.D. Mich. July 10, 2009) ..............................................31, 33

*Sergent v. McKinstry*,
    472 B.R. 387 (E.D. Ky. 2012) ...................................................................16, 28

*Slyfield v. Penfold*,
    66 F. 362 (6th Cir. 1895) ..................................................................................32

*Stalbowsky v. Belew*,
    205 F.3d 890 (6th Cir. 2000) .....................................................................19, 23

*Sudekamp v. Fayette County Board of Education*,
    2005 WL 2137739 (E.D. Ky. Sept. 1, 2005) ..............................................26, 27

*Taylor v. JPMorgan Chase Bank, North America*,
    2014 WL 66513 (E.D. Ky. Jan. 8, 2014) ....................................................19, 24

*Ten Broeck Dupont, Inc. v. Brooks*,
    283 S.W.3d 705 (Ky. 2009) ........................................................................19, 33

*United States v. Mitchell*,
    476 F.3d 539 (8th Cir. 2007) ...........................................................................28

*United Construction Co. v. Milam*,
    124 F.2d 670 (6th Cir. 1942) ...........................................................................18

*Waddle v. Galen of Kentucky*,
    131 S.W.3d 361 (Ky. Ct. App. 2004) ..............................................................28

*Westlake Vinyls, Inc. v. Goodrich Corp.*,
    518 F. Supp. 2d 947 (W.D. Ky. 2007) ......................................................31, 33

*Young v. United States Department of Agriculture*,
    2011 WL 4543083 (W.D. Ky. Sept. 28, 2011) ................................................19

*Zebrowski and Associates, Inc. v. City of Indianapolis*,
    457 N.E. 2d 259 (Ind. Ct. App. 1983)........................................................31, 33

STATUTES

11 U.S.C. § 1104(a), (c).........................................................................................22

KRS 271B.8-420.....................................................................................................28

KRS 273.226...........................................................................................................28

OTHER AUTHORITIES

12 Oxford English Dictionary 472 (2d ed. 1989) ...................................................32

Fed. R. Civ. P. 16............................................................................................ passim

Black's Law Dictionary 525 (9th ed.)..............................................................................32

Fed. R. Civ. P. 56(a) ........................................................................................................17

Restatement (Second) of Agency § 213 (1958)..............................................................23, 24, 25

Restatement (Second) of Conflict of Laws (1971) ........................................................18

Webster's 3d New International Dictionary 1800 (2002)...............................................32

## I.      INTRODUCTION

Plaintiff Taft McKinstry, as Trustee of the BD Unsecured Creditors Trust (the "Trust"), seeks to lay the blame for the failed reorganization of Black Diamond Mining Company, LLC, a start-up coal company in eastern Kentucky (collectively with its affiliates, "Black Diamond" or the "Debtors"[1]), at the feet of Alvarez & Marsal North America, LLC ("A&M"), a nationally recognized financial advisor with expertise in assisting distressed companies.  Prior to the filing of involuntary bankruptcy proceedings, A&M was retained by Black Diamond in 2007 and, again in early 2008, to assist in restructuring Black Diamond's financial processes and controls. Once Black Diamond's secured creditors commenced involuntary bankruptcy proceedings in February 2008, the Bankruptcy Court appointed Ira Genser, a managing director with A&M, as the Debtors' chief restructuring officer ("CRO").  Genser, in turn, appointed Larry Tate, then a director with A&M who had significant pre-petition experience with Black Diamond, as the Debtors' chief financial officer ("CFO").  A&M made Genser and Tate available to Black Diamond pursuant to an Engagement Letter, which the Bankruptcy Court expressly approved and made binding on the Debtors' estates.

Black Diamond's reorganization efforts in 2008 ultimately proved unsuccessful amid extreme coal price fluctuations and the complete collapse of the world financial markets.  In 2009, the creditors, who had supported and praised Genser before the financial collapse, turned on him.  When Black Diamond was finally liquidated, certain claims of the Debtors' estates were

---

[1]      The Debtors include:  (1) Black Diamond Mining Company, LLC (Case No. 08-70066); (2) Black Diamond Land Company, LLC (Case No. 08-70067); (3) FCDC Coal, Incorporated (Case No. 08-70069); (4) Martin Coal Processing Corporation (Case No. 08-70070); (5) Spurlock Energy Corporation (Case No. 08-70071); (6) Turner Elkhorn Mining Company (Case No. 08-70072); and (7) Wolverine Resources, Incorporated (Case No. 08-70073).  The Amended Complaint asserts claims on behalf of "the chapter 11 estate of Black Diamond Mining Company, LLC and its affiliates."  (Am. Compl., AP DE 171, p. 1.)  A&M has assumed that the Trust intends to assert claims on behalf of the Chapter 11 estate of each Black Diamond debtor, and refers herein collectively to the Debtors' estates.

assigned to the Trust, including the claims it now asserts against A&M.

Although the Amended Complaint does not clearly articulate the Trust's asserted theories of liability against A&M, a generous reading suggests claims for (1) negligent hiring and retention and (2) negligent supervision, as well as an allegation of (3) vicarious liability based on respondeat superior. Each is premised on alleged tortious conduct of Genser and/or Tate.

This Court should grant summary judgment in favor of A&M on all claims because, applying the undisputed facts to the claims, each fails as a matter of law:

- the Bankruptcy Court, not A&M, appointed Genser as CRO after determining that he was qualified to act in that capacity, and Genser appointed Tate as CFO, thus precluding a claim for negligent hiring by A&M;

- Genser and Tate were qualified to act as CRO and CFO, respectively, such that their appointment and retention did not create a foreseeable risk of harm, thus precluding a finding that A&M breached a duty in connection with a negligent hiring and retention claim;

- A&M had no reason to believe that the employment of either Genser or Tate, both senior professionals with flawless records, created a risk of harm, and A&M consequently had no duty to supervise them, thus precluding a negligent supervision claim; and

- the Trust does not have a viable cause of action sounding in breach of fiduciary duty against Genser or Tate, thus A&M cannot be found liable for negligent hiring and retention or negligent supervision, or be vicariously liable on a respondeat superior theory.

Alternatively, this Court should determine under Federal Rule of Civil Procedure 16 that the Trust cannot recover any damages against A&M. The parties' July 22, 2009 Settlement Agreement provides that the Trust may only collect from A&M on claims that are "Non-Indemnifiable" under A&M's Engagement Letter. (July 22, 2009 Settlement Agreement, Ex. B

to Confirmation Order, BK DE[2] 1562, pp. 160-175 (hereinafter cited as "Settlement Agreement, p. __"), p. 5, ¶ 6.)  Under the Engagement Letter, a claim is "Non-Indemnifiable" only if the "losses, claims, damages, liabilities, penalties, obligations and expenses . . . [are] found . . . to have resulted ***primarily and directly*** from [the A&M Parties'] gross negligence or willful misconduct."  (Indemnification Agreement, BK DE 94, ¶ A (attached to Engagement Letter) (emphasis added).)  A&M's conduct cannot be characterized as negligent, let alone grossly negligent, and A&M cannot be said to have acted willfully.  Nor is there evidence that A&M's conduct was the "direct and primary" cause of any harm to the Debtors' estates.  To the contrary, any possible liability of A&M for the Trust's claims is derivative of or secondary to the alleged tortious conduct of Genser and Tate.  Accordingly, this Court should find under Rule 16 that all of the Trust's claims against A&M are indemnifiable.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      A&M Was Engaged as a Consultant by Black Diamond Before the Bankruptcy; Tate Was the Primary Consultant on That Engagement.

1.      Black Diamond was a coal company that began operations in eastern Kentucky in 2006 under the direction of Harold Sergent.  (Third Am. Disclosure Statement ("Disclosure Statement"), BK DE 1473, p. 11; Feb. 13, 2103 Sergent Dep. ("Sergent 2013 Dep."), DE 51, pp. 11:23-21:13.)

2.      Black Diamond was heavily leveraged from its inception and began having financial difficulty in 2007.  (Disclosure Statement, BK DE 1473, pp. 15-17.)

3.      In early 2007, Black Diamond's lenders requested that Black Diamond retain a

---

[2]      The record in this proceeding is contained in three related proceedings before this Court and the Bankruptcy Court.  The A&M Parties cite to the record as follows:  (1) this above-captioned withdrawn proceeding: "DE __"; (2) the underlying Black Diamond bankruptcy proceedings, *In re Black Diamond Mining Co., et al.,* Bankr. E.D. Ky., No. 08-70066: "BK DE __"; and (3) the adversary proceeding, *McKinstry v. Genser, et al.,* Bankr. E.D. Ky., AP No. 11-ap-07010: "AP DE __."

financial advisor to provide on-site assistance to Black Diamond in the development of financial controls and in communications with its lenders.  (Cohn Decl., BK DE 387, ¶¶ 2, 3; May 22, 2013 Cohn Dep. ("Cohn 2013 Dep."), DE 41, pp. 123:19-125:3).)

4.      Black Diamond chose A&M from among several potential advisors.  (Dep. Ex. 274, Letter from then-CEO James Campbell to Scott Carlson (Mar. 29, 2007), attached as *Exhibit A*.)

5.      The A&M engagement began on March 29, 2007, and was led by Managing Director Steven Cohn and Director Larry Tate.  (Mar. 21, 2008 Genser Decl., BK DE 241, p. 3, ¶ 8.)

6.      At the time of the initial retention, Tate was a Director with approximately 13 years of experience, including approximately four at A&M.  (Mar. 26, 2009 Tate Exam. ("Tate 2009 Exam."), DE 66, p. 36:7-14 (describing "approximately 14 years of experience reviewing financial statements in quite some level of detail and negotiating with lenders and seeing companies through a difficult restructuring").)

7.      The engagement letter for the initial engagement explicitly names Larry Tate as one of the individuals chosen to work on the matter.  (Mar. 29, 2007 Engagement Letter, Ex. A to Second Supp. Decl. of Genser, BK DE 382, p. 2.)

8.      During the initial engagement, A&M developed financial models that could be used in connection with preparing thirteen-week cash flows, an annual business plan, and an extended business plan.  (Cohn Decl., BK DE 387, ¶ 4.)

9.      Mr. Tate played a central role in creating these financial models.  (Cohn 2013 Dep., DE 41, p. 163:9-23.)

10.     Tate spent between approximately 1,600 and 1,700 hours working on Black

Diamond matters during A&M's initial engagement.  (Tate 2009 Exam., DE 66, p. 32:17-23.)

11.     Tate's 2007 performance reviews were consistently excellent; they contained occasional constructive advice, but no substantive criticism.  (Oct. 2007 Evaluation of Tate by M. Roberts, MLB_Alvarez_00157388-89, attached as *Exhibit B* (recommending Tate work on "soft skills," but noting his "good modeling [and] analytical skills," and that he is a "team player," "always willing to work hard" and a "very detailed and analytical professional"); Dep. Ex. 35, Oct. 2007 Evaluation of Tate by S. Cohn, attached as *Exhibit C* (calling Tate "a quick study" with "integrity").)

12.     On or about October 12, 2007, Sergent determined that Black Diamond's objectives for hiring A&M had been satisfied, and he terminated A&M's initial engagement. (Genser Decl., BK DE 241, ¶ 8; Cohn Decl., BK DE 387, ¶ 4.)

**B.     A&M Was Engaged as a Consultant by Black Diamond Again in January 2008, Before the Bankruptcy; Genser Led That Engagement.**

13.     On January 7, 2008, A&M was again engaged by Black Diamond following a default under Black Diamond's modified credit arrangements.  (Cohn Decl., BK DE 387, ¶ 5.)

14.     Ira Genser, a Managing Director, led the 2008 consulting engagement.  (*Id*.)

15.     At the time he was asked to lead the second A&M engagement, Genser had approximately 18 years of restructuring experience, including approximately six at A&M.  (Apr. 21, 2009 Genser Exam. ("Genser Apr. 2009 Exam."), DE 59, pp. 21:23-24, 71:14-16.)

16.     Although Genser did not have coal industry experience, he had previously served in a de facto CRO role.  (*Id*. at 57:6-58:8; Feb. 7, 2013 Genser Dep. ("Genser 2013 Dep."), DE 34, pp. 125:21-127:8.)

17.     Genser had the requisite experience because the skills necessary to lead the engagement were "not industry specific," but were "functional skill sets in terms of dealing with

cash flow shortfalls and dealing with a bankruptcy."  (2013 Cohn Dep., DE 41, p. 140:14-25.)

18.     Cohn also believed that industry experience was not a key factor in determining

who should lead the engagement:

> Q.     You had some other people that you utilized [in other coal
> company restructurings].  Why didn't you utilize those people for
> this particular job?
>
> A.     Because we are also looking beyond coal.  We are looking
> for bankruptcy-related experience, distressed experience, and we
> are looking for somebody with managerial heft, and the ability to
> deal with constituencies, and so some of the younger people who I
> utilized would not have the mean or demeanor or the experience to
> do that. And so way beyond coal expertise is a whole issue of
> managing and restructuring to a bankruptcy process, which you
> only get that experience over time and having done it.
>
> Q.     So you believe that Mr. Genser had the experience to do
> that?
>
> A.     I believed he did, yes.

(*Id.* at 159:17-160:9.)

19.     In his capacity as CRO, Genser was supported by the Debtors' management team,

which had a combined total of more than 200 years of experience in the coal industry.  (Genser

Apr. 2009 Exam., DE 59, pp. 21:23-22:7, 23:7-15 (noting total years of experience among

management team members).)

20.     Larry Tate was also assigned to the second Black Diamond engagement.  (Genser

Decl., BK DE 241, ¶ 9.)

21.     Tate's reassignment was the result of the knowledge he amassed during the initial

retention.  (*Id.*; Cohn 2013 Dep., DE 41, pp. 162:19-163:17 ("Larry Tate . . .  had just finished

the ground-up exposure in building [Black Diamond's] business plan . . . . So he was the logical

choice to put back there with [Genser] . . . . [Tate] had learned an enormous amount, because he

had to build their model from the ground up.").)

**C.     When the Involuntary Bankruptcy Was Filed, Genser Was Chosen to Be CRO as a Compromise Between Black Diamond's Founder and Its Primary Secured Lender; the Bankruptcy Court Overruled Objections and Approved the Appointment; Genser Appointed Tate as CRO.**

22.     On February 19, 2008, CIT Capital USA Inc. ("CIT"), The Prudential Insurance Company of America, and the CIT Group/Commercial Services, Inc. (collectively, the "Petitioners"), Black Diamond's primary secured lenders, filed involuntary Chapter 11 petitions against the Debtors.  (Invol. Pet., BK DE 1.)

23.     On the same day, the Petitioners filed an Emergency Motion for Appointment of Interim Trustee pursuant to Bankruptcy Code Section 1104(a) (the "Interim Trustee Motion") that sought the appointment of an interim trustee to run and control Black Diamond due to the alleged gross negligence and mismanagement of Sergent, then Chairman of the Board.  (Interim Trustee Motion, BK DE 2, ¶¶ 1-3.)

24.     At an emergency hearing the following day, February 20, 2008, the Petitioners advised the Court that they had reached an agreement with Sergent that resolved the Interim Trustee Motion, pursuant to which Genser would be appointed as chief restructuring officer ("CRO").  (*See* Hr'g Tr., Feb. 20, 2008, BK DE 107, pp. 14, 17-18.)

25.     A&M had no role in the appointment of Genser as CRO.  (*See id*. at 14; Hr'g Tr., Apr. 2, 2008, BK DE 385, p. 41.)

26.     Genser was not present in the courtroom when he was nominated for the role:

> MR. FERDINANDS [proposed counsel for the Debtors]: . . . And the point I would make is that my understanding is that, you know, Mr. Gen[s]er and the folks from A&M, they weren't down here at that hearing. Somebody called Mr. Gen[s]er after the fact and said, guess what, you're the new CRO.
>
> THE COURT: You got elected to an office you weren't running for.
>
> MR. FERDINANDS: Exactly.

(Hr'g Tr., Apr. 2, 2008, BK DE 385, p. 41.)

27.    Sergent, not A&M, insisted upon an order that explicitly named Genser, and objected to a draft order in which A&M was identified, as the CRO.  (Sergent Objection, BK DE 16, p. 2, ¶¶ 2-4 ("[T]he Proposed Order fails to mention Mr. Genser, but instead provides that the Debtors will employ 'Alvarez & Marsal as [CRO]' . . . . [T]he parties expressly and unambiguously identified, to the Court and to the parties in interest . . . Mr. Genser as the individual whom they had agreed would serve as CRO."); Hr'g Tr., Feb. 26, 2008, BK DE 108, pp. 9-10 (same).)

28.    On February 27, 2008, the Bankruptcy Court entered its Order Providing for the Employment of a Chief Restructuring Officer (the "CRO Order"), which resolved Sergent's objection and provided:

> IT IS HEREBY ORDERED that Debtors shall immediately employ and keep in place pending further order of the Court Ira Genser of Alvarez & Marsal North America, LLC . . . as Chief Restructuring Officer.

(CRO Order, BK DE 56, p. 2.)

29.    Among other things, the CRO Order provided that, as CRO, Genser (a) "shall have the same powers as a trustee as set forth in the Bankruptcy Code"; (b) "shall be vested with the powers to investigate, oversee, manage and direct . . . the operation of Debtors' business"; (c) "shall direct and manage the Debtors' operations, including without limitation, negotiating with significant business partners, contractors and customers of the Debtors"; and (d) "that actions taken by the CRO pursuant to the authorizations contained in this Order shall be valid, binding and enforceable acts of the Debtors."  (*Id*. at 2, 6.)

30.    The CRO Order also ordered, among other things, the filing of an engagement letter between A&M and the Debtors, allowing a notice period for parties to object to the terms

in that engagement letter.  (*Id*. at 4.)

31.     Genser appointed Tate as CFO pursuant to his powers under the terms of the CRO Order.   (*Id*.; July 17, 2009 Genser Exam. ("Genser July 2009 Exam."), DE 60, p. 25:20-23.)

32.     On March 5, 2008, the Debtors filed with the Bankruptcy Court their post-petition engagement letter with A&M (the "Engagement Letter").  (Engagement Letter, BK DE 94.)

33.     The Engagement Letter provided that:

> A&M shall make available to the Company: (i) Ira Genser to serve as the Chief Restructuring Officer (the "CRO"); (ii) Larry Tate to serve as the Chief Financial Officer (the "CFO"); (iii) upon the mutual agreement of A&M and the Chief Executive Officer of the Company (the "CEO"), Steve Cohn and such additional personnel as are necessary to assist in the performance of the duties set forth . . . below (the "Additional Personnel").   Such Additional Personnel shall be designated by the Company as executive officers.

(*Id.* at 1.)

34.     The Engagement Letter incorporated an attached Indemnification Agreement limiting A&M's liability, pursuant to which the Debtors agreed to indemnify and hold the A&M Parties harmless:

> [A]gainst any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the costs for counsel or others . . . in investigating, preparing or defending any action or claim . . . as and when incurred, caused by, relating to, based upon or arising out of . . . [A&M's] acceptance of or the performance or nonperformance of their obligations under the Agreement.

(Indemnification Agreement, BK DE 94, ¶ A.)

35.     The indemnification obligation set forth in the Engagement Letter applies only if the alleged "loss, claim, damage, liability or expense" is "found . . . to have resulted primarily and directly from [A&M's] gross negligence or willful misconduct."  (*Id*.)

36.     The Bankruptcy Court addressed objections to the CRO Order at four hearings: on March 10, 2008, March 14, 2008, April 2, 2008, and April 16, 2008, several of which included discussions and testimony regarding Genser's qualifications.  (Hr'g Tr., Mar. 10, 2008, BK DE 184, pp. 22:13-20, 53:1-16, 186:19-25, 206:16-21; Hr'g Tr., Mar. 14, 2008, BK DE 211, pp. 41:21-42:9; Hr'g Tr., Apr. 2, 2008, BK DE 385, pp. 43:21-44:7, 78:19-24; Hr'g Tr., Apr. 16, 2008, BK DE 572, pp. 48:24-49:9, 56:16-58:6.)

37.     On March 18, 2008, Mr. Sergent filed an objection to the CRO Order on the ground that "[Genser] is relatively inexperienced in the coal industry as compared to the management team proposed by the voluntary Debtors."  (Sergent Objection, BK DE 210, p. 7, ¶ d.)

38.     While the Official Committee of Unsecured Creditors (the "Committee") was not present for the initial hearings on Genser's appointment, when subsequently given the opportunity, the Committee supported Genser's appointment.  (*See* Ltd. Objection of Comm., BK DE 245, p. 1 ("The Committee does not generally object to the employment of Ira Genser ("Genser") as Chief Restructuring Officer of the Debtors . . . ."); Hr'g Tr., Apr. 2, 2008, BK DE 385, p. 78 ("[T]he [C]ommittee at this point is supportive of Mr. Ira Genser staying in his role as the CRO.").)

39.     Furthermore, the Committee did not object to Tate's appointment as CFO.  (*See generally*, Docket, *In re Black Diamond Mining Co.*, Bankr. E.D. Ky., Case No. 08-70066.)

40.     Counsel for the Committee acknowledged in open court that it was Genser, not A&M, who was appointed as CRO.  (*Id*. at 78-79 ("I would note, though that the [C]ommittee was under the same impression . . . that it was Mr. Genser who was appointed CRO not Alvarez & Marsal.").)

-10-

41.     At the April 16, 2008 hearing, the Bankruptcy Court noted that:

> The Court hasn't seen anything to this date which suggests that Mr.
> [Genser] has [followed] anything other than the fiduciary duties
> that are imposed on him, that is, primarily to creditors and
> secondarily to equity.  The Court hasn't seen anything to suggest
> that he has not been operating in the best of good faith in that
> regard.

(Hr'g Tr., Apr. 16, 2008, BK DE 572, p. 57:17-23.)

42.     In considering the appointment of Mr. Genser, the Bankruptcy Court observed that neither A&M nor Mr. Genser was retained as a professional within the meaning contemplated by the Bankruptcy Code.  (*Id*. at 56:25-58:5 (approving appointment of Mr. Genser as CRO).)

43.     On April 22, 2008, the Court, "having heard said objections, and being otherwise sufficiently advised," overruled all objections to the CRO Order, and entered a final order expressly approving the terms of the Engagement Letter.  (*See* Order Overruling Objections to the CRO Order ("Final Order"), DE 439.)

44.     None of the parties to the bankruptcy proceedings appealed the entry of the CRO Order or the Final Order.  (*See generally*, Docket, *In re Black Diamond Mining Co.*, Bankr. E.D. Ky., Case No. 08-70066.)

**D.      Both the Bankruptcy Court and the Committee Were Pleased with Genser's and Tate's Performance.**

45.     At no time did the Bankruptcy Court revise the CRO Order or the Final Order, nor did it require any amendment of the Engagement Letter to impose any supervisory duty on A&M or any of its personnel with respect to Genser.  (*Id*.)

46.     No party in interest ever approached A&M in an effort to replace Genser or Tate, reduce their roles, or expand the involvement of other A&M personnel in the bankruptcy.

47.    At no time did any party attempt to have Genser terminated as CRO, despite the

fact that the Engagement Letter provided that either party could terminate Genser's employment

without cause merely by giving thirty days written notice.  (*See* Engagement Letter, BK DE 94,

p. 4, ¶ 3.)

48.    At the end of June 2008, the Committee lauded the Black Diamond management

team for their good work:

> Four months ago things were not looking so rosy.  We now think
> things are looking a little bit better, certainly through the pricing of
> the coal, but also through the efforts of those gentlemen.  They
> stabilized this company.

(Hr'g Tr., June 26, 2008, BK DE 739, p. 75:19-23.)

49.    The Bankruptcy Court agreed, commenting that:

> Your question, of course, ignores that aspect of keeping everybody
> onboard a ship that seems to be sailing rather well right now.

(*Id.* at 52:22-24.)

50.    In mid-July 2008, the Bankruptcy Court noted Genser's success in stabilizing

Black Diamond's business:

> It is clear to the Court that the chief restructuring officer and the
> debtor have exercised business judgment in coming to the
> conclusion that an incentive plan would be beneficial to the debtor.
>
> First, it's hard to argue with success.  While the coal market, I'm
> sure, gets a large share of credit for what has happened in this case
> since February, it's also clear from the evidence in the record that
> the management team sitting out here . . . also deserve significant
> credit.  The financial results have been greatly encouraging to all
> parties, and while the company operated under different economic
> circumstances prior to the filing, it's clear that since the filing the
> economics of the company have improved immeasurably.

(Hr'g Tr., July 16, 2008, BK DE 740, pp. 37:22-38:10.)

51.    On August 1, 2008, the Committee told the Bankruptcy Court that it had no

complaints about the A&M Parties, saying "they're fine professionals, and they're doing the best job they can."  (Hr'g Tr., Aug. 1, 2008, BK DE 1632, pp. 13-14.)

52.     In an email dated September 25, 2008, Committee counsel noted that Genser had done "a tremendous job lining up AEP" and acknowledged that "we have to let Ira take credit for what he has done (note to Ira – you don't have to say everybody worked hard to get to this point – the [C]ommittee knows that."). (Dep. Ex. 139, Email from E. Green to C. Oellermann (Sept. 25, 2008), BD/UCC 000013133, attached as _Exhibit D_.)

53.     In February 2009, the Committee objected to a motion to convert the cases that was filed in late 2008.  (Objection to Mot. to Convert, BK DE 1140; _see also_ Mot. to Convert to Chapter 7, BK DE 1047.)

54.     The Committee's objection to the motion to convert noted the improvement in Black Diamond's financial condition and even expressed optimism about the prospects for rehabilitation:

> Since the Petition Date, the Debtors have, among other things, (a) paid off their DIP financing facility in full (over 7 months ago); (b) paid all post-petition interest and unpaid pre-petition interest accruing under their pre-petition credit facility (other than certain pre-petition interest accruing in January 2009); and (c) generated over $20 million in additional cash. The financial position of the Debtors therefore is substantially better now than it was in February or March of 2008.
> . . . .
> Here, there is a reasonable likelihood that the Debtors will reorganize in chapter 11.  The Debtors are flush with cash, and the Committee believes the Debtors will be able to use cash collateral through at least June 1, 2009 . . . .  Accordingly, the Committee expects the Debtors' chapter 11 cases to make substantial progress in the coming months.

(Object. to Mot. to Convert, BK DE 1130, pp. 3-4, ¶¶ 8, 12.)

55.     Tate was promoted to Senior Director of A&M during the Black Diamond

bankruptcy.  (Tate 2009 Exam., DE 66, p. 25:4-6 (noting promotion in fall 2008).)

56.    No party has disputed the quality of Tate's work on the Black Diamond bankruptcy.  (Aug. 26, 2013 McKinstry Dep. ("McKinstry Dep."), DE 71-5, sealed,  p. 47:10-11 ("I don't know that he made any mistakes in the financial reports that he provided"); *see also* Apr. 26, 2013 Hull Dep. ("Hull 2013 Dep."), DE 74-2, sealed, pp. 279:23-280:1 ("And as far as the financial work [Tate] did during the bankruptcy, you didn't have any problems with his work, did you?  A. I don't think so, no."); Sergent 2013 Dep., DE 51, p. 140:3-6 ("[Tate] was good with the numbers.  Can't criticize him.").)

### E.    After the Restructuring Effort Failed and the Committee Began to Scapegoat Genser, the Parties Made an Agreement That the Trust Cannot Collect from A&M Unless It Can Prove That Its Claims Are "Non-Indemnifiable" Under A&M's Engagement Letter.

57.    In February 2009, the Committee requested permission to conduct Bankruptcy Rule 2004 examinations of certain individuals involved in the Black Diamond bankruptcy and to collect documents related to, among other things, the A&M Parties' work during the bankruptcy case.  (*See* Mot. for Rule 2004 Order, BK DE 1175.)

58.    On April 17, 2009, the Committee filed an Objection to the Debtors' Disclosure Statement, arguing that:

> The Debtors' estates (and specifically unsecured creditors) may possess significant causes of action against A&M.  The claims against A&M arise out of, among other things, A&M's undeniable failure to make reasonable efforts to take advantage of a historic coal market - despite repeated demands from the Committee and others - in order to protect an illusory "bid" supported by the Lenders.

(Comm. Objection to Disclosure Statement, BK DE 1302, p. 22, ¶ 66.)

59.    On July 23, 2009, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Debtors' Third Amended Joint Plan of Liquidation (the "Plan"), which

became effective on July 31, 2009.  (Confirmation Order, BK DE 1562; Not. of Confirmation Order, BK DE 1581, p. 3.)

60.      In connection with the Plan, A&M and the Committee entered into a Settlement Agreement dated July 22, 2008.  (Settlement Agreement, p. 1.)

61.      Upon confirmation of the Plan, (i) the Trust became effective, (ii) Taft McKinstry was appointed as Trustee, (iii) certain claims of the Debtors against the A&M Parties were assigned to the Trust, and (iv) the Settlement Agreement was made part of the modified Plan that was attached to the Confirmation Order.  (Plan, pp. 2-13, art. IV § C; Confirmation Order, BK DE 1562, p. 9, § I.E.1.f, pp. 21-22, § II.F.1, & p. 31, § III.E (incorporating Settlement Agreement); *id.* at 31-32, § II.E (approving Settlement Agreement); Designation of Trustee, BK DE 1502.)

62.      The Trust succeeded to the Committee as the party to the Settlement Agreement. (Confirmation Order, BK DE 1562, pp. 31-32, § III.E; Plan, p. 20, § IV.C.1.)

63.      The Settlement Agreement provides:

> The Committee agrees that the A&M Parties have valid indemnification rights against the Debtors and will not claim that A&M's indemnification agreement with the Debtors is void or would not have been enforceable against the Debtors.

(Settlement Agreement, pp. 5-6, ¶ 9.)

64.      The parties agreed that "[i]n the event that the Trust obtains a judgment against any A&M Party for amounts which are subject to indemnity under the Engagement Letter, (an 'Indemnifiable Claim'), the Trust agree[s] that it will limit its right to collect on such Indemnifiable Claims to any Insurance Proceeds."  (*Id.* at 5, ¶ 6.)

65.      The Insurance Policies are the Debtors' $10,000,000 director and officer liability insurance policies (the "D&O Policies") – a $2.5 million primary policy issued by Greenwich

Insurance Company, now XL Specialty; a $2.5 million first-layer excess policy issued by Beazley Insurance Company; a $2.5 million second-layer excess policy issued by Arch Insurance Company; and a $2.5 million third-layer excess policy issued by Twin City Fire Insurance Company, part of The Hartford Insurance Group ("The Hartford").  (D&O Policies, Exs. 2-5 to Trustee Mot. re: Adequate Security, BK DE 1929-1, pp. 11-46 & BK DE 1929-2, pp. 1-16.)

66.     The parties agreed that the determination of whether a claim is an Indemnifiable Claim is made in accordance with the terms of the Engagement Letter.  (Settlement Agreement, p. 5, ¶ 6.)

## III.    PROCEDURAL POSTURE AND NATURE OF THE TRUST'S CLAIMS

On July 30, 2010, the Trust, as the assignee of the claims of the Debtors' Chapter 11 estates, filed this case in Kentucky state court against defendants Genser, Tate, and A&M (together, the "A&M Parties") and Harold Sergent.[3]  (Compl., Ex. A to Not. of Removal, AP DE 1-2.)  The Trust alleged that the A&M Parties acted with "gross negligence" or "willful misconduct" in connection with the Black Diamond bankruptcy.  (*Id*. at 25-26, ¶¶ 60-62.)

On March 21, 2012, in connection with jurisdictional proceedings, this Court reviewed the nature of the Trust's claims against the A&M Parties, rejected the Trust's arguments that its claims against Genser and Tate were state law claims for gross negligence, and concluded that the Trust's claims against Genser and Tate are equitable claims for breach of fiduciary duty. *Sergent v. McKinstry*, 472 B.R. 387, 409 (E.D. Ky. 2012).  This Court characterized the Trust's claims against A&M as vicarious liability claims.  *Id*. at 415.

On May 11, 2012, the Trust filed its Amended Complaint, making substantially the same allegations against the A&M Parties as in the original Complaint, and again styling its claims as

---

[3]        Sergent is no longer a defendant in this case.  (*See* Agreed Order of Dismissal, AP DE 288.)

ones for "gross negligence and willful misconduct," but also adding an allegation of simple "negligence." (Am. Compl., AP DE 171, pp. 18-19, ¶¶ 71-80.) In the Amended Complaint, the Trust asserts that: (a) "A&M is . . . liable for all of Genser's and Tate's acts and omissions with respect to Black Diamond" (*id.* at 18, ¶ 64); (b) A&M owed a duty to Black Diamond "to act in a reasonable and prudent manner," which duty A&M breached "as a result of Genser's and Tate's refusal to take the most fundamental of steps to protect the viability of the Company" (*id.* at 18, ¶ 65); and (c) A&M further breached a duty of care to Black Diamond "by appointing Genser and Tate as CRO and CFO, respectively, even though they had no experience in such positions or in the coal industry" (*id.* at 18, ¶ 66).

In light of this Court's rulings, and taking into consideration the Trust's allegations outside the pleadings, as best as Defendants can discern, the Trust's claims against A&M potentially include: (1) a claim for negligent hiring and retention; (2) a claim for negligent supervision of Genser and Tate; and (3) the assertion of vicarious liability on the basis of respondeat superior for the alleged conduct of Genser and Tate.[4]

## IV.   A&M IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS

### A.   The Trust Cannot Establish That There Are Any Disputes of Material Fact as to Its Claims for Negligent Hiring and Retention, Negligent Supervision, and Its Assertion of Vicarious Liability on the Basis of Respondeat Superior.

Summary judgment is proper where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of informing the court of the "basis for its motion" and identifying the material portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To rebut,

---

[4]     It is doubtful that the Amended Complaint adequately sets forth the elements of claims for negligent hiring and retention or negligent supervision. Even if those claims have been pleaded, the Trust cannot go forward on either claim for the reasons set forth below.

the nonmoving party must establish the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). To be "genuine," the issue must be based on more than the "mere existence of some alleged factual dispute" or mere allegations, and instead be rooted in specific facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Maki v. Laakko*, 88 F.3d 361, 364 (6th Cir. 1996).

Courts within the Sixth Circuit are divided about whether a federal court exercising bankruptcy jurisdiction should apply the forum state's choice-of-law rules or apply federal choice-of-law rules, such as those embodied in the Restatement (Second) of Conflict of Laws (1971) (the "Restatement").[5]  In the present case, however, it is unnecessary to resolve this intra-circuit split because the application of Kentucky state law would be required under both Kentucky's and the Restatement's test because the claims asserted against A&M are common law tort claims, and Kentucky has the most significant relationship with the occurrences and the parties since nearly all of the contacts in this case occurred in Kentucky. *Compare Saleba v. Schrand*, 300 S.W.3d 177, 181 (Ky. 2009) (citing *Foster v. Leggett*, 484 S.W.2d 827, 829 (Ky. 1972) (applying Kentucky's any significant contacts test and finding that forum law applies)), *and Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010), *with Limor*, 160 B.R. at 91 (applying the Restatement's most significant relationship test).

As set forth below, there are no disputes of material fact and A&M is entitled to summary judgment under Kentucky law on each of the Trust's claims.

---

[5]        *Compare Limor v. Weinstein & Sutton (In re SMEC, Inc.)*, 160 B.R. 86, 91 (M.D. Tenn. 1993) (explaining that Sixth Circuit would likely adopt Restatement's most significant relationship test as the choice-of-law methodology to be used by federal court sitting pursuant to bankruptcy jurisdiction), *with In re Wallace's Bookstores, Inc.*, 317 B.R. 709, 712-13 & n.3 (Bankr. E.D. Ky. 2004) (concluding until  Sixth Circuit overrules *United Construction Co. v. Milam*, 124 F.2d 670, 671 (6th Cir. 1942), federal court sitting pursuant to bankruptcy jurisdiction must apply the choice-of-law rules of the forum state).

**B.     The Negligent Hiring and Retention Claim Fails Because There Is No Underlying Tort, A&M Did Not Appoint Genser or Tate, and They Were Qualified for Their Respective Positions in Any Event.**

As an initial matter, claims for negligent hiring and retention derive from the commission of an underlying tort. *Ten Broeck Dupont, Inc. v. Brooks*, 283 S.W.3d 705, 727 (Ky. 2009) ("In order for [an] employer to be held liable for negligent hiring [or] retention . . . the employee must have committed a tort." (citations omitted)); *see also Roth v. City of Newport*, 2008 WL 5264314, at *3 (Ky. Ct. App. Dec. 19, 2008) ("Liability on the employer [for negligent hiring or retention] is derivative of the employee's commission of a compensable act."); *Airdrie Stud, Inc. v. Reed*, 2003 WL 22796469, at *1-2 (Ky. Ct. App. Nov. 26, 2003) (holding employer not liable for negligent hiring and retention of employee whose threatening conduct was not tortious).

Assuming that the employee has committed an underlying tort, a plaintiff seeking to hold an employer liable under a negligent hiring or retention claim must ***also*** "show the traditional negligence elements of a negligence claim can be established [against the employer] – duty, breach, and consequent injury." *Young v. U.S. Dep't. of Agric.*, 2011 WL 4543083, at *7 (W.D. Ky. Sept. 28, 2011) (citations omitted). To meet the duty and breach of duty elements, the Trust must show that A&M knew or reasonably should have known that (1) Genser or Tate was unfit for the job for which he was employed and (2) placement or retention of Genser or Tate in that job created an unreasonable risk of harm to the Debtors' estates. *Stalbowsky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000); *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. Ct. App. 1998); *Taylor v. JPMorgan Chase Bank, N.A.*, 2014 WL 66513, at *9 (E.D. Ky. Jan. 8, 2014) ("[T]here must be some foreseeability or awareness on the part of the employer that the employee created the risk at issue.").

Currently pending before, or to be filed with, this Court are (i) Defendant Ira J. Genser's Motion for Summary Judgment (the "Genser Motion") and (ii) Defendant Larry Tate's Motion

-19-

for Summary Judgment (the "Tate Motion").  For the reasons set forth in the Genser Motion and the Tate Motion, the Trust cannot show that either Genser or Tate committed an underlying tort. Even if the Trust could prove that Genser or Tate committed an underlying tort, the Trust still cannot recover against A&M because it cannot show that the placement or retention of Genser or Tate created an unreasonable risk of harm to the Black Diamond estates.

### 1.      A&M Did Not Appoint Genser or Tate.

A&M cannot be held liable for negligently appointing Genser as CRO because it is undisputed that A&M did not appoint him.  To the contrary, Genser's appointment as CRO was agreed to by the Petitioners and Sergent, without input from A&M.  (Hr'g Tr., Feb. 20, 2008, BK DE 107, p. 14.)  And the Bankruptcy Court – not A&M – appointed Genser over numerous objections, including objections concerning the extent of his coal industry experience and expertise.  (*See generally* CRO Order, BK DE 56; Final Order, BK DE 439.)  As set forth in detail in Defendants' Rule 16 Motion Requesting That This Court Find That the Bankruptcy Court's April 22, 2008 Order Establishes That Mr. Genser Was Qualified to Serve as CRO, DE 77 (the "Qualification Motion"), which is currently pending before this Court, the Bankruptcy Court already determined that Genser was qualified to serve as CRO.  Because it is undisputed that A&M was not responsible for appointing Genser as CRO, A&M cannot be liable for negligently hiring him.

A&M also cannot be held liable for negligently appointing Tate as CFO because A&M did not appoint Tate as CFO.  Tate was retained as CFO by Genser, acting in his capacity as CRO under the CRO Order, and not by A&M.  (*See* CRO Order, BK DE 56, p. 4; Genser July 2009 Exam., DE 60, p. 25:20-23.)

-20-

> **2.      The Trust Cannot Prove That A&M Knew or Should Have Known That Genser's or Tate's Continued Retention Created a Risk of Harm to the Debtors' Bankruptcy Estates.**

The negligent hiring and retention claim also fails because the Trust cannot show that A&M had a duty to the Trust, namely that A&M knew or reasonably should have known that (1) Genser or Tate was unfit for the job for which he was employed and (2) the placement or retention of Genser or Tate created an unreasonable risk of harm to the Debtors' estates.

The undisputed facts show that A&M reasonably believed that Genser was qualified, so his placement and retention did not create an unreasonable risk of harm to the Black Diamond bankruptcy estates.  As shown above, the Bankruptcy Court found that Genser was qualified to serve as CRO.  This establishes that A&M's belief that Genser was fully qualified to serve as CRO was a reasonable belief.  Additional undisputed facts further establish the reasonableness of A&M's belief:

- Genser was a senior restructuring professional with A&M – a managing director – with over 18 years of experience, and who had previously served in a de facto CRO role.  (Genser Apr. 2009 Exam., DE 59, pp. 21:23-25, 57:24-58:8; Genser 2013 Dep., DE 34, pp. 126:15-127:8.)

- Genser was going to be supported by a management team with a combined total of 200 years of experience as well as Tate, an experienced professional who not only was qualified to serve as CFO, but who also had significant nuts-and-bolts knowledge about Black Diamond at the time of the bankruptcy filing.  (Genser Apr. 2009 Exam., DE 59, pp. 21:23-22:7, 23:7-15 (noting total years of experience among management team members); Cohn 2013 Dep., DE 41, pp. 163:9-164:15.)

- Genser's general restructuring experience made him an appropriate choice for CRO. (Cohn 2013 Dep., DE 41, pp. 159:19-160:6 ("We are looking for bankruptcy-related experience, distressed experience, and we are looking for somebody with managerial heft, and the ability to deal with constituencies.").)

There is also no genuine dispute of fact that A&M reasonably believed throughout the Black Diamond bankruptcy that Tate was fully qualified for the position of CFO.

- At the time of the Black Diamond bankruptcy, Tate had approximately 13 years of experience, including approximately nine years of restructuring experience, about five of which were with A&M. (Tate 2009 Exam., DE 66, pp. 16:23-20:14, 36:7-14 (describing experience through March 2009).)

- Tate's 2007 performance reviews were uniformly excellent. (Ex. B, Oct. 2007 Evaluation of Tate by M. Roberts, MLB_Alvarez_00157388-89; Ex. C, Oct. 2007 Evaluation of Tate by S. Cohn.)

- Tate was promoted to Senior Director at A&M during the Black Diamond bankruptcy. (Tate 2009 Exam., DE 66, p. 25:4-6 (noting promotion in Fall 2008).)

- Tate had been heavily involved in A&M's prepetition engagements at Black Diamond, during which he had not only developed an understanding of the Debtors' finances, but also designed the Debtors' financial models from the ground up. (Cohn 2013 Dep., DE 41, pp. 163:9-164:15; Tate 2009 Exam., DE 66, p. 32:17-23 (noting approximately 1,600 to 1,700 hours spent on the pre-petition Black diamond engagement).)

- The Trust has not identified any error in Tate's work. (McKinstry Dep., DE 71-5, sealed, p. 47:10-11; Hull 2013 Dep., DE 74-2, sealed, pp. 279:23-280:1.)

Until the Committee began to scapegoat Genser, there were no complaints by the Committee regarding Genser's or Tate's performance during the bankruptcy. Indeed, contrary to the Trust's allegations, the record reflects numerous instances in which both the Bankruptcy Court and the Committee, the predecessor to the Trust, praised Genser and/or Tate. (Hr'g Tr., June 26, 2008, BK DE 739, pp. 52:22-24, 75:19-23; Tr. Hr'g, July 16, 2008, BK DE 740, pp. 37:22-38:10; Hr'g Tr., Aug. 1, 2008, DE 1632, pp. 13-14; Ex. D, Email from E. Green to C. Oellermann (Sept. 25, 2008), BD/UCC 000013133.) Had the Committee – or any party in interest – been concerned with the way the Debtors were being managed, that party could have sought the appointment of a trustee or an examiner at any time. *See* 11 U.S.C. § 1104(a), (c) (authorizing bankruptcy court to appoint trustee or examiner at any time prior to plan confirmation, on request of party in interest). Neither the Committee nor any other party ever made such a request.

Because the undisputed facts establish that A&M reasonably believed (and had no reason to believe otherwise) that Genser and Tate were qualified, and did not create a risk of harm to the Black Diamond bankruptcy estates, the Trust cannot prove that A&M breached a duty in connection with the retention of Genser as CRO or Tate as CFO. *See Stalbowsky*, 205 F.3d at 894 ("Under Kentucky law, the two elements of a suit for negligent hiring and retention are that (1) the employer knew or reasonably should have known that the employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff."). Accordingly, A&M is entitled to summary judgment on the Trust's negligent hiring and retention claim.

### C. The Negligent Supervision Claim Against A&M Fails Because There Is No Underlying Tort and the Trust Cannot Show That A&M Had a Duty to Supervise Either Genser or Tate.

Like the claims for negligent hiring and retention, "[t]he tort of negligent supervision is a second tort that derives from a tort committed by the person negligently supervised. In other words, the [employer] could be liable for a tort committed by its employee if the employer did not reasonably supervise the employee." *Grego v. Meijer, Inc.*, 187 F. Supp. 2d 689, 694 (W.D. Ky. 2001); *see also Dortch v. Fowler*, 588 F.3d 396, 405 (6th Cir. 2009) (citations omitted) (stating that "absent a viable tort claim against an employee, the plaintiff cannot maintain an action against the employer for negligent retention and supervision"); *Roth*, 2008 WL 5264314, at *3 ("Liability on the employer is derivative of the employee's commission of a compensable act . . . the underlying wrong allegedly committed by an employee in a negligent supervision or negligent retention claim must be based on an injury resulting from a tort which is recognized under common law.")

Kentucky has adopted the Restatement (Second) of Agency Section 213 (1958), which sets forth the requirements for establishing a claim of negligent supervision. *Booker v. GTE.Net*

*LLC*, 350 F.3d 515, 517 (6th Cir. 2003); *see also Taylor*, 2014 WL 66513, at *9.   The

Restatement states in relevant part that "[a] person conducting an activity through . . . agents is

subject to liability for harm resulting from his conduct if he is negligent or reckless . . . in the

supervision of the activity." *Davidson v. D.H.H.S.*, 2007 WL 3120666, at *5 n.5 (E.D. Ky. Oct.

19, 2007) (quoting Restatement (Second) of Agency § 213 (1958)); *see also Taylor*, 2014 WL

66513, at *9 (same).[6] Assuming the existence of an underlying tort, to succeed on a negligent

supervision claim against an employer, a plaintiff must plead and prove that the employer had a

duty, the breach of which caused the plaintiff's harm.   *See Cummins v. City of Augusta*, 2013

WL 5436657, at *4 (Ky. Ct. App. Sept. 27, 2013).

An employer only has a "duty" to supervise if the employer "knew or had reason to know

of the risk the employment created." *Booker*, 350 F.3d at 517 (affirming dismissal where there is

no evidence that the employer knew or should have known that the employee would have taken

the actions in controversy); *Taylor*, 2014 WL 66513, at *9 (noting foreseeability requirement);

*Buckminster v. Arnold*, 2008 WL 2168882, at *2 (W.D. Ky. May 23, 2008).   An employer has

reason to know of the likelihood of harm where, for example, there were multiple warnings or

accusations of which the employer was aware.   *Booker*, 350 F.3d at 517 (affirming dismissal of

negligent supervision claim where plaintiff failed to allege that employer "knew or should have

known" that employee who would act as she did); *Davidson*, 2007 WL 3120666, at *6 (granting

summary judgment on negligent supervision claim where employer had no reason to foresee

---

[6]      Restatement (Second) of Agency Section 213 states, in its entirety, that a principal is liable for harm
resulting from conduct if he is negligent or reckless:

   (a) in giving improper or ambiguous orders or in failing to make proper regulations;

   (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others;

   (c) in the supervision of the activity; or

   (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his
   servants or agents, upon premises or with instrumentalities under his control.

continued employment created a risk).  Where the record is devoid of evidence indicating that the employer had ***reason to believe*** the employee would likely cause harm, there is no claim for negligent supervision.  *Id*. at \*6; *Divita v. Ziegler*, 2007 WL 29390, at \*8-9 (Ky. Ct. App. Jan. 5, 2007) (same) (quoting Restatement (Second) of Agency § 213, cmt. d (1958)).

Accordingly, to prevail on a negligent supervision claim, the Trust must prove that (1) Genser or Tate committed an underlying tort and (2) A&M had reason to know that Genser or Tate would likely cause harm, thereby creating a duty.  For the reasons set forth in the Genser Motion and the Tate Motion, the Trust cannot satisfy the first part of its burden.  Nor can the Trust show that A&M should have known that Genser or Tate would likely cause harm.

The record is devoid of evidence that would allow a reasonable jury to find that A&M had ***reason to believe*** that Genser or Tate would likely cause harm.  As set forth above, both Genser and Tate are experienced professionals with extensive bankruptcy and restructuring experience. (Genser Apr. 2009 Exam., DE 59, pp. 57:24-58:8; Genser 2013 Dep., DE 34, pp. 126:15-127:8; Cohn 2013 Dep., DE 41, pp. 140:14-25, 159:17-160:9; Tate 2009 Exam., DE 66, pp. 16:23-20:14; 36:7-14.)  Indeed, the record regarding Genser's expertise was sufficient for the Bankruptcy Court to appoint Genser as CRO over objections to his qualifications.  (CRO Order, BK DE 56; Final Order, DE 439.)  Nor is there evidence that A&M was made aware by the Committee, or any other party in interest, that Genser or Tate would likely cause harm to the estates.  Specifically, at no time did the Committee contact A&M or seek intervention from the Court or undertake any effort to remove Genser or Tate or limit their roles as CRO and CFO.   To the contrary, both the Court and the Committee praised Genser's efforts.  (Hr'g Tr., June 26, 2008, BK DE 739, pp. 52:22-24, 75:19-23; Hr'g Tr., July 16, 2008 BK DE 740, pp. 37:22-38:10; Hr'g Tr., Aug. 1, 2008, DE 1632, pp. 13-14; Ex. D, Email from E.

Green to C. Oellermann (Sept. 25, 2008), BD/UCC 000013133).)  And despite the Trustee's generalizations to the contrary, the record shows that Tate completed his work as CFO satisfactorily.  (*See* McKinstry Dep., DE 71-5, sealed, p. 47:10-11; Hull 2013 Dep., DE 74-2, sealed, pp. 279:23-280:1; Sergent 2013 Dep., DE 51, p. 140:3-6.)  Therefore, the undisputed facts establish that A&M had no reason to foresee a risk of harm, and consequently had no duty to supervise Genser and Tate.  Because the Trust cannot establish that A&M had a duty to supervise Genser or Tate (let alone that A&M breached that duty), the Trust's claims for negligent supervision must fail.

### D.    A&M Is Not Vicariously Liable Under a Theory of Respondeat Superior Because Genser and Tate Did Not Commit an Underlying Tort.

The doctrine of respondeat superior, which is one type of vicarious liability, provides the legal rationale for holding a master responsible for a tort committed by his servant.  *Patterson v. Blair*, 172 S.W.3d 361, 363 (Ky. 2005); *see also Papa John's Int'l, Inc. v. McCoy*, 244 S.W.3d 44, 56 (Ky. 2008).  To establish vicarious liability against A&M based on the actions of Genser or Tate, the Trust must prove that Genser or Tate (1) committed a tort or otherwise breached a duty (2) while acting in the scope of his employment.  *Patterson*, 172 S.W.3d at 364 ("The employer is liable only for damages resulting from the tortious acts of his employees. . . . And the employer is only liable for acts of its employee committed in the scope of his employment."); *see also Sudekamp v. Fayette Cnty. Bd. of Educ.*, 2005 WL 2137739, at *3 (E.D. Ky. Sept. 1, 2005) (citations omitted) ("[A]lthough the doctrines of respondeat superior and vicarious liability impose responsibility despite lack of fault on the part of the employer, they apply only where the employee has actually committed a tort or a breach of duty.").

Vicarious liability is also secondary in nature; the employer is held "secondarily liable" for the torts of its employee, who is the "primary tortfeasor."  *Copeland v. Humana of Ky., Inc.*,

769 S.W.2d 67, 70 (Ky. Ct. App. 1989); *see also Jones v. Helm*, 2011 WL 1979165, at *4 (W.D. Ky. May 20, 2011) (citing *Copeland*, 769 S.W.2d at 69) ("The employer's liability is merely secondary to its employee's liability, and as such, the employer does not owe 'separate and distinct' duties apart from its employee."). Likewise, vicarious liability depends upon the employee having committed an underlying tort or breach of duty, which is then imputed to the employer to hold the employer vicariously liable. *See Patterson*, 172 S.W.3d at 364; *see also Sudekamp*, 2005 WL 2137739, at *3 (citation omitted) (stating that vicarious liability only applies "where the employee has actually committed a tort or a breach of duty").[7]

The Trust cannot satisfy the first element of respondeat superior. Where, as here, an employee's conduct is not actionable as a tort or a breach of duty, there is no basis for holding the employer vicariously liable. *See Patterson*, 172 S.W.3d at 364; *Sudekamp*, 2005 WL 2137739, at *3. For example, in the negligence context (which is the typical context in which respondeat superior is applied), if the employee's conduct does not amount to negligence, then there is no tortious act to be imputed to the employer, and thus, no basis for imposing vicarious liability on the employer. *See Patterson*, 172 S.W.3d at 364 (explaining that there is no liability based on respondeat superior where employee "exercis[ed] due care" and was therefore not negligent); *Cohen v. Alliant Enters.*, Inc., 60 S.W.3d 536, 539 (Ky. 2001) ("Clearly, if the agent did not act negligently, there can be no vicarious liability imputed to the principal."); *Floyd v. Humana of Va.*, 787 S.W.2d 267, 279 (Ky. Ct. App. 1990) (affirming grant of summary

---

[7] Although there is no Kentucky case expressly taking up the issue, the available case law indicates that it is the employee's tort that is imputed to the employer, so that the employer is held responsible for the tort of its employee, rather than the employee's actions being imputed to the employer, so that the employer would somehow be deemed the tortious actor. *See Patterson*, 172 S.W.3d at 363-64. This is consistent with the rationale underlying the doctrine of respondeat superior, which is that the employer is held responsible for the torts committed by its employee – rather than deemed the tortious actor – because allocating responsibility in this way serves sound public policy interests, including that the employer is best situated to pay tort damages as a cost of doing its business, and to incentivize the employer to be careful when hiring employees. *See id.* at 365.

judgment on vicarious liability claim because "employee was free of negligence"). The same is true where the injured party, in a settlement agreement or other release of claims, discharges all claims against an employee arising out of that employee's conduct. *See Copeland*, 769 S.W.2d at 70 (holding that hospital could not be vicariously liable for negligence of its doctors because patient had executed release of all claims against doctors); *see also Waddle v. Galen of Ky.*, 131 S.W.3d 361, 366-67 (Ky. Ct. App. 2004) (applying *Copeland*).[8]

Here, there is no basis on which to hold A&M vicariously liable because neither Genser nor Tate committed a tort or breached his fiduciary duty to the bankruptcy estates. As an initial matter, this Court has already ruled that the challenged acts of Genser and Tate are not actionable as a negligence-based claim, but are instead actionable only as claims for breach of fiduciary duty. *Sergent*, 472 B.R. at 409-11. It is unlikely that the Trust has a state law cause of action against Genser or Tate for breach of fiduciary duty,[9] and the undisputed facts do not meet the

---

[8]       These instances where an employee's conduct is not actionable – such as where the employee's conduct does not meet the elements of a tort, or because all claims against an employee were discharged in a release – are distinct from situations in which the employee did commit a tort, but the injured party cannot recover against the employee because, for example, the statute of limitations has run or an immunity doctrine applies. *See Cohen*, 60 S.W.3d at 538 (holding that employer may still be vicariously liable for tort committed by employee, even though statute of limitations had run on negligence claim committed by employee, and analogizing statute of limitations to immunity defense); *Dishman v. Corr. Corp. of Am.*, 2010 WL 3294679, at *5 (E.D. Ky. Aug. 20, 2010) ("The fact that [the plaintiff] cannot recover from the agent here does not negate the fact that liability may exist, and that it may be imputed to the principal."). This is because, as this Court recognized, "[i]t is the negligence of the servant," i.e., tort committed by the servant, "that is imputed to the master, not the liability." *Id.* at *5; *see also Patterson*, 172 S.W.3d at 364.

[9]       It is unclear whether the Trust has standing to pursue a cause of action for breaches of state law fiduciary duties to begin with. Bankruptcy estates and debtors are legally distinct entities. *In re Thompson Boat Co.*, 252 F.3d 852, 853-54 (6th Cir. 2001); *United States v. Mitchell*, 476 F.3d 539, 544 (8th Cir. 2007). The Trust stands in the shoes of the Black Diamond bankruptcy estates only, not the separate Black Diamond corporate entities. (Plan, p. 22, Art. IV.C.4.a. (assigning causes of action the bankruptcy Estates had against Genser that arose during the bankruptcy to the Trust); Am. Compl., AP DE 171, p. 1 (identifying the Trust as "the assignee of the claims of the chapter 11 estate[s] of [Black Diamond]"); Plan, p. 20, Art. IV.C.2.) The duties arising from Kentucky's corporate officer statute, however, were owed directly to Black Diamond, the business entities (not the bankruptcy estates), and its "shareholder/member[s]" are the only persons entitled to maintain "a derivative action" for their violation, calling into doubt whether the Trust has standing to pursue any claims under that statute. *See Fenley v. Kamp Kaintuck, Inc.*, 2011 WL 5443440, at *2 (Ky. Ct. App. Nov. 10, 2011) (interpreting KRS 273.226, Kentucky nonprofit corporation statute, which is identical to KRS 271B.8-420); *see also Grand Realty Corp. v. Goose Creek Energy, Inc.*, 656 F. Supp. 2d 707, 715 (E.D. Ky. 2009) ("A suit for damages arising from an injury to the corporation can only be brought by the corporation itself or by a shareholder derivatively if the corporation fails to

"willful and deliberate" standard that applies to federal claims for breach of fiduciary duty.  (*See* Genser Motion and Tate Motion.)  *See also Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 462 (6th Cir. 1982).

For the reasons set forth in the Genser Motion and the Tate Motion, it is undisputed that Genser and Tate did not engage in any tortious conduct or fiduciary breach.  Because there is no individual liability against Genser and Tate, there can be no vicarious liability against A&M.  Accordingly, A&M is entitled to summary judgment on the Trust's allegation that A&M is vicariously liable under a theory of respondeat superior.

## V.   IF THIS COURT DOES NOT GRANT SUMMARY JUDGMENT, IT SHOULD FIND UNDER RULE 16 THAT ALL CLAIMS AGAINST A&M ARE INDEMNIFIABLE CLAIMS

### A.   The Trust Cannot Collect Unless It Can Prove That A&M's Gross Negligence or Willful Misconduct Primarily and Directly Caused the Trust's Harm.

Even if the Trust could somehow create a factual dispute with respect to the claims set forth above, which it cannot, at the very least the Trust is unable to establish that A&M's actions primarily and directly caused the Trust's purported damages, rendering the Trust unable to recover damages on its claim.[10]

Under the Settlement Agreement, "[t]he Trust may obtain recoveries on" any claim against A&M in only one of two ways:  "(a) from amounts due and payable under the Insurance Policies . . . ; and (b) directly from the A&M Parties on claims that are not subject to indemnity under the Engagement Letter (a 'Non-Indemnifiable Claim')."  (Settlement Agreement, p. 5,

---

act . . . since only the corporation has an action for wrongs committed against it." (quoting *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir. 1987))).

[10]     As set forth in Defendants' Motion for Rule 16 Finding That the Trust's Claims Are "Indemnifiable Claims" and Summary Judgment on Defendants' First Counterclaim for Indemnification ("Indemnity Motion"), New York law applies to the determination of whether A&M's conduct was the primary and direct cause of the Trust's alleged damages.

¶ 6.)  Under the Engagement Letter, a claim is a Non-Indemnifiable Claim "to the extent it is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted ***primarily and directly*** from [A&M's] gross negligence or willful misconduct." (Indemnification Agreement, BK DE 94, ¶ A (emphasis added).)   In other words, the Trust cannot recover from A&M unless the Court determines that A&M's purported gross negligence or willful misconduct was the ***primary and direct*** cause of the Trust's harm.  Accordingly, A&M requests, in the event that the Court does not enter summary judgment against the Trust on the claims against A&M, that the Court rule that A&M's alleged misconduct was not the "primary and direct" cause of the Trust's harm.

The parties already have agreed that it is up to the Court to decide whether the Trust is entitled to indemnification and under what circumstances.  (Settlement Agreement, p. 5, ¶ 6.)[11] The Court has ample authority to dispose of this issue to streamline the case for trial.  Under Federal Rule of Civil Procedure ("Rule") 16, the Court can "actively manage the timetable of case preparation so as to expedite the speedy disposition of cases."  *See Newton v. A.C. & S., Inc.*, 918 F.2d 1121, 1126 (3d Cir. 1990); *accord In re Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984).  Rule 16 was designed with an eye toward "promoting efficiency and conserving judicial resources by ***identifying the real issues prior to trial***, thereby saving time and expense for everyone."  Fed. R. Civ. P. 16 Advisory Committee Notes (emphasis added); *see also Perry v. Creech Coal Co.*, 55 F. Supp. 998, 999-1000 (E.D. Ky. 1944) (noting that Rule 16 allows courts to narrow litigation to "genuine issues which are material to the case").  Rule 16 is frequently used to streamline and narrow the issues before trial.  *See, e.g.*, *Kohler Co. v. Oasis Indus., Inc.*, 1987 WL 7250, at *5 (N.D. Ill. Feb. 26, 1987) (treating parties' cross motions for summary

---

[11]       The Settlement Agreement states that "the Bankruptcy Court shall make the final determination." (Settlement Agreement, p. 5, ¶ 6.)  The reference to the Bankruptcy Court over this proceeding having been withdrawn, the determination is now before this Court.  (Order Withdrawing the Reference, DE 22.)

judgment as Rule 16 motions and determining that three issues were "resolved in favor of plaintiff as a matter of law . . . [and therefore] . . . [t]hese issues may not be raised at the trial of this case"); *N. Jackson Pharmacy, Inc. v. Caremark RX, Inc.*, 385 F. Supp. 2d 740, 743 (N.D. Ill. 2005) (granting Rule 16 narrowing motion that would "facilitate the just, speedy and inexpensive disposition of this action"); *Harris Tech. Sales, Inc. v. Eagle Test Sys., Inc.*, 2008 WL 343260, at *11 (D. Ariz. Feb. 5, 2008) (citations omitted) (explaining that Rule 16 speeds up litigation by eliminating before trial those matters where there are no genuine issues of fact).

This Court also has "substantial inherent power to manage [its] docket[]." *In re NLO, Inc.*, 5 F.3d 154, 157 (6th Cir. 1993); *accord G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 653 (7th Cir. 1989) ("Inherent authority remains the means by which district judges deal with circumstances not proscribed or specifically addressed by rule or statute, but which must be addressed to promote the just, speedy, and inexpensive determination of every action."). This Court should now determine that the Trust cannot prevail against A&M under the heightened causation standard contractually agreed upon by the parties.

### B.    The Nature of the Trust's Claims Against A&M Precludes a Finding That A&M "Primarily and Directly" Caused the Trust's Alleged Harm.

The Trust cannot meet the "primary and direct" threshold for causation under the Settlement Agreement.[12]   As set forth in Defendants' Motion for Rule 16 Finding That the Trust's Claims Are "Indemnifiable Claims" and Summary Judgment on Defendants' First Counterclaim for Indemnification ("Indemnity Motion"), New York law applies to the

---

[12]        It is the Trust's burden to show that it is not bound by the contractual terms that preclude its direct recovery from the A&M Parties.  *See, e.g., Davies Flying Serv. v. United States*, 216 F.2d 104, 106 (6th Cir. 1954); *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F. Supp. 2d 947, 952 (W.D. Ky. 2007) ("Proof of the exception to an indemnity claim is an affirmative defense to be raised and proven by the indemnitor." (citations omitted)); *Sankarathil v. EF Prods., Inc.*, 2009 WL 2046160, at *2 (E.D. Mich. July 10, 2009) (same); *Zebrowski & Assocs., Inc. v. City of Indianapolis*, 457 N.E.2d 259, 262 (Ind. Ct. App. 1983) (same).

determination of whether A&M's conduct was the primary and direct cause of the Trust's alleged damages.  (Indemnity Motion, DE 85, pp. 21-23.)

With respect to what constitutes a "primary" and/or "direct" cause, because this is a contractual standard, New York case law does not provide definitive guidance.  With respect to the term "primary," in the context of reviewing statutes with primary causation requirements, the United States Supreme Court relied upon the dictionary definition of the term, finding that "primary cause" means the "foremost, chief, or principal cause."  *Brown v. Plata*, 131 S. Ct. 1910, 1936 (2011) (citing American Heritage Dictionary 1393 (4th ed. 2000); Webster's Third New International Dictionary 1800 (2002); 12 Oxford English Dictionary 472 (2d ed. 1989)); *cf. Blue v. United Air Lines*, 98 N.Y.S.2d 272, 274 (N.Y. Sup. Ct. 1950) (noting in pleading that plaintiff contended its fault was secondary or passive while defendant's was primary or active). This concept of "foremost, chief, or principal cause" is consistent with the findings of other courts that have addressed the question.  *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 920 (E.D. Cal. and N.D. Cal. 2009) (quoting Random House Webster's Unabridged Dictionary 1537 (2d ed. 1998)); *Slyfield v. Penfold*, 66 F. 362, 364 (6th Cir. 1895) (primary cause requires unbroken connection between wrongful act and injury).

With respect to the term "direct," courts have explained that to constitute the "direct cause" of an event, an action must be, "directly and independently of all other causes, sufficient to produce" the alleged result.  *Honican v. Stonebridge Life Ins. Co.*, 455 F. Supp. 2d 662, 664 (E.D. Ky. 2006) (finding fall was not "direct cause" of insured's injury); *see also* Black's Law Dictionary 525 (9th ed.) (defining "direct" as "[f]ree from extraneous influence; immediate"). The Trust must therefore prove that A&M's actions were the "principal" cause that, "independently of all other causes, [was] sufficient to produce" the Trust's purported damages.

*Honican*, 455 F. Supp. 2d at 664; *see also Coleman*, 922 F. Supp. 2d at 920; *Ohuche v. Merck & Co., Inc.*, 903 F. Supp. 2d 143, 150 (S.D.N.Y. 2012) (noting New York law requires proof of direct causation for products liability claim).

It is the Trust's burden to show that it is not bound by the contractual terms that preclude its direct recovery from the A&M Parties. *See, e.g.*, *Davies Flying Serv.*, 216 F.2d at 106; *Westlake Vinyls*, 518 F. Supp. 2d at 952 ("Proof of the exception to an indemnity claim is an affirmative defense to be raised and proven by the indemnitor." (citations omitted)); *Sankarathil*, 2009 WL 2046160, at *2 (same); *Zebrowski & Assocs.*, 457 N.E.2d at 262 (same). The Trust cannot meet this burden. As set forth above, each of the Trust's claims against A&M is either derivative of or secondary to the commission of a tort by Genser and Tate. (*See supra* § IV(B) – (D).) *See, e.g.*, *Ten Broeck Dupont*, 283 S.W.3d at 727; *Grego*, 187 F. Supp. 2d at 694; *Roth*, 2008 WL 5264314, at *3; *Dortch*, 588 F.3d at 405. The derivative and/or secondary nature of the Trust's claims precludes a finding that A&M was primarily and directly liable for the Trust's harm. Indeed, the very notion of derivative and/or secondary liability is that it is neither primary nor direct.

Thus, even in the unlikely event that the Trust could prove A&M engaged in tortious conduct or was vicariously liable for Genser's or Tate's tortious conduct (which it cannot for the reasons set forth above and in the Genser Motion and the Tate Motion), the Trust cannot recover against A&M. Accordingly, this Court should determine that the claims asserted against A&M are "Indemnifiable," as that term is used in the Settlement Agreement.

## VI.    CONCLUSION

A&M is entitled to summary judgment on all of the Trust's claims. The Trust cannot come forward with sufficient evidence to support a claim for negligent hiring or supervision

under Kentucky law.  Any claim against A&M on a theory of respondeat superior fails because neither Genser nor Tate committed an underlying tort.

Even if there were a genuine dispute of material fact about any claim against A&M, the Court still should determine, as a matter of law, that any claim against A&M is an "Indemnifiable Claim" under the Settlement Agreement.  Any conceivable claim against A&M is necessarily derivative and/or secondary in nature – meaning that by definition, A&M cannot be the "direct and primary" cause of any harm to the Black Diamond bankruptcy estates.

Accordingly, A&M respectfully requests that the Court grant this Motion and enter final judgment in its favor on all claims directed against it or, in the alternative, enter an order that all the claims against A&M are "Indemnifiable Claims" under the Settlement Agreement.

Dated: <u>March 18, 2014</u>                                    Respectfully Submitted,

<div style="margin-left:40%">

/s/ Chacey R. Ford
Mary Elisabeth Naumann (KY Bar # 88328)
Jay E. Ingle (KY Bar # 86994)
Chacey R. Ford (KY Bar # 91019)
JACKSON KELLY PLLC
175 E. Main Street, Ste. 500
Lexington, KY 40507
Telephone:  (859) 255-9500
Fax:  (859) 252-0688
Email:  mnaumann@jacksonkelly.com
          jingle@jacksonkelly.com
          crford@jacksonkelly.com

John C. Goodchild, III (PA Bar # 74856)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103-2921
Telephone:  (215) 963-5000
Fax: (215) 963-5001
Email: jgoodchild@morganlewis.com

*Counsel for Alvarez & Marsal North*
*America, LLC, Ira J. Genser, & Larry Tate*

</div>

## CERTIFICATE OF SERVICE

On March 18, 2014, I electronically filed the foregoing document through the ECF

system, which will send a notice of electronic filing to the following:

Ellen Arvin Kennedy, Esq.     Mackenzie Mayes Walter
ellen.kennedy@dinslaw.com    mackenzie.walter@dinslaw.com
jennifer.christian@dinslaw.com   kelly.jordan@dinslaw.com

Grahmn N. Morgan
grahmn.morgan@dinslaw.com
jane.courtney@dinslaw.com


         /s/ Chacey R. Ford_____
         Chacey R. Ford
         JACKSON KELLY PLLC
         175 E. Main Street, Ste. 500
         Lexington, Kentucky 40588-2150
         Telephone: (859) 255-9500
         E-mail: crford@jacksonkelly.com

         *Counsel for Alvarez & Marsal North*
         *America, LLC, Ira J. Genser, and Larry*
         *Tate*