**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION**
**PIKEVILLE**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| BLACK DIAMOND MINING COMPANY, ) | |
| LLC, *et al.*, ) | |
| ) | |
| ) | |
| _____ ) | **Civil No. 7:13-125-ART** |
| ) | |
| TAFT A. MCKINSTRY, AS TRUSTEE ) | |
| OF THE BD UNSECURED CREDITORS ) | |
| TRUST, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| IRA J. GENSER, et al., ) | |
| Defendants. ) | |
| ) | |
| ) | |

**TRUSTEE'S RESPONSE IN OPPOSITION TO DEFENDANTS'**
**RULE 16 MOTION REQUESTING THAT THIS COURT FIND THAT KOCH CARBON**
**DID NOT "OFFER" TO PURCHASE ALL BLACK DIAMOND COAL FROM 2009**
**THROUGH 2011 UNDER KENTUCKY LAW**

Plaintiff, Taft A. McKinstry, as Trustee (the "Trustee") of the BD Unsecured Creditors

Trust (the "Trust"), hereby responds in opposition to the *Rule 16 Motion Requesting that this*

*Court Find that Koch Carbon Did Not "Offer" to Purchase All Black Diamond Coal From 2009*

*Through 2011 Under Kentucky Law* [DE 80] (the "Motion") filed by Defendants Alvarez &

Marsal North America, LLC, Ira J. Genser, and Larry Tate (collectively, "A&M Parties").

## INTRODUCTION

The A&M Parties' Motion should be denied because the June 4, 2008 "Koch Carbon

LLC Term Sheet Indication for Purchasing All of Black Diamond Coal" was a clearly an offer

(June 4, 2008 email from Brad Speer to Genser and attached "Koch Term Sheet," attached as Exhibit 1).[1] It included, among other things:  the **term** of the offer (2009 through 2011), the **specific coal quality characteristics** for the three different types of coal that Koch Carbon LLC ("Koch") wanted to purchase from Black Diamond (12,000 BTU, 1% sulfur; 12,500 BTU, 1% sulfur; and 12,350 BTU, 1.5% sulfur), the **delivery method** for the different types of coal (FOB truck delivered to Big Sandy River and FOB CSX railroad), the **quantities** of the different types of coal Koch wanted to buy from Black Diamond for each specific year of the term of the offer (i.e., for coal with 12,000 BTU, 1% sulfur ("Product A"), 750,000 tons in 2009, 250,000 tons in 2010 and 500,000 tons in 2011), the **price** Koch would pay for each particular ton purchased (i.e., for Product B, $103 per ton in 2009, $100 per ton in 2010 and $98 per ton in 2011), the **sampling and testing method** for each delivery during the term of the offer, and the **payment terms** ("ten (10) business days after receipt of invoice on each train shipment and each Friday for the previous week's truck deliveries to the Big Sandy River.").  (Id.).

The terms of this offer would have generated over Five-Hundred Million Dollars ($500,000,000) in revenue for Black Diamond, yet Genser and Tate *never* followed-up on the offer, never made a counteroffer, destroyed all notes and communications regarding the offer, and never even disclosed its existence to Black Diamond's stakeholders. Two different representatives from Koch testified that it was an offer and that Koch sent it with the intention of purchasing Black Diamond's coal. (Speer Depo, pp. 55, 70-71, 122-123 [DE 49][2]); (Bach Depo, pp. 49, 89 [DE 36]). Steve Cohn, the Chief Financial Officer for Alvarez and Marsal ("A&M"),

---

[1] Rule 16 is not designed to give a party additional and unlimited opportunities to present dispositive or *in limine* motions, or to conduct a "mini-trial."  *McCargo v. Hedrick*, 545 F.2d 393, 396-397 (4th Cir. 1976) ("The idea is to help the lawyers and the litigants--not to exhaust them."). Yet this is plainly what the A&M Parties are seeking to do.  Thus, their Motion should be stricken.  *See Kapsner v. Burlington N. & Santa Fe Ry. Co.*, Cause No. CV 02-116-BLG-RWA, 2004 U.S. Dist. LEXIS 30060, at *4 (D. Mont. Feb. 19, 2004).

[2] Citation to the record in the above captioned proceeding is noted as "DE ___." Citation to the record in the underlying Bankruptcy Proceeding is noted as "BK DE ____." Citation to the record in the withdrawn Adversary Proceeding, *McKinstry v. Genser, et al.*, is noted as "AP DE ____."

testified it was an offer. (Cohn Depo, pp. 286-286 [DE 41]). Carl Mullins, Black Diamond's Vice President of Coal Sales, testified it was an offer. (Mullins Depo, pp. 266-270 [DE 74]). Genser even recognized it was an offer. (Genser Depo, pp. 169-170 [DE 59]).

Even if the foregoing overwhelming evidence was disregarded, however, the A&M Parties' attempt to obtain an order from this Court prior to trial that the Koch Term Sheet is not an offer as a matter of law, still fails.  Under Kentucky law, whether the Koch Term Sheet was an offer or not "is a question of fact to be determined from the terms of the quotation and the circumstances." *A & A Mech., Inc. v. Thermal Equip. Sales*, 998 S.W.2d 505, 511 (Ky. Ct. App. 1999). Thus, this Court should deny the Motion because the A&M Parties' arguments are directly contrary to the facts of this case and Kentucky law.

Further, as this Court indicated in its March 26, 2013 Minute Entry Order, to the extent that this Court must make findings of fact or other rulings outside of the scope of Rule 16, the A&M Parties' Motion will be denied. [DE 123]. As explained throughout this Response, there are, at the very least, significant issues of fact regarding whether the Koch Term Sheet was an offer to purchase Black Diamond's coal. Thus, this Court should deny the Motion as being outside the scope of Rule 16.

## BACKGROUND

As outlined in the Trustee's First Amended Complaint, the A&M Parties were negligent, grossly negligent and acted with willful misconduct in operating Black Diamond by failing to sell a single ton of coal forward in the summer of 2008 when coal prices were at historic highs. [AP DE 171]. The A&M Parties blame everyone and everything for their failure to enter into coal transactions that would have saved Black Diamond, but, as the Koch Term Sheet illustrates, the A&M Parties failed to act on real opportunities to do so. As will be shown at trial, the A&M

Parties hid these opportunities due to, among other things, the conflict of interest created by their relationship with CIT.[3]

On June 4, 2008 Ira Genser, while acting as CRO of Black Diamond, received an offer from Brad Speer, Vice President of Coal Sales for Koch, to purchase substantially all of Black Diamond's coal production for the years 2009, 2010 and 2011 for approximately $100/ton.[4] (Exhibit 1). Contrary to the A&M Parties' claims that the Koch Term Sheet was an isolated correspondence that cannot, as a matter of law, be construed as a "legally binding offer" to purchase Black Diamond's coal, evidence of record establishes that Mr. Speer's correspondence was in fact a an offer.[5] At the very least, there exists a genuine issue of material fact about whether it is an offer or not.

June 4, 2008 was not the first time Koch attempted to enter a deal to purchase Black Diamond's coal. In February and March 2008, Black Diamond entered into agreements to sell Koch 252,000 tons of coal to be delivered to Koch at different points in time in 2008.[6] (Purchase Orders Executed in February and March 2008, collectively Exhibit 2). The deals brokered between Koch and Black Diamond were consummated from offers outlined on term sheets

---

[3] On the same day that Genser received the Koch Term Sheet, he also received an email from CIT representative, Harry Schroeder, indicating that CIT preferred that Black Diamond not enter into long term contracts because CIT favored a sale of Black Diamond's assets. (*See* June 4, 2008 email from Schroeder to Genser, Exhibit 3). Schroeder thought long term sales commitments would hinder opportunities to sell the company. (Id). As it turned out, Schroeder, a banker, was completely wrong about his belief, as several financial buyers chose not to enter into substantive discussions with the Debtors because Black Diamond had no long term contracts in place. Regardless, the email communication from Schroeder to Genser was in response to an earlier email that Genser had sent to Schroeder on a different long term contract opportunity. (Id.).

[4] To put this in perspective, in the recent years leading up to 2008 coal sold for prices of around $50-$60 per ton.

[5] The A&M Parties' Motion suggests that the Trustee's claim is predicated completely on the finding that the Koch Term Sheet was a "legally binding offer." The A&M Parties never explain their contention or what they mean by "legally binding offer" in the context of the Trustee's claims. The Trustee is not pursuing Koch for breach of contract, she is not seeking to enforce the offer from Koch, she is not arguing that a communication from Genser or Tate to Koch constituted an acceptance of the offer (because neither Genser nor Tate ever followed up on it) and she is not seeking to establish the existence of a contract between the Debtors and Koch (again, because Genser and Tate failed to do anything about the offer received from Koch). The overwhelming testimony and evidence in this case is that Koch made an offer worth a **half-billion dollars** to the Debtors and the A&M Parties did nothing to pursue it, accept it, follow-up on it, or capitalize on it.

[6] In total, Black Diamond executed purchase orders for 820,000 tons of coal to be delivered to Koch in 2008. None of these deliveries were for years 2009, 2010 or 2011.

nearly identical, and in some cases with less specificity, to the Koch Term Sheet sent to Genser on June 4, 2008. (*See* Speer Depo, pp. 113-116 [DE 49]); (Feb. 26, 2008 email and attached term sheet from Koch to Genser and others, Exhibit 4); (March 3, 2008 email and attached executed purchase orders between Koch and Black Diamond, Exhibit 5).

During his deposition Brad Speer indicated that this was the way in which deals would usually get done with Black Diamond; Koch would send an offer in the form of a term sheet and if Black Diamond accepted the offer, a written contract would be drawn up and executed by the parties.  In reference to a February 26, 2008 term sheet sent by Koch to Black Diamond, which was nearly identical to the Koch Term Sheet sent on June 4, 2008, Mr. Speer testified:

> Q. [The February 26, 2008 term sheet] was a proposal at which Koch Carbon was willing to transact business with Black Diamond; correct?
>
> A. Correct.
>
> Q. And, ultimately, the parties were able to enter into a contract seven days later with the same or very similar terms to the proposal that was sent on February 26, 2008; correct?
>
> A. Correct.
>
> Q. Is that generally how a contract comes to be?
>
> A. Generally.
>
> Q. One party has to say here's what I want to buy your product at, and another party has to say here's what I'm willing to sell you the product for, right, generally speaking?
>
> A. Yes.
>
> Q. And [Exhibit] 606 was what Koch Carbon was willing to buy Black Diamond's coal for and [Exhibit] 610 is a contract that evidences Black Diamond's willingness to sell its coal to Koch for prices and delivery terms; correct?
>
> A. That's right.

Q. And [Exhibit] 610 is actually a set of multiple purchase contracts.  It looks like at least two; is that correct?

A. Yes.

Q. Both of which were signed on March 3rd, 2008.

A. Yes.

(Speer Depo, pp. 115-116 [DE 49]).[7]

As early as February 23, 2008, Koch and Black Diamond began discussions regarding Koch's purchase of Black Diamond's *entire production*. (Feb. 23, 2008 email from Speer to Genser and others: "Depending on actual price and quality we could probably take *everything* Black Diamond produces," Exhibit 6 (emphasis added)); (Speer Depo, p. 74 [DE 49]) (indicating he would not have sent the Feb. 23 email if he did not mean Koch could purchase everything Black Diamond produced). Koch had ongoing discussions with Black Diamond regarding its desire to purchase Black Diamond's production at least through the time that Mr. Speer sent the June 4 Koch Term Sheet. (Id. at pp. 74-75) (indicating ongoing dialogue between the Feb. 23 email and the June 4 offer); (*See also* Id. at p. 36) (indicating that Speer had discussions with Genser prior to sending the June 4 Koch Term Sheet about purchasing Black Diamond's production).

On June 4, 2008 the terms of the offer were reduced to writing and were sent by Mr. Speer to Genser in the form of the Koch Term Sheet. (Exhibit 1). The primary terms of any contract are (1) Price; (2) Term; (3) Quantity; and (4) Quality. (Bach Depo, pp. 129-130 [DE 36]); (Speer Depo, pp. 50, 122 [DE 49]); (Schwartz Depo, pp. 176-179 [DE 46]) (all indicating that the primary terms for any coal contract are price, quantity, term and quality). The Koch Term Sheet

---

[7] The A&M Parties argue that language at the bottom of the Koch Term sheet makes it something other than a "legally binding offer." The argument is misplaced for several reasons discussed below in section II.B. The Trustee notes, however, that the February 26, 2008 term sheet referenced by Mr. Speer as being the basis of a deal executed seven days later between Koch and Black Diamond contained the exact same language. (*See* Exhibit 4).

is titled "Koch Carbon LLC Term Sheet Indication for purchasing Black Diamond coal" and contains more than the primary and essential terms upon which Koch was willing to transact with Black Diamond. [8] It is undisputed that the Koch Term Sheet contains specificity regarding: the term of the deal, product types, quantities, purchase price, the point of delivery, terms regarding weighing and analysis of the coal, and payment terms. (Id.).

Two Koch Carbon employees who were engaged in discussions with Black Diamond throughout 2008 regarding Koch's attempts to buy coal from Black Diamond testified that the Koch Term Sheet, was in fact a bona fide offer.  Mr. Speer, the Koch Vice President who sent the Koch Term Sheet indicated on numerous occasions during his deposition that he would not have sent the Koch Term Sheet unless Koch had intended to purchase Black Diamond's coal on the terms set forth therein:

> Q. Do you remember whether you were looking as of June 4, 2008, to purchase all of Black Diamond's production?
>
> A. I believe that was the intent here.

(Speer Depo, p. 45 [DE 49]).

> Q. The term sheet that's identified and attached as Exhibit 584, Page 2 of Exhibit 584, would you have sent this out to Mr. Genser if you did not intend to purchase the coal you've identified?
>
> MR. ARMSTRONG: Object to the form.

---

[8] The A&M Parties attempt to paint the Koch Term Sheet as a document that the Trustee "out of nowhere" decided to cling to as an indication that the A&M Parties had an opportunity to enter into a long-term contract with Koch but willfully and recklessly dismissed it to Black Diamond's detriment. (Memo in Support, at pp. 1-2).  The A&M Parties argue that the Trustee did not specifically name the Koch offer in her complaint. However, the Trustee's Amended Complaint states that the A&M Parties unreasonably and recklessly prevented Black Diamond from selling coal forward and frittered away tangible opportunities to do so. ([AP DE 171] paras. 38, 52, 63, 71, and 76). Additionally, the A&M Parties did not produce the Koch Term Sheet until well after the complaint was filed and since it was never disclosed there was no way for the Trustee to know of its value. (*See* Nov. 21, 2012 letter from Scarafile to Morgan serving documents bates numbered MLB_Alvarez-32138-MLB_Alvarez-33417, Exhibit 7) (the Koch Term Sheet is bates numbered MLB_Alvarez 32385). In January 2014, over a year later and after discovery had long since closed, the A&M Parties produced what they claim to be part of Genser's hard copy files from the Black Diamond engagement. These documents contained not one, but two copies of the Koch Term Sheet alongside the Trustee's Complaint, underscoring the apparent importance of the Koch offer to this litigation, and further evidencing the A&M Parties' willful withholding of documents during discovery.

A. I don't think I would have sent it to him if we did not intend to purchase this coal, no.

(Id. at 55); (*See also* Id. at 70-71,122-123). John Bach, a buyer for Koch who routinely interacted with Black Diamond during 2008, and who transacted numerous shorter term deals with Black Diamond, also testified about the Koch Term Sheet. Mr. Bach stated that based on his experience as someone who was often engaged in buying coal on behalf of Koch, that the Koch Term Sheet was a standard written document that Koch would send to sellers if Koch was looking to purchase tons in multiple years from the seller. (Bach Depo, pp. 45-46 [DE 36]).[9]  Mr. Bach indicated that based on his experience as a buyer for Koch the Koch Term Sheet was a binding offer. (Id. at 49, 89).[10]

Mr. Genser testified that he recalls Koch making an offer to purchase Black Diamond's coal in 2008. (Genser Depo, pp. 169-170 [DE 59]).[11] Following receipt of the Koch Term Sheet, Genser forwarded the offer to Steve Cohn at A&M who advised Mr. Genser to follow up on the offer and share it with CIT and CIT's coal expert, Seth Schwartz.  (June 4, 2008 email chain between Genser and Cohn with Koch Term Sheet attached, Exhibit 8). Genser did not do so. At his deposition, Mr. Cohn testified that it was his understanding, as well as Genser's

_____

[9] Mr. Speer also testified that the Term Sheet is consistent with what Koch would send to a producer when they were looking to purchase coal. (Speer Depo, p. 37 [DE 49]).

[10] In their Motion the A&M Parties contend that the Trustee's counsel "pressured" Mr. Speer and Mr. Bach to speculate that Koch considered the Koch Term Sheet an offer. (Memo in Support, at p. 3). This is not so. In fact, the A&M Parties' own counsel, Attorney Chacey Ford, elicited testimony from Mr. Bach that the Koch Term Sheet was in fact a binding offer:

> Q. Okay. You talked about this being like a typical term sheet for Koch Carbon.  Is this a binding offer that could be accepted?
>
> A. I would—yeah.  I would say if they had come back and said, hey, we want to do this deal at these price levels, more than likely yes.  Yeah.

(Bach Depo, p. 89 [DE 36]).

[11] At his 2009 Rule 2004 Exam, Mr. Genser was asked: "Did any of the other entities ever make an offer of a specific amount of coal for a specified price?"  Mr. Genser's response was: "I believe both Cogentrix and Koch.  I can't recall if price was involved, but I do believe there were definitely quantities discussed back and forth."

understanding, based on the Koch Term Sheet, that Koch was offering to buy Black Diamond's

entire production at high prices:

> Q. What did you understand Mr. Genser to be saying?
>
> A. **That he thought it was very interesting that they would offer to buy out the entire production at prices that were quite high.**
>
> . . . .
>
> Q. Okay.  Now, even though this is an offer to purchase all of Black Diamond's coal, nothing would have prevented Mr. Genser from selling a portion of Black Diamond's coal to Koch on June 4, 2008, right?
>
> A. I don't know.  **This is their offer to purchase all.**  I don't know whether they would have split it into parts.  I have absolutely no idea.

(Cohn Depo, p. 285-286 [DE 41]).[12]  Black Diamond's management team similarly recognized

the Koch Term Sheet as an offer from Koch.  (Mullins Depo, pp. 266-270 acknowledging the

Koch Term Sheet as an offer to purchase Black Diamond's coal [DE 74]).

Despite the A&M Parties' recent contention otherwise, Koch, Black Diamond

Management and the A&M Parties themselves all understood the Koch Term Sheet to be an

offer to purchase Black Diamond's coal.  Moreover, this was an offer that would have generated

over $500 million in revenue that Genser failed to act upon and failed to disclose to Black

Diamond's stakeholders to whom he owed fiduciary duties.  (*See* Haggard Depo, pp. 105-106

[DE 71]); (Schroeder Depo, pp. 314-315 [DE 71]); and (Cohn Depo, pp. 287-288 [DE 41]) (all

indicating that they are not aware that the Koch term sheet was shared with constituencies);

---

[12] An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." REST. (SECOND) OF CONTRACTS § 24 (1981). Thus, Mr. Cohn's interpretation of the Koch Term Sheet is itself relevant and probative in this case.  Additionally, because Mr. Cohn is Chief Financial Officer of A&M (Cohn Depo, pp. 11-12 [DE 41]) his statements constitute "Opposing Party's Statements" under Fed. R. Evid. 801(d)(2)(D) and are thus admissible at trial against A&M.  Federal law has long been clear that the declarant need not have personal knowledge in order for the statement to be admissible under Fed. R. Evid. 802(d)(2)(D). *U.S. v. Lawson*, Criminal Action No. 08-21-KSF, 2009 U.S. Dist. LEXIS 114663, at *11 (E.D. Ky. Dec. 9, 2009); *see also Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 330 n. 7 (3d Cir. 2005); *U.S. v. Goins*, 11 F.3d 441, 443-444 (4th Cir. 1993).

(Affidavit of Carl Mullins [DE 112-14]) (indicating that he was present at the June 10-11, 2008 meetings with stakeholders and the "June 4, 2008 Term Sheet Offer from Koch Carbon was neither shared nor discussed at these meetings.").

Regardless, whether the Koch Term Sheet was an offer is a question of fact for the jury and, at the very least, there is a genuine issue of material fact with respect to whether the Koch Term Sheet was an offer. Thus, the A&M Parties' attempt to get this Court to rule as a matter of law that it was not on offer must be denied.

## ARGUMENT

### I.      The Motion Fails Procedurally.

Despite the A&M Parties' suggestion, Rule 16[13] is not designed to provide additional opportunities to present dispositive or *in limine* motions or conduct a "mini-trial." *McCargo*, 545 F.2d at 396-397. Despite the A&M Parties' characterizations, "Rule 16 by its terms does not confer special powers to enter judgment not contained in Rule 56 or the other rules." *Fidelity & Deposit Co. v. Southern Utilities., Inc.*, 726 F.2d 692, 693 (11th Cir. 1984). Instead, the proper scope of a Rule 16 *pre-trial conference* is limited. *C & A Constr. Co. v. DHC Dev.*, 501 F. App'x 763, 777 (10th Cir. 2012). A district court may use the conference "to weed out frivolous claims or to simplify the issues for trial." *Id.* A district court, however, should not hold a "mini-trial" for "resolv[ing] highly-contentious factual issues and disputes." *Id.*

---

[13] Rule 16 provides, in relevant part:

> (a) Purposes of a Pretrial Conference. In any action, the court may order the attorneys and any
> unrepresented parties to appear for one or more pretrial conferences for such purposes as:
>   (1) expediting disposition of the action;
>   (2) establishing early and continuing control so that the case will not be protracted because of
>      lack of management;
>   (3) discouraging wasteful pretrial activities;
>   (4) improving the quality of the trial through more thorough preparation; and
>   (5) facilitating settlement.

Fed. R. Civ. P. 16.

Through Rule 16 the A&M Parties are attempting to argue a Motion for Summary Judgment without having to meet the strict standard required for granting summary judgment. The Sixth Circuit has clearly articulated the summary judgment standard:

> An entry of summary judgment can be upheld only if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(f)(c). For a fact to be material, it must affect the outcome of the suit, as "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* . . . [A] Court must view the entire record in a light most favorable to the party opposing summary judgment, and draw all reasonable inferences in that party's favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986).

*Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 (6th Cir. 2000). Viewed in the light most favorable to the Trustee, there is no doubt that a genuine issue of material fact exists with respect to the Koch offer and the A&M Parties cannot meet the stringent standard necessary for summary judgment to be granted.

The Court should not allow the A&M Parties to use Rule 16 as a method to bypass the requirements of a Rule 56 motion for summary judgment. *Kapsner*, 2004 U.S. Dist. LEXIS 30060, at *4 ("The Court will not allow BNSF to use Rule 16 to circumvent the procedural requirements governing summary judgment practice."); *VSI Holdings, Inc. v. SPX Corp.,* Case No. 03-CV-70225-DT, 2006 U.S. Dist. LEXIS 15428, at *12 (E.D. Mich. March 7, 2006) ("SPX has not shown that Rule 16 is a rule which can circumvent the Court's scheduling orders and the dispositive motion procedures in order to argue dispositive issues.").[14]  As this Court has already ruled that it will deny the A&M Parties' Motion to the extent that it is outside the scope of Rule

---

[14]Notably, the Defendants expressly rejected this Court's preferred method of managing dispositive motions – as seen in the Court's standard Scheduling Order issued pursuant to Rule 16 – in favor of this extra round of motions.

16 and/or requires the Court to rule on an issue of fact, the A&M Parties' Motion should be denied.

## II.    The Motion Fails Substantively.

### A.    The Koch Term Sheet is an Offer and the A&M Parties Fail to Cite This Court Applicable Law Regarding the Construction of Offers.

Defendants conflate contract interpretation and formation, but these are distinct concepts requiring different forms of analysis. While courts can *interpret contracts* as a matter of law, the initial questions of whether one party has made an offer and the other has accepted, creating a contract are ultimately questions of fact for the jury to decide.

"The question of the existence of a contract is a question of fact for the jury to answer." *Audiovox Corp. v. Moody*, 737 S.W.2d 468, 471 (Ky. Ct. App. 1987) (citing *Hickey v. Glass*, 285 Ky. 848, 149 S.W.2d 535 (1941)); *accord Princesse D'Isenbourg Et Cie Ltd. v. Kinder Caviar, Inc.*, No. 3:09-29-DCR, 2011 U.S. Dist. LEXIS 17281, at *19 (E.D. Ky. Feb. 22, 2011); *Nat'l Info. & Commc'ns. Equip. Network Inc. v. Willigan*, No. 06-28-DLB, 2007 U.S. Dist. LEXIS 75799, at *38-39 (E.D. Ky. Oct. 11, 2007).  This very Court has recognized as much. *Ranger Natural Gas, LLC v. Burns*, No. 07-202-ART, 2010 U.S. Dist. LEXIS 62071, at *10-12 (E.D. Ky. June 21, 2010) (finding that a material issue of fact existed as to the parties' intent regarding the making of a new contract thus preventing a grant of summary judgment).

In *General Motors Corp. v. Herald,* the Kentucky Supreme Court explained that this factual inquiry is made in two stages, the first being whether an offer was made, and the second

being whether an offer was accepted. 833 S.W.2d 804, 806 (Ky. 1992).[15] In *General Motors Corp.*, the trial court, faced with a disputed issue of material fact as to whether an offer had been made and accepted, acted as the fact finder in a two day evidentiary hearing with eight witnesses and determined that a settlement offer had in fact been made and accepted, and thus a settlement agreement had been formed. *Id.* The Supreme Court noted that the trial court's decision was based on its judgment of the credibility of witnesses and evidence and would not be set aside absent a finding of clear error because the trial court issued extensive findings of fact on the issues presented. *Id.*

Similarly, the Kentucky Court of Appeals has held that whether a "price quotation is an offer or merely an invitation to offer is **a question of fact** to be determined from the terms of the quotation and the circumstances." *A & A Mech.*, 998 S.W.2d at 511(emphasis added); *United States v. Hardy*, 916 F. Supp. 1373, 1376 (W.D. Ky. 1996) ("To determine the contractual relationship between the parties, the court must piece together documents, purchase orders, and testimony from witnesses, some of whom are deceased."). In *Hardy*, the "proposal" in question "was addressed to a specific person and contained 'definite' prices, time frames, potential services, and an indemnity clause." *Id.* at 1381. In the court's findings of facts and conclusions of law following a bench trial, the court held that the facts justified a party's understanding that assent to the letter was invited and would form a contract, *i.e.* the proposal was an offer. *Id.*  The same approach applies here. The jury will consider all evidence together to determine whether

---

[15]The parties agree that coal is a movable "good" and thus Article 2 of the UCC as adopted in the Kentucky Revised Statutes governs the formation of contracts for the sale of coal mined in Kentucky.  Although *General Motors Corp.* is not a case involving an offer and an acceptance under the UCC, Kentucky's version of the UCC explicitly states that "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause, supplement its provisions." KRS 355.1-103(2).  Because the UCC does not define what constitutes an "offer" or indicate whether an offer has been made is a question of law or fact, common law is to be used to supplement the UCC's provisions and answer these questions.

the Koch Term Sheet was an offer. At this juncture, however, the Court must construe all facts and evidence in the light most favorable to the Trustee as to whether the Koch Term Sheet was an offer.

The cases selectively cited by the A&M Parties do not change these principles. In *Nat'l Bank of Ky. v. Louisville Trust Co.*, the Sixth Circuit remanded a Depression-era contract dispute back to the trial court. 67 F.2d 97 (6th Cir. 1933). The case discussed whether communications made contemporaneous with the stock market crash of 1929 created a contract, but the appeal itself turned on what remedies were available against an insolvent bank. *Id.* at 100-101. Before remanding, the Sixth Circuit announced general contract principles to guide the lower court, but it expressly reserved ruling on the question of whether a contract existed. *Id.* at 105. The Sixth Circuit was direct in explaining that the issue of a contract's existence is a factual one:

> And so, should there be a conflict of evidence upon these matters in the event of a retrial at law, **the question of the existence or nonexistence of a valid and binding contract should be submitted to and determined by the jury under proper instructions**.

*Id.* at 103 (emphasis added).

Similarly, in *Cent. Bank v. Gill*, the Kentucky Supreme Court expressly noted that "the parties *have presented us with no factual disputes* regarding whether the agreement reached at the Master Commissioner's hearing constituted a meeting of the minds, as the entire stipulated settlement agreement is on the record." 2011-SC-000442-DG, 2013 Ky. Unpub. LEXIS 57, at *10-11 (Ky. Sept. 26, 2013) (emphasis added). Further, "[a] determination of an issue of law is presented where the question is one…where the relevant facts are undisputed and the dispositive issue thereby becomes the legal effect of those facts." *Id.*  Because of the absence of a factual dispute regarding the meeting of the minds, the Kentucky Supreme Court explained that "[w]e believe *in the case sub judice* that whether there was a meeting of the minds and, thus, an

14

enforceable contract is an issue of law to be determined by the court." *Id.* at *10 (emphasis added for the portion of the quote omitted by the A&M Parties in their Memorandum).

In *Cinelli v. Ward*, 997 S.W.2d 474 (Ky. Ct. App. 1999), another case cited by the A&M Parties, the Kentucky Court of Appeals addressed the interpretation of an acknowledged contract, "which is a question of law" as opposed to the formation of a contract, which is currently before this Court. Similarly, *Sommerkamp v. Linton* deals with questions of contract interpretation, not formation. 114 S.W.3d 811, 817 (Ky. 2003) (in fact *Sommerkamp* actually points out that *Cinelli* dealt with the *interpretation* of a contract).[16]

*Excel Energy, Inc. v. Cannelton Sales Co.*, 246 F. App'x 953 (6th Cir. 2007), highlights some of the differences between contract interpretation, a question of law, and contract formation, i.e. determining whether an offer has been made and accepted, a question of fact. *Excel Energy Inc.* involved a dispute over a contract between a coal producer and a company that resells coal on behalf of such producers.  246 F. App'x at 955. The contract entered into between

---

[16] The other cases cited by the A&M Parties do not support their position either. *Kovacs v. Freeman* involved a court's holding that a medical consent form, which did not contain terms related to payment for surgery but only related to the agreement of the patient to undergo surgery, was not a contract because there existed no mutuality of obligation between the patient and the surgeon. 957 S.W.2d 251, 254. If Genser had accepted the Koch Term Sheet there would have certainly been an obligation on the part of Black Diamond to supply and Koch to purchase coal as outlined in the terms of the Koch Term Sheet. The court in *Fowler's Bootery v. Selby Shoe Co.*, held that an agreement lacked mutuality because either party could terminate the agreement at any time and the agreement did not spell out specific quantities of goods to be purchased and delivered at specified times, as the agreement was instead for one party to be the exclusive sales agent for the other. 117 S.W.2d 931, 933. The Koch Term Sheet not only outlines specific quantities, qualities, and prices, it goes into detail on terms related to payment, weighing, delivery, analysis, and method of shipment. The court in *Elkhorn-Hazard Coal Co. v. Ky. River Coal Corp.*, 280 F. 2d 67, 70 (6th Cir. 1927) stated that "whether a contract results from an exchange of definite communications, when a formal contract is intended later to be prepared and executed is a question which has received much consideration. Whether one so results is mainly a question of intention." Intention of the parties is always a question of fact for the jury. Finally, the court in *Giverny Gardens, Ltd. v. Columbia Hous. Partners LTD. P'ship*, 147 F. App'x 443, 447 (6th Cir. 2005) quoted *Cineli* for the proposition that "where an agreement leaves the resolution of material terms to future negotiations, the *agreement* is generally unenforceable for indefiniteness *unless* a standard is supplied from which the court can supplement the open terms should negotiation fail." (emphasis added). Again, the Trustee is not seeking to enforce a contract with Koch because neither Genser nor Tate ever followed up on the offer. Regardless, the Koch Term Sheet supplies the material and essential terms of a coal contract and the additional, non-material terms and conditions which were generally included in the purchase confirmations sent as a form of acceptance of similar term sheets, were boilerplate and had been previously agreed upon by Koch and Black Diamond with respect to other purchases of coal.

the two companies granted Excel an exclusive right to "present" the coal producer's coal to Missouri Portland Cement Plant in Joppa, Illinois (the "Joppa facility"). *Id.* at 956. At issue was whether this contract was breached by the coal producer when an affiliate of the coal producer submitted a bid to supply coal to the Joppa facility. *Id.* at 962-967. First, the court interpreted the already executed contract between Excel and the coal producer, finding that a reasonable interpretation of the term "presentation" is that it meant "offering to sell coal . . . whether or not such an offer was made in the context of a bid solicitation." *Id.* at 964. After deciding this question of law regarding a fully executed contract, the court next turned to determining whether the defendant coal producer had breached the exclusivity provision in the agreement with Excel by having its affiliated company make an offer to sell its coal to the Joppa facility. The court determined that because the affiliated company's bid contained the exact specifications for Cannelton's coal, "a reasonable jury could conclude that the November of 1993 bid constituted an offer to sell Cannelton coal" and thus reversed the trial court's grant of summary judgment in favor of the defendants that a breach had not occurred. *Id.* This Court is not being asked to interpret a final contract. The issue is, instead, whether an offer was made in the first place.

Indeed, to the detriment of the Debtors and their creditors, the A&M Parties did not accept the offer, make a reasonable counter offer, or pursue the offer from Koch at all, due to, among other things, the A&M Parties' conflicts with CIT.[17]  At the very least, there are factual

---

[17] As the Trustee will show at trial, not only were Genser and A&M conflicted throughout this case because they owed their involvement in the case, which generated the company millions in revenue, to CIT, Genser and others at A&M sought additional referrals from CIT for business throughout the engagement. Genser indicated during his deposition that A&M directors that brought in such referrals were entitled to 15% of the collections from such engagements, on top of their current salaries. (Genser Depo, pp. 62-63 [DE 34]). Larry Tate also testified that CIT was on the list of banks that A&M looked to for referral sources. (Tate Depo, p. 152 [DE 35]). Steve Cohn, A&M's Chief Financial Officer, testified during his deposition that seeking referrals from a creditor while working for a debtor in bankruptcy was inappropriate. (Cohn Depo, pp. 374-375 [DE 41]). The record is replete with evidence of Genser and A&M's self-dealing behavior and will be addressed in more detail in other of the Trustee's responses to the A&M Parties' various motions.

disputes regarding the communications between Koch and Genser, and these are for the jury to resolve.

### B.    Factual Questions Surround the Koch Offer.

Determination of whether the Koch Term Sheet was an offer hinges on consideration of the circumstances surrounding the sending and receipt of the Koch Term Sheet.  In determining whether a term sheet constitutes an offer, the fact finder must consider the totality of circumstances surrounding the issuance of the term sheet. *R.E. Crummer & Co. v. Nuveen*, 147 F.2d 3, 5 (7th Cir. 1945) ("Accordingly, whether a communication naming a price is a quotation or an offer depends upon the intention of the owner as it is manifested by the facts and circumstances of each particular case.")  In doing so, the fact finder is not limited by descriptive terms written on the face of offering documents. *Mead Corp., v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1203 (6th Cir. 1981) ("Hence, we cannot accept that Mead's standard purchase order form, with its fine print 'offer' term, is dispositive of the fundamental and complex question in this appeal: what constituted the offer and what was the acceptance? Rather, we repair to the record and the totality of the circumstances to make a fair and informed decision on this matter.");[18] Notably, although the Koch Term Sheet is labeled a "proposal" to purchase all of Black Diamond's coal production for a three year period, the A&M Parties' own expert has testified that the terms "offer," "indication," and "preliminary proposal" are terms interchanged in the coal industry quite a bit. (Scott Depo, pp. 199-200 [DE 74]).

---

[18] The A&M Parties attempt to rely on *Fairmount Glass Works v. Cruden-Martin Woodenware Co.*, 51 S.W. 196, 197 (Ky. 1899) to argue that interpretation of the Koch Term Sheet must be based on the language of the Koch Term Sheet alone. However, not only did the court in *Fairmount Glass Works* determine that a letter, labeled a "quote" and including terms related to quantity, location of delivery, and price, similar to the Koch Term Sheet, was a binding offer, the court also looked to prior correspondence between the two parties to so hold: "Appellee's letter was plainly an inquiry for the price and terms on which appellant would sell it the goods, and appellant's answer [labeled a 'quote'] was not a quotation of prices, but a definite offer to sell on the terms indicated, and could not be withdrawn after the terms had been accepted." *Id.*

In determining whether a term sheet constitutes an offer, the jury is to consider whether the term sheet includes things like product, price, quantity, and terms of payment. Other factors include whether the term sheet is just a general list of prices or whether it was addressed to a specific person or entity as well as the course of dealings between the parties. *A&A Mech., Inc.*, 998 S.W.2d at 511 (noting support in the record that there was an offer: "[h]ere, TES's quotation was not a general list of prices, but was addressed to the particular project at UK."); *Loranger Plastics Corp. v. Incoe Corp.*, 670 F. Supp. 145, 147 (W.D. Pa. 1987) (case dealing with executed contract interpretation and holding that the course of dealing of two parties revealed that a price quotation was an offer and a written purchase order constituted acceptance).

At the very least, there is a genuine issue of material fact as to whether the Koch Term Sheet constituted an offer.  The Koch Term Sheet was not a mass solicitation but was instead specifically directed to Genser as CRO of Black Diamond and is labeled "Koch Carbon LLC Term Sheet Indication for purchasing Black Diamond coal." In fact, according to one of the A&M Parties' experts, the Koch Term Sheet was sent in response to a solicitation from Genser. (Heller Depo, p. 161 "I believe [Genser] solicited the indicative pricing, the indicative – the indicative term sheet, I believe so." [DE 57]). ). This also supports the fact that the Koch Term Sheet was an offer. Here, a reasonable fact finder could construe Genser's request for pricing as an invitation to make an offer and the Koch Term Sheet as the offer.  The Koch Term Sheet contains the specific terms upon which Koch intended to contract with Black Diamond.  The Koch Term Sheet specifies a term of 2009 through 2011 and lists three distinct products:

> (A): 12,000 BTU, 1% sulfur product;
> (B): 12,500 BTU, 1% sulfur product; and
> (C): 12,350, 1.5% sulfur product

The Koch Term Sheet provides for specific quantities of each product by year.  The Koch Term

Sheet breaks down the price of each product by year.  There are specific delivery terms laid out for each product, which include both the method of delivery as well as the delivery point, the Koch Term Sheet specifies the method by which the product is to be weighed depending on whether it is shipped via rail or truck, who is to perform analysis of the shipments, what standards are to be used to perform the analysis, as well as the location of where the analysis is to be performed. The Koch Term Sheet further provides specific payment instructions: "Koch will pay within ten (10) business days after receipt of invoice on each train shipment, and each Friday for the previous week's truck deliveries to the Big Sandy River."[19]

The course of dealings between Koch and Black Diamond further supports the conclusion that the Koch Term Sheet was in fact an offer.  Koch's Vice President of Coal Trading, Brad Speer, who sent the June 4 offer, indicated that this is the way in which deals were transacted between Koch and Black Diamond in the past and throughout 2008; Koch would send a term sheet and if Black Diamond accepted, a purchase order would be executed. *See* Background Section, *supra*. These executed purchase orders were labeled "Purchase Confirmation." (*See* Exhibit 2).

In *Mead Corp.*, the Sixth Circuit was faced with a situation where a manufacturer submitted a bid proposal for the manufacture of a coal wash facility. 654 F.2d at 1200-1204. After the manufacturer's bid was selected, negotiations ensued and eventually the terms of the proposal were incorporated into a purchase order sent to the manufacturer by the coal company's owner. *Id.* The Sixth Circuit noted that that the purchase order incorporating the terms of the proposal was described as a "CONFIRMATION" and stated that the only conclusion that could

---

[19] The A&M Parties own expert has testified that even less specificity and formality is required to strike a deal between parties for the sale of coal. (Doyle Depo, pp. 27–30 [DE 55] indicating that when he was employed as a coal buyer he would simply call up a coal salesman for a mine, make a bid for quality, and if they agreed on price and the salesman accepted there existed a deal between the two).

be garnered from this course of conduct was that the proposal was the offer and the purchase

order sent in response constituted acceptance of the offer:

> The purchase order clearly indicates an assent to the terms as specified on the face
> of the form and contains all the necessary details for performance . . . In
> commercial transactions of this type, this course of conduct can only be held to
> constitute an acceptance.

*Id*. at 1203-1204.  This course of conduct is identical to the course of performance routinely

engaged in by Koch and Black Diamond in executing deals.

Mr. Speer and other Koch employees have testified that the Koch Term Sheet was intended

as an offer to purchase Black Diamond's coal. (Speer Depo, p. 45 indicating that it was Koch's

intent to purchase all of Black Diamond's production; p. 55 indicating that he would not have

sent the term sheet if he did not intend to purchase the coal; pp. 70-71 indicating that the terms in

the June 4 Koch Term Sheet were the terms at which Koch was willing to transact with Black

Diamond; pp. 122-123 indicating that these were the terms at which Koch was willing to deal

and if Black Diamond would have accepted the two parties would have ended up with a contract

[DE 49]); (Bach Depo, p. 49 indicating that in his experience the Koch Term Sheet looks like an

offer from Koch; pp. 89-91 indicating that the Koch Term Sheet was a binding offer that could

be accepted [DE 36]). Black Diamond management and the A&M Parties, themselves, agree that

this was an offer.[20] (Genser Depo, pp. 169-170 indicating that he recalls Koch making an offer for a specified amount of coal [DE 59]); (Cohn Depo, pp. 285-287 indicating that he considers the Koch Term Sheet to be an offer and understood it to be Genser's belief that Koch was offering to buy Black Diamond's entire production at prices that were quite high [DE 41]); (Mullins Depo, pp. 266-270 acknowledging the Koch Term Sheet as an offer[DE 74]).

The A&M Parties own experts have testified that the Koch Term Sheet was an offer. (See e.g., Doyle Depo, p. 114 indicating he recalls an offer on June 4, 2008 from Koch to purchase physical coal from Black Diamond [DE 55]). In James Heller's deposition, he was asked about a phone call that Morgan Lewis had arranged between Genser and the A&M Parties' experts. Mr. Heller testified that one of the things he wanted to ask Mr. Genser about was the "Koch offer" and "what happened with Koch afterwards." (Heller Depo, p. 128 [DE 57]). Mr. Heller later reiterated that the phone call revolved around the "indicative offer" received from Koch. (Id. at 131). After Mr. Heller was unable to give specifics regarding the call he had with Mr. Genser, the Trustee probed whether Mr. Heller had spoken with Morgan Lewis about the offer from

---

[20] The A&M Parties attempt to analogize the Koch offer to the non-binding Letter of Intent submitted by Massey Energy for the purchase of Black Diamond.  However, the Koch offer and the non-binding Letter of Intent from Massey are anything but comparable. At the time that it was received, the A&M Parties agreed that the Letter of Intent was nonbinding, they openly recognized it as non binding and they disclosed it to the stakeholders as such. Ironically, however, because CIT wanted them to pursue the sale to Massey, the A&M Parties made painstaking efforts to follow up on the non-binding letter, negotiate the terms of the non-binding letter, meet with Massey and its representatives, make available all documents that Massey requested, and drafted and sent proposed contracts to Massey. They did none of those things with Koch even though Koch would have generated more revenue than a deal with Massey. Second, the Massey Letter of Intent did not include a firm price or the degree of specificity that the Koch offer contained. Third, the Massey Letter of Intent concerned the sale of Black Diamond's assets, which include real property, including a preparation plant and rail load-out facility, as well as leasehold interests. Thus the liberal principals applicable to the sale of moveable goods such as coal would not apply to the interpretation of that document. The UCC governs the sale of coal under the Koch offer.  The UCC is to be liberally construed so as to promote its purposes of: (a) simplifying, clarifying, and modernizing the law governing commercial transactions; (b) permitting the continued expansion of commercial practices through custom, usage, and agreement of the parties; and (c) to make uniform the law among the various jurisdictions. KRS 351.1-103.  Moreover, testimony exists that the Koch offer contained the essential terms needed to purchase Black Diamond's coal but it is not at all clear what the essential terms would be for Massey to purchase Black Diamond as a business or in an asset sale. Importantly, no party in this case recognizes the Massey Letter of Intent as a binding offer, while Koch, Genser and A&M (through Cohn) have all at some point indicated that the Koch Term Sheet was in fact an offer to purchase Black Diamond's coal.

Koch. Mr. Heller acknowledged (i) that he had and (ii) that he had considered the Koch Term

Sheet an offer at the time he spoke to Morgan Lewis:

> Q. How did you ask Morgan Lewis the questions that you came to later ask
> Mr.Genser?
>
> A. In one of the calls that I had with Miss Bloom [counsel for the A&M Parties],
> I, I believe I raised these questions.
>
> Q. Okay. And what questions were they?
>
> A. I can't recall with specificity, but they had to do with the Koch **indicative offer**
> and what was done -- and what was done with that **offer** and what happened
> subsequently, because I didn't see much in the record that was helpful to me. I
> didn't see much in the record, period, about it.

(Id. at pp. 138-139) (emphasis added). The Trustee submits that in response to Mr. Heller's

questions and concerns about the Koch Term Sheet, Morgan Lewis told Mr. Heller to try not to

refer to the Koch Term Sheet as an "offer."

When Trustee's counsel asked Mr. Heller about the "Koch indicative offer," and before

Mr. Heller could answer the question, the A&M Parties' counsel interjected and stated: "I am

just going to object and put a standing objection in as to your characterization of the Koch

indicative proposal as an offer…." (Id. at 139). This objection was improper for a number of

reasons, including that the witness had used the phrase "offer" and "indicative offer" repeatedly

to describe the Koch Term Sheet already. In any event, the A&M Parties' counsel acknowledged

that her objection did not apply to her own witness's use of "offer" and "indicative offer" to

describe the Koch Term Sheet. (Id. at 139-140). Thus, even the A&M Parties' own expert

witnesses acknowledge the Koch Term Sheet was an offer.

The language displayed at the bottom of the Koch Term Sheet does not take from the jury

the right to determine the factual question of whether the Koch Term Sheet constitutes an offer.

The Sixth Circuit, in a decision under Kentucky law, held that a reasonable jury could conclude a

proposal containing similar language stating that the proposal was "subject to execution of a mutually agreeable purchase order and the tonnage offered is subject to prior sale" constituted an offer to sell coal. *Excel Energy, Inc.*, 246 F. App'x at 964; (Nov. 30, 1993 Coal Sales Proposal, Exhibit 9).[21] The totality of the circumstances indicate that the Koch Term Sheet was an offer to purchase Black Diamond's coal.

### C.   The Koch Offer Contains the Essential Terms of the Contract.

Despite the A&M Parties' contention otherwise, the Koch Term Sheet contains the essential terms of a contract. Both Mr. Speer and Mr. Bach, long time participants in the coal industry, testified that the key components of a coal contract are price, quantity, quality, delivery term, and payment terms. (Speer Depo, pp. 50, 51 [DE 49]; Bach Depo, pp. 129-130 [DE 36]).[22]

These terms were included in the Koch Term Sheet:

Q. Do you agree that this term sheet identifies those key components of a coal contract?

A. Yes, I agree it does.

(Speer Depo, p. 50 [DE 49]).

---

[21] The Koch Term Sheet contains as much, if not more detail than the proposal at issue in *Excel Energy, Inc.* As discussed, the Koch Term Sheet contains a description of the product type (BTU and sulfur content), the tonnages, the term, the price based on product and year, provisions on weights, standards for analysis (what standards apply and where analysis should be performed), method of delivery, location of delivery, and even payment terms. The coal proposal in *Excel Energy, Inc.* contains provisions on tonnage, method of delivery, location of delivery, and price. The coal proposal in *Excel Energy, Inc.* also contains a typical analysis of the coal offered for sale in the proposal. In the instance of the Koch Term Sheet, Mr. Bach of Koch Carbon testified that it would not have been necessary for Black Diamond to provide such an analysis to Koch as by June 4, 2008 Koch had already been taking their coal and thus they would have already exchanged "ultimates and ash mineral assay sheets and those kinds of things" and thus Koch would have had a "pretty good handle by then." (Bach Depo, pp. 98-99 [DE 36]).

[22] Seth Schwartz, a coal industry expert hired by the secured lenders during the main bankruptcy proceedings, has also testified that the primary terms of a coal contract include term, delivery point, price, quality, and quantity. (Schwartz Depo, pp. 176-179 [DE 46]).

Q. Okay. This document contains all of the primary terms for a deal to purchase coal from Black Diamond; does it not, it includes the price and the quantity and the payment terms, right?

A. Yes, it does.

(Bach Depo, p. 129 [DE 36]).[23]

### D.    Extrinsic Evidence is Admissible.

The A&M Parties again conflate the law on the interpretation of a contract with the law on the determination of whether an offer has been made in claiming that extrinsic evidence cannot be considered in determining whether an offer has been made. While the parol evidence rule in Article 2 of the UCC, as adopted in the Kentucky Revised Statutes, has been retained, "the rule applies only to writings or memoranda clearly 'intended by the parties as a final expression of their agreement with respect to such terms as are included therein . . .'" *A&A Mech., Inc.,* 998 S.W.2d at 510 (quoting KRS 355.2-202). There has been no claim that the Koch Term Sheet constituted an executed contract. Instead, the Koch offer was just that, an offer to purchase all of Black Diamonds coal which was never accepted or shared by Genser. The law is clear: whether an offer has been made is a question of fact for the jury to decide based on all of the surrounding circumstances.

Additionally, even if the parol evidence rule did apply (and it cannot because Genser

---

[23] The A&M Parties hang their hat on the fact that the term sheet did not include the additional boiler plate terms and conditions incorporated into purchase orders executed between Koch and Black Diamond. (Memo. in Support, at p. 14-15).  However, both Mr. Speer and Mr. Bach testified that these terms and conditions would have been previously negotiated and agreed to by Koch and Black Diamond:

> Q. Yes.  Is this typical that a purchase contract like this would have to be approved by the legal department?
> A. It's not typical.  Typically, we would have terms and conditions in boilerplate language that's been pre-approved. Wouldn't necessarily approve each individual contract thereafter.

(Speer Depo, p. 133 [DE 49]); (Bach Depo, pp. 93-94 indicating Koch used standard terms and conditions in putting together both short and long term contracts [DE 36]).  A review of the purchase orders executed between Koch and Black Diamond in 2008 shows that in fact the same pre-approved, boilerplate terms and conditions were affixed to each purchase order evidencing acceptance of an offer. (*See* Exhibit 2).

never accepted the offer and never shared it with constituencies making it a formal written expression of the deal between the two parties), the final writing may be explained or supplemented by course of dealing or usage of trade or by course of performance. *Id.* Both the course of dealings and course of performance between Black Diamond and Koch indicate that deals were often concluded between the two parties by Koch sending Black Diamond a term sheet, in some cases identical to the Koch Term Sheet at issue, which was then accepted by the Debtor to form a contract.

### E.     The Testimony of Mr. Speer and Mr. Bach is Not Speculative.

The A&M Parties seem to move to exclude the testimony of Mr. Speer and Mr. Bach pursuant to Federal Rule of Evidence 602 by arguing that their testimony lacks foundation. This premature motion *in limine* as well falls outside the scope of a Rule 16 Motion. Ignoring the timing of this premature evidentiary motion, it lacks merit. "A witness is required to have personal knowledge of the matters about which he testifies, except in the case of expert opinions, but the threshold for admitting testimony under Rule 602 is low." *United States v. Kelsor*, 665 F.3d 684, 697 (6th Cir. 2011). Federal Rule of Evidence 701 further permits lay witness testimony in the form of an opinion that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other special knowledge within the scope of Rule 702. Rule 701 "does not undercut the requirement of personal knowledge; in fact *Rule 701* effectively incorporates the personal knowledge requirement as a prerequisite to acceptance of opinions by lay persons." *Datamill, Inc. v. United States*, 91 Fed. Cl. 722, 734-735 (2010). Under Rule 701 "[l]ay opinion testimony based upon extensive experience in an industry is admissible." *Global Computer Enters., Inc. v. United States*, 88 Fed. Cl. 52, 67 (2009) (compiling cases nationwide

holding lay witnesses can testify to inferences or opinions drawn from a series of personal observations over time as well as a combination of their personal observations and their knowledge obtained through their vocation). Statements that are "general, conclusory, and evaluative" and "are based entirely upon personal experience and observation obtained through the declarant's line of work" are admissible. *Id*. at 68.

The testimony of Mr. Speer and Mr. Bach clears Federal Rule of Evidence 602's threshold and also clearly falls within the gambit of Rule 701. Mr. Speer was Koch's Vice President of Coal Trading in 2008 when he personally sent the Koch offer to Mr. Genser.  Mr. Speer examined the Koch Term Sheet and the email to which it was attached and indicated that he recalled the Koch Term Sheet and email and that the term sheet was consistent with what he would have generated:

> Q. Do you recognize the second page of Exhibit 584?
>
> A. It seems familiar.
>
> Q. Is the second page of 584, which is also dated June 4, 2008, and which is titled Koch Carbon, LLC Term Sheet Indication for purchasing Black Diamond coal, is it a document you created?
>
> A. I seem to remember, yes, it's consistent with an indicative proposal I would have generated.

(Speer Depo, p. 37 [DE 49]); (*see also* Bach Depo, pp. 69-70 indicating that the Koch Term Sheet is standard in terms of what Koch would send out to a producer when trying to execute a physical deal for coal [DE 36]).

As noted above, Genser cannot deny having received the offer as he referenced it in his Rule 2004 Examination and forwarded the email and attachment to Steve Cohn exclaiming that it was "CRAZY" that Black Diamond had the opportunity to sell coal for multiple years at such high prices. (Exhibit 8). Of Course, on the very same day the offer from Koch was received CIT

would tell Genser that it did not want Black Diamond to enter such long term contracts and, conveniently, all notes taken by Genser about Koch in general, or this offer for $500 million in revenue, have been destroyed. [DE 23-1]. In his response to Genser, Cohn discussed ways to move forward on this offer, including, by suggesting "price escalators" that Cohn believed the "buyer" would agree to. (Exhibit 8). Genser did not accept the offer, did not pursue the opportunity, did not make a counter offer and Cohn disappeared, never following up with Genser (who had no coal industry experience)[24] to determine whether he had followed his advice.[25] Tate admitted that the offer should have been shared with the bankruptcy stakeholders, but he did *nothing*. (Tate Depo, pp. 255-256 [DE 35]).

John Bach worked at Koch from 2005 through 2011 and was in charge of buying coal for physical delivery. (Bach Depo, pp. 26-27 [DE 36]). Mr. Bach had multiple interactions with Black Diamond throughout 2008 regarding the purchase of Black Diamond's coal. (Id. at 32-33). Though he was not copied on the specific communication between Mr. Speer and Mr. Genser, Mr. Bach testified that based on his experience as a buyer for Koch, he recognized the Koch Term Sheet as being a term sheet Koch would send out to a producer if it was looking to purchase tons in multiple years. (Id. at 45-46). Mr. Speer was Mr. Bach's supervisor at Koch. (Id. at 36-37). Both Mr. Speer and Mr. Bach have sufficient personal knowledge under Fed. R. Evid. 602 to testify that the Koch Term Sheet was an offer. Mr. Speer has worked for Koch or an affiliate since he graduated college in 1989 – a career now spanning 25 years. (Speer Depo, pp. 6-16 [DE 49]). During most of his career he has held positions centered around the buying and

---

[24] In fact, in an email dated September 5, 2008, it became clear that Tate and Genser did not even know what "price escalators" were or how they worked. (Sept. 5, 2008 email chain between Tate and Genser, Exhibit 10). This is something that high ranking officers of a coal company should know about and, in fact, was something Larry Tate would have been tasked to deal with as CFO of Black Diamond. (Mullins Depo, pp. 338-340 [DE 74]).

[25] Cohn went to work on two other engagements for A&M, Fedders and Lehman Brothers. (Cohn Depo, pp. 137-139, 175 [DE 41]). He had no oversight and provided no supervision. (June 24, 2009 email chain between Genser, Tate, and attorneys at Jones Day, Exhibit 11).

selling of coal. (Id.).  In 2002 Mr. Speer was named Vice President of Coal Trading for Koch and

held that position in 2008 when he made the three year term offer to Black Diamond. (Id.). Mr.

Bach has worked in the coal industry for the past 33 years. (Bach Depo, pp. 8-9 [DE 36]).

Throughout his career he has been involved in physical coal sales. (Id. at pp. 15-16).  Both Mr.

Bach and Mr. Speer's testimony related to the Koch Term Sheet is based on their rationally

based perceptions, based on their experience with Koch, Black Diamond and the coal industry in

general, is certainly helpful to determining a fact in issue, and is permissible under both Federal

Rule of Evidence 602 and 701 as it is based on their personal observations as well their

observations obtained through their line of work.[26]

---

[26] The cases cited by the A&M Parties do not change this outcome:

- In *United States v. Smith*, 516 F. App'x 592, 595 (6th Cir. 2013), the court excluded a chart compiling loan agreements pursuant to Federal Rule of Evidence 1006 as the offering party did not make available the actual loan agreements and it was unclear who actually created the summary as the offering witness indicated that he did not create it but it was instead provided to him by the defendant and defense counsel. The court further excluded the offering witness's testimony related to the chart as the witness testified that he was not provided the loan documents that were the subject of the chart but his determination that they were loans was based solely on what the defendant told him. *Id.* The court ruled that because the witness's testimony was based on hearsay statements the district court did not abuse its discretion in determining that no reasonable juror could believe that the witness had personal knowledge of the loans. *Id.* No question exists in this case as to who created the Koch Term Sheet, as Mr. Speer testified he created the Koch Term Sheet and it is consistent with a proposal he would have drafted. Mr. Bach's testimony that the Koch Term Sheet, properly authenticated by Mr. Speer, is consistent with a binding offer submitted by Koch is not based on hearsay but is based on his experience as a buyer for Koch and his nearly life time experience in the coal industry.
- In *United States v. Blackwell*, 459 F.3d 739, 756 (6th Cir. 2006), the court held that a witness could not testify as to the contents of a stock ticket when that witness had no knowledge of how stock transactions were accomplished because normally his stock broker took care of the details of his stock transactions. In this case Mr. Speer created the Koch Term sheet and Mr. Bach testified that he had personal knowledge, based on his employment as a coal buyer, of how Koch went about making offers to purchase coal.
- The court in *Akins v. Zeneca, Inc.*, No. 94-5132, 1995 U.S. App. LEXIS 21536, at *21-22 (6th Cir. 1994) found it improper for the plaintiff to attempt to introduce an internal memorandum through an employee that had no personal knowledge of a document or its contents. Mr. Speer, the individual who sent Genser the Koch Term Sheet, was involved in the creation of the Koch Term Sheet.  Thus, Mr. Speer does have personal knowledge of the Koch Term Sheet and is one of the proper witnesses with which to introduce this document. Again, Mr. Bach has personal knowledge of how Koch entered into contracts and is competent to testify that the Koch Term Sheet is consistent with a binding offer sent by Koch.
- *GW Equity LLC v. Xcentric Ventures, LLC*, CIVIL ACTION NO. 3:07-CV-977-O, 2009 U.S. Dist. LEXIS 1445, at *32-34 (N.D. Tex. Jan. 9, 2009), involved a court's exclusion, for summary judgment purposes, the affidavit of a witness when that affidavit largely contradicted his deposition testimony and the court's determination that the witness was drinking and had "no clue" what he wrote. *Id.* at *33.  The case has no relevance here.

Additionally, the A&M Parties did not object to the Trustee's counsel's questioning of Mr. Bach and Mr. Speer during the deposition regarding the intent behind the Koch offer. *See In re Stratosphere Corp. Sec. Litig.*, 182 F.R.D. 614, 618 (D. Nev. 1998) ("Questions to which timely objections should be made during the deposition include those which are leading or suggestive; ambiguous or uncertain; compound; assume facts not in evidence; call for a narration; *call for speculation or conjecture*; or argumentative.") (citing William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, *Federal Civil Procedure Before Trial*, § 11:493 at 11-99) (emphasis added).  Failure to raise objections to speculation at a deposition constitutes waiver of the objection because there is no opportunity to cure an alleged defect in questioning. *NGM Ins. Co. v. Walker Const. & Dev., LLC*, 1:11-CV-146, 2012 U.S. Dist. LEXIS 177161, at *6-7 (E.D. Tenn. Dec. 13, 2012) ("Specifically, any objection based on the form of the question or answer is waived. This includes leading questions, lack of foundation, . . . lack of personal knowledge, testimony by counsel, speculation . . .") (citations omitted). *Harper v.Griggs*, CIVIL ACTION NO. 04-260-C, 2007 U.S. Dist. LEXIS 10395, at *4 (W.D. Ky. Feb. 12, 2007) (holding that with the exception of objections relating to relevancy and hearsay, all of defendant's objections, including those related to lack of foundation or speculation, were waived by the defendant's failure to raise them during the deposition). The A&M Parties' counsel also elicited their fair share of testimony from Mr. Bach and Mr. Speer indicating that the Koch Term Sheet was intended as an offer. *See supra.* fn. 10.

Moreover, the A&M Parties cannot contend that their own statements are not admissible to prove that the Koch Term Sheet was in fact an offer to purchase Black Diamond's coal.[27] Ira Genser and Steven Cohn have also testified that Koch made an offer to purchase Black Diamond's coal in 2008.

### F.     The AEP Offer from Black Diamond Contained the Same Language as the Koch Term Sheet.

The A&M Parties' argument that the Koch Term Sheet is not an "offer" because it contains boilerplate language at the bottom is directly contrary to the position that the A&M Parties have taken with respect to the Term Sheet Genser caused to be sent to AEP for the attempted sale of Black Diamond's coal in September 2009. (September 24, 2008 email from Genser to Morgner and others where Genser indicates he used the Koch Term Sheet as a model by which to draft the AEP Term Sheet, Exhibit 12); (Sept. 29, 2008 email from Mullins to Stiltner attaching AEP Term Sheet, Exhibit 13). Throughout this litigation, the A&M Parties have argued and claimed that the Term Sheet sent to AEP was an offer. The Term Sheet sent by Black Diamond to AEP, however, contains the exact same language the A&M Parties now claim makes the Koch Term Sheet something other than an offer:

> This Term Sheet Indication does not include descriptions of all of the terms, conditions and other provisions that would be contained in any definitive documentation or required bankruptcy court approvals and is not intended to limit the scope of the discussion and negotiation of the parties of any matters. Moreover, the Term Sheet Indication is not intended to impose any obligation whatsoever on either party including without limitation, an obligation to negotiate in any way.

(Exhibit 13).

Black Diamond's management, the A&M Parties themselves, their experts, and even their counsel consider the AEP Term Sheet to be an offer for the sale of Black Diamond's coal.

---

[27] *See supra* fn. 12, explaining that the personal knowledge requirement of Fed. R. Evid. 602 does not apply to the statements of an opposing party under Fed. R. Evid. 801(d)(2)(D).

(Mullins Depo, pp. 372- 373 [DE 74]); (Hull Depo, p. 243 [DE 74]); (Genser Depo, p. 365 [DE 34]); (Scott Depo, pp. 281–282 [DE 74]); (Heller Report, pp. 24-25  [DE 85-23]) (indicating Black Diamond's "price offer" was rejected by AEP); (Heller Depo, pp. 284-285 [DE 57]) (recognizing that a reasonable person could construe the AEP Term Sheet as an offer); (Heller Exhibit 1032, Exhibit 14) (chart prepared by Heller calling AEP Term Sheet "BD '09-'11 Offer"); (A&M Parties' Memorandum in Support of Motion for Summary Judgment, p. 20 [AP DE 82-1]).  In fact, Genser explicitly refers to the AEP Term Sheet as a three year term offer:

> Q.   Was your offer to AEP a three-year term offer?
>
> A.   I believe our – I believe our offer that we made to them was for a three-year term.

(Genser Depo, p. 365 [DE 34]).  One of the A&M Parties' experts, Robert Scott, testified during his deposition that the Term Sheet submitted to AEP was an "offer" (even though the AEP Term Sheet contains the same boiler plate language as the Koch Term Sheet that the A&M Parties now argue makes the Koch Term Sheet something other than an offer). (Scott Depo, pp. 280-281 [DE 74]). Interestingly, Mr. Scott also opined that Black Diamond was actually "further along" in the process of entering into a contract with Koch based on the Koch Term Sheet than Black Diamond was with AEP based on the AEP Term Sheet (Id.). Having taken a completely contrary position with respect to the AEP Term Sheet, the A&M Parties should be estopped from now trying to argue that the Koch Term Sheet was anything but an offer.  The similarities between the AEP and Koch Term Sheets, especially the fact that they both contain the language that the A&M Parties claim takes the Koch Term Sheet from the realm of an acceptable offer, make it

impossible for the A&M Parties to now claim that the Koch Term Sheet was not a bona fide offer to purchase Black Diamond's coal.[28]

### G.     Evidence of an Oral Offer

As a last ditch effort to try and suppress mention of the dealings between Koch and Black Diamond during 2008, the A&M Parties claim that there is no evidence that Koch ever made an oral offer to purchase Black Diamond's coal on a long term basis. The record establishes that there is at least a genuine issue of material fact as to whether an oral offer was made by Koch in 2008.

From the time Brad Speer first indicated in February that Koch was willing to purchase all of Black Diamond's production, Mr. Speer testified that he spoke to Mr. Genser on more than one occasion about purchasing Black Diamond's coal in 2008 for future deliveries on a long term basis:

Q. Did you speak with Mr. Genser about purchasing coal from Black Diamond.

A. Yes.

Q. Did those discussions involve purchasing coal from Black Diamond in 2008 for future deliveries.

A. Yes.

(Speer Depo, p. 33 [DE 49]).

---

[28] The A&M Parties apparently believe it behooves them to recognize that the AEP Term Sheet as a bona fide offer in conjunction with their often raised argument that the UCC prevented the deal with AEP from being consummated by demanding a higher price than what AEP was willing to accept.  While Black Diamond management suggested prices closer to an average of $121 per ton for the term offer to AEP, the record establishes that Genser coaxed the UCC into requesting a higher price, misrepresenting to them that AEP would be willing to pay prices in the $130's for coal. (Sept. 24, 2008 email from Tate to Genser indicating he is very concerned about the representation of getting contracts from AEP in the $130s, Exhibit 15; Sept. 25, 2008 email from Green to Oellermann acknowledging that someone on Genser's team had represented the prior day that prices from AEP could range from $120 to $130, Exhibit 16). This was of course after Genser learned that CIT, the secured lender that A&M catered to throughout the bankruptcy, did not want to do a deal with AEP. Genser tried to set up a "no lose" situation for himself in that after he coaxed the UCC into believing they could get a higher price from AEP, he was prepared to blame them if AEP walked away because the price was too high, which he has now done. The Trustee is confident that the jury will see through this game playing at trial.

32

Q. Do you remember attempting to purchase coal from Black Diamond in 2008 for deliveries in 2009, 2010, and/or 2011?

A. I'm aware there were discussions about that.  I don't believe we actually transacted anything.

(Id. at p. 34); (*see also* Id. at p. 36 indicating that prior to sending the Koch Term Sheet he had discussions with Genser about purchasing Black Diamond's production).

Mr. Bach also had communications with Black Diamond throughout 2008 about Koch purchasing Black Diamond's coal on a long term basis. (Bach Depo, pp. 32-33 indicating he spoke to Carl Mullins somewhat regularly about purchasing Black Diamond's coal; pp. 40-41 indicating that he had several conversations with Mr. Mullins during his attempts to put together two and three year deals; pp. 100-101 indicating he believes he and Mullins had several conversations about different qualities and prices [DE 36]). In August of 2008, Mr. Bach responded to an email from Carl Mullins, Black Diamond's Vice President of Sales, indicating that he believed he could get a deal put together between Black Diamond and Koch at prices close to those prices announced by brokerages, United Coal and Evolution, for 2009 and 2010. (Aug. 14, 2008 email from Bach to Mullins forwarded to Genser, Exhibit 17).  Those prices were $123 per ton and $125.13 per ton, respectively, for 2009 and $116 per ton and $117.50 per ton, respectively, for 2010 deliveries. (Id.) Mr. Bach indicated at the end of this email that he would give Mr. Mullins a call shortly. (Id.).  Genser refused to allow Mr. Mullins to capitalize on these opportunities, which would have generated tens of millions of dollars in revenue for Black Diamond. (Mullins Depo, pp. 296-297 [DE 74]) (indicating that Genser emailed him the day after Massey told Genser that it wanted Black Diamond's future production to remain unsold, to tell Mr. Mullins that the record high prices identified by Mr. Bach didn't get him "jazzed to do a deal."); (Exhibit 17). On August 20, 2008 Sidharth Sridhar, an employee of Miller Buckfire, the investment banker hired by Ira Genser to help sell Black Diamond in the summer of 2008,

emailed another Miller Buckfire employee copying and pasting what he calls the "2 offers from Koch and D[T]E."[29] (Aug. 20, 2008 email from Sridhar to Haggard, Exhibit 18).  Mr. Sridhar also states in the email "Is there another email from Koch that refers to the 0.5-1 million tons referenced this morning?  Or was that verbal?  I'll send to Rich once I hear from you." (Id.).  The A&M Parties produced no documents and no notes regarding any such offer or discussion. The record is replete with indications that there were ongoing discussions and offers from Koch to purchase Black Diamond's coal on a long term basis in 2008, creating a genuine issue of material fact whether yet another offer (verbal) was made by Koch to purchase Black Diamond's coal.

## CONCLUSION

For the above stated reasons, the Motion should be denied. It is not proper under the Federal Rules of Civil Procedure or under Kentucky substantive law. The issues raised in the Motion require determination of factual disputes and the Court should not entertain the A&M Parties' latest attempt to delay and distract.

---

[29] DTE is Detroit Edison, a utility which offered to purchase 600,000 tons of Black Diamond's coal for delivery in 2009 on August 18, 2008 at a price of $124 per ton.  Mr. Genser also rejected this opportunity to lock in substantial profit for Black Diamond.

Respectfully submitted,

DINSMORE & SHOHL LLP

/s/  Grahmn N. Morgan
Grahmn N. Morgan, Esq.
Ellen Arvin Kennedy, Esq.
250 West Main Street, Suite 1400
Lexington, KY 40507
Telephone:  (859) 425-1000
Facsimile:  (859) 425-1099
Email:   ellen.kennedy@dinsmore.com
    grahmn.morgan@dinsmore.com
**ATTORNEYS FOR TAFT A. MCKINSTRY,
TRUSTEE OF THE BD UNSECURED
CREDITORS TRUST**

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing was served this the 1st day of April

2014, electronically in accordance with the method established under this Court's CM/ECF

Administrative Procedures upon all parties in the electronic filing system in this case.

/s/  Grahmn N. Morgan
**ATTORNEY FOR TAFT A. MCKINSTRY,
TRUSTEE OF THE BD DIAMOND
UNSECURED CREDITORS TRUST**