**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION at PIKEVILLE**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BLACK DIAMOND MINING COMPANY, | ) | |
| LLC, *et al*., | ) | |
| | ) | |
| Debtors, | ) | |
| ‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒ | ) | |
| | ) | Civil No. 7:13-cv-125-ART |
| TAFT A. MCKINSTRY, AS TRUSTEE | ) | |
| OF THE BD UNSECURED CREDITORS | ) | ***Electronically Filed*** |
| TRUST, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| IRA J. GENSER, LARRY TATE, AND | ) | |
| ALVAREZ & MARSAL NORTH AMERICA, | ) | |
| LLC, | ) | |
| Defendants. | ) | |

<u>**TRUSTEE'S RESPONSE TO DEFENDANT LARRY TATE'S MOTION FOR**</u>
<u>**SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR A**</u>
<u>**DETERMINATION THAT ALL CLAIMS AGAINST LARRY TATE ARE**</u>
<u>**"INDEMNIFIABLE CLAIMS" UNDER THE SETTLEMENT AGREEMENT**</u>

Taft A. McKinstry, as Trustee (the "Trustee") of the BD Unsecured Creditors Trust (the

"Trust"), submits the following Response to Defendant Larry Tate's Motion for Summary

Judgment or, in the alternative, Motion for a Determination that all claims against Larry Tate are

"Indemnifiable Claims" under the Settlement Agreement (DE 90) ("Motion"):

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii, iv

INTRODUCTION ...................................................................................................... 1

RESPONSE TO TATE'S ALLEGEDLY UNDISPUTED FACTS ............................... 2

PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS........................... 6

      Tate's Duties as CFO of Black Diamond. ........................................................ 6

      Tate's Specific Duties Related to Long-Term Contracts and Financial Hedging. ............ 7

      Tate Was Unqualified to Serve as CFO. ........................................................ 11

      Tate Viewed the Position of CFO as a Way to Move Up Within A&M. ........................ 11

      Tate Wanted to Please Secured Lender CIT. ................................................... 12

      Tate Failed to Carry Out His Duties as CFO of Black Diamond.................................. 12

      Expert Evidence On Tate's Failure To Perform His Duties. ............................................ 14

ARGUMENT ........................................................................................................... 16

I.      TATE CANNOT SATISFY THE STANDARD FOR A SUMMARY
        JUDGMENT IN HIS FAVOR. ................................................................... 16

II.     ISSUES OF MATERIAL FACT EXIST REGARDING TATE'S
        DUTIES AND PERFORMANCE AS CFO. .................................................. 17

      A.     The Engagement Letter confirms that Tate had the duty
            to manage Black Diamond.......................................................... 18

      B.     A CFO is responsible for cash management and, in a
            commodities-based company, is in charge of managing price risk. .................... 18

      C.     The record evidence confirms that Tate was unqualified for the
            CFO position.............................................................................. 19

          1.     Tate was not qualified for the position of CFO. ....................... 19

          2.     Tate took the position as CFO to bolster his resume even
              though he was not qualified for the job, and the position
              was not appropriate for him. .................................................. 20

      D.     Tate had the authority to take actions to prevent harm to Black
            Diamond but failed to do so.......................................................... 21

          1.     Untrained and unwilling to seek help, Tate did not
              perform the job responsibilities as CFO. ................................. 21

i

2.      Tate undermined Hull and put Mullins in an untenable position. .................................................................................... 25

E.      Case law does not provide that only one person can be responsible for a corporate act. ................................................................ 26

F.      Spoliation of evidence bars this Motion. ................................................ 27

III.    THE ENGAGEMENT LETTER PROVIDES THAT TATE CAN BE FOUND LIABLE FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, AND BY BREACHING HIS DUTIES AS AN OFFICER OF BLACK DIAMOND, TATE IS LIABLE. ................................ 29

A.      Under Kentucky law, the Trustee can prove her claims against Tate by showing gross negligence. ............................................................ 29

B.      Tate is not a trustee and the "willful and deliberate" standard is inapplicable. ............................................................................................ 32

IV.     TATE INCORRECTLY DEPICTS THE APPLICABLE CAUSATION STANDARD. ........................................................................................... 36

A.      Causation is a factual issue for the jury to determine. ......................... 37

B.      Tate's "heightened" causation standard is unsupported. ..................... 37

C.      Tate's actions proximately caused the Trustee's damages, thus meeting the Indemnification Agreement's requirement that Tate's gross negligence and/or willful misconduct "primarily and directly" cause the Trustee's damages. ........................................... 39

CONCLUSION ................................................................................................... 40

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Old Nat'l Bancorp*, 675 F. Supp. 2d (W.D. Ky. 2009) ............................................. 16

*Asher v. Unarco Material Handling, Inc.*, No. 6:06-548-DCR, 2008 WL 2636455 (E.D. Ky., June 26, 2008) ................................................................................................................................ 16

*Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 2013 Ky. LEXIS 642 (Ky. Dec. 19, 2013) ................................................................................................................................ 31

*Branham v. Stewart*, 307 S.W.3d 94 (Ky. 2010) ........................................................................ 30

*Brown v. Plata*, 131 S. Ct. 1910 (2011) ...................................................................................... 37

*Cadmus v. Aetna Cas. & Sur. Co.*, No. 9505721, 1996 U.S. App. LEXIS 29443 (6th Cir. Nov. 7, 1996) ............................................................................................................................................. 17

*Coleman v. Emily Enters., Inc.*, 58 S.W.3d 459 (Ky. 2011) ....................................................... 37

*Columbia First Bank v. United States*, 60 Fed. Cl. 97 (Fed. Cl. 2004) ....................................... 39

*Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520 (6th Cir. 2007) ......................... 36

*Cumberland Valley Contrs., Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644 (Ky. 2007) ........... 32

*Fitch v. Califano*, 615 F.2d 1360 (6th Cir. 1980) ....................................................................... 38

*Flagg v. City of Detroit*, 715 F.3d 165 (6th Cir. 2013) ............................................................... 28

*Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir. 1982) .................................. 34, 35, 36

*Fulkerson v. Konecranes*, No. 1:08-CV-00114-JHM, 2011 WL 666341 (W.D. Ky., Feb. 14, 2011) ............................................................................................................................................. 16

*Honican v. Stonebridge Life Ins. Co.*, 455 F. Supp. 2d 622 (E.D. Ky. 2006) .............................. 38

*In re Bindermann Indus. U.S.A.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) ..................................... 34

*In re Greater Southeast Community Hospital Corp.*, 333 B.R. 506 (B.R. D.D.C. 2005) ........... 27

*In re Reich*, 54 B.R. 995 (Bankr. E.D. Mich. 1985) .................................................................... 35

*Jaffee v. Davis*, NO. 2001-CA-000817-MR, 2003 Ky. App. Unpub. LEXIS 700 (Ky. Ct. App. May 2, 2003) ............................................................................................................................... 29

*James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt.*, Civil Action No. 5:11-374-DCR, 2014 U.S. Dist. LEXIS 53064 (E.D. Ky. Apr. 17, 2014) ............................................... 31

*KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213 (S.D.N.Y. 2012) ............................................................................................................................................. 31

*KDW Restructuring & Liquidation Servs. v. Greenfield*, 874 F. Supp. 2d 213 (S.D. N.Y. 2012) 27

*LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1 (1st Cir. 1999) ... 35

*Marrowbone Pharm., Inc. v. Johnson*, No. 2010-CA-000429-MR, 2011 Ky. App. Unpub. LEXIS 881 (Ky. Ct. App. Dec. 2, 2011) ............................................................................................... 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .................................. 16

*McTavish v. Chesapeake & Ohio R.R. Co.*, 485 F.2d 510 (6th Cir. 1973) .................................. 16

*Miller v. Morgan*, Case No. 3:10-cv-156, 2013 U.S. Dist. LEXIS 108772, 40 (S.D. Ohio Aug. 2, 2013) ............................................................................................................................................. 26

*Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982) ........................................................................................................................................... 27

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841 (N.D. Cal. 1979) ............................................................................................................................................. 27

*Peoples Bank of N, Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255 (Ky. Ct. App. 2008) ...... 16

*Peoples Bank of N. Ky., Inc. v. Horwath*, 390 S.W.3d 830 (Ky. Ct. App. 2012) ....................... 30

*Pereira v. Cogan*, 294 B.R. 449 (S.D.N.Y. 2003) ................................................................ 26, 27

*Phelps v. Louisville Water Co.*, 103 S.W.3d 46 (Ky. 2003) ....................................................... 31

iii

*Phillips v. Cohen*, 400 F.3d 388 (6th Cir. 2005) ............................................................... 17
*Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122 (Fed. Cl. 2004)........................ 39
*Sergent v. McKinstry*, 472 B.R. 387 (E.D. Ky. 2012) ........................................... 3, 29, 30, 34, 36
*Shrenuj USA, LLC v. Rosenthal & Rosenthal, Inc.,* 12 Civ. 4827, 2014 U.S. Dist. LEXIS 40323, at *20-26 (S.D.N.Y. March 25, 2014) .................................................................. 28
*Smith v. Collins*, 251 S.W. 979 (Ky. 1923).................................................................... 38
*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005)............................. 17
*Sylfield v. Penfold*, 66 F. 362 (6th Cir. 1895) ...................................................... 37, 39
*Thaqui v. Wal-Mart Stores East, LP,* 09-CV-755(JMA), 2014 U.S. Dist. LEXIS 45107 (E.D.N.Y. March 31, 2014) ........................................................................ 28
*V&M Star Steel v. Centimark Corp.*, 678 F.3d 459 (6th Cir. 2012) ........................................... 36
*Wiley v. U.S.*, 20 F.3d 222 (6th Cir. 1994)..................................................................... 16
*Wolf v. Weinstein*, 372 U.S. 633 (1963).................................................................... 30
*Wright v. House of Imps., Inc.*, 381 S.W.3d 209 (Ky. 2012) ......................................................... 31

**Statutes**
KRS § 271B.8-420(5) ............................................................................................. 31

**Other Authorities**
Black's Law Dictionary at 1225 (6th Ed. 1990) ........................................................... 39
Kurt F. Gwynne, *Indemnification and Exculpation of Professional Persons in Bankruptcy Cases,* 10 Am. Bankr. Inst. L. Rev. 711, 712-713 (2002)................................................ 30
Rutheford B. Campbell, Jr., *Corporate Fiduciary Duties in Kentucky*, 93 Ky. L J. 551, 580 (2004)............................................................................................. 31, 32

**Rules**
57A Am. Jur. 3d *Negligence* § 410................................................................................ 39
Fed. R. Civ. P. 56(a) ............................................................................................. 16

## INTRODUCTION

To avoid personal liability, Larry Tate, Black Diamond's former Chief Financial Officer ("CFO"), labels himself as nothing more than a "bean-counter" and a "number-cruncher." Tate was a high-ranking executive charging $450 per hour, and yet he claims that he had no control over Black Diamond – and thus should be absolved of responsibility for his failure to manage Black Diamond's commodity price risk while CFO. Tate avers that he satisfied his duties by performing the job like a low-level analyst[1] whose actions were dictated completely by Genser. The evidence does not support Tate's "I just followed orders" defense.

Tate actively sought out a CFO position to build his resume at A&M. Even though he did not have the experience or education for the role, Tate held himself out to Black Diamond's management[2] and stakeholders as Genser's second in command, qualified to serve in the "C suite" level of the high-stakes business world that he desperately wanted to join. Though he now paints his role as a low-level employee with no authority, during his engagement he was secure enough in his position to undermine, mock and belittle other officers of Black Diamond not only to Genser, but also to Black Diamond's secured lenders and Black Diamond's lawyers. As CFO, Tate was aware of, and involved in, every single opportunity Black Diamond had to manage its commodity price risk. He failed miserably. Tate's knowing acceptance of a job that he was unqualified for, and his failures to perform as CFO, render him liable to the Trustee.

The documentary proof and fact witness testimony confirms the merits of the Trustee's claims against Tate. The Trustee also has produced expert opinion evidence that supports her

---

[1] Notably, the Order permitting Black Diamond's employment of Genser and Tate provides that A&M shall be compensated at $175-$400 per hour for the services of analysts/associates, not $450 per hour reserved for high-ranking officers such as Tate. (BK DE 56 at p. 5). Though Tate depicts himself as having the job duties of an analyst, Black Diamond employed its own financial analyst and accounting department responsible for compiling financial statements. (Tran. 6-26-08 Hr'g. 23, 39 BK DE 739).

[2] As used in this Response, "management" refers to Black Diamond employees Larry Hull, Carl Mullins, Bill Potter, Joe Funk, and Brad Branham and does not refer to A&M employees Genser and Tate.

1

position. Bradley Sharp, an experienced turn-around management professional, has opined that Tate failed to satisfy his obligations to the Black Diamond estate through his misconduct, inaction, and self-interests. Sharp's testimony alone precludes summary judgment.

Finally, Tate (and Genser and A&M) destroyed evidence. Tate destroyed his notes and deleted his emails. He also destroyed papers on Genser's desk. Given their spoliation of evidence, an adverse inference instruction should issue that the A&M Parties intentionally destroyed relevant records because those records would have supported the Trustee's claims. Such an instruction also would preclude summary judgment.

The facts of record do not support Tate's story. The Trustee can and will demonstrate to a jury that Tate's failure to do his job as CFO amounted to gross negligence and caused damages to the Black Diamond estate. At a minimum, there are material questions of fact that bar summary judgment on the Trustee's claims against Tate.

## RESPONSE TO TATE'S ALLEGEDLY UNDISPUTED FACTS

The Trustee responds to Tate's Statement of Undisputed Material Facts (the "Statement") as follows:

1.     Admitted.

2.     Disputed. The CRO Order[3] provided for Black Diamond's employment of Genser as Chief Restructuring Officer ("CRO"), not his appointment. (BK DE 56); *see also* (Tran. 4-16-08 Hr'g, 56-58, BK DE 572 (the Bankruptcy Court states that the A&M Parties "were not brought into this case as professionals. They were brought in as management of these debtors . . .

---

[3] Capitalized terms not defined herein shall have the meaning assigned to them in the Motion. (DE 90-1). Citations to the record in this case are referred to as (DE __). Citations to the record in the Debtors' main bankruptcy cases, consolidated under Case No. 08-70066, are referred to as (BK DE __). Citations to the record in the adversary proceeding involving the Trustee's claims against the A&M Parties, Adv. No. 11-7010, are referred to as (AP DE __).

[Genser] is effectively an employee, and he is effectively the management of the company.")); (AP DE 144, at 4-5); *Sergent v. McKinstry*, 472 B.R. 387, 412-15 (E.D. Ky. 2012).

3.      Disputed. A&M and Genser made Tate CFO of Black Diamond. (Am. Compl. AP DE 171, ¶ 30); *see also*  (Engagement Letter, BK DE 94, ¶ 1).

4.      Admitted.

5.      Disputed. The Engagement Letter did not set forth all of Tate's responsibilities as CFO. As a corporate officer, Tate also was subject to the legal duties imposed upon such persons under applicable statutory and common law. *See also infra* ¶¶ 5-21 of Counterstatement ("C/S") (describing Tate's duties as CFO).

6.      The Trustee admits that the Engagement Letter contains the words quoted in ¶ 6.

7.      Disputed to the extent the words quoted differ from the language of the Engagement Letter and to the extent the Settlement Agreement supersedes the Engagement Letter. Tate does not accurately set forth the entirety of Section 1.d. of the Engagement Letter.

8.      Disputed. *See infra* ¶¶ 1-22 of C/S.[4]

9.      Disputed. Tate did not actually compile Black Diamond's financial statements and models during the bankruptcy, nor was his work as CFO satisfactory. *See supra* fn. 1, 4 and *infra* ¶¶ 32-47 of C/S.[5]

---

[4] The A&M Parties also misstate the cites they contend support their position. These cites (Tate 2/8/13 Depo. 131 and 198-200, DE 35) primarily relate to Tate's responsibilities when serving as an advisor to Black Diamond in 2007 and show that even in 2007 the actual "data crunching" and responsibility for projections and cash flow analysis rested with another lower-level A&M employee. Tate admitted in his February 2013 Deposition that his duties changed once he was named CFO in 2008. (Id. at 137-138). Tate also testified that in 2008, another Black Diamond employee, Joe Funk, actually was responsible for updating the cash flow model. (Id. at 198-200).

3

10.     Disputed. *See infra* ¶¶ 4, 7, 9-13, 17-21, and 42-43 of C/S. Tate's failure to carry out his duties as CFO does not mean that such duties did not exist.

11.     Disputed. *See infra* ¶¶ 9-13, 15, and 17-21 of C/S. Sergent's testimony lacks foundation and relevance as he was not working at Black Diamond when Tate served as CFO.

12.     Disputed. *See infra* ¶¶ 4, 7, 9-13, 17-21, 42-43 of C/S.[6] Hull's testimony does not alter the duties imposed on CFO Tate by the Engagement Letter or common law.

13.     Disputed. *See infra* ¶¶ 9, 10, 11, and 17-21 of C/S.

14.     Disputed. *See infra* ¶¶ 9-13, 17-19, and 34 of C/S.

15.     The Trustee admits that Tate did not communicate directly with DTE, did not appear on email correspondence directly to or from DTE, and was not mentioned during a deposition of a DTE representative. These are non-material facts. Tate participated in internal communications among Black Diamond's management team regarding DTE's offers to purchase Black Diamond's coal in the summer of 2008. *See infra* ¶ 18 of C/S.

16.     Disputed. *See infra* ¶ 18 of C/S.

17.     Disputed. *See infra* ¶ 10, 12, 18, and 19 of C/S.

---

[5] Tate's quotes from the Trustee's deposition are also incomplete. The Trustee testified that Tate failed to properly perform his duties as CFO of Black Diamond and was grossly negligent in his conduct. (*See*, *e.g.*, McKinstry Depo. 38 ("The [UCC] repeatedly asked -- almost begged Mr. Genser and Mr. Tate to have the company enter into coal contracts for greater than the period spot market. They asked for term contracts."); 45-46 (describing Tate as a "yes man" to Genser and stating "I don't know that I could see that he did anything as CFO"); 46-48 (as CFO Tate was responsible for the financial condition and future stability of the company, he was far more than a bookkeeper or an accountant, and had a duty to point out that not entering long-term contracts was extremely detrimental to the company; As CFO Tate had a duty to care for the finances of the company, to look at all aspects of reorganization, and having failed to carry out these duties Tate was grossly negligent); 50, 66-67 (Tate was grossly negligent in having a person who had no experience in sales handling sales); 88-89, 93 (the A&M Parties caused Black Diamond to spurn the advice of Black Diamond's consultants and other coal experts to enter into long-term coal sales agreements, lock in high prices, and hedge prices); 98-100 (Tate, Genser and A&M failed to explore hedging opportunities); 100 ("The chief restructuring officer was Mr. Genser, if Mr. Genser was not performing his responsibilities I think Mr. Tate had a responsibility to speak up. And to lay silent was grossly negligent."), DE 149).

[6] Tate's own expert, Robert E. Ogle, stated that a CFO should be a strategist. (Ogle Depo. 248, DE 54).

4

18.     The Trustee admits that Tate did not communicate directly with Koch in June 2008. However, Tate was forwarded Koch's offer to purchase substantially all of Black Diamond's coal for a three year term on the day the offer was made. It was his duty as CFO to advise on the company's entrance into such term deals in an effort to mitigate price risk, but he sat idly by and did nothing. *See infra* ¶ 17 of C/S.

19.     The Trustee admits that Tate did not negotiate directly with AEP in the summer of 2008. Tate participated in internal and external conferences and discussions among the Black Diamond management team, Black Diamond's lawyers and also certain UCC representatives regarding negotiations with AEP in the summer of 2008. *See infra* ¶ 19 of C/S.

20.     Disputed. *See infra* ¶¶ 1, 3, 4, 7, 9-13, 21, 42, and 45 of C/S.

21.     Disputed.  Genser testified that he had the final say on major financial decisions but also stated that he often depended on Tate regarding Black Diamond's management, and Tate was on the executive committee that "conferred on all major decisions, including discussions regarding proposals for long-term coal sales." *See infra* ¶¶ 2 and 9 of C/S.

22.     Admitted.

23.     Disputed.  Tate's responsibilities as CFO at Black Diamond were explored during both examinations. (*See e.g.,* Tate 2/7/13 Depo. 158-159, DE 35; Tate 3/26/09 Depo. 108-109, 252-253, DE 66). Tate's general citation to his full testimonial transcripts is inapt.

24.     Disputed. *See supra* fn. 5.

25.     Admitted.

26.     The Settlement Agreement speaks for itself. The Trustee disputes all allegations in ¶ 26 that conflict with the terms of the Settlement Agreement.

27.     The Settlement Agreement speaks for itself. The Trustee disputes all allegations in ¶ 27 that conflict with the terms of the Settlement Agreement.

28.     Disputed. The Trustee disputes that the A&M Parties have incurred "Defense Costs" (as defined in the Settlement Agreement to be only those "reasonably incurred") that exceed the coverage limits of the "Insurance Policies." (*See e.g.,* Objection to Reasonableness of the A&M Parties' Fees and Expenses and Any Attempt to Draw-Down Adequate Security filed under seal in the main bankruptcy case on 5/30/13; BK DE 2199).[7] The letter from the A&M Parties' counsel, attached as Exhibit V to the Motion, is not admissible for summary judgment purposes.

29.     Disputed to the extent the allegations conflict with the terms of the Settlement Agreement.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS

### Tate's Duties as CFO of Black Diamond.

1.     In 2008 and 2009, Tate was put in the position of second-in-command at Black Diamond behind Genser. (Dep. Ex. 350, Exh. A).

2.     Genser relied on Tate to help evaluate actions to take on behalf of Black Diamond. (MLB_Alvarez 157396-398 Tate's Nov. 08 – Jul. 09 Performance Evaluation , Exh. B); (Genser 7/17/09 Depo. 12, DE 60).

3.     The Engagement Letter lists duties to be performed by both Genser (as CRO) and Tate (as CFO). (BK DE 94).

---

[7] Pursuant to the Settlement Agreement, to the extent that the A&M Parties have drained the Insurance Policies with unreasonable fees and expenses, the A&M Parties are obligated to pay those amounts to the Trustee when she obtains her judgment on negligence. Even if the A&M Parties had properly exhausted the Insurance Policies with Defense Costs (which they have not done), pursuant to the Settlement Agreement, the Trustee can and will pursue her negligence claim and obtain a judgment against the A&M Parties for negligence.

4.       Per the Engagement Letter, both Tate and Genser were responsible for "developing possible restructuring plans or strategic alternatives for maximizing the enterprise value of the Company's various business lines." (Id. at 1.b.(iii).).

5.       Tate understood that he owed a fiduciary duty to Black Diamond, its secured and unsecured creditors, its equity holders, and "anybody who had a financial tie to the outcome of the engagement, making sure that we got the best result possible for all those people." (Tate 2/8/13 Depo. 158-159, DE 35).

6.       Tate had a fiduciary duty to maximize return to all creditors, including the UCC, even if a creditor appears "out of the money." (Tate 3/26/09 Depo. 108-109; 252-253, DE 66).

7.       Tate also held traditional CFO responsibilities including overseeing accounting, financial reporting, budgeting, cash management, risk management and being "involved in all financial transactions of the company." (Ogle Depo. 237; 239-240 (charging Tate with overseeing the risk management of the company, which included management of coal price risk); 240 (there is more to being a CFO than getting the numbers right); 248 (CFO should be a strategist), DE 54); (Sharp Report, ¶ 23 ("A CFO is responsible for managing financial risk and liquidity" and should have the experience necessary to provide direction to the CRO, CEO and others on the management team), Exh. C).

8.       Tate had a duty to know the coal business. (Ogle Depo. 251, DE 54).

**Tate's Specific Duties Related to Long-Term Contracts and Financial Hedging.**

9.       Tate was on the executive committee charged with conferring on all major decisions, including those related to long-term coal sales. (Ogle Depo. 262, DE 54).

10.       Tate had direct supervision and authority over Black Diamond's staff, including Carl Mullins, the VP of Sales and his pursuit of long-term contracts. (MB_43450-55 Genser

email to CEO Hull stating he is disappointed a coal transaction was approved without he or Tate being involved, Exh. D);(MLB_Alvarez 15365-66 concerning Tate's direction to Mullins on how to approach customers regarding long-tem coal contracts, Exh. E); (MLB_Alvarez 8479-81 regarding Tate's direction to Mullins on the sale of high sulfur coal, Exh. F); (MLB_Alvarez 16100 discussing Genser and Tate's agreement on the strategy (or lack thereof) for long-term coal sales contracts and how to make Mullins "feel" like he is part of the decision-making process, Exh. G); (MLB_Alvarez 16277-79 discussing the template Tate sent to Mullins for creating a customer contact log: "I strayed away from my previous idea of making it more of a log…since ultimately what I care about is knowing who he contacted, when he last contacted them (to make sure my information on their appetite for coal isn't stale), what their need for coal is, and how I can be their provider if the price is right," (emphasis added) Exh. H).

11.     Tate had responsibility to assess whether the company should enter coal sales contracts. (Ogle Depo. 238; 239 (the CFO should be on the team of officers overseeing a material sale), DE 54); (Sharp Depo. 102 (the area of long-term contracts "should have been the [CFO's] responsibility"); 82 (CFOs are "the driving force behind any financial issues on long-term contracts."), DE 139).

12.     Tate was responsible for negotiating coal contract terms, like price-reopener and escalator clauses. (Mullins 4/30/13 Depo. 338-340 (Tate, not Mullins, would work with the customer on details in coal contracts such as price reopeners and escalators), DE 150).

13.     CFOs of energy commodity companies are responsible to pursue financial hedging contracts. (Ogle Depo. 327, DE 54).

14.     According to another of the A&M Parties' own experts, over 270 million tons of coal were hedged during 2008 through publicly reported over-the-counter hedging transactions. (Doyle Report, Appendix B, Exh. I).[8]

15.     Because Tate did not pursue hedging opportunities, Black Diamond did not hedge its coal during 2008. (Doyle Depo. 114-115 (Black Diamond (i.e. Genser and Tate) did nothing to financially hedge coal prices from July – Sept. 2008 although it was told financial hedging was necessary to mitigate price risk if long-term physical sales were not executed), DE 55).

16.     As late as November 2008, Goldman Sachs was still offering to enter into hedges for Black Diamond's coal at over $80 per ton, but it does not appear that anyone even contacted Goldman about such an opportunity until fall 2008. (MB_48740-42, Exh. J).

17.     Tate was forwarded Black Diamond's opportunity to pursue a lucrative contract with Koch Carbon in June 2008 on the same day that Koch sent the offer to Genser. (Dep. Ex. 584, Exh. K). There is no evidence in the record that Tate considered the proposal, let alone encouraged Genser to accept it, which would have generated over $500 million in revenue.

18.     Tate was immediately informed of the opportunity Black Diamond had to pursue a lucrative contract with Detroit Edison ("DTE") in August 2008, which would have generated over $74 million in revenue ($30 million in profit), and stood by while Genser rejected the offer. (BD/UCC 13244-46, Exh. L); (Genser 4/21/09 Depo. 245,  DE 59).

19.     Tate was involved in Black Diamond's attempted sale of coal to AEP. (Sept. 24, 2008 email from Tate to Genser (Tate is very concerned about Genser's representation to the UCC of getting contracts from AEP in the $130s), Exh. M); (Sept. 26, 2008 email from Tate to

---

[8] Doyle testified that additional tons (up to 20% of what was reported in public over-the-counter transactions) were hedged in private deals for which there is no publicly available information. Prior to October 2008, the period in which Tate should have pursued hedging opportunities for Black Diamond, coal trades were on track to exceed 400 million tons hedged, a record exceeding that set in 2007 at 379 million tons. (Exh. I).

Genser about the AEP offer, Exh. N); (Dep. Ex. 439 (Tate redlined Genser's proposed summary

to the UCC of the feedback Genser received from AEP), Exh. O); (MLB_Alvarez 23499-500

referencing Genser and Tate's discussion on what they should tell the UCC about discussions

with AEP and what approach will provide the most "air cover," Exh. P).

20.     Tate also had the opportunity to weigh in on decision-making about the sale of the

company to a strategic purchaser or a financial buyer. (MLB_Alvarez 25760-62 where Tate

comments on a letter from prospective purchaser ECP, Exh. Q); (MB_57753-54 where Tate

weighs in on feedback from potential purchaser Tygris, Exh. R); (MLB_Alvarez 27843-850

where Tate weighs in on a response from prospective purchaser Massey, Exh. S); (Genser 2/7/13

Depo. 371, DE 34).

21.     Tate was involved in Black Diamond's hiring decisions on integral roles like VP

of Sales, investment banker, and Debtors' counsel. (Genser 4/21/09 Depo. 298 (regarding hiring

of Miller Buckfire), DE 59); (Genser 2/7/13 Depo. 193, DE 34); (Genser 7/17/09 Depo. 39

(regarding hiring of Jones Day as Debtors' counsel), DE 60); (BDc53 (email from Tate to Genser

regarding their decision to put Mullins in charge of sales: "I think we have proven that carl [sic]

is not a salesman and he doesn't have the connections to move coal" and stating that he believes

they should consider a broker post confirmation (emphasis added)), Exh. T).

22.     Between February 2008 and July 2009 (when A&M's engagement with Black

Diamond ended), Tate billed 3,223 hours as CFO at $450/hour, netting A&M a total of

$1,450,350 in collections from his work alone. (BK DE 457, 514, 592, 651, 743, 804, 868, 907,

1019, 1073, 1173, 1210, 1287, 1287, 1408, 1456, 1497, 1586).

**Tate Was Unqualified to Serve as CFO.**

23.     Tate holds a degree in "law and society," has no post-graduate education, and is not a CPA. (Tate 3/26/09 Depo. 14, 16 DE 66)

24.     Prior to serving as Black Diamond's CFO, Tate had never before held the position of CFO or any other similar role. (Id. at 35-36).

25.     Prior to working with Black Diamond, Tate had no experience working with coal companies or in the coal industry. (Dep. Ex. 35 ("This assignment represented a new industry to Larry – coal mining"), Exh. U); (Hull 4/26/13 Depo. 37; 276, DE 143); (Tate 3/26/09 Depo. 15-18, DE 66); (Ogle Depo. 247(describing Tate's admitted lack of experience with respect to managing coal price risk), DE 54).

26.     Prior to working as CFO of Black Diamond, Tate had no experience with hedging coal, nor did he gain any such experience while there. (Tate 2/8/13 Depo. 97-98, DE 35).

**Tate Viewed the Position of CFO as a Way to Move Up Within A&M.**

27.     Tate viewed obtaining the title of CFO as necessary to increase his standing at A&M. (Cohn Depo. 338-339, DE 41); (Tate 2/8/13 Depo. 192-198, DE 35); (Dep. Ex. 38 (Cohn writes that Tate was looking for the experience and CFO credential to round out his A&M resume), Exh. V); (Dep. Ex. 559 ("Larry was very keen to have an assignment where he would get the title CFO . . . he viewed it as necessary within A&M to take the next step up the ladder"), Exh. W); (Dep. Ex. 558 (Cohn congratulates Tate on his promotion to Senior Director at A&M and states "Now you have both the A&M Title and the 'C' level work experience to include on the resume"), Exh. X).

**Tate Wanted to Please Secured Lender CIT.**

28.     Tate wanted to ensure that CIT, the primary secured lender and a potential source of future business and referrals for him and A&M, recognized that he and Genser were working on the "prize" of "get[ting] the banks out whole." (Dep. Ex. 37, Exh. Y); (Tate 2/8/13 Depo. 152 (stating that CIT was on the long list of banks A&M sought referrals from), DE 35).

29.     The A&M Parties owed allegiance to CIT for their retention by Black Diamond both pre-petition and post-petition. (Dep. Ex. 537 (explaining that CIT was the referral source behind A&M being engaged by Black Diamond in 2007 and 2008), Exh. Z).

30.     CIT even paid $272,859.54 to A&M for its unpaid fees for pre-petition services to Black Diamond on the eve of the company's involuntary filing. (BK DE 360 ¶ 15);(BK DE 275).

31.     CIT wanted a payoff of its loan quickly through a sale of Black Diamond (instead of long term contracts which would have generated revenue upon each delivery) and conveyed this desire to Genser and Tate. (Mullins 4/30/13 Depo. 246, DE 150).

**Tate Failed to Carry Out His Duties as CFO of Black Diamond.**

32.     While Tate served as CFO, Black Diamond failed to sell or hedge any coal forward in 2008 on a term basis (into 2009 and beyond). (Genser 4/21/09 Depo. 97-98,  DE 59).

33.     Producers such as Black Diamond mitigate coal price risk by entering into long-term physical contracts and engaging in financial hedging. (Bellum Report p. 4 (long-term contracts are the foundation of most coal company sales strategies), Exh. AA); (Exh. I, p. 8 (establishing the optimal mix between spot and term sales and using products in the OTC and Nymex markets (i.e. engaging in financial hedging) allows coal companies to manage their exposure to revenue volatility)); (Bach Depo. 127 (producers like Black Diamond sell their coal

12

to brokers like Koch to mitigate against drops in the price of coal), DE 36); (Schwartz Depo. 87 (one of the ways to mitigate against the fall in coal prices is to lock in long-term physical coal contracts), DE 46); (Wagner Depo. 180 (hedging is standard in the coal industry), DE 43); (Bauersachs Depo. 154 (hedging limits your downside and is commonplace in the coal industry), DE 37); (Tate 2/8/13 Depo. 96 (entering long-term contracts is a way to manage a coal company's price risk), DE 35).

34.     Tate did not educate himself on the key components of his job related to negotiating aspects of coal contracts. (Dep. Ex. 252 (six months after he took the CFO job Tate admits to Genser that he is "not savvy enough to know how the re-openers and price escalators work" for "the longer term business."), Exh. BB); (Mullins 4/30/13 Depo. 338-340 (Tate was responsible for negotiating price reopener and escalator provisions with customers), DE 150); (Schwartz Depo. 173-175 (price reopeners are commonly negotiated as part of a multi-year steam coal contract), DE 46).

35.     Despite Tate's duty as CFO to manage coal price risk, his primary contributions to Black Diamond included being "in the middle of a lot of email traffic" about sales and participating in a meeting with Miller Buckfire and Genser on hedging. (Ogle Depo. 240-242, DE 54). Tate did nothing after this meeting to pursue financial hedging. (Id. at 245).

36.     Tate took no action to have Larry Hull, Black Diamond's CEO, removed from his position, even though Tate stated he had no confidence in Hull. Instead, Tate undermined Hull. (Dep. Ex. 349 (Genser states "I have lost all respect for him [Hull] (Tate was there about 2 months ago)" and that "I am really hoping that [Hull] shoots himself in the head tomorrow in front of the [UCC]"), Exh. CC);  (Dep. Ex. 348  (Tate states that "Hull serves no purpose in my opinion and I wish he were gone"), Exh. DD); (Exh. Y (Tate calls Hull a "buffoon" and tells

Genser "I really think you need to take him down a peg or two. Let's think of how to best accomplish that without destroying our go forward relationship with him")).

37.     Tate also did not seek to replace Mullins as VP of Sales although Tate knew that Mullins lacked the ability and connections to sell Black Diamond's coal. (Exh. T).

38.     Despite his duty to oversee Black Diamond's staff, Tate lacked concern for them. (Dep. Ex. 351 (in response to Hull expressing disappointment that the Key Employee Incentive Plan was altered to make it harder for the Black Diamond management team to receive the performance incentives, Tate quotes the movie *Airplane*, stating "they knew what they were getting into when they bought their tickets . . . I say, let'em crash"), Exh. EE).

39.     Tate even belittled Hull directly to Harry Schroeder at CIT. (June 10, 2008 emails from Tate to Schroeder, collectively Exh. FF).[9]

40.     Tate expressed disdain toward the constituencies to which he owed fiduciary duties. (JD-BDM 64042-44 ("I hope they come away with absolutely nothing since that is what they are entitled to. NADA!"), Exh. GG); (MLB_Alvarez 31383-85 ("Here's my opinion: Fuck the UCC, Fuck the Harris', Fuck the banks, and Fuck Fifth Third." The Jones Day attorney Tate helped hire responds, "What we all want out of this process is a confirmed plan with payment of as much of our fees as possible and an exculpatory release."),  Exh. HH).

**Expert Evidence On Tate's Failure To Perform His Duties.**

41.     The Trustee's expert, Bradley Sharp, is a Senior VP at Development Specialists, Inc. ("DSI"), a leading provider of management consulting and financial advisory services. He

---

[9] The Court should note that two email strings are attached as Exh. FF.  Both emails strings contain replies from Tate to an email written by Schroeder. Because of the way in which the email strings have been produced the reader must refer to both documents and the time stamps of the emails in order to understand the sequential ordering of the conversation between Shroeder, Tate and Genser.

has been employed by DSI for almost 20 years and his primary responsibilities include acting as a court-appointed fiduciary for companies operating in bankruptcy. (Exh. C, ¶ 7).

42.    Sharp has opined that a CFO is tasked with managing financial risk and liquidity of a company and should have the experience necessary to provide feedback on outcomes for a given strategy and provide appropriate direction to the management team, including the CRO. (Id. at ¶ 23).

43.    According to Sharp, Tate, as CFO, had an obligation to ensure that in instances where he lacked skills to manage Black Diamond's inherent commodity-based business risk, he relied on others with the requisite skills to assist him. (Id. at ¶ 26; *see also* ¶ 24).

44.    Due to Tate's inexperience, "Tate was unable to lead or properly support the Company with respect to financial management and execution of its business plan." (Id. at ¶ 30). Tate did not have the basic knowledge to deal with long-term coal contract issues that were his task to negotiate as CFO. (Id.). Tate also did not possess any coal hedging experience and "didn't believe it was critical to learn about hedging coal." (Id.).

45.    Among other things, Sharp has opined that Tate and Genser failed to properly evaluate and structure the management team to compensate for their own deficiencies and willfully disregarded the advice of A&M professionals who did have industry experience. (Id. at ¶ 19).

46.    Tate and Genser were negligent, grossly negligent and displayed reckless disregard for the best interests of Black Diamond by ignoring the advice of Black Diamond's stakeholders who had more coal industry experience, failing to take corrective actions to maximize the value of the estate, failing to staff Black Diamond with management qualified to

15

deal with commodity price risk, and willfully and recklessly disregarding the commodity price risk facing Black Diamond. (Id. at ¶¶ 13, 64, 65, 68, 69, 70).

47.    Tate's actions "significantly deviated from the practices and standards in the turnaround industry that should be expected" of Tate and the other defendants. (Id. at ¶ 71).

## ARGUMENT

### I.    Tate Cannot Satisfy The Standard For A Summary Judgment In His Favor.

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is not the court's function at this stage to weigh evidence or make factual determinations and the court must view the facts and draw all inferences in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994) (citation omitted). If the parties offer different accounts of what transpired, and neither account is belied by "objective evidence in the record," summary judgment is inapt. *Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011).

Summary judgment is rarely apt in negligence cases. "[T]here is eminent authority in support of the proposition that issues of negligence are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner. It is only in the exceptional negligence case that the rule should be invoked." *McTavish v. Chesapeake & Ohio R.R. Co.*, 485 F.2d 510, 512-13 (6th Cir. 1973) (citations omitted).[10]

---

[10] Courts in Kentucky routinely deny summary judgment motions in gross negligence cases. *See, e.g.*, *Fulkerson v. Konecranes*, No. 1:08-CV-00114-JHM, 2011 WL 666341 (W.D. Ky., Feb. 14, 2011); *Anderson v. Old Nat'l Bancorp*, 675 F. Supp. 2d 701, 719 (W.D. Ky. 2009); *Asher v. Unarco Material Handling, Inc.*, No. 6:06-548-DCR, 2008 WL 2636455 (E.D. Ky., June 26, 2008). *See also Peoples Bank of N, Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255 (Ky. Ct. App. 2008).

In this Circuit, a summary judgment should not be granted in the face of expert opinions that, if believed, would support a jury verdict in favor of the claim asserted. *See*, *e.g.*, *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005) ("Our precedents hold that if the opposing party's expert provides a reliable and reasonable opinion with factual support, summary judgment is inappropriate.") (citation omitted). A court that weighs the credibility of expert reports engages in improper fact-finding. *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) ("competing expert opinions present the 'classic battle of the experts' and it is up to a jury to evaluate what weight and credibility each expert opinion deserves.") (citation omitted); *see also Cadmus v. Aetna Cas. & Sur. Co.*, No. 9505721, 1996 U.S. App. LEXIS 29443, at *6 (6th Cir. Nov. 7, 1996) (reversing summary judgment premised on lower court's determination of expert witness credibility). The testimony of the Trustee's expert, Sharp, on Tate's failure to uphold his duties as CFO, based on record evidence, creates a fact issue for a jury to resolve. Reading the facts in the light most favorable to the Trustee, a reasonable jury could conclude Tate was grossly negligent, warranting denial of summary judgment.

## II.     Issues of Material Fact Exist Regarding Tate's Duties and Performance as CFO.

Tate's argument that he lacked authority to make decisions at Black Diamond, and that this relieves him of any liability to the Trustee, is myopic. As called for in the Engagement Letter, Tate and Genser managed Black Diamond together. The CFO of a coal company is responsible for managing coal price risk, meaning Tate was more than a number-cruncher. Significant record evidence belies Tate's assertion that he had no authority with respect to the management of the company and Tate is incorrect that only the ultimate decision-maker can face liability for a corporate action (or inaction). Finally, Tate's destruction of evidence that likely further revealed his involvement in decision-making cannot be disregarded in connection with his Motion.

17

**A.      The Engagement Letter confirms that Tate had the duty to manage Black Diamond.**

The Motion repeatedly posits that, as Genser's co-pilot, Tate's only duty was to read the instruments, even though the evidence demonstrates that Tate had the controls right in front of him that would have prevented Genser from destroying the company. The Motion contradicts the very Engagement Letter it quotes. The Engagement Letter states explicitly that the CRO (Genser) <u>and</u> the CFO (Tate) had the same obligations to perform a financial review of the company, assist in the identification of cost reduction and operations improvement opportunities, work to develop restructuring plans or strategic alternatives for maximizing the enterprise value of the Company, serve as the principal contact for the Company's creditors, and provide "other services as requested by the CEO and agreed to by such officer." Genser did not have sole responsibility for these core management tasks, as he and Tate were to accomplish them together

**B.      A CFO is responsible for cash management and, in a commodities-based company, is in charge of managing price risk.**

Tate was second-in-command to Genser during the Black Diamond bankruptcy.[11] Tate's own expert acknowledged that Tate was part of the executive committee that determined whether the company should enter long-term coal sales contracts.[12] Genser made it no secret that he relied on Tate to evaluate actions to be taken on behalf of Black Diamond and his reliance on Tate was unsurprising given that, during the bankruptcy, Tate billed 3,223 hours as CFO (at $450/hour).[13] Tate worked in a leadership role as the CFO at Black Diamond, and he believed that he had a fiduciary duty to maximize the return to all creditors, including the UCC.[14]

Yet the Motion claims that Tate's "primary" duties as CFO related to making estimates and projections, presenting Tate as a "number-cruncher" and not an officer charged with

---

[11] (Exh. A).
[12] (Ogle Depo. 262, DE 54).
[13] *See supra* ¶ 22 of C/S.
[14] (Tate 3/26/09 Depo. 108-109; 252-253, DE 66).

strategic decision-making.[15] In fact, Tate depicts himself as handling the job duties actually undertaken by his subordinates.[16]

Despite Tate's contention otherwise, a CFO is responsible for managing a company's financial risk and liquidity and providing important feedback as to potential outcomes of strategies engaged in by the company.[17] As Tate's own expert testified, in Tate's case, this included managing commodity price risk and thus making decisions related to long-term coal sales contracts and financial hedging.[18] As CFO, Tate was responsible for being "involved in all financial transactions of the company."[19] As Tate's expert acknowledged, there is more to being a CFO than getting the numbers right - a CFO should be a strategist.[20]

**C.   The record evidence confirms that Tate was unqualified for the CFO position.**

Tate was woefully unqualified to serve as Black Diamond's CFO.  Despite never having served as a CFO of any company, let alone a coal company, Tate took on the role in what the A&M Parties' have called a complex bankruptcy, in an effort to boost his own standing at A&M.

*1.    Tate was not qualified for the position of CFO.*

Tate's education never proceeded beyond a college degree in "law and society," Tate was not a certified public accountant, a typical credential for a CFO, and in terms of practical experience, prior to the Black Diamond bankruptcy Tate had never served as a CFO.[21] Prior to working with Black Diamond, Tate had no experience working with coal companies or in the

---

[15] If anything, Tate's characterization of himself as only a number-cruncher constitutes an admission that Tate failed to carry out his duties as CFO and warrants a grant of summary judgment that Tate was at the very least negligent. No reasonable juror could find that an officer charged with managing commodity price risk and caring for the financial well-being of a company (as testified to by experts on both sides of this case) was anything but negligent if all the officer did was compile financial information.
[16] (Tran. 6-26-09 Hr'g. 23, 39, BK DE 739); (Tate 2/8/13 Depo. 198-200, DE 35).
[17] (Exh. C, ¶ 23).
[18] (Ogle Depo. 237, 239-240, DE 54).
[19] (Id.).
[20] (Id. at 240, 248).
[21] (Tate 3/26/09 Depo. 14, 16, 35-36, DE 66).

coal industry.[22] Tate had no experience with hedging coal, nor did he gain any such experience while acting as Black Diamond's CFO.[23] Yet, as the CFO, Tate had a duty to know the business in which he was working.[24]

Tate lacked the education, training and experience to take the position as Black Diamond's CFO. He sought out and took the job anyway, holding himself out as qualified even though he lacked the necessary competencies. Due to inexperience, Tate was unable to fulfill his leadership role as CFO of Black Diamond.[25]

> 2. *Tate took the position as CFO to bolster his resume even though he was not qualified for the job, and the position was not appropriate for him.*

Although unqualified to accept the position, Tate viewed obtaining the title of CFO as necessary to round out his A&M resume and advance there.[26] Tate believed he needed the "C" level position to be the "gold star" on his resume that took him from the director to senior director position at A&M. Indeed, upon Tate's promotion to senior director several months into the engagement, A&M's Cohn congratulated him and wrote "Now you have both the A&M Title and the 'C' level work experience to include on the resume."[27]

Tate also looked at the CFO position as a way to generate business for A&M. Tate considered CIT, the lead lender for the syndicate of Black Diamond's secured lenders, to be on the long list of banks from which A&M would seek referrals going forward.[28] Tate wanted to make sure CIT recognized the work he and Genser were doing on its behalf. In response to an April 17, 2008 email from Genser (who wrote "let's keep our eyes on the prize – getting the banks out whole"), Tate responded "the banks need to appreciate the situation for what it is: we

---

[22] (Exh. U); (Hull 4/26/13 Depo. 37, 276, DE 143).
[23] (Tate 2/8/13 Depo. 97-98, DE 35).
[24] (Ogle Depo. 251, DE 54).
[25] (Exh. C, ¶ 30).
[26] (Cohn Depo. 338-339, DE 41); (Tate 2/8/13 Depo. 192-198, DE 35).
[27] (Exh. X); *see also* (Exh. W).
[28] (Tate 2/8/13 Depo. 152, DE 35).

will div [*sic*] the company and get them out whole DESPITE Hull, whersa [*sic*] at present they are under the false impression that he is out there working the business and making shut [*sic*] happen, when nothing could be further from the truth."[29] Both Genser and Tate desired to "get the banks out whole" and derive additional business from CIT to line their own pockets.[30]

**D.      Tate had the authority to take actions to prevent harm to Black Diamond but failed to do so.**

Based on the terms of the Engagement Letter and the parties' expert testimony on the standard applicable to Tate as the CFO of Black Diamond, Tate cannot avoid liability by saying that he had no real responsibility as Black Diamond's CFO because every decision fell to Genser. Although he was unqualified for the job, Tate's position as CFO provided him with the actual authority to prevent the harm caused to Black Diamond. In 2008, Tate knew that Black Diamond had not sold coal forward into 2009 and knew that Black Diamond had not engaged in any financial hedging transaction to manage commodity price risk, yet he did nothing to help the company avoid the imminent and foreseeable crash that came as a result.

*1.      Untrained and unwilling to seek help, Tate did not perform the job responsibilities as CFO.*

Tate's own expert testified that Tate, as the CFO, had the responsibility to assess whether Black Diamond should enter into contracts for the sale of coal or financial hedging contracts in an effort to manage coal price risk.[31] This is consistent with the Trust's expert's opinion.[32] Virtually every witness in this case with any background in the coal industry has stated that coal producers like Black Diamond commonly sell their coal forward on a long-term basis or enter into financial hedging contracts in an effort to prudently manage coal price risk. Yet, while Tate

---

[29] (Exh. Y).
[30] (*See* Genser 2/7/13 Depo. 62 (the referral fee awarded to A&M employees for brining in business was up to 15% of the collections), DE 34).
[31] (Ogle Depo. 238, 239, DE 54).
[32] (Sharp Depo. 82, 102, DE 139).

served as CFO, Black Diamond failed to sell any coal forward in 2008 on a term basis (into 2009 and beyond) and failed to even explore financial hedging opportunities.[33]

Contemporaneous documents confirm that Tate was expected to take the lead with regard to decisions integral to Black Diamond's operations and its strategy for exiting bankruptcy, including the oversight of Mullins' pursuit of long-term contracts. Despite never selling coal before, Tate gave Mullins direction on how to approach customers for coal sales, how to create customer contact logs helpful to Tate in overseeing Mullins' pursuit of coal contracts, and even gave Mullins direction on the sales strategy to employ for Black Diamond's coal.[34] Genser made clear to Black Diamond's management that Tate was to be involved in coal sale decisions.[35]

Tate not only had "direct" supervisory responsibility for Mullins and other Black Diamond employees, but Tate also was responsible for negotiating coal contract terms, like price-reopener and escalator clauses.[36] Despite his obligation to be familiar with the coal industry and his duty to negotiate key aspects of coal contracts, Tate did not educate himself on these key components of his job. In fact, when Mullins sought input from Tate on potential bids for long-term business, Tate admitted to Genser that six months after the bankruptcy began, and after having worked in some capacity for Black Diamond for over a year, he still did not have enough of a basic understanding of coal contract concepts to meaningfully weigh in.[37] Tate could have and should have educated himself on these common contractual issues by consulting Black Diamond's experienced management team or A&M's own in-house resources, including Steve Cohn, or by seeking advice from other coal experts that were available to him. He did not, choosing instead to remain ignorant about this major component of his job.

---

[33] (Genser 4/21/09 Depo. 97-98, DE 59).
[34] (Exh. E, F, G and H).
[35] (Exh. D).
[36] (Mullins 4/30/13 Depo. 338-340, DE 150).
[37] (Exh. BB).

Tate avers that he had no role to play in connection with Black Diamond's failure to sell coal forward to Koch, DTE, and AEP in 2008, or to hedge prices through financial contracts. Tate's depiction of his involvement with coal sales and hedging is inaccurate. Evidence shows that he was involved in each of these major failures but did nothing to take advantage of these lucrative opportunities. First, Tate received an email from Genser attaching the Koch Offer on June 4, 2008, the same day Genser received Koch's offer "to purchase all of the estimated Black Diamond coal production for 2009 through 2011."[38] Despite having the opportunity to weigh in on this offer, which would have generated over $500 million in revenue, and even though a CFO's job is to manage his company's financial risk and liquidity, there is no evidence in the record that Tate even advised Genser on the consequences of accepting or rejecting this offer, let alone encouraged him to pursue it.

Second, Tate had the opportunity to weigh in on DTE's multiple offers to purchase coal from Black Diamond in August 2008. In fact, Genser has testified that Tate took part in the process that led to rejection of the offers.[39] Tate was forwarded the initial offer from DTE by Hull along with Hull's recommendation that he "STRONGLY" believed Black Diamond should accept. Yet Tate did nothing more than respond by paying lip service to the constituencies' desire that Black Diamond lock in coal prices.[40] He did not urge Genser to take Hull's opinions seriously, despite Hull's thirty years in the industry.

Third, Tate also had the opportunity to weigh in on Black Diamond's attempted sale of coal to AEP. Genser and Tate represented to the UCC's professionals (counsel and financial adviser) that AEP would be willing to commit to contracts with Black Diamond for

---

[38] (Exh. K).
[39] (Genser 4/21/09 Depo. 245, DE 59).
[40] (Exh. L).

approximately $130 per ton.[41] Although Tate knew that this was untrue and secretly expressed concern to Genser about Genser's representation that prices could range that high, a decision was made to send AEP an offer at an amount higher than Black Diamond's management team initially advised.[42] In response to that decision, Tate did not attempt to counsel Genser (or the UCC members involved) to make a more measured offer; instead, Tate viewed AEP's potential rejection of the higher offer as an opportunity to lay blame for lack of coal sales on the UCC:

> I agree that AEP will be surprised at a price in excess of $130. As you point out, the good news is that we are in a 'no lose' situation because if AEP accepts a higher price than the blended $121 we were originally suggesting, we are better off, and if our offer is not well received by AEP because of the price, the UCC will only have themselves to blame . . . although I doubt they will see it that way if it goes that direction[.][43]

In other words, Tate counseled Genser to extend an offer to sell coal at a price that he thought would "surprise" AEP because an offer at a high price might result in a comeuppance to a constituency in the bankruptcy that he viewed as hostile, and get himself and Genser off the hook for blowing yet another possible sale.

Also, as the A&M Parties' expert's own experience reflects, the CFOs of energy commodity companies are responsible to pursue financial hedging contracts.[44] Financial hedging contracts allow the CFO to manage coal price risk. Yet, Tate did nothing to pursue financial hedging.[45] Tate's failure to acknowledge hedging as a viable alternative for Black Diamond constituted a failure to carry out his duties as its CFO.[46]

Tate did not do his job as the officer responsible for the financial health of Black Diamond. Managing coal price risk was an essential element of his duties as CFO yet he did not

---

[41] (Exh. M and N).
[42] (Exh. N).
[43] (Exh. N).
[44] (Ogle Depo. 327-329, DE 54).
[45] (Id. at 240-242).
[46] (Sharp Depo. 102, DE 139).

demand that Black Diamond ensure future cash flow by selling coal forward or entering into financial hedging transactions. Despite having opportunities to make a difference, he sat and watched the airplane hit the mountain.

### 2. Tate undermined Hull and put Mullins in an untenable position.

Tate directly supervised Black Diamond staff. In that role, Tate interacted with both Hull and Mullins daily. The decades of experience that both men possessed in the coal industry purportedly were to remedy the fact that Tate and Genser had none.[47] Instead of either treating Hull and Mullins respectfully or removing them because (in his opinion) they were ineffective at their jobs, Tate denigrated Hull and knowingly tasked Mullins with a job he could not perform.

Shortly after taking the CFO job, Tate made it clear to Genser that he lacked respect for Hull. In April 2008, calling Hull a "buffoon," Tate told Genser "I really think you need to take him down a peg or two. Let's think of how to best accomplish that without destroying our go forward relationship with him."[48] In May 2008, Tate told Genser that "Hull serves no purpose in my opinion and I wish he were gone."[49] In June 2008, Genser reported to Steve Cohn that "I have lost all respect for him [Hull] (Tate was there about 2 months ago)."[50] Yet Tate did nothing to remove Hull, never suggested replacing him, and instead (along with Genser) undermined him and maneuvered around him, rendering his vast experience moot.

Tate also undermined Mullins by handing him a job he lacked the skills to perform. Mullins, who had no prior experience in coal sales,[51] was given the responsibility to contact customers and attempt to sell coal as Black Diamond's VP of Sales. In other words, rather than

---

[47] (Exh. C, ¶ 24).
[48] (Exh. Y).
[49] (Exh. DD).
[50] (Exh. CC).
[51] Mullins was in charge of quality control and transportation prior to being named VP of Sales. (Mullins 4/30/13 Depo. 25, DE 150).

engage professional salespersons with industry contacts to sell Black Diamond's coal, Tate, though equally inexperienced in coal sales, "supervised" Mullins in that role, knowing Mullins lacked the ability and connections to do the job.[52]

Despite his duty to oversee Black Diamond's staff, Tate lacked concern for them. When Hull expressed disappointment that the Black Diamond Key Employee Incentive Program was altered to make it harder for the employees to obtain the plan's benefits, Tate sarcastically quoting the movie *Airplane,* relished the fact that the management team would "crash."[53] Tate belittled the industry professionals who were supposed to (and attempted to no avail) help him.

### E.     Case law does not hold that only one person can be responsible for a corporate act.

Not only is Tate's argument that he cannot be held liable for the aforementioned failures to do his job because he lacked the authority to cause Black Diamond to act factually wrong, it is also wrong on the law. Even where an officer involved with a transaction *abstains* from voting on it, that officer can be responsible for the repercussions. *See Miller v. Morgan*, Case No. 3:10-cv-156, 2013 U.S. Dist. LEXIS 108772, 40 (S.D. Ohio Aug. 2, 2013) (mere abstention from voting on a transaction cannot absolve an officer from liability, where the evidence demonstrated the officer's involvement in the transaction).

Tate cites many cases for the theory that an officer can avoid personal responsibility if he/she is not in a position of authority. These cases (all from outside of Kentucky) do not stand for the proposition that only the officer whose signature finalizes a transaction can face liability for that transaction. For example, in *Pereira v. Cogan*, 294 B.R. 449, 522 (S.D.N.Y. 2003), the court (applying Delaware law) explained that "a defendant may be classified as a corporate officer for liability purposes if he had discretionary authority in the relevant functional area and

---

[52] (Exh. T).
[53] (Exh. EE).

the ability to cause *or prevent* the complained of action" (emphasis added). As shown above, Tate did have such discretionary authority.[54] And, contrary to Tate's jaundiced depiction of the law, courts have recognized that a corporate "officer or director is, in general, personally liable for all torts *which he authorizes or directs or in which he participates*, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 852 (N.D. Cal. 1979) (emphasis added), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982) (quoting Ballantine, *Corporations* § 112 (rev. ed. 1946)).

Tate held "authority" and "control" of strategic decisions for Black Diamond while serving as CFO and was responsible to oversee the company's financial health. The Engagement Letter required that Genser and Tate oversee the company together. At the very least, a jury should decide whether Tate's "I only followed Genser's orders" argument is consistent with the facts of record, such that he should not be held liable for his role in Black Diamond's crash.

## F.   Spoliation of evidence bars this Motion.

Tate destroyed evidence. Tate testified that he regularly kept notes while acting as CFO of Black Diamond and specifically took notes about meetings and conversations with potential buyers, although he could not recall the specifics of those meetings and conversations. None of Tate's notes were produced because he destroyed them. Tate also has admitted to deleting emails related to Black Diamond "fairly often" while acting as CFO.  Additionally, Tate shredded

---

[54] The *Pereira* court also cited another case for the premise that: "officers who lack 'the slightest connection' with events in question or ability to meaningfully participate should not be considered officers for liability purposes." *Id.* (citing *Gold v. Sloan*, 486 F.2d 340, 351 (4th Cir. 1973)). Tate certainly cannot be said to "lack 'the slightest connection'" with Black Diamond's mismanagement during his tenure as CFO, as the facts reveal.  As such, other cases Tate cites for the same proposition are of no greater applicability. *See, e.g.*, *In re Greater Southeast Community Hospital Corp.*, 333 B.R. 506 (B.R. D.D.C. 2005) (applying Delaware law and stating that officers are not liable to a company if they could not prevent improper travel expenses or forgiveness of corporate loans); *KDW Restructuring & Liquidation Servs. v. Greenfield*, 874 F. Supp. 2d 213 (S.D.N.Y. 2012) (applying Delaware law and stating that officers, who were not directors, were not liable for carrying out transactions authorized by directors because they did not vote on the transactions).

documents at Genser's request on the very day the Settlement Agreement was signed, which assigned to the Trustee the right to bring claims against the A&M Parties.[55]

The parties have briefed the Trustee's Motion for Sanctions due to the Spoliation of Evidence in which the Trustee laid out in detail Tate's (and Genser and A&M's) intentional destruction of evidence in the face of a duty to preserve, and its impact on the Trustee's ability to litigate her claims. Here, Tate seeks to walk away from this case under the premise that he had no real input into decisions being made. His notes of meetings (internal and external to Black Diamond), "to-do" lists, and related emails, if they still existed, certainly would shed light on this argument. For the reasons detailed in the Spoliation Motion (and the Reply on that Motion), the Trustee is entitled to an adverse inference instruction regarding that destroyed evidence. *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013) (courts have "broad discretion" to fashion spoliation sanctions to fit the spoliating party's degree of fault and circumstances of each case). Because an adverse inference instruction is warranted, said instruction precludes any argument that Tate is entitled to a summary judgment. *Thaqui v. Wal-Mart Stores East, LP,* 09-CV-755(JMA), 2014 U.S. Dist. LEXIS 45107, at *17 (E.D.N.Y. March 31, 2014) ("for purposes of summary judgment, plaintiff is entitled to an adverse inference concerning the allegedly missing video. That adverse inference is sufficient to defeat summary judgment."); *Shrenuj USA, LLC v. Rosenthal & Rosenthal, Inc.,* 12 Civ. 4827, 2014 U.S. Dist. LEXIS 40323, at *20-26 (S.D.N.Y. March 25, 2014) (denying summary judgment in light of the plaintiff's spoliation motion).

---

[55] (DE 23-1 and 23-2).

III. **The Engagement Letter Provides that Tate Can Be Found Liable for Gross Negligence or Willful Misconduct, and By Breaching his Duties as an Officer of Black Diamond, Tate is Liable.**

Quibbling about the characterization of the Trustee's cause of action against Tate is tilting at windmills. There is no authority in Kentucky that prohibits a plaintiff from pursuing a defendant for gross negligence and for breach of fiduciary duty in the same lawsuit. The opposite is true; Kentucky courts have allowed a breach of fiduciary duty claim to proceed alongside a claim for gross negligence or willful misconduct. *Jaffee v. Davis*, NO. 2001-CA-000817-MR, 2003 Ky. App. Unpub. LEXIS 700, at *15 (Ky. Ct. App. May 2, 2003) (analyzing a lease management agreement which provided that the manager owed a duty measured by gross negligence or willful misconduct). Nevertheless, the Trustee may pursue Tate for gross negligence under Kentucky law.

A. **Under Kentucky law, the Trustee can prove her claims against Tate by showing gross negligence.**

Tate avers that the Trustee's allegations against him should be characterized as a claim for breach of fiduciary duties under federal law. In taking this position, Tate mischaracterizes a prior opinion of this Court.[56] Regardless, it is not dispositive how the Trustee's claims are labeled because, under Kentucky law, the same legal elements will apply, and the same evidence will prove Tate's gross negligence and willful misconduct.

---

[56] The A&M Parties argued for a similar reading of *Sergent v. McKinstry*, 472 B.R. 387 (E.D. Ky. 2012), when seeking to dismiss the Trustee's claims for negligence, gross negligence, and willful misconduct, but the Bankruptcy Court rejected it. (AP DE 181 at 4-5). In denying that motion, Judge Scott explained that although this Court characterized the Trust's gross negligence and willful misconduct claims asserted against the A&M Parties as "being in the nature of claims a corporation would assert against its officers . . . There is nothing in the District Court Order requiring the claims to be relabeled as breaches of fiduciary duty." Even the A&M Parties acknowledged then that the "proper remedy would be to construe the causes of action as ones for breach of fiduciary duty, much as the District Court did." (Id.).

Despite Tate's attempt to expand the opinion, this Court also did not hold that federal law governed the claims against him.[57] The order accompanying the decision applied to the "state-law claims against Sergent and the A&M Parties." *Sergent*, 472 B.R. at 422 (emphasis added). This Court's discussion of federal law, including the citation to *Wolf v. Weinstein*, 372 U.S. 633 (1963), was part of the Court's determination that the Trustee enjoyed a right to a jury trial on her claims against Tate. *Sergent*, 472 B.R. at 408-415.[58]

Furthermore, under Kentucky law, the concepts of negligence and breach of fiduciary duty are closely aligned. As this Court noted, the Trustee "may be correct that individual instances of Genser and Tate's mismanagement could be described in terms of gross negligence or willful misconduct." *Sergent*, 472 B.R. at 409. Often, claims for negligence (particularly professional negligence) and claims for breach of fiduciary duties co-exist. *See, e.g. Branham v. Stewart*, 307 S.W.3d 94, 103 (Ky. 2010) (reversing summary judgment in a legal malpractice and breach of fiduciary duty lawsuit); *Peoples Bank of N. Ky., Inc. v. Horwath*, 390 S.W.3d 830, 837 (Ky. Ct. App. 2012) (discussing evidence introduced to establish both negligence and breaches of fiduciary duties by defendants). However this Court may choose to label the

---

[57] Additionally, even if federal breach of fiduciary duty law did apply, summary judgment is not proper in this case. Tate acknowledges that the duty of care "requires the fiduciary to make good-faith decisions that can be attributed to rational business purposes" and the "duty of loyalty obligates the officer to 'refrain from self-dealing, and to treat all parties to the case fairly.'" (DE 90-1 at 14). Tate could not have acted in good-faith to make decisions on behalf of Black Diamond as he was knowingly unqualified to deal with the responsibilities of a CFO, refused to seek help to rectify his incompetence, and failed to take actions customarily taken in the coal industry to mitigate coal price risk, despite being begged by Black Diamond's management and constituencies to do so. Moreover, Tate can hardly claim that he refrained from self-dealing, as he took on the CFO position to promote himself within A&M and catered to secured lender CIT in hopes of receiving additional business referrals for A&M. With respect to Tate's claim to have treated all parties to the case fairly, his statement that the UCC deserved "NADA" speaks for itself.

[58] The Court concluded that because the Trustee sought compensatory damages, a legal remedy, against Tate, who was employed as a corporate officer, she was entitled to a jury trial. *Sergent,* 472 at 415. The Court looked to *Wolf* for support for the contention that Tate, as an officer of a corporate debtor, owed fiduciary duties to the bankruptcy estate. *Id.* at 409. The *Wolf* decision simply provides that bankruptcy "does not insulate management's conduct from review under state corporate law fiduciary principles." Kurt F. Gwynne, *Indemnification and Exculpation of Professional Persons in Bankruptcy Cases,* 10 Am. Bankr. Inst. L. Rev. 711, 712-713 (2002) (citing *Wolf*, 372 U.S. at 649, and *In re Schepps Food Stores, Inc.*, 160 B.R. 792, 799 (Bankr. S.D. Tex. 1993)) ("State law standards continue to apply to post-petition fiduciary obligations")). The Court did not resolve how Tate's duties would be analyzed or how the Trustee should prove her state law claims based on Tate's gross negligence and willful misconduct.

Trustee's allegations, the evidence must meet the same basic elements of duty, breach, causation, and damages.

By demonstrating that Tate is liable for gross negligence and willful misconduct, the Trustee also will prove that Tate breached his fiduciary duties. Or, as a case cited by the A&M Parties explained, "[t]o prove a breach of the duty of care, a plaintiff must demonstrate gross negligence." *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012).[59] Pursuant to KRS § 271B.8-420(5),[60] a claim against a corporate officer requires showing (1) a breach of his or her duties and (2) that breach constituted "willful misconduct or wanton or reckless disregard for the best interests of the corporation or its shareholders." As used by Kentucky courts, "gross negligence" overlaps with this second element. *See, e.g. Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003).[61]

Additionally, the Settlement Agreement provides the standard here. The A&M Parties negotiated and agreed that principles of gross negligence would govern, and they cannot escape

---

[59] While that case construed Delaware corporate law, Kentucky law and the parties' Settlement Agreement provide the same result.

[60] In a footnote Tate argues that even if Kentucky law applies, the Trustee cannot meet her heightened burden of proof under Kentucky's corporate officer statute. (DE 90-1 at. 13, n.7). With respect to the "clear and convincing" evidence standard expressed in the statute, at the summary judgment stage, "the plaintiff does not have to show clear and convincing evidence at this stage, only evidence that could support a reasonable factfinder in their determination . . . by the clear and convincing standard." *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt.*, Civil Action No. 5:11-374-DCR, 2014 U.S. Dist. LEXIS 53064, at *17 (E.D. Ky. Apr. 17, 2014). The Kentucky Supreme Court also has recognized that Kentucky's corporate statutory scheme has not abrogated common-law fiduciary claims. *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 2013 Ky. LEXIS 642, at *2-3 (Ky. Dec. 19, 2013) (analyzing the companion statute applicable to corporate directors). These statutes provide the protection of the business judgment rule, but *only* when directors or officers meet the criteria for the rule's benefit. *Id.* at *16-*22. In other words, "when corporate fiduciaries act in conflicted settings, Kentucky courts have been willing to enhance the substantive standard and reassign the burden of proof to the conflicted fiduciaries." Rutheford B. Campbell, Jr., *Corporate Fiduciary Duties in Kentucky*, 93 Ky. L J. 551, 580 (2004). For example, when a corporate decision involves self-interest, the business judgment rule does not operate as a presumption and the burden shifts to the interested officer to "show that their actions were fair, honest, and reasonable in all aspects." *Marrowbone Pharm., Inc. v. Johnson*, No. 2010-CA-000429-MR, 2011 Ky. App. Unpub. LEXIS 881, at *19-20 (Ky. Ct. App. Dec. 2, 2011) (citations omitted). There is ample evidence upon which the jury may determine that the A&M Parties, including Tate, were conflicted.

[61] Similarly, the "basic elements" of a common-law breach-of-fiduciary-duty cause of action are "(1) the existence of a fiduciary duty; (2) the breach of that duty; (3) injury; and (4) causation." *Baptist Physicians Lexington, Inc.*, 2013 Ky. LEXIS 642, at *6. These mirror the elements for a negligence claim. *Wright v. House of Imps., Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).

that standard now. *Cumberland Valley Contrs., Inc. v. Bell Cnty. Coal Corp.*, 238 S.W.3d 644, 654 (Ky. 2007) ("Kentucky courts have long upheld exculpatory clauses in arm's-length transactions between sophisticated parties with equal bargaining power and allowed such parties to bargain against liability for their own negligence and even gross negligence").[62] Providing evidence of grossly negligent conduct, therefore, would prove Tate's liability to the Trustee.

The Trustee has satisfied the elements for her claims based on Tate's mismanagement as CFO. There is no dispute that Tate owed a duty to the bankruptcy estate and its creditors. At the very least, genuine factual disputes remain regarding the final elements of breach, causation, and damages. The Trustee has provided evidence showing that Tate's conduct amounted to gross negligence and willful misconduct and is entitled to offer that evidence to a jury.

## B.      Tate is not a trustee and the "willful and deliberate" standard is inapplicable.

As noted above, Tate relies heavily upon the Court's conclusion that, for jurisdictional purposes, the Trustee's claims sound in breach of fiduciary duty rather than gross negligence. Yet Tate does not credit the remainder of the Court's opinion – or other rulings made during this litigation. Based on the Court's conclusion that the Trustee has raised breach of fiduciary duty claims, Tate avers that debtors-in-possession, under federal law, must shoulder the same fiduciary obligations as a trustee. And, thus, Tate avers that, just like a trustee, he only may be liable to the Trust for "willful and deliberate" misconduct.

First, Judge Scott held years ago that Genser as CRO (and, by extension, Tate as CFO) is not a trustee: "The Court has already stated that: 'Mr. Genser is a chief restructuring officer. He

---

[62] This is also the standard Kentucky courts would likely apply in the corporate context. *See* Campbell, 93 Ky. L.J. 551, 573 (predicting gross negligence as the standard Kentucky courts would apply to claims of corporate officers' fiduciary breaches).

is not a Trustee under the law. There is no Trustee in this case.'"[63] Judge Scott detailed how Genser lacked "the important limitations of a trustee," and noted that unlike a trustee, Genser and Tate's employment required that A&M and the Debtor negotiate an engagement letter.[64]

Importantly, Judge Scott also noted that the A&M Parties "have already twice negotiated the terms of their limitations of liability and immunity. First in the Engagement Letter and second in the Settlement Agreement. They cannot now escape those negotiated terms."[65] The Engagement Letter incorporated an Indemnification Agreement, which, in turn, provides that the A&M Parties shall not have any liability to the Debtors for or in connection with the engagement of A&M, except to the extent that any such liability for losses, claims, damages, liabilities or expenses are found to have resulted primarily and directly from the A&M Parties' gross negligence or willful misconduct.[66]

The Settlement Agreement then superseded the Indemnification Agreement and Engagement Letter, providing that the Trust may pursue Tate for ordinary negligence and for "Non-Indemnifiable" claims.[67] Under the Engagement Letter, a claim is a Non-Indemnifiable Claim if it resulted primarily and directly from Tate's gross negligence or willful misconduct.[68] As Judge Scott recognized, the A&M Parties agreed to those terms and thus "cannot now escape those negotiated terms."[69]

---

[63] (AP DE 144 at 4 (quoting Judge Howard, Tran. 7/16/08 Hr'g, 75:13-14, BK DE 740)). As a result, Judge Scott denied the A&M Parties' Motion for Summary Judgment and found that the "A&M Parties are *not* entitled to quasi-judicial immunity." (Id. at 5). (emphasis in original).
[64] (Id.). Judge Scott also concluded that the A&M Parties "cannot now change their position" after previously asserting "that they are officers of the Debtor rather than professionals under the Bankruptcy Code." (Id. at 5).
[65] (Id.).
[66] (BK DE 94, Addendum ¶ A).
[67] (BK DE 1562 at 5, ¶ 6).
[68] (BK DE 94, Addendum ¶ A).
[69] (AP DE 114 at 5).

This Court also concluded that Genser and Tate were not the "functional equivalents" of Trustees. *Sergent*, 472 B.R. at 413-415.[70] "Thus, any liability to the Plaintiff for causing the estate to lose value stems from their employment as *corporate officers*." *Id.* at 415 (emphasis added). As corporate officers of Black Diamond, Genser and Tate were subject to the legal duties imposed upon such persons under applicable statutory and common law and the Settlement Agreement they entered.

Second, Tate was not a court appointed debtor-in-possession. Tate's power, along with his duties, derived from his status as a corporate officer of Black Diamond. Even Genser recognized that Tate received his title and authority from the Engagement Letter naming him CFO of Black Diamond,[71] not from any appointment by the Bankruptcy Court.[72]

Tate relies upon *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451 (6th Cir. 1982), for the proposition that the Trust can recover against Tate only if he "'willfully and deliberately' violated his fiduciary duties."[73] This argument is incorrect. *Ford Motor* does not so hold.[74] *Ford*

---

[70] While the A&M Parties attempt to distort this Court's prior holding in *Sergent*, 472 B.R. 387, to argue that the claims against Tate sound in breach of fiduciary duty under federal law, they notably do not cite the portion of the Court's opinion holding that Genser and Tate derived their power from their employment as corporate officers and not "from the Bankruptcy Court's power to supervise over Chapter 11 trustees" to which the willful and deliberate standard applies. 472 B.R. at 413.

[71] (Exh. V (Cohn asks Genser if Tate is acting as the CFO and Genser replies "Yes, received title in our engagement letter.")).

[72] Distinctions, however, have been drawn between the pre-petition management of a debtor-in-possession and those brought in during bankruptcy proceedings, such as Genser and Tate, imposing an even higher standard of care on the latter. One court recognized this distinction in a case involving A&M's co-founder, Bryan Marsal. *In re Bindermann Indus. U.S.A.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997). In *Binderman*, the court questioned a proposed buyout of the debtor due to Marsal's apparent conflict of interest in the sale. The court explained that not only was Marsal a fiduciary by virtue of his position as CEO, but he was also hired by the debtors in possession for his "professional expertise in running troubled companies," being paid a salary of $700,000 per year for his services and $350,000 per year for one of his colleagues. *Id.* The court held that "by virtue of the latter role, [Marsal] was placed in a position of trust and confidence so that, if there be any consequence at all, it is that his actions ought be subject to a scrutiny *even higher than that usually accorded the debtor's management*." *Id.* (emphasis added). Like Marsal, Genser and Tate were hired by the debtor-in-possession and placed in positions of trust and confidence. Accordingly, Tate's actions cannot escape the scrutiny demanded by his position and by the terms of the A&M Parties' own agreements.

[73] (DE 90-1 at 2).

*Motor* dealt with the court appointment of an individual as debtor-in-possession for a partnership under Chapter XI of the Bankruptcy Act of 1898 (repealed by the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101 *et. seq.*). The Sixth Circuit remanded the case for a factual determination of whether Weaver, in his court appointed position, had acted willfully and deliberately in violation of his fiduciary duties to the creditors of the debtors' estates.[75]

*Ford Motor* is distinguishable from this case. First, Genser was not "appointed" by the Bankruptcy Court in any capacity (trustee or "debtor-in-possession"). He was hired by Black Diamond, and his employment was not ordered under the auspices of either 11 USC §§ 327 or 363. Genser and A&M then selected Tate, who similarly was not "appointed" by the Bankruptcy Court. *Ford Motor* does not remotely address this situation. While the debtor-in-possession in *Ford Motor* was "at all times subject to the control of the court," *id.* at 461, Genser and Tate were not subject to the Bankruptcy Court's control. The Bankruptcy Court has already considered *Ford Motor* and held that Genser, and by extension Tate, "did not have the important limitations of a trustee."[76] This Court agreed with that reasoning, "In short, the Bankruptcy Court could not have used its limited equitable power to craft and oversee Genser's position as CRO

---

[74] As a general matter, courts have questioned the Sixth Circuit's reasoning in *Ford Motor*. *See, e.g. LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 7 (1st Cir. 1999) (explaining the Sixth Circuit had misconstrued prior case law because "there is simply no principled way … to avoid the conclusion that a bankruptcy trustee can be personally liable for negligent breach of fiduciary duty."); *In re Reich*, 54 B.R. 995, 1001 (Bankr. E.D. Mich. 1985) ("In establishing a distinction between a trustee's personal liability and his 'official' liability, that decision misinterpreted established law, and it has been justly criticized on this point … the Sixth Circuit adopted a standard which is legally and practically difficult to accept.").

[75] In *Ford Motor*, two partnerships and two individual partners each filed bankruptcy petitions seeking protection under Chapter XI (the predecessor to the modern Chapter 11). After the petitions were filed, the bankruptcy court "*appointed* Robert Weaver as the debtor in possession." *Ford Motor Credit Co.*, 680 F.2d at 454 (emphasis added). While the opinion is unclear, it appears that Robert Weaver was appointed debtor-in-possession as a means of designating him as the representative for the interrelated entities. A creditor of one of the partnerships sought to hold Robert Weaver personally liable for his alleged failure to safeguard farm equipment belonging to a Chapter 11 partnership. The Sixth Circuit concluded that no findings had been made by the bankruptcy court or the district court as to whether "Robert Weaver, in his capacity as debtor in possession, was negligent or acted willfully and deliberately in violation of his fiduciary duties to the creditors of the Weaver Farms estate." *Id.* at 462. The court remanded the case for a factual determination about whether Robert Weaver, as debtor-in-possession, had acted willfully and deliberately by failing to safeguard assets of the estates. *Id.*

[76] (AP DE 144 at p. 5).

and Tate's position as CFO." *Sergent*, 472 B.R. at 415. Instead, unlike a court-appointed bankruptcy trustee, Genser and Tate were at all times employed by A&M, who in turn negotiated the terms of use of its employees with the Debtors.

Second, in *Ford Motor*, the appointed debtor in possession was himself a debtor and filed a personal bankruptcy petition in conjunction with the partnership petitions. *Id.* at 454. In this case, Genser and Tate were not themselves Chapter 11 debtors; instead, Black Diamond and its affiliated debtors were. Thus, *Ford Motor*'s holding regarding the liability standards of Robert Weaver, debtor in possession, is not controlling here.[77]

Despite rulings from this Court and the Bankruptcy Court, Tate continues to seek the protections afforded by trustee status. Tate is not a trustee. Instead, as an officer of Black Diamond, he is governed by the standard of care he and the A&M Parties expressly negotiated.[78]

## IV.    Tate incorrectly depicts the applicable causation standard.

Tate argues that the Trustee cannot proceed against him because she cannot prove that his misconduct "primarily and directly" caused her damages.[79] In making this argument, Tate wrongfully asserts that the "primary and direct" causation threshold only can be satisfied if the

---

[77] Furthermore, Tate, Genser and A&M signed contracts that establish the limits of their liability. They cannot avoid the terms of these agreements. The standard of care, as contracted, should apply. *See V&M Star Steel v. Centimark Corp.*, 678 F.3d 459, 466 (6th Cir. 2012) (applying the standard of care negotiated between the parties in their contract); *Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520, 536 (6th Cir. 2007) (Rogers, J., concurring and dissenting in part) ("one could contract to exercise any of various levels of care, not just the maximum that the government could impose under tort law").

[78] Even if a willful and deliberate standard did apply to Tate's actions as CFO, summary judgment is inappropriate. Tate's own expert has recognized that he and Genser made up the executive committee that determined whether or not sales contracts were entered into by Black Diamond.  The record evidence bears this out.  Tate and Genser, together, were in charge of managing and restructuring Black Diamond. Together, they deliberately turned down lucrative opportunities for Black Diamond to enter long-term coal contracts instead choosing to cater to A&M referral source CIT who desired a quick sale of the company. They both deliberately ignored advice from experienced Black Diamond employees and constituencies begging them to enter into long-term contracts and financial hedging deals to mitigate coal price risk. Tate permitted Mullins, whom he knew had no experience in selling coal to remain in place as the VP of Coal Sales, despite his recognition that Mullins was unqualified for the job.

[79] (DE 90-1 at p. 25-29).

Trustee proves that Tate's wrongful actions were the principal cause which, independently of all other causes, caused the Trustee's damages.[80] Tate is wrong.

**A.      Causation is a factual issue for the jury to determine.**

First, under Kentucky law, causation is a factual issue to be decided by the jury. *Coleman v. Emily Enters., Inc.*, 58 S.W.3d 459, 462 (Ky. 2011) ("Causation is a matter to be decided by the fact-finder."). Even the cases cited in the Motion admit this point and thus, as an initial matter, this Court should reject Tate's causation argument because it is a fact question to be decided by the jury. *See Brown v. Plata*, 131 S. Ct. 1910, 1932 (2011) (explaining that a causation requirement under a statute weighs heavily on the fact side); *Sylfield v. Penfold*, 66 F. 362, 364 (6th Cir. 1895) (causation is "generally a question of fact, to be determined, in each case, by the circumstances attending the injury and conditions in which it happened.").

**B.      Tate's "heightened" causation standard is unsupported.[81]**

Second, Tate's causation argument, even if entertained by the Court, is neither supported by Kentucky law nor the cases on which Tate relies. The Motion cherry-picks various definitions and pieces them together to declare that the "primary and direct" causation threshold means that Tate's wrongful actions must be "the principal cause, that independent of all other causes, was

---

[80] (Id. at p. 28).

[81] Tate's causation argument mirrors the one made in the Defendants' Motion for a Rule 16 Finding that the Trust's Claims are "Indemnifiable Claims" and Summary Judgment on the Defendants' First Counterclaim for Indemnification (DE 85). The Trustee will respond to the argument at length in her Response to that motion, and will summarize her position herein.

sufficient to produce the Trust's alleged damages."[82] This fabricated "heightened" causation standard, however, cannot even be found in the cases cited in the Motion.

Tate's definition of a "primary and direct" cause is faulty because Tate asserts that the phrase necessarily means that there only can be a single "primary cause" to any particular harm.[83] Tate avers that because the Trustee also has alleged that Ira Genser caused the Trustee's damages, Tate cannot be *the* primary cause.[84] This argument contradicts Kentucky and Sixth Circuit law that there can be multiple "primary causes" to a particular harm. *See, e.g., Smith v. Collins*, 251 S.W. 979, 980 (Ky. 1923) (explaining that unusual rains *and* the original construction of the dam were the *primary causes* of the alleged harm); *Fitch v. Califano*, 615 F.2d 1360, 1360 (6th Cir. 1980) (affirming determination that "severe orthopedic injuries suffered by plaintiff in a construction accident in 1969 and cardiac problems revealed by a medical examination in 1974 were the *primary causes* of plaintiff's total disability." (emphasis added)). Furthermore, accepting Tate's argument that there only can be one "primary cause" would lead to the absurd result that all of the defendants could breach their duties to the Trustee and then simply point to the others' misconduct as proof that there was no primary cause of her injury. This Court should reject Tate's interpretation of the "primarily and directly" clause because it leads to an absurd and unintended result.

---

[82] (DE 90-1 at p. 28). For example, Tate cites *Honican v. Stonebridge Life Ins. Co.*, 455 F. Supp. 2d 622, 668 (E.D. Ky. 2006), for the proposition that, for an action to be a "direct cause," the action "must be, 'directly and independently of all other causes, sufficient to produce' the alleged result." (DE 90-1 at p. 27-28). A quick review of the case, however, proves that it does not support this definition of "direct cause." Rather, the case concerned the interpretation of language in an insurance policy, which language required proof of a "sole and independent cause of death." *Honican,* 455 F. Supp. 2d at 669. Here, the Settlement Agreement does not require that the Trustee prove that Tate's wrongful actions were the "sole" or "independent" cause of her damages, rendering *Honican* irrelevant. Tate cannot rely upon *Honican* to support his skewed interpretation of a "direct cause."
[83] (DE 90-1 at p. 25-26 (arguing that Tate must be "*the* primary and direct cause") (emphasis added)).
[84] (Id. at 28).

**C.**     **Tate's actions proximately caused the Trustee's damages, thus meeting the Indemnification Agreement's requirement that Tate's gross negligence and/or willful misconduct "primarily and directly" cause the Trustee's damages.**

In the Indemnification Agreement, the A&M Parties agreed that they would be liable to the Trustee for "any such liability for losses, claims, damages, liabilities or expenses [which] are found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from [their] gross negligence or willful misconduct."[85] This requirement that Tate's gross negligence or willful misconduct must *primarily and directly* cause the Trustee's damages is the same as a proximate cause requirement. *See, e.g.,* 57A Am. Jur. 3d *Negligence* § 410 ("The term 'direct cause' has no special significance but should instead be understood as synonymous with 'proximate cause.'").[86] Furthermore, as the Sixth Circuit explained in *Slyfield v. Penfold* (which Tate cites in the Motion), when determining whether an act is a primary or proximate cause of an injury, "[t]he question always is, was there an unbroken connection between the wrongful act and the injury, -- a continuous operation?" 66 F. 362, 364 (6th Cir. 1985). Contrary to Tate's position that the Trustee must satisfy the "heightened" standard of proving that Tate's wrongful acts were the principal cause which, independent of all other causes, caused the Trustee's damages, the Trustee need only show that there is an unbroken connection between Tate's gross negligence or willful misconduct and the Trustee's injury (i.e. there was no efficient intervening cause which broke the causal chain between Tate's wrongful acts and the Trustee's injury). *See, e.g.*, *Slyfield*, 66 F. at 364; Black's Law Dictionary at 1225 (6th Ed. 1990).

---

[85] (BK DE 94, Addendum ¶ A  (emphasis added)).

[86] *See also Precision Pine & Timber, Inc. v. United States*, 63 Fed. Cl. 122, 128-29 (Fed. Cl. 2004) (adopting a substantial factor test for proximate cause and explaining that a "breach is a 'substantial factor' causing the lost profits if it *directly and primarily* caused the injuries.") (emphasis added); *Columbia First Bank v. United States*, 60 Fed. Cl. 97, 105 (Fed. Cl. 2004) (defining a substantial factor causing the alleged loss as that which *directly and primarily caused* the loss complained of).

When this correct standard is applied to Tate's misconduct, Tate's causation argument must be rejected. As the evidence of record proves, Tate took a job he was not qualified for. He failed to do that job properly by managing coal price risk. He further failed to ensure that he had expertise surrounding him that made up for his personal deficiencies. The natural and foreseeable consequence of all of these wrongful actions was that the Trustee was injured when Tate helped cause Black Diamond's crash. Furthermore, Tate has not identified (and cannot identify) any intervening causes which broke the causal relationship between Tate's failures to act and Black Diamond's destruction (i.e. the Trustee's injury).  As such, Tate's causation argument on summary judgment lacks merit because, at a minimum, the above evidence creates a genuine dispute of material fact regarding whether Tate's gross negligence and willful misconduct proximately (i.e. primarily and directly) caused the Trustee's damages.

## CONCLUSION

Tate acted in a grossly negligent fashion and with reckless disregard for the best interests of Black Diamond, and caused injuries for which the Trustee is entitled to compensation. For the reasons set forth above, Tate's motion should be denied in full.

Respectfully submitted,

DINSMORE & SHOHL LLP

/s/Grahmn N. Morgan
Grahmn N. Morgan, Esq.
Ellen Arvin Kennedy, Esq.
250 West Main Street, Suite 1400
Lexington, KY 40507
Phone:   (859) 425-1000
Fax:      (859) 425-1099
Email:  grahmn.morgan@dinsmore.com
          ellen.kennedy@dinsmore.com
**ATTORNEYS FOR TAFT A. MCKINSTRY, TRUSTEE OF THE BD UNSECURED CREDITORS TRUST**

40

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a copy of the foregoing was served this the 25th day of April, 2014, electronically in accordance with the method established under this Court's CM/ECF Administrative Procedures upon all parties in the electronic filing system in this case.

*/s/Grahmn N. Morgan*                
**ATTORNEY FOR TAFT A. MCKINSTRY, TRUSTEE OF THE BD UNSECURED CREDITORS TRUST**
