UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BLACK DIAMOND MINING COMPANY, LLC, *et al.*, | ) | |
| | ) | |
| | ) | |
| Debtors, | ) | |
| ———————————————————— | ) | |
| | ) | |
| TAFT A. MCKINSTRY, AS TRUSTEE OF THE BD UNSECURED CREDITORS TRUST, | ) | **CASE NO. 7:13-cv-125-ART** |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| IRA J. GENSER, LARRY TATE, AND ALVAREZ & MARSAL NORTH AMERICA, LLC, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**TRUSTEE'S RESPONSE TO THE A&M PARTIES'
MOTION FOR RULE 16 FINDING THAT THE TRUST'S CLAIMS ARE
"INDEMNIFIABLE CLAIMS" AND SUMMARY JUDGMENT ON THE DEFENDANTS'
FIRST COUNTERCLAIM FOR INDEMNIFICATION**

Plaintiff, Taft A. McKinstry, as Trustee (the "Trustee") of the BD Unsecured Creditors

Trust (the "Trust"), by counsel, submits the following Response to the A&M Parties'[1] Motion for

for Rule 16 Finding that the Trust's Claims Are "Indemnifiable Claims" and Summary Judgment

on the Defendants' First Counterclaim for Indemnification (DE 85) (the "Motion"):

---

[1] Capitalized terms not defined herein shall have the meaning assigned to them in the Motion. Citations to the record in this case are referred to as (DE __). Citations to the record in the Debtors' main bankruptcy cases, consolidated under Case No. 08-70066, are referred to as (BK DE __). Citations to the record in the adversary proceeding involving the Trustee's claims against the A&M Parties, Adv. No. 11-7010, are referred to as (AP DE __).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

    I.    Response to the A&M Parties' Statement of Allegedly Undisputed Material Facts. ......... 2

    II.    Trustee's Counterstatement of Material Facts. ............................................................. 11

        A.    Despite Being Advised to Do So, the A&M Parties Did Not Enter Into Contracts to Sell Black Diamond's Coal at Favorable Prices. ................................................................. 11

        B.    The A&M Parties Primarily and Directly Cause Black Diamond's Collapse. ........... 16

        C.    The Miller Brothers Bankruptcy Did Not Affect Black Diamond's Reorganization Efforts. ......................................................................................................................... 18

        D.    The Coal Market During the Summer of 2008 Presented the A&M Parties with Favorable Reorganization Prospects, Which They Proceeded to Squander. ...................... 20

        E.    Economic Factors Did Not Cause Black Diamond's Collapse. ................................ 21

ARGUMENT ........................................................................................................................ 22

    I.    This Motion Should Be Decided Under Rule 56, Not Rule 16. ....................................... 22

    II.    Kentucky Law Applies to the Determination of the Issues Raised in the Motion. ........... 24

    III.    Kentucky Law on Primary and Direct Causation. ......................................................... 26

        A.    Causation is a Fact Issue For the Jury to Determine. ................................................. 26

        B.    Primary and Direct Cause Means that the A&M Parties' Actions Must Be the Proximate Cause of the Trustee's Damages. ...................................................................... 27

    IV.    There Is, at the Very Least, a Genuine Issue of Fact as to Whether the A&M Parties Primarily and Directly Caused the Trustee's Damages. .......................................................... 30

        A.    The Evidence Shows that the A&M Parties Primarily and Directly Caused Black Diamond's Collapse. ........................................................................................................ 30

        B.    Contract Miners Did Not Cause Black Diamond's Damages. .................................... 32

        C.    The Volatility of the Market Helped, Not Hindered, Black Diamond's Prospects for Reorganization. ............................................................................................................... 34

        D.    The Economic Downturn Was Not a Superseding Cause of Black Diamond's Collapse. ........................................................................................................................ 36

        E.    The Committee's Disclosure Statement Is Not "Evidence" that Any of the Circumstances Identified by the A&M Parties Are Superseding Causes. ........................... 38

        F.    The A&M Parties' Spoliation of Evidence Precludes Summary Judgment. .............. 39

    V.    The Trustee's Claims Are Not Indemnifiable Claims and Summary Judgment Is Inappropriate. ...................................................................................................................... 39

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662 (E.D. Ky. 2010)........................ 26

*Braman-Johnson Flying Serv., Inc. v. Thomson*, 167 Misc. 167 (N.Y. Mun. Ct. 1938) .............. 29

*Brown Hotel Co. v. Pittsburgh Fuel Co.*, 224 S.W.2d 165 (Ky. 1949) ........................................ 27

*Brown v. Plata*, 131 S. Ct. 1910 (2011)....................................................................................... 26

*Coleman v. Emily Enters., Inc.*, 58 S.W.3d 459 (Ky. 2001)......................................................... 26

*Columbia First Bank v. U.S.*, 60 Fed. Cl. 97 (Fed. Cl. 2004)...................................................... 28

*Dale v. E. R. Knapp & Sons, Inc.*, 433 S.W.2d 880 (Ky. 1968) ....................................... 29, 34, 37

*Derdiarian v. Felix Contractor Corp.*, 414 N.E.2d 666 (N.Y. 1980)........................................... 29

*Deutsch v. Shein*, 597 S.W.2d 141 (Ky. 1980) ............................................................................ 28

*Dews v. A.B. Dick Co.*, 231 F.3d 1016 (6th Cir. 2000)................................................................ 24

*Ernest v. Red Creek Cent. Sch. Dist.*, 717 N.E.2d 690 (N.Y. 1999)............................................ 29

*Erwin v. Neversink S.B. Co.*, 88 N.Y. 184 (N.Y. 1882)............................................................... 29

*Fitch v. Califano*, 615 F.2d 1360 (6th Cir. 1980) ...................................................................... 28

*German v. Brooklyn H. R. Co.*, 107 A.D. 354 (N.Y. App. Div. 1905) ......................................... 29

*January-Wood Co. v. Bramel*, 67 S.W.2d 14 (Ky. 1934) ........................................................... 27

*Kellioka Coal Co. v. Blanton*, 255 S.W. 120 (Ky. 1923).............................................................. 27

*Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 427 N.Y.S.2d 10 (N.Y. App. Div. 1980) ....... 24

*New Hampshire Ins. Co. v MF Global, Inc.*, 970 N.Y.S.2d 16 (N.Y. App. Div. 1st Dep't 2013) 29

*NKC Hosps., Inc. v. Anthony*, 849 S.W.2d 564 (Ky. 1993)................................................ 29, 34, 37

*Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012)............................................................................ 28

*Pike Co., Inc. v Customweld Indus., Inc.*, 980 N.Y.S.2d 533 (N.Y. App. Div. 2d Dep't 2014)... 23

*Precision Pine & Timber, Inc. v. U.S.*, 63 Fed. Cl. 122 (Fed. Cl. 2004) ..................................... 27

*Propane Transport Co. v. Edelen*, 400 S.W.2d 697 (Ky. 1966).................................................. 28

*Providence v. Young*, 13 S.W.2d 1022 (Ky. 1929)...................................................................... 27

*Rescildo v. R.H. Macy's*, 187 A.D.2d 112 (N.Y. App. Div. 1993) ............................................... 24

*Saleba v. Schrand*, 300 S.W.3d 177 (Ky. 2009)......................................................................... 25

*Scheck Mech. Corp. v. Borden, Inc.*, 186 F. Supp. 2d 724 (W.D. Ky. 2001) .............................. 23

*Sergent v. McKinstry*, 472 B.R. 387 (E.D. Ky. 2012) ............................................................ 2, 24

*Shanahan v. Vallat*, 2008 WL 4525452  (S.D.N.Y. Oct. 3, 2008) ............................................. 36

*Smith v. Collins*, 251 S.W. 979, 980 (Ky. 1923)........................................................................ 28

*Standard Oil Co. v. Fidelity & Cas. Co. of N.Y.*, 66 F. Supp. 603 (W.D. Ky. 1946) ................... 26

*Sylfield v. Penfold*, 66 F. 362 (6th Cir. 1895) ........................................................................... 26

*Wells Fargo Financial Leasing, Inc. v. Griffin*, Civil Action No. 5:13-cv-0075-TBR, 2013 U.S.
     Dist. LEXIS 127718 (W.D. Ky. Sept. 5, 2013) ...................................................................... 25

**Statutes**

11 U.S.C. § 1112(b)(4) .............................................................................................................. 32

**Other Authorities**

57A Am. Jur. 2d *Negligence*....................................................................................................... 27

Black's Law Dictionary (6th Ed. 1990)....................................................................................... 28

Restatement (Second) of Torts.................................................................................................... 28

## <u>INTRODUCTION</u>

The Motion is procedurally and substantively inapt. The A&M Parties characterize the Motion as being pursuant to Rule 16 to avoid the rigorous standard for summary judgment found in Rule 56 and the record establishes that the A&M Parties were the primary and direct cause of the damages suffered by Black Diamond. Genser and Tate had final authority over Black Diamond at a time when a surge in the coal market sent coal prices to historic highs.  The pair was warned that the coal market is fickle, that they needed to act quickly to take advantage of the boom, and that if they did not lock in coal prices during the summer of 2008 with term contracts, Black Diamond would suffer when the market inevitably turned. Genser and Tate willfully ignored these warnings, rejecting multiple lucrative offers and botching negotiations with potential buyers. When the market cooled, just as Genser and Tate were warned that it would, Black Diamond had sold no coal under long term contracts and Black Diamond was forced to liquidate.

Given the foregoing, the A&M Parties cannot credibly argue that they did not primarily and directly cause Black Diamond's demise and, notably, they do not even attempt to argue that their actions did not contribute to its failure. Instead, the A&M Parties urge that three other factors – Black Diamond's reliance on contract miners, the volatility of the coal market, and general economic conditions – were more to blame for Black Diamond's collapse than they were. Their theory fails for three reasons.

First, conflating causation with correlation, the A&M Parties offer no evidence showing that these presumed "factors" actually caused Black Diamond's collapse or contributed to it.

Second, had the A&M Parties locked in coal prices when they were warned to do so, the factors would have been completely irrelevant. Irrespective of outside forces, the damage to

1

Black Diamond could have been avoided if the A&M Parties had set aside their own personal self interest and allowed Black Diamond to do what coal companies do: sell coal.

Finally, the risks posed by all of these factors were foreseeable and were brought to the A&M Parties' attention repeatedly. The A&M Parties knew that Black Diamond employed contract miners when they took over, they knew or should have known that the coal market is volatile by nature, and they were repeatedly warned that coal prices would not remain at record highs. The A&M Parties – who advertise themselves as "corporate doctors" with expertise in turning around distressed companies – cannot blame their failures on known obstacles that all companies in an industry face, and which the A&M Parties were paid millions to navigate.

## FACTUAL BACKGROUND

### I.      Response to the A&M Parties' Statement of Allegedly Undisputed Material Facts.

The Trustee responds to the A&M Parties' Statement of Allegedly Undisputed Material Facts (the "Statement") as follows:

1,      Admitted.[2]

2.      Admitted.

3.      The CRO Order provided for the employment of Genser as CRO, not his appointment. *See* Trustee's Response to ¶ 2 of the Statement in Larry Tate's Motion for Summary Judgment ("Tate MSJ"). (DE 159); *Sergent v. McKinstry*, 472 B.R. 387, 412-15 (E.D. Ky. 2012); (June 29, 2010 Letter from A&M General Counsel Poretsky admitting that the Order "provid[es] for the <u>employment</u>" of a CRO and sets forth the "terms and conditions of the <u>employment</u> of Mr. Genser and Mr. Tate and A&M employees," (emphasis added), Exh. A).

---

[2] Any admission of the facts alleged in a particular paragraph is not an admission as to the veracity of the contents of the document or documents cited as support for such paragraph.  Unless otherwise stated, the Trustee does not admit the truth of the contents of any documents referred to in the Motion. The Trustee also states that the headings interspersed throughout the Statement are all subjective characterizations to which no response is required.

4.　　　Disputed. A&M <u>and</u> Genser made Tate CFO of Black Diamond. *See* Response to ¶ 3 of the Statement in Tate MSJ.

5.　　　Disputed to the extent the A&M Parties contend that the Engagement Letter sets forth all of the "terms and conditions" of the A&M Parties' employment.  Additional terms and conditions are contained in the CRO Order and, as officers of Black Diamond, Genser and Tate were subject to statutory and common law legal duties. (BK DE 56).

6.　　　Admitted, but the allegations are immaterial to this Motion.

7.　　　Admitted, but the allegations are immaterial to this Motion.

8.　　　Disputed. The Objections filed opposed the employment of the A&M Parties, particularly in light of the fact that A&M had received a significant pre-bankruptcy payment from CIT, one of Black Diamond's primary secured lenders. (*See, e.g*., BK DE 360 ¶ 25 (noting the payment from CIT)); (BK DE 206, p. 7 ("[A]ny reasonable person . . . would be forced to inquire into [A&M's] objectivity."). As the Engagement Letter related to the employment of the A&M Parties, the Objections related to the terms of the Engagement Letter.

9.　　　Admitted that the court entered an order, which speaks for itself.

10.　　Disputed to the extent words quoted differ from the language of the Engagement Letter and Indemnification Agreement and to the extent the Settlement Agreement supersedes the Engagement Letter. The A&M Parties do not accurately set forth the entirety of ¶ A of the Indemnification Agreement.

11.　　Disputed to the extent set forth in Response to ¶ 10, *supra.*

12.　　Admitted.[3]

13.　　The Trustee admits that the Plan was filed on June 15, 2009.

---

[3] The Trustee states that this is not a material fact as the Settlement Agreement, governed by Kentucky law, superseded the Engagement Letter.

14.     Admitted.

15.     The Trustee admits that the Committee wrote, in its objection to the Debtors' Plan, that the A&M Parties were likely to assert a right to indemnity, which could lead to the assertion of administrative expense claims. (BK DE 1511, p. 20-21). The Committee also wrote that that argument was a "red herring." (*Id.*).

16.     Admitted.

17.     The Trustee disputes the subjective characterization of the documents cited. The Trustee further states that the negotiations concerning the Settlement Agreement included negotiation of a provision that the A&M Parties may only draw on Adequate Security to cover the cost of their *reasonably incurred* fees and expenses.

18.     Disputed as to Mr. Goodman. He is not involved in litigating the claims against the A&M Parties. (AP DE 59).

19.     Admitted.

20.     The Trustee disputes that the Trust became effective or that she formally became the Trustee prior to July 31, 2009. (Plan, p. 20, BK DE 1562); (BD Unsecured Creditors Trust Agreement (the "Trust Agreement"), Exh. B).

21.     Disputed. The Trust and Trustee were deemed parties to the Settlement Agreement "immediately upon commencement of such trust's existence." (BK DE 1562, p. 31-32).

22.     The Trustee admits only that the "Committee" agreed to the statements in the referenced paragraph (but the Trust did not). (Settlement Agreement, p. 5 ¶ 9).

23.     Admitted to the extent that the term "parties" refers to the parties to the Settlement Agreement.

4

24.     Disputed to the extent that the A&M Parties imply that the Trustee cannot pursue her negligence claims against them. (Settlement Agreement, p. 5 ¶ 6 (referring only to the Trustee's ability to collect, not pursue her negligence claims)); (*see also* DE 159, p. 6 fn. 7).

25.     *See* Response to ¶ 23, *supra*.

26.     Admitted.

27.     Admitted.

28.     Admitted.[4]

29.     Admitted.

30.     The Trustee disputes the subjective characterization of the documents cited.

31.     Disputed. Had the A&M Parties pursued the offer from DTE, the $32 million profits would have allowed Black Diamond to operate with its own employees, eliminating dependence on contract miners.[5] (Hull 2013 Depo. 164-72, DE 142). The $500 million in revenue from the Koch offer could have been used similarly. (*Id.*).

32.     Disputed. Black Diamond maintained a database of contract mining firms that could be called on as replacements. (Confidential Information Memorandum[6] "CIM," Exh. C); (*see also* Hull 2009 Depo. 29 (the advantage to contract miners is, "if you have 11, 12, or 13 . . . , is that if you lose one, you haven't lost your entire company."), DE 67). Although the company had ceased production at the time of the bankruptcy filing, the contract miners were back to work within 2 weeks of the filing. *See infra* ¶ 26 of C/S.

---

[4] Use of contract miners is not uncommon for producers operating in the region where Black Diamond's mines were located. *See infra* ¶ 25 of Counterstatement ("C/S").

[5] It also would have allowed Black Diamond to "face-up" a new mine next to the Debtors' prep plant; the company that purchased the Debtors took just such action and is running the mine "very well." (Hull 2013 Depo. 164-172, DE 142).

[6] The CIM, sent to prospective purchasers of the company, was prepared with Genser and Tate's assistance and approval. (Morgner 2013 Depo. 81-85, DE 146).

33.     Disputed. *See* Response to ¶ 32, *supra*; (*see also* CIM, p. 22 Miller Brothers was to be responsible for a smaller portion of Black Diamond's production going forward).

34.     Admitted.

35.     Disputed. The A&M Parties failed to implement such a process in actuality. (Sharp Report ¶ 57 (stating that a true dual track process "provides a mechanism to shift from one track to the other when necessary" and describing how the A&M Parties failed to actually implement such a process, DE 127-2); (*see also* Turnbull 2009 Depo. 69-71, DE 69).

36.     Admitted.

37.     Admitted.

38.     Admitted that the proposals submitted were not binding because Black Diamond had no commitments for its coal production. Several financers did not pursue Black Diamond because of its lack of long term contracts. (DE 85-9, p. 2).

39.     Disputed to the extent ¶ 39 states that the lender's withdrawal of interest was based on their decreased debt capacity. Interested parties declined to finance Black Diamond because the A&M Parties failed to secure a future income stream for the company by hedging or entering into term contracts for 2009 and beyond. (Buckfire/UCC 1652-53 (Credit Suisse wanted to see 75% of Black Diamond's coal output for 2009 contracted), Exh. D); (AP DE 351-14, p. 11, 13 (lenders wanted Black Diamond to lock in long-term contracts or hedge its production)); (AP DE 351-15, p. 3 (all lenders wanted a "substantial portion" of 2009 and 2010 production to be under contract)); (AP DE 351-19, p. 2 ("any new financing will be conditioned on substantial contracted coal;" lenders would not market the deal until coal was contracted)); (*see also* McCarthy Depo. 35-36, 97-100, (Aurora wanted Black Diamond to lock up 75%-80% of its production), DE 42); (Buckfire/UCC 9958, (although Black Diamond failed to lock up long term

contracts as Goldman Sachs requested, the institution was going to "see if they could get to a commitment w/o contracts and have the entire 75-80% of production hedged," Exh. E).

40.     Disputed that coal prices were "unusually volatile." Genser and Tate were repeatedly told that volatility is normal. (BD-MCK 141 (July 3, 2008 UCC Counsel tells Genser that the UCC "[did] not want to hear that . . . [the A&M Parties] never saw the dip coming"), Exh. F); (Tran. 08-01-08 Hr'g, 20, BK DE 1632 (the court acknowledges that the coal market is "fickle"); (Turnbull 2009 Depo. 38-39 (noting that the coal market had "a history of going up and a history of coming down"), DE 69); (Bach Depo. 115-16 ("I mean, I've been in this business for 30 years, so I've seen a lot of ups and a lot of downs, as opposed to some people who might have been new to the business that didn't understand it."), DE 36); (Bellum Report, p. 3 ("Historically, however, coal prices have varied considerably in the short-term."), DE 127-1).

41.     Disputed. The document referenced in ¶ 41 does not support the proposition that "coal prices shifted up and down quickly from day to day."[7]

42.     Disputed. The price of coal from 2000 through 2008 had periods where it dropped below $40 per ton and then rose to greater than $100 per ton, which cannot be characterized as "fairly steady." (Heller Report, p. 8 and Exh. 2, DE 85-23); *see also* fn. 7, *supra*.

43.     Disputed. It is unclear if the price of coal referred to is a "prompt-month" price or a calendar year "forward price." (Heller Report, at 7 and Ex. 1 to the Report, DE 85-23); *see also* fn. 7, *supra*.

44.     The Trustee admits that counsel for the Committee sent the email attached as Exhibit 11 to the Motion stating that the Committee did not want to hear "three months from

---

[7] ¶ 41 also cites to a graph compiled by A&M's proposed expert, Heller. This graph is inadmissible pursuant to FRE 1006 until the A&M Parties supply the underlying data used to compile this graph and show the data itself is admissible.

now that 'you never saw the dip in coal prices coming'" after emphasizing the volatile nature of the coal market. (emphasis added).

45.     The Trustee admits that counsel for the UCC made the statement referenced as part of an argument, which must be considered in context. The Trustee disputes any implication that Mr. Green's statement somehow conflicts with his email to Genser on July 3, 2008. Read in context, it is clear that Green's point at the July 16, 2008 hearing was that the coal market is volatile. The volatility of the coal market underscored the need for Genser and Tate to lock in coal prices at profitable levels while they were available.[8]

46.     Disputed as to any implication that the coal market was not volatile in the past.

47.     Admitted that the UCC's professionals and others in the industry predicted a decline in coal prices and although they did not predict the exact *price* to which coal would fall in 2009, they warned Genser and Tate to enter into long term contracts before prices fell, which was a near certainty. (*See* Sharp Report ¶ 65, cataloging examples of the numerous instances in which Genser and Tate were warned that prices would fall and they needed to lock in the price of coal through long term physical contracts or financial hedging contracts, DE 127-2).

48.     Disputed as to the A&M Parties' subjective characterization of John Wagner's testimony. The Trustee also disputes that DTE "need[ed] to purchase more coal for 2010 than 2009 . . . ." (DTE 51, Exh. G (DTE was looking to purchase 600,000 tons for 2009 and 500,000 tons for 2010)). The Trustee further disputes that DTE waited until the price fell to enter into any

---

[8] Mr. Green's complete statement is that "Mr. Krakauer actually stole a lot of my thunder in terms of coal price. I would hope, and the Committee would also pray, that we are paid in full with interest but unfortunately the price of coal goes up and down, and I've been repeatedly told by the traders on my Committee that I should stop being in the business of predicting where the price of coal is going." (Tran 7/16/08 Hr'g, p. 72, BK DE 740). In other words, lock the prices in when they are high. Brian Krakauer, counsel for CIT had noted, just prior to Mr. Green's statements, the generally volatile nature of the coal markets: "prices go up, the prices go down in the coal market. It's volatile . . . There is a lot of volatility and it is very important that we handle this process very reasonably, and not in a gambling way." (*Id.* at 71-72).

long-term contracts. DTE twice offered to purchase coal from Black Diamond's 2009 production, but Genser and Tate rejected those offers. (Mullins 2013 Depo. 321; 327, DE 150).

49.   Disputed. AEP's "general policy at that time was to look at both short-term and long-term and based on what [AEP] thought the market was doing and the market conditions, [AEP] would look at any offers that [they] got." (Henry Depo. 44 [filed under seal]). Additionally, as early as July 2008 AEP expressed an interest in entering term deals extending through 2011. (July 10, 2008 email from Rusk to Mullins, Exh. H). AEP also entered into negotiations with Black Diamond for a three year deal in September 2008. (Sept. 23, 2008 email from Genser to Green, Exh. I).[9]

50.   Disputed as to the subjective characterization of the sources cited.

51.   Admitted.

52.   Admitted.

53.   Admitted.

54.   Admitted.

55.   Admitted.

56.   Admitted.

---

[9] However, Genser misrepresented that his relationship with AEP was strong enough that Black Diamond could submit a higher offer to AEP and then negotiate downward the price of a contract without fear of AEP walking away from the bargaining table. (Holmes 2013 Depo. 246 ("I asked Ira, are you comfortable with your relationship with AEP such that if they do not like this price they will engage in dialogue with you to try to come up with a price that is meaningful and acceptable to all parties. And he assured me in that call with all of these people on the line that if they thought that price was too high then they could fall back and negotiate."), DE 145); (Hull 2013 Depo. 238 ("I don't think a single person sitting at that AEP table would remember who Ira Genser is."), DE 142); (Mullins 2013 Depo. 162 ("Q. And what was AEP's reaction [to the offer]? A. At one point the word insulted was expressed. But they didn't entertain the offer."), DE 150); (Henry Depo. 260-261 [filed under seal] ("Q. All right. Do you remember meeting Mr. Genser in person? A. I do not. Q. You have no impressions of him? A. No, I do not. Q. You do not recall speaking to him? A. I do not. Q. I take it you don't remember whether he stood up at this meeting and gave a speech? A. I don't even know what the gentleman looks like.")). Contemporaneous emails show that the A&M Parties were less concerned with delivering an offer to AEP that AEP would accept, and more concerned with avoiding blame for their conduct. (Sept. 26, 2008 email string between Tate, Oellermann, and Genser (Tate states "As you point out, the good news is that we are in a 'no lose' situation because if AEP accepts a higher price than the blended $121 we were originally suggesting, we are better off, and if our offer is not well received by AEP because of the price, the UCC will only have themselves to blame . . . ."), Exh. J).

57.     Disputed as to the subjective characterization of that transcript.

58.     Disputed. Black Diamond still had opportunities to sell its coal at favorable prices in late summer and fall 2008 around the time of the crash. *See infra* ¶ 14, 15 of C/S.

59.     Disputed to the extent discussed in fn. 7, *supra*. The Trustee admits only that prices of CSX Origin 1% Sulfur Coal dropped below $60 per ton during the first quarter of 2009. (Heller Report, p. 8 and Ex. 2 of Report)

60.     Admitted only that the transcripts cited contain the statements quoted. The Trustee states that the A&M Parties' advisors encouraged the A&M Parties to enter into long-term coal contracts prices were at historic highs. *See* Response to ¶ 47, *supra*.[10]

61.     *See* Response to ¶ 60, *supra*.

62.     *See* Response to ¶ 60, *supra*.

63.     *See* Response to ¶ 60, *supra*.

64.     *See* Response to ¶ 60, *supra*.

65.     *See* Response to ¶ 60, *supra*.

66.     Admitted only that, in a section of its proposed disclosure statement dated April 17, 2009, the UCC identified "Risks Due to Fluctuation in Price of Coal" as one of seven "Risk Factors to be Considered" by potential creditors in evaluating the UCC's proposed plan of reorganization. (BK DE 1310, p. 50-51).

---

[10] The A&M Parties knew or should have known that in 2006 and 2007, prior to the run up in coal prices, steam coal sold at an average of $55 to $60 per ton (Bellum Report, p. 3, DE 127-1).  They were repeatedly warned that the prices in excess of $90 to $100 per ton seen in the summer of 2008 would not be sustained and that they should lock in prices before they fell back to the prior levels. These prior levels were very near to Black Diamond's production costs which ranged in the mid $60 per ton range. (Gelber Report, Ex. 1 relying on calculations from the CIM, DE 131-15).  The extent to which prices fell below Black Diamond's cost of production and whether anyone predicted they would fall to that level is irrelevant. Genser and Tate knew or should have known that prices were likely to fall back to prior levels (below Black Diamond's cost of production) and once that happened Black Diamond's profitability would plummet in the absence of a locked in revenue stream.

67.     *See* Response to ¶ 66, *supra*. "Risks Due to Reliance on Contract Miners" was another one of the seven risk factors identified.

68.     Admitted only that the UCC's proposed disclosure statement dated April 17, 2009, well after Genser and Tate failed to manage Black Diamond's commodity price risk by either selling coal forward or executing a financial hedge, contains the statement quoted. Disputed as to the subjective characterization of that statement and the document.

69.     See Response to ¶ 68, *supra*.

70.     *See* Response to ¶ 68, *supra*.

71.     *See* Response to ¶ 68, *supra*.

## II.     Trustee's Counterstatement of Material Facts.

The Trustee presents a Counterstatement of Material Facts (the "C/S"):

### A.     Despite Being Advised to Do So, the A&M Parties Did Not Enter Into Contracts to Sell Black Diamond's Coal at Favorable Prices.

1.     A&M's Steve Cohn, who had coal experience and had previously worked with Black Diamond, was unavailable to manage Black Diamond's bankruptcy because another engagement was higher on his priority list. (Email String between Genser and Cohn, DE 136-4, p. 1).

2.     A&M, through Cohn, introduced Genser to CIT, and ensured that Genser would have CIT's approval to act as Black Diamond's CRO. (*Id.*)

3.     A&M markets itself by touting its industry experience. (Dep. Ex. 322, slide 10, Exh. K). A&M contracted with Black Diamond to make Genser and Tate available to work on the engagement. (Engagement Letter, p. 1, DE 85-2); (Exh. A). A&M made this staffing decision despite knowing that Genser and Tate lacked the proper experience to manage Black Diamond

and failed to give them the oversight necessary to ensure that they fulfilled their duties to Black Diamond. (Sharp Report ¶¶ 19-43, DE 127-2).

4.      As CRO, Genser had final decision-making authority with respect to any action taken or to be taken by Black Diamond. (Genser Apr. 2009 Depo. 10, 19-20, DE 59); (MLB 7259-61 (Genser tells Cohn that the"best suggestion" that Cohn ever had was to include Genser on the top of the "org chart" and that Genser hopes that Hull, Black Diamond's CEO, will shoot himself in the head), Exh. L); (BD-MCK 191 (Debtors' Organizational Chart), Exh. M. Genser and Tate conferred on all major decisions, including long-term contracts. (Ogle Depo. 262, DE 54).

5.      A&M advertises that "organizations choose [it] to help tackle their toughest business and operational challenges." (2014 Excerpt from A&M Website, Exh. N.  Even back in 2008, A&M stated that its professionals are "[o]ften compared to corporate doctors . . . ."  (2008 Excerpt from A&M Website, Exh. O).

6.      Any business that sells a product has risk. (Doyle Depo. 144, DE 55). In fact, all businesses have risks that officers must navigate. (*Id.* ("Q. Doing business is a risk, right? A. Yes, as I wrote [in] my report.")).

7.      Black Diamond was "engaged in the production and sale of steam and stoker coal," and, as such, it had to sell coal to generate revenue and profit. (Exh. C, p. 3).

8.      During the course of 2008, multiple parties involved with or familiar with Black Diamond's bankruptcy, including the Bankruptcy Court, encouraged Genser and Tate to enter into contracts for long-term business before the market dropped and significant profits could no longer be realized. *See* Response to ¶ 47, *supra*.

9.      Genser and Tate ignored or dismissed this advice. (Genser April 2009 Depo. 97-98, Black Diamond failed to sell or hedge any coal forward in 2008 on a term basis into 2009 and beyond, DE 59); (Sharp Report ¶ 66, DE 127-2 ("Once informed of the significant commodity price risks, the Defendants demonstrated a substantial lack of concern for whether damage to Black Diamond would result from their failure to mitigate this business risk.")).

10.     Genser and Tate did not seek advice from Seth Schwartz, a nationally known coal expert hired by CIT in connection with the bankruptcy. (Schwartz Depo. 26, DE 46).

11.     Genser and Tate waited until November 3, 2008, well after the market had already fallen, to try to retain a coal broker to market Black Diamond's coal.  (MLB 8779-80, Exh. P).

12.     Genser did not let Carl Mullins, Black Diamond's VP of Sales, sell coal forward for 2009 deliveries until November 3, 2008 (after Massey disappeared and the market had dropped off severely).  (Mullins 2013 Depo. 389-90, DE 150); (*see also* Buckfire/UCC 5442-46 (Nov. 20, 2008 Email from Mullins to Genser), Exh. Q).

13.     When Black Diamond received offers to buy coal, Genser and Tate refused them. Koch Carbon submitted an offer to Genser to purchase substantially all of Black Diamond's coal for 2009, 2010, and 2011 on June 4, 2008. (MLB 32390-91 and MLB 32384-85 (A&M's Cohn suggested the offer be forwarded to CIT), Exh. R). Genser and Tate failed to follow up on the offer and Black Diamond missed out on $500 million in revenue as a result. (Gelber Report, p. 8, 14, DE 131-15).

14.     When Mullins received an offer from DTE for Black Diamond's 4th quarter 2008 and 2009 coal, Genser ordered him to reject it. (DE 159-12 Hull states that they should "STRONGLY consider" the DTE offer). Although Mullins warned Genser that DTE would not do a multi-year commitment, Genser ordered Mullins to tell DTE that Black Diamond would

only sell coal to DTE if DTE purchased coal for 2010 as well. (JD-BDM 55835-40, Exh. S); (BD-MCK 861-62, Exh. T). DTE looked elsewhere for its 2009 coal needs, and Black Diamond missed out on $32 million in profits. (MLB 15339-40, Exh. U). By demanding conditions that Genser already knew would be rejected, Genser ensured that Black Diamond would not sell any of its coal forward (as Massey Energy had demanded and as CIT wanted). Around the same time Koch Carbon expressed interest in putting together a two year deal with Black Diamond to supply coal to Southern Company. (Dep. Ex. 391, Exh. V); (Bach Depo. 66 (stating that he believed he could get a deal done with Southern using Black Diamond's coal at prices ranging from $116 per ton to $123 per ton), DE 36).

15.     On September 23, 2008, Genser told counsel for the UCC that his meeting with AEP, another prospective purchaser, on September 19, 2008 went so well that he was afraid that if he had made a verbal offer at the meeting, AEP would have accepted and Black Diamond would have been obligated to the transaction. (Exh. I). In truth, AEP warned Genser that Black Diamond would have to hit their "sweet spot" in terms of price (i.e. make a significantly below market offer) for a deal to get done. (Henry Depo [filed under seal] 262-263 (Henry informed producers like Black Diamond that in order to do term business a supplier would have to make an offer significantly lower than market indications); (Mullins 2013 Depo. 359-360, DE 150). On the following day, Charles Oellermann, legal counsel for Black Diamond, reported to Genser that CIT did not want Black Diamond to submit a bid to AEP. (Sept. 24, 2008 email from Oellermann to Genser and others, Exh. W). On that same day, Genser told the UCC that based on his dealings with AEP, AEP would agree to prices in the $130/ton range, but private emails between Genser and Tate prove otherwise. (Sept. 25, 2008 email from Green to Oellermann stating that someone on Genser's team had represented the prior day that prices from AEP could

range from $120-$130, Exh. X); (Sept. 24, 2008 email from Tate to Genser stating that he is "concerned about the representation of possibly getting contracts from AEP in the $130s," Exh. Y). On September 26, 2008, Tate wrote Genser and others that AEP would be surprised at a price in excess of $130, but pointed out that this was a "no lose" situation for them because "if AEP accepts a higher price than the blended $121 we were originally suggesting, we are better off, and if our offer is not well received by AEP because of the price, the UCC will only have themselves to blame." (Exh. J). The UCC believed Genser that Black Diamond could sell coal at prices in excess of $130 to AEP and that if AEP did not like the initial price they would negotiate, not cut off communication. *See* fn. 9, *supra.* In reality, Genser was just a spectator at the meeting with AEP, and AEP refused to negotiate further with Black Diamond. (*Id.*).

16.     During the summer of 2008, while Genser and Tate acted as officers of Black Diamond, Black Diamond did not enter into any contracts for its 2009, 2010, or 2011 coal production when coal prices were double, and nearly triple what it cost Black Diamond to produce. (Genser April 2009 Depo. 97-98, DE 59); (MLB 27399-402 (in October 2008 Oellermann tells Genser "it sounds like the Perfect Storm just blew over."), Exh. Z).

17.     Black Diamond also did not even explore financial hedging opportunities until September of 2008,[11] after the coal market had declined and, despite being the CFO, Tate had no experience with financial hedging. (Sharp Report ¶¶ 30, 61, DE 127-2).

18.     The A&M Parties' refusal to enter into long-term contracts or financial hedging arrangements can be explained by their allegiance to CIT, Black Diamond's primary secured lender. Genser and Tate were paid by A&M and not Black Diamond. Their compensation was linked to the profits A&M made from engagements such as Black Diamond, which in this case was approximately $3,000,000. (DE 136, p. 20 fn. 20); (Alvarez & Marsal's Objections and

---

[11] And even then evidence of efforts by the A&M Parties to educate themselves on financial hedging is scant.

Responses to Plaintiff's Second and Third Set of Interrogatories, at 7, Answer to Interrog. No. 30, Exh. AA); (Genser 2013 Depo. 62-64, DE 34 (A&M awarded its employees up to 15% of collections made off of an engagement if the employee obtained the referral that landed the engagement)). Throughout 2008 and 2009, Genser sought out and obtained additional referrals for business from CIT. (March 17, 2008 email chain between Genser and H. Schroeder of CIT regarding referral request, Exh. BB); (Dep. Ex. 320 (Genser and Cohn refer to CIT executives as referral sources), Exh. CC); (Carlson May 2013 Depo. 283 (Carlson believed that an August 2008 lunch was an attempt by A&M to market more business to CIT), DE 138); (MLB 33171 (November 2008 email where Genser writes Cohn that he wants to make sure that CIT has been happy with A&M's work to date and stating that "Harry and Mike shared with me that they have been given responsibility for the commercial real estate portfolio of CIT in their workout role – that could be a huge opportunity for the firm (REAS/NACR) – not sure how we seize on that opportunity"), Exh. DD). Not surprisingly, during the Black Diamond bankruptcy, A&M was interested in doing what was best for CIT. (Dep. Ex. 37 (Genser writes Tate that they should "keep [their] eye on the prize – getting the banks out whole"), Exh. EE); (MLB 32543-45 (Genser commenting on a press release, tells Cohn, "Damn right – the actual quote was 'we are going to sell this thing for $180,000,001 [the amount of secured debt plus $1] – once the banks are paid off we are all going home' . . ."), Exh. FF).

### B.  The A&M Parties Primarily and Directly Cause Black Diamond's Collapse.

19.    Because Black Diamond did not lock up any of its production at favorable prices during the summer of 2008, it was unable to remain profitable. (Bellum Depo. 138-39 ("The fact that [the A&M Parties] did not lock up the contracts and the coal prices fell, that's what caused [Black Diamond's failure to exit from bankruptcy]."), DE 141); (MB 42914-17 (Oellermann says

16

Black Diamond's "achilles heel" is it hadn't sold the bulk of its coal for the 1st half of 2009), Exh. GG); (*cf.* Hull 2009 Depo. 54 (when asked, if Black Diamond had been able to lock in prices in the summer of 2008, "that would have solidified Black Diamond's status as a going concern…?," Hull answers "If we had locked in those prices long term, yes."), DE 67).

20.     The Trustee's experts have found that the A&M Parties' gross negligence and willful misconduct caused Black Diamond to fail and led to the damages that the Trustee seeks. (Bellum Depo.138-39, DE 141); (Sharp Report ¶¶ 42, 43, 69, DE 127-2).

21.     The major constituencies affiliated with Black Diamond's bankruptcy also stated that the A&M Parties caused Black Diamond's collapse. (BK DE 1047, p. 3 (filed by the Harris Sublessors) ("The post-petition operational decisions of Debtors' management – on both coal production and coal sales – have left Debtors with few options as of January 1, 2009 . . . .")); (BK DE 1310, p. 17 (filed by the UCC) ("The Debtors' inability or unwillingness to sell coal beyond 2008 hampered any efforts to sell their assets to financial buyers or reorganize the company, as such parties required coal sales through at least 2010 to move forward with a financial transaction."); (CIT 2089-90 (October 29, 2008 Harry Schroeder of CIT states "[i]t will be a cold day in hell before I ever work with A&M again . . . .  What a FU Genser is."), Exh. HH).

22.     Even Black Diamond's counsel understood that the A&M Parties' failure to enter into long term contracts led to its collapse. (MB 20422-27 (Oellermann tells investment banker Miller Buckfire, "Chickens come home to roost on coal sales," in response to Genser's concerns over the UCC's objections to the proposed bankruptcy plan), Exh. II); (MB 40062-71 (Oellermann states that what Black Diamond has sold is a "black box" and that Genser's failure

to close the DTE deal was "the same old story . . . trying to squeeze the last few bucks out of the marketplace when it isn't willing to pay it."), Exh. JJ).

23.     In response to his own acknowledgement that he was likely to be sued for his mismanagement of Black Diamond, Genser encouraged Black Diamond's employees and agents to create documents that he believed would give A&M "air cover." (Exh. Q. (Genser tells Miller Buckfire, "As you can imagine I am very concerned about a potential lawsuit down the road from anyone regarding my role as steward of the assets and ability to sell coal. You guys could help me out tremendously by combining the two spreadsheets that are attached and appending the information presented in the email below into 1 huge master call log."), Exh. KK (BD-MCK 36 (Genser tells Hull and Mullins that the, "call log . . . will be a very valuable tool for vindicating any careless or callous accusations that are thrown our way regarding efforts to date.")). Hull recognized these efforts as "[Genser] trying to cover his own tail."  (*Id.*)

24.     The A&M Parties expert Doyle recognizes that Black Diamond's failure is attributable to Genser and Tate's failure to lock in long term contracts. (Doyle Depo. 116 (stating that he has witnessed the failure of coal companies because they didn't effectively manage coal price risk and that it wouldn't surprise him if he at some point told someone that Black Diamond failed because it didn't effectively manage its coal price risk); at 103-104 (stating that in 2008 coal producers should have done everything possible to lock in coal prices at $100 per ton or more), DE 55).

**C.     The Miller Brothers Bankruptcy Did Not Affect Black Diamond's Reorganization Efforts.**

25.     It is not uncommon for producers similar to Black Diamond to use contract miners and Black Diamond's use of contract miners was acknowledged from the very beginning

of the bankruptcy. (Tran. 2/20/08 Hr'g, p. 9, BK DE 107 (MR. BROWN: . . . I think this company operates almost entirely with contract miners.")).

26.     Though Black Diamond's contract miners were not working on the mines at the outset of the bankruptcy case, they were back at work in two weeks. (Tran. 3/10/08 Hr'g. p. 51, BK DE 184 (Hull states "we now have nine of our 12 contractors back up and running" and that Black Diamond has potential replacements for the other three as well)); (AP DE 82-1, p. 10-11); (*see also* Exh. C, p. 3 (Black Diamond had "stabilized relationships with contracted miners" and were generating approximately "$1 million a week" in coal sales on the spot market)).

27.     On December 29, 2008, Genser believed Black Diamond no longer had viable prospects for success. (MB 44896 (Genser forwards current coal prices and states "Stick a fork in this thing"), Exh. KK). That same day, a motion to convert or dismiss the Debtors' Chapter 11 cases was filed by the Harris Sublessors (as that term is defined in the motion to convert). (BK DE 1047). Soon after, Genser began to hear from other parties that Black Diamond's days were numbered. (JD-BDM 10789 (Jan. 27, 2009 Genser writes that the "rumor mill is getting quite ugly" -- Koch's Brad Speer had heard that Black Diamond was shuttering because it had not sold any coal for 2009), Exh. LL).

28.     Miller Brothers, one of Black Diamond's largest contract miners, filed for bankruptcy in January 2009.

29.     At this time, the price of coal on the spot market had fallen to $45-$50 per ton. (Ogle Depo. 340, DE 54). Had Black Diamond contracted with DTE at $124 per ton for 2009, it could have purchased coal on the spot market for $45 to $50 per ton, used that coal to supply DTE and realized even more profit than it would have if Miller Brothers had mined Black Diamond's coal.(*Id*. at 340-41).  Similarly, had Black Diamond pursued the Koch Offer in June

2008, it could have purchased coal on the spot market to satisfy the contract, rather than mine its own coal via contract miners, and generated even greater profits.[12]

**D.      The Coal Market During the Summer of 2008 Presented the A&M Parties with Favorable Reorganization Prospects, Which They Proceeded to Squander.**

30.     Genser and Tate were told from the beginning that the rise in coal prices gave them an "incredible opportunity" and put Black Diamond in a "very unique position to take advantage of this market . . . ." (CIT-BD 437, Exh. MM).

31.     The A&M Parties acknowledged that the rise in coal prices was advantageous for Black Diamond's reorganization efforts. (MLB 32312-13 (May 23, 2008 Cohn tells Genser that "[i]t's not bad to be in restructuring with a rising commodity price"), Exh. NN).

32.     At least one buyer informed Genser that "it is easy to buy coal in a rising market . . . ." (Exh. Z).

33.     According to the A&M Parties' expert, Steve Doyle, a coal producer would be overjoyed to lock in term sales at the $100/ton and greater prices seen in the summer of 2008. (Doyle Depo. 100-04, DE 55 (such producers would be doing a "chicken dance")).

34.     Genser and Tate were advised of the harm that would result if they failed to lock in prices, but they ignored that advice. *See* Response to ¶¶ 40, 47, *supra*.

35.     Most other coal companies with available production locked in contracts during 2008 for their 2009 and 2010 production even though Black Diamond failed to do so. (Turnbull 2009 Depo. 41-42 ("[T]he information we got back was that a lot of coal companies at this point in the market locked in coal – in the summer of 2008, locked in coal, because the prices were attractive relative to their costs for extraction."), DE 69); (MB 63087-88 (Black Diamond's

---

[12] It is common in the coal industry for producers to purchase coal on the spot market.

competitors had locked in 71% and 40% of their coal production in 2009 and 2010, respectively by  Aug. 2008), Exh. OO).

36.     According to the A&M Parties' expert, Doyle, over 270 million tons of coal were hedged during 2008 through publicly-reported over-the-counter hedging transactions. *See* ¶ 14 of Tate MSJ C/S. Additional tons (up to 20% of what was reported in public over the counter transactions) were also hedged in private deals for which there is no publicly available information. (*Id.*) Prior to October 2008, trades were on track to exceed 400 million tons hedged, a record exceeding that set in 2007. (*Id.*).

37.     The prices that contract miners charge fluctuate with the price of coal, so when coal prices go down, the prices the contract miners charge also go down.  (Hull 2013 Depo. 124-26, DE 142).[13]

**E.     Economic Factors Did Not Cause Black Diamond's Collapse.**

38.     Pursuant to the Turnaround Management Association ("TMA"), of which Genser is purportedly a member, "[d]uring the course of an economic cycle, good performers outperform poor performers by astonishing rates. . . .  The lesson is that good management can offset poor economic conditions." (excerpts of TMA, Body of Knowledge-Management, p. 1-2 (2009), Exh. PP).[14]

39.     By September 2008, when Lehman Brothers filed for bankruptcy, Genser and Tate had been running Black Diamond for nearly seven months.  (Engagement Letter, DE 85-2 (dated Feb. 20, 2008)).  During that time, they received offers or bid invitations from many potential buyers but rejected them all in favor of CIT's desires. *See* ¶¶ 13-14 of the C/S, *supra*.

---

[13] Coal prices decreased in late 2008 and into 2009 when Black Diamond would have begun delivery on contracts with Koch and DTE, had Genser and Tate approved the deals.
[14] The A&M Parties' expert, Robert Ogle, also relied on the Body of Knowledge in opining on the standards applicable to Genser and Tate. (Ogle Depo. 95-98, DE 54).

40.     The A&M Parties still had opportunities to close transactions with DTE, Koch, and others around the time of the crash.  *See* ¶¶ 14-15 of the C/S, *supra*; (MB 48740-42, Exh. QQ).

## ARGUMENT

The A&M Parties are short on taking responsibility for their failures and long on making excuses. However, none of the "excuses" they provide absolve them of liability for their negligence and gross negligence in managing Black Diamond. They attempt to divert attention from their own acts (and inaction) by arguing that a "primary and direct" cause amounts to something other than a proximate cause and that Black Diamond's reliance on contract miners, volatility in the coal markets, and an economic down turn were the causes of Black Diamond's failure to reorganize. The record and the law establish otherwise. Black Diamond's reliance on contract miners, if anything, provided an opportunity for Black Diamond to increase profits from deals Genser and Tate should have locked in. The increase in coal prices in the summer of 2008 provided Genser and Tate with the opportunity to lock in long term contracts at exceptional prices and had Black Diamond locked in prices, as virtually every constituency and industry professional in this case warned, Black Diamond would have weathered the storm of the economic downturn. The A&M Parties' Motion should, thus, be denied.

**I.      This Motion Should Be Decided Under Rule 56, Not Rule 16.**

The A&M Parties assert that the Motion is, in part, one for a "Rule 16 Finding" that the Trustee's claims are "Indemnifiable Claims." Based on the presumption that the Court will make such a finding, the A&M Parties also seek a summary judgment under Rule 56 on their counterclaim for indemnification.

For the definition of "Indemnifiable Claims," the Settlement Agreement refers to the Engagement Letter. Under the Engagement Letter, the A&M Parties are liable to Black Diamond for any loss or damage that results "primarily and directly" from the A&M Parties' gross negligence or willful misconduct. (Settlement Agreement ¶ 6; Indemnification Agreement ¶ A). In order to grant the relief requested by the A&M Parties, the Court must determine that there is no genuine issue of material fact as to whether Black Diamond's losses were "primarily and directly" caused by the A&M Parties' gross negligence.[15]

This Court has stated that "it will deny any Rule 16 motion that requests the Court to make findings of fact or other rulings outside Rule 16's scope." (DE 123, at 1). In seeking their Rule 16 "finding" that they did not cause the Trustee's damages, the A&M Parties have asked the Court to make such factual findings, and the Motion therefore should be denied.[16]

In order to grant summary judgment, the Court, viewing the entire record in the light most favorable to the Trustee must determine that, based on the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," there exists no genuine issue of material fact and the A&M Parties are entitled to judgment as a matter of law.

---

[15] The A&M Parties themselves acknowledge that their Motion in effect seeks a summary judgment on the Trustee's claims, as they assert that "[t]he Trust . . . cannot prove any set of facts demonstrating that the A&M Parties' conduct rose to the level of gross negligence or willful misconduct." (Motion, at 2). The A&M Parties allege that the "issue of whether the Trust's claims against the A&M Parties are Indemnifiable Claims" is a legal one because it concerns the interpretation of a contract (Motion, at 20), but this argument is disingenuous. While contractual interpretation is often (although not always) a legal issue, the issue of whether a contractual condition has been met is a factual one under both Kentucky and New York law. *Scheck Mech. Corp. v. Borden, Inc.*, 186 F. Supp. 2d 724, 730 (W.D. Ky. 2001) (genuine factual issue remained as to whether one party had met certain scheduling conditions so summary judgment was inappropriate); *Pike Co., Inc. v Customweld Indus., Inc.*, 980 N.Y.S.2d 533, 534-535 (N.Y. App. Div. 2d Dep't 2014) (factual issues regarding whether one party waived contractual requirements and whether it caused any delays prevented summary judgment). Thus, whether or not the Trustee's claims are "Indemnifiable Claims" is a fact issue for a jury.

[16] Although they ask the Court to preclude the Trustee from pursuing her claims, the A&M Parties cite Rule 16 as giving the Court "broad discretion in conducting pre-trial procedures in order to narrow the issues, reduc[ing] the field of fact controversy for resolution, and [] simplify[ing] the mechanics of the offer and receipt of evidence." (*See, e.g.*, DE 80-1, at 5 (citation omitted)). This "broad discretion" is far from Rule 56's requirement to find no genuine issue of material fact. The Trustee previously has objected to the A&M Parties' attempted use of "Rule 16" motions to decide issues of fact and she incorporates those arguments by reference herein.  (*See* DE 136, at 5 n.4); (DE 129, at 10-12).

*Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 (6th Cir. 2000). The A&M Parties have not, and cannot, satisfy the burden of establishing no genuine issue of material fact.[17]

## II.    Kentucky Law Applies to the Determination of the Issues Raised in the Motion.

The A&M Parties incorrectly rely on the Engagement Letter to argue New York law governs this Motion. Though it states that it "shall be governed and construed in accordance with the laws of the State of New York . . . .," this language was not incorporated into the Settlement Agreement. (Engagement Letter ¶ 9). Through its merger clause, the Settlement Agreement supersedes any and all prior agreements, including this choice of law provision. (Settlement Agreement ¶ 17).[18] A choice of law provision governing how a contract is to be construed does not dictate the law that is to be applied in a tort action.[19] *Nothing* in the Engagement Letter (or the Indemnification Agreement it references) requires (1) the Trustee's tort claims filed against the A&M Parties to be based on New York law, or (2) the fact question of whether the Trustee's losses resulted primarily and directly from the A&M Parties' misconduct to be resolved under New York law.

---

[17] The Trustee incorporates by reference Section I. of her Response to Tate's Motion for Summary Judgment (DE 159) explaining that summary judgment is rarely appropriate in gross negligence cases and that the law in this Circuit holds that a summary judgment should not be granted in the face of expert opinions that, if believed, would support a jury verdict in favor of the claim asserted.  The Trustee's experts, Bellum and Sharp, have both opined that it was the gross negligence of the A&M Parties that caused Black Diamond's harm, not any of the factors set forth by the A&M Parties in their Motion. (DE 127-1, 127-1).

[18] This Court already has held that the jury trial waiver in the Engagement Letter was superseded because it was not included in the Settlement Agreement. *Sergent v. McKinstry*, 472 B.R. 387, 419-20 (E.D. Ky. 2012) ("If the parties had wanted to require the Plaintiff to resolve her claims without a jury, they would have incorporated this waiver from the Engagement Letter into the Settlement Agreement. They did not."). The same reasoning applies here. The Engagement Letter's choice-of-law provision was eliminated via the Settlement Agreement.

[19] Additionally, New York law is clear that a clause stating that a contract is to be "governed" by a state's law, as the Engagement Letter does in this case, does not require that state's law apply to extra-contractual claims, in any event. *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 427 N.Y.S.2d 10, (N.Y. App. Div. 1980), overruled on other grounds by *Rescildo v. R.H. Macy's*, 187 A.D.2d 112 (N.Y. App. Div. 1993) (holding that clause stating that contract "shall be governed by the laws of the State of New York" did not bind the Court to apply New York law to claims for fraud and negligence). As such, the Court should hold that the Engagement Letter's choice of law does not govern the Trustee's tort claims.

The Engagement Letter's choice-of-law provision does not provide that New York law applies to the issues raised in the Motion.[20] The provision states that the Engagement Letter itself shall be "governed and construed" in accordance with New York law. The Indemnification Agreement incorporated into the Engagement Letter, however, states that the A&M Parties may be held liable for the Trustee's damages if those damages "are found in a final judgment by a court of competent jurisdiction . . . to have resulted primarily and directly from [the A&M Parties'] gross negligence or willful misconduct." (Indemnification Agreement ¶ A). The only requirement is that a court of competent jurisdiction find that the A&M Parties conduct primarily and directly caused Black Diamond's harm.

Conflicts of law principles require that Kentucky law determine whether the A&M Parties' conduct amounted to gross negligence or willful misconduct.[21] *See, e.g., Saleba v. Schrand,* 300 S.W.3d 177, 181 (Ky. 2009) (under Kentucky law governing conflicts of law in tort actions, any significant contact with Kentucky is sufficient to allow Kentucky law to be

---

[20] When a Kentucky Federal Court applies the forum state's choice of law rules, Kentucky law advocates that contractual choice of law provisions be disregarded and Kentucky substantive law be applied if Kentucky has the most significant relationship. *Wells Fargo Financial Leasing, Inc. v. Griffin,* Civil Action No. 5:13-cv-0075-TBR, 2013 U.S. Dist. LEXIS 127718, at *17-23 (W.D. Ky. Sept. 5, 2013) ("Recent decisions by Kentucky's highest court have shown this prediction to be mistaken and, instead, have affirmed the application of *§ 188*'s most-significant-relationship test, even where the parties have expressly agreed to have their contractual rights and duties governed by a particular state's laws."); *Schnuerle v. Insight Commn'cns, Co.,* 376 S.W.3d 561, 566-67 (Ky. 2012) (applying Kentucky law irrespective of the fact that the contract at issue contained a choice of law provision).

[21] Despite their argument that New York law should apply to the Motion, the A&M Parties agree that Kentucky law should apply in other dispositive motions. In A&M's individual motion for summary judgment, A&M states that Kentucky law should apply "because the claims asserted against A&M are common law tort claims, and Kentucky has the most significant relationship with the occurrences and the parties since nearly all of the contacts in this case occurred in Kentucky." (DE 95-1, at 18). If the A&M Parties concede that Kentucky law should apply to the analysis of their claims against A&M, there is no reason not to apply Kentucky law to the causation issues raised in this Motion. Indeed, if the Court were to do otherwise, the Court would be construing A&M's liability under one state's law and whether it caused the Trustee's damages under another state's law. The Trustee expects that the A&M Parties will argue that the Motion seeks a summary judgment on their contract claim, and therefore the contractual choice-of-law provision in the Engagement Letter should govern. The A&M Parties cannot deny that the Trustee's claims against them are tort claims, and the underlying "finding" that they ask the Court to make is with respect to a tort issue. As such, the issues raised in the Motion are not governed by a choice-of-law provision governing the interpretation of a contract. As with the A&M Parties' effort to obtain *de facto* summary judgment in the guise of a "Rule 16 finding," the Court should see through this transparent manipulation of choice-of-law principles.

applied); *Standard Oil Co. v. Fidelity & Cas. Co. of N.Y.*, 66 F. Supp. 603 (W.D. Ky. 1946) (applying Kentucky law where injuries arose out of work performed in Kentucky). This Court likewise has noted that a "strong preference exists in Kentucky for applying Kentucky law." *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010). "Kentucky courts have apparently applied Kentucky substantive law whenever possible . . . Kentucky law will apply to a contract issue if there are sufficient contacts and no overwhelming interests to the contrary." *Id.* at 674 (citing *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000)). When there is no conflict and "a state has a presumption for applying its own law, its own law will apply." *Id.* at 668 n.1 (citing *Williams v. Toys "R" Us*, 138 F. App'x. 798, 803 (6th Cir. 2005)). "Kentucky indeed has a presumption for applying its own law and would require a significant reason to displace it." *Id.* The Trustee's claims concern the A&M Parties' gross mismanagement of businesses based in Kentucky, during a Kentucky bankruptcy, which caused damages to Kentucky entities. Both the Trust and the Trustee herself are Kentucky residents. The A&M Parties came to Kentucky as part of the engagement. No other state has a significant connection with the issues in this case. Kentucky law should apply.

## III.     Kentucky Law on Primary and Direct Causation.

### A.     Causation is a Fact Issue For the Jury to Determine.

As an initial matter, causation is a factual issue to be resolved at trial by the jury. *Coleman v. Emily Enters., Inc.*, 58 S.W.3d 459, 462 (Ky. 2001). In fact, even the cases which the A&M Parties rely upon in the Motion admit this point. *See Brown v. Plata*, 131 S. Ct. 1910, 1932 (2011) (explaining that a causation requirement under a statute weighs heavily on the fact side); *Sylfield v. Penfold*, 66 F. 362, 364 (6th Cir. 1895) (causation is "generally a question of

fact, to be determined, in each case, by the circumstances attending the injury and conditions in which it happened.").  This fact alone warrants denial of the Motion.

> ### B.   Primary and Direct Cause Means that the A&M Parties' Actions Must Be the Proximate Cause of the Trustee's Damages.

The Indemnification Agreement's provision making the A&M Parties liable to the Trustee for damages resulting "primarily and directly" from their gross negligence does not impose a "higher threshold of proof" of causation on the Trustee. A "primary and direct" cause equates to a "proximate" or "legal" cause. *January-Wood Co. v. Bramel*, 67 S.W.2d 14, 17 (Ky. 1934) (workers compensation award was satisfactory where it stated that worker's injury was "the primary and direct cause of his death, notwithstanding it fails to disclose that pneumonia intervened and hastened his death"); *Providence v. Young*, 13 S.W.2d 1022, 1024 (Ky. 1929) (instruction was sufficient where it stated that plaintiff could recover on a tort claim if the "failure of the [defendant] to discharge its primary duties therein defined was the direct and proximate cause of her injuries"); *Kellioka Coal Co. v. Blanton*, 255 S.W. 120, 121 (Ky. 1923) (referring to "causal negligence" as the "primary and direct cause" of an injury).[22]

Other jurisdictions have also held that "primary and direct" cause is synonymous with proximate cause. *See* 57A Am. Jur. 2d *Negligence* § 410 ("The term 'direct cause' has no special significance but should instead be understood as synonymous with 'proximate cause.'"); *Precision Pine & Timber, Inc. v. U.S.*, 63 Fed. Cl. 122, 128-29 (Fed. Cl. 2004) (adopting a substantial factor test for proximate cause and explaining that a "breach is a 'substantial factor' causing the lost profits if it *directly and primarily* caused the injuries." (emphasis added));

---

[22] The words primary and direct also have been used in Kentucky indemnity cases to distinguish more culpable tortfeasors from those whose liability is not *in pari delicto*. *See, e.g., Brown Hotel Co. v. Pittsburgh Fuel Co.*, 224 S.W.2d 165, 167 (Ky. 1949) (holding that failure of fuel company to replace manhole lid was "primary, efficient and direct cause" of pedestrian's injury). This use is consistent with the use of the phrase "primarily and directly" as a synonym for proximate cause.

*Columbia First Bank v. U.S.*, 60 Fed. Cl. 97, 105 (Fed. Cl. 2004) (plaintiff must show defendants were a "*substantial factor* causing the alleged loss, *that is, that the breaching provisions directly and primarily caused the lost profits damages it seeks.*" (emphasis added)). Black's Law Dictionary defines proximate cause as the "primary or moving cause." Black's Law Dictionary at 1225 (6th Ed. 1990) (emphasis added).

Kentucky courts have adopted the definition of legal or proximate cause used in the Restatement (Second) of Torts § 431, which states that an "actor's negligent conduct is a legal cause of harm to another if: (a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." *See also Deutsch v. Shein*, 597 S.W.2d 141, 143-45 (Ky. 1980), *overruled on other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012) (citing the Restatement and approving of "substantial factor" formulation as test for proximate cause).[23] The A&M Parties, therefore, have no right to indemnity as their gross negligence was a substantial factor in bringing about the Trustee's harm.

Kentucky and Sixth Circuit law both acknowledge that there can be multiple primary or proximate causes to a particular harm. *See, e.g., Smith v. Collins*, 251 S.W. 979, 980 (Ky. 1923) (explaining that unusual rains *and* the original construction of the dam were the primary causes of the alleged harm); *Fitch v. Califano*, 615 F.2d 1360, 1360 (6th Cir. 1980) (affirming the Secretary's determination that "severe orthopedic injuries suffered by plaintiff in a construction accident in 1969 and cardiac problems revealed by a medical examination in 1974 were the *primary causes* of plaintiff's total disability." (emphasis added)); *see also Propane Transport Co. v. Edelen*, 400 S.W.2d 697, 699 (Ky. 1966) ("The apparent belief of the appellant that there can be only one proximate cause is of course fallacious").

---

[23] This substantial factor test is the same test used by the Federal Court of Claims in the cases discussed above.

As discussed *infra,* the A&M Parties are wrong that superseding causes absolve them of liability. According to the Kentucky Supreme court, "[a] superseding cause is an intervening independent force; however, an intervening cause is not necessarily a superseding cause. [I]f the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause." *NKC Hosps., Inc. v. Anthony*, 849 S.W.2d 564, 568 (Ky. 1993). The critical inquiry is whether an *injury* is a reasonably foreseeable risk created by a defendant's malfeasance. *See id.*; *Dale v. E. R. Knapp & Sons, Inc.*, 433 S.W.2d 880, 884 (Ky. 1968) ("[I]ntervening cause need not be reasonably anticipated in ordinary human experience but can be only a normal incident of the risk created by the defendant. . . . [W]hile it could be argued that [defendants] could not reasonably anticipate that one car would force another off the road into the hole, yet the accident was a normal incident to leaving an unbarricaded hole next to the road.").[24]

Under these general causation principles, the A&M Parties' have not met their burden to establish that no genuine material fact exists as to causation.  The Motion should be denied.

---

[24] The Trustee notes that, even if the A&M Parties were correct that New York law applied to the Motion, the A&M Parties' heightened causation argument would still fail. New York courts similarly have used the terms primary and direct when defining causation for negligence purposes. *See, e.g., Erwin v. Neversink S.B. Co*., 88 N.Y. 184, 189 (N.Y. 1882) ("It is equally undisputed that she did attempt to pass her, and it was this violation of duty which was the direct and primary cause of the collision. The negligence of the defendant is, therefore, abundantly established."); *German v. Brooklyn H. R. Co*., 107 A.D. 354, 357-358 (N.Y. App. Div. 1905) (evidence supported jury's finding that "the direct and primary cause [of railcar explosion] was the negligence of the motorman in the operation of the car."); *Braman-Johnson Flying Serv., Inc. v. Thomson*, 167 Misc. 167, 172 (N.Y. Mun. Ct. 1938) (finding defendant negligent because defendant's deviation from flight plan without proper care for fuel tank was "direct and primary cause of the accident and resulting damage."). New York courts also have interpreted "direct loss" as the equivalent of "proximate cause" for indemnity purposes. *New Hampshire Ins. Co. v MF Global, Inc*., 970 N.Y.S.2d 16, 19 (N.Y. App. Div. 1st Dep't 2013) (collecting cases). As in Kentucky, New York courts have cited the Restatement when describing the plaintiff's burden on causation: "the plaintiff must generally show that the defendant's negligence was a substantial cause of the events which produced the injury." *Derdiarian v. Felix Contractor Corp*., 414 N.E.2d 666, 670 (N.Y. 1980) (citing Restatement (Second) of Torts § 431). Furthermore, when intervening causes are at issue, liability turns upon what is foreseeable. "Because questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve." *Id.; see also Ernest v. Red Creek Cent. Sch. Dist*., 717 N.E.2d 690, 694 (N.Y. 1999) ("Proximate cause is a question of fact for the jury where varying inferences are possible.")

**IV.    There Is, at the Very Least, a Genuine Issue of Fact as to Whether the A&M Parties Primarily and Directly Caused the Trustee's Damages.**

**A.    The Evidence Shows that the A&M Parties Primarily and Directly Caused Black Diamond's Collapse.**

The A&M Parties' Motion is fatally flawed because it does not address the overwhelming evidence that their conduct proximately caused Black Diamond's collapse. The record shows that Genser and Tate exercised control over Black Diamond's reorganization process. Cohn, Genser's superior at A&M, introduced Genser to CIT and ensured that Genser would have CIT's support to act as the CRO. A&M made Genser and Tate available to work for Black Diamond, despite knowing that they lacked the experience necessary to run Black Diamond, and failed to provide Genser and Tate with any meaningful oversight or support. Cohn ensured that Genser and Tate were at the top of Black Diamond's organizational chart while working there and even had the power to overrule Hull, the Black Diamond's CEO.[25] Genser exercised his power over Black Diamond by ignoring and rejecting lucrative offers and failing to investigate financial hedging.[26] A&M allowed Genser and Tate to operate without appropriate oversight, given their lack of needed experience for their respective positions.

Despite an excellent climate to restructure, Genser and Tate did not take advantage of the market or wield their authority over Black Diamond for its benefit; instead they took to doing CIT's bidding for personal gain. During the summer of 2008, the price of coal rose to over $140 per ton, which was double Black Diamond's cost to produce per ton. Genser and Tate were repeatedly warned to lock up Black Diamond's future coal production and of the consequences if they failed to do so.[27] They not only failed to heed this advice, they dismissed it, failing to lock up any of Black Diamond's production in long term contracts in 2008. They ignored or rejected

---

[25] *See* ¶¶ 1-4 of C/S, *supra.*
[26] *See* ¶¶ 13-17 of C/S, *supra.*
[27] *See* ¶¶ 8, 9 of the C/S, *supra.*

offers from buyers to purchase Black Diamond's coal at advantageous prices during the summer of 2008, and they ruined opportunities presented by other buyers like AEP to purchase Black Diamond's coal.[28] These opportunities would have netted Black Diamond hundreds of millions of dollars in profits.[29]

This chain of events establishes that the A&M Parties caused Black Diamond's downfall. Genser and Tate's failure to manage coal price risk primarily and directly led to Black Diamond's failure to reorganize. And, A&M, which staffed Genser and Tate on this project despite the fact that both lacked the appropriate experience to perform their jobs as officers of a troubled coal producer, also primarily and directly caused the damages at issue by making them available to work with Black Diamond and failing to supervise its employees appropriately.

Notably, all of Black Diamond's major constituencies, including the Harris Sublessors, the UCC, and CIT, recognized that the A&M Parties were to blame for its failure to reorganize and that the A&M Parties grossly mismanaged Black Diamond. Even Black Diamond's counsel and Genser himself, privately suggested that the failure to sell coal (and thereby manage coal price risk) caused the Debtors' estate's damages and would lead to a lawsuit.[30] Finally, the Trustee's experts and the A&M Parties' experts have opined that the fact that the A&M Parties did not lock up contracts or hedge its production caused Black Diamond's collapse.[31]

Given all of this evidence, there is at least a genuine issue of fact regarding whether the A&M Parties' gross negligence or willful misconduct was a substantial factor in causing Black Diamond's damages and, therefore, the Motion should be denied.

---

[28] *See* ¶¶ 13-17 of C/S, *supra*.
[29] (Gelber Report, DE 131-15).
[30] *See* ¶¶ 21-24 of C/S, *supra*.
[31] *See* ¶¶ 20, 24 of C/S, *supra*.

**B.      Contract Miners Did Not Cause Black Diamond's Damages.**

The A&M Parties do not support their allegation that Black Diamond's reliance on contract miners contributed to its failed reorganization with any evidence. Indeed, the A&M Parties do not truly allege that Black Diamond's contract miners actually affected the reorganization, but instead assert that the contract status of Black Diamond's miners made it "susceptible to production stoppages and other risks beyond the A&M Parties' control," such as the contract miners' ability to terminate a contract or the miners' own business failures. (Motion, at 30-31). These "risks" were just that – risks. Every business has risks and the A&M Parties were paid handsomely to manage the risks but they failed to do so.[32] With the exception of Miller Brothers' bankruptcy in January 2009, the A&M Parties do not even argue that any of these risks came to fruition. It is not enough for the A&M Parties to say that Black Diamond was "susceptible" to various problems with contract miners (that never occurred) and the A&M Parties have failed to demonstrate that the Miller Brothers' bankruptcy actually detrimentally impacted Black Diamond's chances of reorganization.

By the time Miller Brothers filed for bankruptcy, the A&M Parties already destroyed Black Diamond's chances to profit from long-term coal contracts or hedging arrangements. The Harris Sublessors filed their motion to convert or dismiss the Black Diamond bankruptcy cases on December 29, 2008, before Miller Brothers filed for bankruptcy.[33] On that same day, Genser himself recognized that Black Diamond's prospects for success were slim ("Stick a fork in this thing"), and within a month, coal purchasers were hearing – correctly – that Black Diamond was

---

[32] *See* ¶ 6 of C/S, *supra*.

[33] The conversion or dismissal of a Chapter 11 case is a step taken when the debtor is unlikely to reorganize. Cause to convert or dismiss a case includes, for example, "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation" and "gross mismanagement of the estate." 11 U.S.C. § 1112(b)(4).

32

floundering because it had not sold any coal for 2009.[34] In December 2008, recognizing the damage he had done, Genser had asked Miller Buckfire to help him create documents that he could use to defend his misconduct.[35] Miller Brothers' bankruptcy could not have caused damage to Black Diamond if Black Diamond already had essentially collapsed due to Genser and Tate's failure to sell term coal or otherwise manage price risk.

Second, the CIM demonstrates that Black Diamond had a number of other contract miners that could step in if it lost one, and Genser and Tate bragged that they had successfully re-started Black Diamond's mines just weeks after all the contract miners left work in February of 2008.[36] This shows that Black Diamond could have located a contract miner to fill the void left by Miller Brothers, which was to be responsible for less and less of Black Diamond's production on a go forward basis according to the CIM, in any case.[37] Black Diamond also could have re-negotiated with contract miners when prices fell or used part of the $32 million in profit from the DTE contract (that Genser and Tate refused to consummate) to eliminate Black Diamond's dependence on contract miners entirely and to realize increased profits by developing a new mine next to its processing plant.[38] Had the A&M Parties not blown Black Diamond's chances to sign lucrative long-term contracts with, for example, DTE and Koch Carbon, Miller Brothers' bankruptcy or loss of any other contract miner would not have affected Black Diamond's ability to mine its coal at all.

Practically speaking, had Black Diamond entered into long term contracts during the summer of 2008, the Miller Brothers' bankruptcy would have allowed Black Diamond to purchase coal on the spot market in 2009 and use the coal to start deliveries on contracts to DTE,

---

[34] See ¶ 27 of C/S, *supra*.
[35] See ¶23 of C/S, *supra*.
[36] See ¶ 26 of C/S and Response to ¶ 32 of the Statement, *supra*.
[37] See Response to ¶ 33 of the Statement, *supra*.
[38] See Response to ¶ 31 of the Statement, *supra*.

Koch, or others.[39] The A&M Parties' own expert admitted as much in his deposition.[40] Had Genser and Tate only signed term contracts when given opportunities to do so in 2008, as they were advised to do multiple times by multiple parties, Black Diamond would have been well-positioned to reorganize into 2009 regardless of any issues with contract miners.

Black Diamond's use of contract miners was always known to the A&M Parties as a risk faced by all producers using contract miners. As a result, even if the risks of relying on them had come to fruition, those risks were foreseeable and would not cut off the A&M Parties' liability. *Dale*, 433 S.W.2d at 884; *NKC Hosps., Inc.*, 849 S.W.2d at 568.

### C.   The Volatility of the Market Helped, Not Hindered, Black Diamond's Prospects for Reorganization.

The A&M Parties also refer to the volatility of the coal market as if it hurt Black Diamond's prospects for reorganization, but multiple parties, including A&M's now CFO, Cohn, recognized that the market provided Black Diamond with a good opportunity to reorganize. On February 26, 2008, less than a week after the Engagement Letter was signed, Hull informed Genser that he had never seen such a rise in prices, and emphasized that Black Diamond had an opportunity to successfully reorganize.[41] As the market continued to go up, Cohn expressed to Genser that reorganizing in a rising market was a good thing, and one buyer told him that buying (and thus selling) in a rising market was easy.[42] Unbeknownst to Black Diamond's stakeholders, Koch Carbon repeatedly tried to purchase all of Black Diamond's coal production and virtually

---

[39] The average price of coal between 2009 and 2011 ranged between $40 and $60 per ton.  As the Court knows, the sales price for the June 4, 2008 Koch offer was approximately $100 per ton for each of those years (which would have yielded profits between $40 and $60 per ton) and the sales price from the DTE offer was approximately $124 per ton (which would have yielded profits between $60 and $80 per ton).  Black Diamond's cost of production, which consisted primarily of contract miner costs, hovered in the mid to upper $60s.

[40] (Ogle Depo. 340-41, DE 54).

[41] *See* ¶ 30 of C/S, *supra*.

[42] *See* ¶¶ 31, 32 of C/S, *supra*.

every party in interest other than CIT warned Genser to lock in prices.[43]   Genser and Tate
ignored this advice. In July 2008 counsel for the UCC specifically warned Genser that the UCC
"did not want to hear . . . three months from now that 'you never saw the dip in coal prices
coming.'"[44] Now, of course, the A&M Parties are saying exactly that.  Genser and Tate failed to
enter into any long term contracts in the summer of 2008, causing Black Diamond's ultimate
liquidation. The A&M Parties' failure to ensure that Black Diamond profited from what was a
historically great market for coal sellers proves, rather than excuses, their gross negligence.

The A&M Parties own expert, Doyle, also testified that price volatility creates
opportunities for producers to enter financial hedging contracts in an effort to mitigate coal price
risk because price volatility attracts speculators (i.e. counterparties willing to enter financial
hedging contracts), who want to profit by taking on risk.[45] Doyle acknowledged that Black
Diamond's failures are attributable to Genser and Tate's failure to effectively manage its coal
price risk, not the volatility of the market.[46] Unlike Black Diamond, most other producers with
available coal took advantage of the high prices seen in the summer of 2008 under long term
contracts.[47]

The A&M Parties' factual allegations miss the point of the Committee's email (and the
other warnings that the A&M Parties received) and do not amount to a superseding cause of the
Trustee's claimed damages. The risk of price fluctuation was a known feature of the coal market
(and, indeed, of any commodities market) and therefore was eminently foreseeable. Those with
industry experience warned Genser and Tate to sign long term contracts *precisely because* the

---

[43] *See* ¶¶ 8, 13 of C/S, *supra.*
[44] (Exh. G).
[45] (Doyle Depo. 109, DE 55).
[46] *See* ¶ 24 of C/S, *supra.*
[47] *See* ¶ 35 of C/S, *supra.*

market was volatile and warned them of the consequences for failing to do so. They cannot now blame market volatility for their inaction.[48]

> **D.      The Economic Downturn Was Not a Superseding Cause of Black Diamond's Collapse.**

The A&M Parties' assertion that the economic conditions during the fall of 2008 were "a partial, if not the dominant, cause of the Debtors' demise" is erroneous. The A&M Parties cite a number of sources for the position that an economic crisis was occurring, but none of these opinions amounts to actual evidence that the economic crisis actually caused Black Diamond's damages.[49] Genser and Tate failed to disclose an offer from Koch in June 2008 that would have generated $500 million in revenue.[50] Black Diamond had offers from DTE and Koch in August 2008.[51] The evidence also shows that financiers wanted Black Diamond to lock in long-term business; since Black Diamond did not do so, it was this failing, not economic conditions, that

---

[48] The A&M Parties' failures on this point are particularly glaring since Black Diamond's competitors had no trouble locking in business for 2009 and 2010. As of August 21, 2008, other coal companies locked in, on average, 71% and 40% of their coal production in 2009 and 2010. Black Diamond collapsed under Genser and Tate's leadership (while A&M left them on an island to fend for themselves) and other coal companies took advantage of the high prices.

[49] Documents issued by the TMA of which Genser is purportedly a member, state that economic factors are rarely to blame for business failures and that good management can overcome bad business conditions. Unfortunately, the A&M Parties did not provide good management. *See supra* ¶ 39 of C/S.

[50] *See* ¶ 13 of C/S, *supra*; *see also* (Mullins Affidavit, ¶ 7 stating that the Koch Term Sheet was neither shared nor discussed at the June 10-11, 2008 meetings with stakeholders, DE 112-14); (Haggard Depo, 105-106, DE 147); (Schroeder Depo, 314-315, DE 148); and (Cohn Depo,  287-288, DE 41) (all stating that they are not aware that the Koch term sheet was shared with constituencies).

[51] *See* ¶¶ 14 of C/S, *supra*. In fact, as pointed out in the previous section, many of Black Diamond 's rivals were able to lock in a substantial amount of their production in 2009 and 2010. *See* ¶ 35 of C/S, *supra*. This factor also defeats the A&M Parties' reliance on *Shanahan v. Vallat*, 2008 WL 4525452, at *5 (S.D.N.Y. Oct. 3, 2008) for the position that "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . . Plaintiff's claim fails when it cannot be proven that the loss was caused by the alleged [] omissions as opposed to the intervening cause." (Motion, at 28). In *Shanahan*, the Court found that the plaintiffs, companies that invested in the Chinese pager market, suffered their losses not from the defendant's actions but from the rise of cellular phones, which rendered pagers obsolete. No such market phenomenon occurred in this case. Coal remains a viable commodity, and many of Black Diamond's competitors were able to continue in business right through the economic downturn because they took advantage of the market during the summer of 2008. Importantly, the holding in *Shanahan* only applies when "it cannot be proven" that the plaintiff's loss was caused by the defendants. As discussed throughout this Response, there is ample evidence that the A&M Parties caused Black Diamond's damages, making *Shanahan* irrelevant.

prevent a refinancing.[52] The facts show that the A&M Parties, not the economy, defeated Black Diamond's reorganization efforts.

Had the A&M Parties complied with their duties and managed coal price risk in the summer of 2008, they would not have had to worry about global economic conditions. Genser and Tate were in charge of Black Diamond as of February of 2008, nearly seven months before the A&M Parties allege the first effects of the economic crash began to appear. By declining to enter into long-term contracts during the summer of 2008, despite opportunities to do so, Genser and Tate left Black Diamond exposed to the entirely foreseeable risk that the price of coal would fall or that credit markets would tighten. And no one from A&M oversaw these inexperienced employees and corrected this gross mismanagement. Thus, the drying up or tightening of the credit markets is irrelevant because the A&M Parties' misconduct already caused Black Diamond's harm.

The economic decline could not have been a superseding cause of harm as the injury resulting from economic decline was foreseeable and preventable. An intervening cause, even if not "reasonably anticipated in ordinary human experience," is not a superseding cause if the injury resulting to the injured party is a reasonably foreseeable risk created by the defendant's conduct. *Dale*, 433 S.W.2d at 884; *NKC Hosps., Inc.*, 849 S.W.2d at 568. In this case, by not locking in coal prices through sales or hedging opportunities, the A&M Parties left Black Diamond open to the risk that market conditions could change, perhaps drastically, and ruin its chances for reorganization. The bankruptcy court, the UCC, and numerous other parties actively warned the A&M Parties to lock in coal contracts while the market was rising. The A&M Parties cannot dispute that they had chances to sell coal long-term and did not. Because the risk of harm created by the A&M Parties' failure to manage coal price risk was foreseeable (and the A&M

---

[52] *See* Response to ¶ 39 of the Statement, *supra*.

Parties were made aware of the risk of harm), the A&M Parties cannot use the economy as an excuse for their incompetence and gross negligence.

**E.     The Committee's Disclosure Statement Is Not "Evidence" that Any of the Circumstances Identified by the A&M Parties Are Superseding Causes.**

Throughout the Motion, the A&M Parties cite the Committee's Disclosure Statement, filed on April 17, 2009, as apparent support for their arguments that Black Diamond's use of contract miners, the volatility of coal markets, and the decline of the economy caused the damages to Black Diamond that the Trustee seeks to recover. The A&M Parties' reliance on this Disclosure Statement is misplaced. First and foremost, the risks that the UCC identified were exactly that – risks. The UCC did not state or imply that any of these risks caused or even affected Black Diamond's ability to profit by selling coal in 2008, and, to the contrary, the UCC states that it was the A&M Parties' inability or unwillingness to sell coal that hampered its reorganization efforts.[53] Indeed, this Disclosure Statement necessarily was forward-looking to explain Black Diamond's go-forward liquidation. In the Disclosure Statement the UCC listed factors to consider when voting on what to do given the financial landscape in the spring of 2009.  The Disclosure Statement is not a statement that these risks were actually in play in the *spring and summer of 2008* when Genser was making crucial decisions, nor is it an attempt to excuse his mistakes. Also, the fact that these were known risks only further demonstrates the A&M Parties' gross negligence. The A&M Parties apparently would have the Court find that they only can be held liable for the Trustee's damages if no other factors could have affected Black Diamond's success or failure other than their mismanagement. However, all businesses have some risks, and, despite claiming that they were qualified to navigate those risks and receiving advice from a number of sources to help them do so, the A&M Parties unambiguously

---

[53]*See* ¶ 21 of C/S, *supra*.

failed.[54] Doing business itself is a risk.[55] The A&M Parties cannot take over businesses, get paid millions of dollars, and then blame the inherent "risk" of the business for their shortcomings. Thus, the Committee's Disclosure Statement is not evidence of anything except the A&M Parties' failure to mitigate the risks that everyone knew existed for Black Diamond.

### F.     The A&M Parties' Spoliation of Evidence Precludes Summary Judgment.

The Court should not grant the Motion because the A&M Parties destroyed evidence. Not only did they destroy documents relevant to the Trustee's allegations of negligence, gross negligence, and willful misconduct, they now ask this Court to apply an incorrect, higher causation standard to the Trustee's claims. There is no length to which the A&M Parties will not go to avoid accepting responsibility for their actions and inaction. As discussed in the Trustee's Response to Larry Tate's Motion for Summary Judgment, the Trustee is entitled to an adverse inference instruction as a result of the A&M Parties' spoliation of evidence.[56] Such an instruction precludes the grant of summary judgment in the A&M Parties' favor.[57]

## V.     The Trustee's Claims Are Not Indemnifiable Claims and Summary Judgment Is Inappropriate.

The A&M Parties move for summary judgment on their first amended counterclaim for indemnity against the Trust based on their allegation that the Trust's claims against them are "Indemnifiable Claims" under the Settlement Agreement. The A&M Parties' arguments in favor of summary judgment hinge on their argument that "[t]he Trust cannot meet its burden to prove any damage to the Debtors' estates 'resulted primarily and directly from [any A&M Party's]

---

[54] In this regard, the A&M Parties' claims that they were befuddled by inherent and foreseeable risks of Black Diamond's business is particularly galling because the A&M Parties hold themselves out as being capable of managing such issues. On A&M's website, it asserts that "organizations choose [it] to help tackle their toughest business and operational challenges," and that its professionals are "[o]ften compared to corporate doctors . . . ." (Exh. O). Having touted themselves in this way, the A&M Parties cannot claim that known risks of Black Diamond's operations were unexpected superseding causes of its collapse.

[55] *See* ¶ 6 of C/S, *supra.*

[56] (DE 159, at 27-28).

[57] (*Id.*).

gross negligence or willful misconduct' . . . ."[58] As established in this Response and the Trustee's Responses to the A&M Parties' other summary judgment motions, however, the Trustee has established, at the very least, an issue of fact as to whether the A&M Parties' gross negligence or willful misconduct primarily and directly resulted in the damage suffered by Black Diamond. The record shows that the A&M Parties' gross negligence or willful misconduct primarily and directly caused harm to Black Diamond.[59] Summary Judgment on their counterclaim should be denied.

## CONCLUSION

As discussed herein, the Motion is factually unsupported and legally unsound. The Trustee requests that it be denied.


Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/  Grahmn N. Morgan*
Grahmn N. Morgan, Esq.
Ellen Arvin Kennedy, Esq.
250 West Main Street, Suite 1400
Lexington, KY 40507
Telephone:  (859) 425-1000
Facsimile:  (859) 425-1099
Email:   ellen.kennedy@dinsmore.com
         grahmn.morgan@dinsmore.com
**ATTORNEYS FOR TAFT A. MCKINSTRY, TRUSTEE OF THE BD UNSECURED CREDITORS TRUST**

---

[58] (Motion, at 39).
[59] There are also fact issues regarding the reasonableness of the fees and expenses sought by the A&M Parties.

## <u>CERTIFICATE OF SERVICE</u>

It is hereby certified that a copy of the foregoing was served this the 30th day of April

2014, electronically in accordance with the method established under this Court's CM/ECF

Administrative Procedures upon all parties in the electronic filing system in this case.

*/s/  Grahmn N. Morgan Esq.*
**ATTORNEY FOR TAFT A. MCKINSTRY,**
**TRUSTEE OF THE BD DIAMOND**
**UNSECURED CREDITORS TRUST**
