**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**SOUTHERN DIVISION AT PIKEVILLE**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BLACK DIAMOND MINING COMPANY, LLC, | ) | |
| *et al.*, | ) | |
| | ) | |
| Debtors, | ) | |
| ——————————————————— | ) | Civil No. 7:13-cv-125-ART |
| | ) | |
| TAFT A. MCKINSTRY, AS TRUSTEE | ) | |
| OF THE BD UNSECURED CREDITORS | ) | ***Electronically Filed*** |
| TRUST, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| IRA J. GENSER, LARRY TATE, AND | ) | |
| ALVAREZ & MARSAL NORTH AMERICA, | ) | |
| LLC, | ) | |
| Defendants. | ) | |

<u>**TRUSTEE'S RESPONSE TO DEFENDANT IRA J. GENSER'S MOTION FOR SUMMARY**</u>
<u>**JUDGMENT ON ALL CLAIMS**</u>

Taft A. McKinstry, as Trustee (the "Trustee") of the BD Unsecured Creditors Trust (the "Trust"), submits the following Response to Defendant Ira Genser's Motion for Summary Judgment on All Claims (DE 100)[1]:

---

[1] Capitalized terms not defined herein shall have the meaning assigned to them in the Motion. Citations to the record in this case are referred to as (DE __). Citations to the record in the Debtors' main bankruptcy cases, consolidated under Case No. 08-70066, are referred to as (BK DE __). Citations to the record in the adversary proceeding involving the Trustee's claims against the A&M Parties, Adv. No. 11-7010, are referred to as (AP DE __).

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

RESPONSE TO GENSER'S ALLEGEDLY UNDISPUTED FACTS ........................................3

PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS........................................19

    Genser's Duties as CRO. ..................................................................................21

    Genser was not qualified to serve as CRO. .........................................................23

    Although unqualified to serve, Genser and A&M placed Larry Tate as CFO. .........24

    Genser places Carl Mullins in the position of Vice President of Sales....................24

    Genser and Tate undermine and belittle Larry Hull..............................................26

    Genser engaged in self-dealing throughout his term as CRO of Black Diamond. ...................26

    A&M seeks to please CIT throughout the bankruptcy – CIT wants a deal with Massey. ........29

    Massey wants Black Diamond's coal uncommitted. ..............................................31

    Other Prospective Buyers and Financiers Want Coal Committed............................33

    Black Diamond's Management, The UCC, Industry Professionals, the Bankruptcy Court, Black Diamond's investment bankers, Black Diamond's counsel, and even Cohn Warned Genser to Mitigate Coal Price Risk.............................................................34

    It is industry practice to hedge against a fall in coal prices....................................37

    Genser was warned that coal prices were going to fall. .........................................38

    Genser followed CIT/Massey's wishes and did not enter into any contracts beyond the end of 2009 despite multiple opportunities to do so...........................................39

    Genser ensures Black Diamond does not enter into a term contract with AEP.......................44

    Black Diamond's VP of Sales expresses frustration over not being allowed to do deals.........46

    Genser failed to hedge Black Diamond's coal production. .....................................46

    Because Genser failed to mitigate price risk, Black Diamond  shuttered operations. ..............48

    Genser manufactured evidence and destroyed documents to attempt to cover his gross negligence and willful misconduct..................................................................50

ARGUMENT ........................................................................................................52

    I.    Genser Cannot Satisfy the Standard for a Summary Judgment in His Favor.................52

    II.    Issues of Material Fact Exist Regarding Genser's Gross Negligence and Willful Misconduct in Acting as Black Diamond's CRO. .................................................54

        a.    Genser and Tate were unqaulified to serve as CRO and CFO, respectivity, of Black Diamond. .............................................................................54

        b.    Mullins was unqualified to serve as VP of Sales; Genser belittled and ignored those individuals with coal industry experience who tried to help him. ......................56

        c.    Genser failed to consider the advice of industry professionals and experienced stakeholders who advised him to lock in coal contracts....................................................58

i

d.      Genser had opportunity upon opportunity to enter into long term contracts on behalf of Black Diamond yet he failed to do so; he failed to even seriously consider, let alone pursue, financial hedging deals. ........................................................................................60

e.      Genser did not run a dual path process; Instead Genser followed CIT's wishes. ..........63

III.    Genser Was Not a Court-Appointed Trustee and Does Not Get the Benefit of the "Willful and Deliberate" Standard; the Trustee Will Prove Her Claims Against Genser by Showing Gross Negligence...................................................................................................66

a.      The Bankruptcy Court has already rejected Genser's immunity argument. .................66

b.      Even if the willful and deliberate standard applied, Genser would not be entitled to summary judgment. ....................................................................................................68

c.      The parties have negotiated via the Settlement Agreement the standard of liability applicable to Genser. ..................................................................................................70

d.      Under Kentucky law, the Trustee can prove her claims against Genser by showing gross negligence. ......................................................................................................71

i.      Genser's self-dealing behavior shifts the burden to him to prove that his actions were fair, honest, and reasonable in all respects. .....................................................................73

ii.      Even if the burden did not shift to Genser to prove his actions were fair, honest and reasonable in all respects, under Kentucky law, the Trustee can prove her claims against Genser by showing gross negligence............................................................................74

CONCLUSION.....................................................................................................................75

## INTRODUCTION

Genser tries to portray himself as a tireless, hard-working CRO who did his best to steer Black Diamond down a path that was in the best interests of all stakeholders. In reality, Genser ignored the best interests of certain stakeholders and sought, first and foremost, to line his own pockets through origination fees on referrals for his A&M -- even if that meant taking Black Diamond down a path that stakeholders, industry experts, and industry practice told him would be disastrous.

Genser makes excuses that this case arises from the turmoil-filled days of an involuntary bankruptcy, but this was just the type of situation the A&M Parties claimed expertise in handling. Genser and his co-defendants marketed themselves as corporate doctors, able to swoop in with their restructuring expertise and industry experience to lead Chapter 11 debtors like Black Diamond. In truth, Genser had never before served as a CRO and had no experience running or even working with a coal company, let alone one in bankruptcy. Genser and A&M compounded this problem by naming Tate CFO even though Tate was not qualified for the position, and designating Carl Mullins, the Black Diamond employee in charge of coal quality and transportation, as Vice President of Sales even though he had never sold coal before. Genser caused further damage to Black Diamond by ignoring persistent advice to enter long term coal sales contracts, and instead spent his time undermining those who tried to counsel him.

From the very inception of the bankruptcy, Genser set out to do secured lender CIT's bidding - after all, he owed his position in the case to CIT's insistence that A&M be hired to oversee Black Diamond. Genser repeatedly sought referrals from CIT during the bankruptcy and wanted to make CIT happy with his work. Genser reminded Tate early in the bankruptcy that the "prize" was "getting the banks out whole." Instead of engaging in a dual-path process designed to provide options of

refinancing or a sale of the company as a means to exit bankruptcy, Genser gave in to CIT's desire to focus solely on selling Black Diamond because CIT wanted its debt paid quickly irrespective of the other creditors' interests. In the summer of 2008, as coal prices were booming, CIT - and thus Genser - became locked on a sale to one of Black Diamond's competitors -Massey Energy to the exclusion of all other alternatives. Massey, however, conditioned its "interest" in Black Diamond on Genser keeping Black Diamond's  coal production substantially uncommitted (relegating a competitor to the sidelines). As a result, Black Diamond failed to manage coal price risk by hedging or selling any of its coal forward.

Virtually every potential purchaser and exit financer that expressed interest in Black Diamond told Genser that, to execute a deal, Black Diamond needed to manage its price risk and lock in its revenue stream through long term contracts. The rising price environment in the summer of 2008 presented Black Diamond with the opportunity to lock in record high prices for its coal and turn a substantial profit. Industry professionals, members of the Unsecured Creditors Committee ("UCC"), Genser's own investment bankers, legal counsel Genser hired to represent Black Diamond, and even A&M's own Steve Cohn beseeched Genser to manage price risk with long term contracts to ensure that Black Diamond remained a going concern. Genser, seeking to curry favor with CIT, refused. These same prescient industry professionals and stakeholders, whom Genser referred to as "snakes," "vultures," "savages", and "MFers," warned Genser that these lucrative prices would soon fall, and they did were right.

Massey was never truly interested in purchasing Black Diamond. As forewarned, coal prices cooled off substantially. Because Genser failed to hedge against the foreseeable price drop, a core competency for any CRO of a coal company, Black Diamond was forced to shutter operations and liquidate in 2009. Genser saw the writing on the wall by at least December 2008 and began creating

evidence to give him "air cover" for future litigation arising from his gross negligence and willful misconduct. By July 2009, when Black Diamond's claims were assigned to the Trust and Genser realized he could become personally liable for his conduct, Genser was desperate enough to order his CFO to shred evidence.

Genser acted with gross negligence and willful misconduct throughout the Black Diamond bankruptcy. Genser was unqualified to serve as CRO, as were the individuals he placed on the management team. Genser ignored industry practice and the advice of those more experienced than him to lock in coal prices at record highs. Despite his duty to act in the best interest of all stakeholders, Genser deliberately followed the wishes of one stakeholder, his referral source CIT, to Black Diamond's detriment. Genser's motion should be denied.

## RESPONSE TO GENSER'S ALLEGEDLY UNDISPUTED FACTS

1.- 4.    Admitted.[2]

5.    Admitted that Sergent testified that Black Diamond was "cash flow short."

6.    Disputed. CIT approached A&M in 2007 looking for an "independent third party to develop a 13 week cash flow and evaluate the business, and the business plan." *See* ¶¶ 1-3 of Counterstatement ("C/S"). At CIT's behest, Black Diamond engaged A&M. (BK DE 382). During the engagement Black Diamond Management suspected that A&M continued to go behind their back and work for CIT. (Sergent Depo. 69-70, DE 51)

7.    Admitted, but A&M had additional employees involved (Cohn Depo. 127, DE 41).

8.    Disputed to the extent Genser implies that Tate was qualified to serve as CFO of Black Diamond. *See* ¶¶ 26-30 of C/S.[3]

---

[2] For the purposes of clarity, the Trustee states that as with her other Responses to the A&M Parties' Motions for Summary Judgment, any admission to an averment is not an admission as to the veracity of the contents of the document cited in support of the averment or that the document supports the averment. Any admission is solely for the purposes of this Motion and not any other as permitted by this Court's Minute Entry Order. (DE 18, p. 6).The Trustee does not waive her right to dispute the averments in other motions or at any trial of this matter.

9.      Admitted.

10.     Admitted. *See also* ¶ 6 of C/S.

11.     Disputed to the extent Genser implies that it was Black Diamond's decision to re-engage A&M. A&M was re-engaged at the insistence of CIT. *See* ¶ 7 of C/S.

12.     Admitted that Genser and Tate were not supervised or monitored.

13.     Disputed as to the characterization of the citations. The cites support that Black Diamond had trouble meeting its covenants with secured lenders, which A&M negotiated.

14.     The citations are incorrect, but the Trustee admits for purposes of this Motion.

15.     Admitted.

16.     Disputed to the extent that Genser implies CIT alone filed the bankruptcy. The A&M Parties worked with CIT to put Black Diamond in bankruptcy. *See* ¶ 12 of C/S.

17.     Admitted.

18.     Denied to the extent the quotations differ from the text of the cited motion.

19.     Admitted.

20.     Disputed to the extent Genser implies that the Bankruptcy Court appointed him. *See* Trustee's Response to the A&M Parties' Motion for Rule 16 Finding that the Trust's Claims are "Indemnifiable Claims" and Summary Judgment on the Defendants' First Counterclaim for Indemnification ("Indem. MSJ Resp."), Resp. to ¶ 3 of Statement. (DE 165). Further, CIT could put Black Diamond into default under the DIP Financing Agreement if Genser was terminated, (Exh. A to BK DE 354, at §§ 4.01(b), 5.01(b), 5.01(e)(7)), and A&M retained authority to replace Genser with Cohn under the Order, (BK DE 56). Thus A&M and CIT expressly controlled whether or not Genser would remain the CRO of Black Diamond, which further shows Genser was not appointed.

---

[3] The cited materials indicate only that Tate had 14 years of experience reviewing financial statements as an analyst. (Tate 4/26/09 Depo. 36, DE 66).

21.     Disputed to the extent the words quoted differ from those in the Order.

22.     Admitted that the Engagement Letter (BK DE 94) was filed with the Bankruptcy Court on March 5, 2008.

23.     Admitted that the Bankruptcy Court entered an Order which speaks for itself. Disputed to the extent Genser claims this was a final and appealable order. *See* (DE 136, at 28-29).

24.     Disputed to the extent Genser implies A&M was not involved in Tate's selection as CFO. Tate was A&M's employee at all times, and A&M made Tate available to Black Diamond via the Engagement Letter. (BK DE 94).

25.     Admitted that Tate previously worked as a financial analyst for Black Diamond and claims to have been familiar with its financials and management team.

26.     Admitted that Genser made these statements at his deposition. Denied to the extent Genser implies that he alone selected Tate or that assisting Tate to move up in the ranks at A&M was not also considered in the decision to appoint Tate as CFO. *See* ¶ 30 of C/S.

27.     Disputed. *See* Resp. to ¶ 9 of Statement, Indemnity MSJ Resp. (DE 165).

28.     Admitted.

29.     Disputed to the extent Genser claims Mullins was qualified to serve as VP of Sales. Mullins had never worked in a sales position. *See* ¶ 34 of C/S.

30.     Admitted.

31.     Disputed. *See* ¶ 39 of C/S.

32.     Disputed to the extent Genser implies that he did not intentionally place Mullins in the VP of Sales role. *See* ¶ 31 of C/S.

33.     Admitted that Mr. Hull's testimony speaks for itself.

34.     Admitted that Mr. Potter's testimony speaks for itself.

35.    Admitted that Mullins was able to procure a deal with AEP for 70% of Black Diamond's remaining 2008 production in July 2008.[4]

36.    Admitted.[5]

37.    Admitted that the citations speak for themselves.[6]

38.    Denied to the extent that Genser takes credit for Black Diamond's management's accomplishments in stabilizing the business. *See* (Hull 4/26/13 Depo. 55-56, DE 142); (Tran. 3/10/08 Hr'g. at 32-33, BK DE 184).

39. - 41. Admitted.

42.    Disputed. The purpose of the competing DIP financing proposal was, among other things, to offer a proposal "to provide a reasonable opportunity for the Debtor to establish production under conditions that favor success and the opportunity for each of the classes of interested parties to avoid total loss." (BK DE 165, at 7).[7]

43. - 44. Admitted.

---

[4] During the same July 2008 time period, Black Diamond had an opportunity to discuss a three-year term deal with AEP as well but, under Genser's leadership, failed to submit an offer. *See* ¶ 100 of C/S.

[5] *See* ¶ 117-119 of C/S. Although Genser represented he had a good relationship with AEP and believed he could get prices from them in the $130s, well above market. Genser actually had no relationship with AEP.

[6] This was just the type of situation Genser and A&M advertised themselves as being able to handle as "corporate doctors." (Ex. N to DE 165); (Ex. O to DE 165). Moreover, Genser contributed to the bankruptcy's litigious and contentious nature by favoring the wishes of secured lender CIT over other stakeholders and withholding information from constituencies. *See* ¶¶ 43-57 of C/S. As pointed out in the Motion to Convert cited by Genser, "Strong and early leadership and consensus building was required to make these Chapter 11 cases work" and Genser failed to provide it. (DE 1047, at 7).

[7] As noted in Sempra and Constellation's Objection & Request for Consideration of Terms of DIP Agreement, BK DE 165:

> The terms of the February 27th [] Financing Order and [] Credit Agreement are: i) overly onerous to the Debtors; ii) so inflexible as to materially impair the Debtor's successful conduct of their business; iii) overly protective of the already secured position of the [] Lenders; iv) expressly and unnecessarily disadvantageous to the interests of the unsecured creditors; and v) generally not in the best interests of the stakeholders of the Debtors. As a result of the dissatisfaction with the provisions of the February 27th [] Financing Order and [] Credit Agreement, Sempra and Constellation propose to provide financing for the debtors so as to replace and supersede the [] Credit Agreement and the existing [] Lenders.

Due to the competing proposal, CIT provided more favorable terms to the Debtor. (Holmes 2013 Depo. 93-94, DE 145).

45.     Admitted, due in large part to Black Diamond's management's efforts, not Genser's.[8]

46.     Admitted.

47.     Denied. Constellation and Sempra were not initially named to the UCC by the U.S. Trustee. (BK DE 148).

48. - 50. Admitted.

51.     Disputed to the extent Genser implies he actually renegotiated the contract instead of signing the contract.[9]

52.     Admitted.[10]

53.     Admitted.

54.     Admitted that the documents speaks for itself.[11]

55.     Admitted that the document speaks for itself.

56.     Admitted.

57.     Disputed. King & Spalding was selected as a quid pro quo favor for A&M. (MLB_Alvarez 103385 (A&M's James Decker writes Genser "it would be great if you can get K&S into this . . . we really owe them one.") Exh. 1).

58.     Admitted.[12]

59.     Admitted.

---

[8] *See* Resp. to ¶ 38.

[9] Black Diamond employee Bill Potter worked closest with the contract miners and did the most to keep them engaged. *See* Resp. to ¶ 38.

[10] On a forward basis, Miller Brothers' contract miners were to be responsible for a smaller percentage of Black Diamond's production. *See* Ex. C to DE 165.

[11] The Committee's Objection asked that the Court either deny the Motion or condition its approval on addressing the Committee's objections. *See* (BK DE 336).

[12] The Court found that King & Spalding, Genser's choice as legal counsel, was not disinterested under section 327 of the Bankruptcy Code and thus the Debtor could not employ them as a professional. When Genser attempted to hire King & Spalding, he knew of and disregarded the conflict of interest despite his duty to act in Black Diamond's best interests. (*See* ¶ 14 of Ex. A to BK DE 240 stating that the Debtors had signed a conflict waiver).

60.      Admitted that the relationship was strained and that Genser cultivated and contributed to the tension between the constituencies and Black Diamond.[13]

61.      Disputed to the extent Genser implies that these were his true beliefs as his private emails with A&M representatives suggest otherwise. *See* ¶¶ 58-63 of C/S.

62.      Disputed to the extent Genser implies that this self-serving email contained his true beliefs as his private emails show that he and Tate both viewed the UCC as an enemy and disregarded their best interests. *See* ¶ 58-63 of C/S.

63.      Admitted only that Genser hired Jones Day and Miller Buckfire.

64.      Admitted.

65.      Admitted that Jones Day made these representations in court filings.

66.      Admitted.

67. – 68. Admitted that Oellermann made these representations.

69. – 70. Admitted.

71.      Admitted that Genser made this representation to the Bankruptcy Court.

72.      Admitted that Genser made this representation to the Bankruptcy Court.

73.      Admitted.

74.      Admitted.[14]  Miller Buckfire and A&M's Cohn had worked together previously.

75.      Admitted that Mr. Haggard described his experience during his deposition.

76.      Admitted.

---

[13] Oellermann testified that "there had not been the level of communication with the creditors committee that I would have encouraged." (Oellermann Depo. 16, DE 48). This situation did not improve as the bankruptcy progressed. Genser became singularly focused on executing a strategy he believed would curry favor with CIT, *see* ¶¶ 57-64 of C/S, and later tried to hide information related to his misconduct. *See* ¶¶ 109, 138 of C/S.

[14] Richard Morgner, the lead for Miller Buckfire had never sold a coal company before. (DE 136-8).

77.     Disputed. The process carried out by Genser during the bankruptcy was not a "dual-path" process. Instead, Genser focused on adhering to secured creditor CIT's wish for an asset sale. *See* ¶¶ 58-70, 9-111 of C/S.

78.     Admitted that Miller Buckfire drafted the CIM in conjunction with Black Diamond and Genser, who verified its accuracy. (Genser 2/8/13 Depo. 216, DE 34).

79.     Admitted that the CIM is dated June 19, 2008 (CIM, p. i. DE 100-8).

80.     Admitted that Miller Buckfire created a list of potential investors and lenders.

81.     Admitted that the citations show that CIT weighed in on persons interested in "acquiring a coal company such as Black Diamond."[15]

82.     Admitted that, on June 4, 2008, Koch offered to purchase substantially all of Black Diamond's production from 2009 through 2011 at prices up to $103 per ton. *See* (DE 129).[16]

83.     Admitted that Genser called the offer a "pricing data point" in the email cited. Genser also recognized Speer's email as an "offer" and  "pricing *we could get*. CRAZY." (Genser Depo, pp. 169-170, DE 59); (DE 129-8).

84.     Disputed. The Koch offer was not set out in the presentation and the offer was not discussed at the June 10 and 11, 2008 meetings. (Mullins Affidavit, ¶ 6-7, DE 112-14); ¶ 98 of C/S.

85.     Disputed. Key offers were not shared with the UCC and Genser and his attorneys schemed to hide information from stakeholders. *See* ¶¶ 98, 109 of C/S.

86.     Admitted only that weekly phone calls were held. The Trustee denies that the calls were a complete download of information (separate calls were held with secured lender CIT) or that key information was timely disclosed. (Genser 2/7/13 Depo.265, DE 34)

87.     Admitted that operating reports and stakeholder presentations were circulated.[17]

---

[15] *See* ¶¶ 60-61 of C/S. CIT was locked on a quick sale of the company and, as a result, so was Genser, even if it was not in the best interest of all stakeholders.

[16] Koch also told Genser previously that it could purchase all the coal Black Diamond produces.

88.     Disputed. Key offers like the one from Koch were not shared. *See* Resp. to ¶ 84.

89.     Disputed. (Schwartz Depo. 26, DE 46).[18]

90.     Admitted only that separate meetings were held with secured and unsecured stakeholders on June 10 and 11, 2008.

91.     Admitted.

92.     Disputed to the extent Genser implies he considered Houlihan Lokey's advice. *See* ¶ 89 of C/S.

93. – 94. Admitted that this representation was made to stakeholders.

95.     Admitted.

96.     Admitted that Massey communicated to Black Diamond that its interest was contingent on 2009 production remaining uncommitted. ¶ 64 of C/S.[19]

97.     Admitted that potential purchasers, other than Massey, preferred that Black Diamond have its coal committed under long term contracts.

98.     Admitted that, after Black Diamond failed to enter a single long term contract, Massey was the only company to submit a non-binding letter of intent after September 15, 2008.

99.     Admitted that Massey was the only entity to submit a second round bid because Black Diamond had sold no coal, other potential buyers were no longer interested.

100.    Disputed that Genser sent this email to CIT. Admitted that this is what Genser represented to Richard Morgner as Genser was attempting to "cover his ass."[20]

101.    Admitted that the citations show that a marked-up APA was received from Massey and forwarded to stakeholders around October 8, 2008, five days after it was received.

---

[17] The Trustee does not admit to the completeness or the accuracy of these reports.
[18] When consultants offered up advice to Genser, he ignored it. *See* ¶¶ 78, 79, 82 of C/S.
[19] The other potential buyers desired coal to be committed. *See* ¶¶ 71-74 of C/S.
[20] The Trustee also objects to hearsay.

102.    Admitted that the UCC responded about 6 days after it received the marked-up APA. *See* (DE 103-17).[21] The Trustee also admits that the email relied upon by Genser also shows Black Diamond and the UCC agreed that the Massey APA was a "non-starter" and that because Genser did not engage in a dual path process, Black Diamond was left with no "alternative" but to try to "turn the Massey deal from a 'non-starter' to something workable," just as CIT and Genser wanted.

103.    Admitted.

104.    Disputed as to Massey's reason for rejecting the proposal and terminating its non-binding letter of intent. *See* ¶¶ 67-70 of C/S.

105.    Admitted this was Miller Buckfire's representation to stakeholders.

106.    Admitted.

107.    Admitted that Lehman Brothers wanted Black Diamond to have "40-60% of production locked in or hedged for [the] first couple of years," "CS" wanted at least "50-75% in near term" locked in, and "Sankaty" wanted at least 50% in 2009 locked in and 25% in 2010. (DE 103-20; 103-10).

108. - 110. Admitted.

111.    Disputed. While Mullins contacted potential purchasers starting in June 2008, Genser did not himself pursue contracts and rejected every opportunity and offer Black Diamond had to enter long term contracts. *See* ¶¶ 91-111 of C/S.

112.    Admitted that Mullins began to send email messages in June 2008, but could not accept, offer or negotiate without Genser's final say. *See* ¶ 91 of C/S.

113.    Admitted only that Genser represented that stakeholders Black Diamond had contacted twelve parties "related to execution of long term contracts." (DE 103-22, p. 2).

114.    Admitted for the purposes of this Response.

---

[21] At that time, the UCC's counsel expressed to Genser that the Massey APA was a "non-starter."  (DE 103-17)

115.    Disputed. Genser never testified that he was conducting a "reverse auction." Further, a "reverse auction" implies that bids or offers for coal would be accepted.  It is undisputed that Genser refused to allow Black Diamond to enter into long term contracts. *See* ¶ 91-111 of C/S.

116.    Admitted that the DIP Financing Agreement permitted Genser to seek approval from the Bankruptcy Court if CIT unreasonably withheld consent on an expedited basis.

117.    Disputed as to CIT's motives for having this term in the DIP. *See* ¶¶ 61, 62 of C/S.

118.    Disputed to the extent Schroeder's full statements are not cited.

119.    Admitted.[22]

120.    Admitted. However, the Trustee notes that in an attempt to try to convince he was not beholden to CIT,  during his deposition pursuant to Banrk. R. 2004, Genser noted that he could maneuver around CIT by getting the bankruptcy court's permission to enter long term contracts. (Genser 4/21/09 Depo. 321-322, DE 59); *see also* Resp. to ¶ 116.

121.    Admitted that Schwartz informed Genser that JEA was looking for coal.

122.    Admitted.

123.    Disputed to the extent Schroeder could not recall why he was not sure the JEA opportunity was "something good in a sale situation." (Schroeder 4/23/13 Depo. 91, DE 148).[23]

124.    Admitted that the email speaks for itself.

125.    Disputed. Genser did not seriously consider long term contracts or financial hedging. *See* ¶¶ 93-112, 124-129 of C/S.

126.    Admitted.[24]

---

[22] Black Diamond did not produce more coal because it had no sales or long term contracts.  Black Diamond  had approximately 100 million tons of reserves and could have produced more coal. (Gelber Supp. Oct. 3 Report. P. 10, DE 131-15). Producers dial back production when coal is not being sold, otherwise it must be stockpiled at an added expense.
[23] *See also* (Dep. Ex. 549 (Genser reports "No other reason than uncertainty about us locking in anything" in response to inquiry of why CIT balked at letting Black Diamond go after the JEA opportunity), Exh. 2).
[24] However, the DIP provided that Black Diamond could submit procedures regarding a proposed hedging or risk management program for court approval. (BK DE 354 ¶ 4.02(f)(2)). Genser's citation to Tate's testimony provides that

127. Admitted that neither Genser, nor Tate, nor the advisors they hired for Black Diamond, had financial hedging experience. *See* ¶¶ 126-128 of C/S. Disputed that Black Diamond's production was questionable. (*See* Gelber Oct. 3 Supp. Report. P. 9-10, DE 131-15); (Sept. 4, 2008 LA Gates Report finding production forecasts reasonable, Exh. 3); discussion *infra,* p. 62-63 regarding Black Diamond's produciton capabilities.

128. Disputed. *See* ¶ 129 of C/S.

129. Disputed. Lehman Brother did not propose to enter a financial hedge with Black Diamond at $88 per ton. As a condition to providing exit financing, Lehman Brothers assumed Black Diamond would enter into financial hedges of at least $88 per ton. (DE 103-4, slide 13 ("Assumes 1.75 million tons of production hedged at $88/ton for 5 years")); (Haggard 04/13 Depo. 140-142 (Lehman was not proposing a hedge at $88/ton despite Genser's attempts to say otherwise); (Dep. Ex. 223, Exh. 4).[25]

130. Admitted that all potential buyers (except Massey) and all possible exit financing lenders wanted Black Diamond to lock in its revenue stream through long term contracts. *See also* ¶¶ 71-74 of C/S.[26]

131. Admitted that individuals were predicting a coal shortage in 2009.[27]

132. Admitted this was Genser's statement during his April 2009 examination, but when given the opportunity to sell coal, he refused.

---

Mullins would have been involved in the hedging discussion. (Tate 03/09 Depo. 151-152, DE 66). But Mullins testified that he was never involved in financial hedging and does not know who was. ¶ 127 of C/S.

[25] Hedging opportunities at or near market price were available to Black Diamond but Genser failed to pursue them. (Gelber Oct. 3 Supp. report. P. 18-19 and documents cited therein); ¶¶ 124-125 of C/S. In fact, in November 2008, Goldman Sachs submitted a hedging proposal that was in line with then-current NYMEX and CSX spot prices. (Compare DE 165-43 (Goldman proposal as of Nov. 3, 2008) to Ex. 4 to Gelber Oct. 3 Supp. Report, DE 131-15 (showing spot prices roughly in line with Goldman proposal). Goldman Sachs was willing to work on a hedging proposal in July 2008 but Genser never even considered hedging until after the price in coal fell off. (Holmes 07/09 Depo. 137-138, DE 70); ¶ 129 of C/S.

[26] There was no requirement that multiple years be locked in with a single buyer. (Hull 04/13 Depo. 413, DE 142).

[27] Genser was never advised to forego an opportunity for 2009 standalone business. (Schwartz Depo. 160-162, DE 46).

133.    Disputed to the extent Genser does not provide Mr. Holmes's full statement and takes it out of context and Mr. Holmes did not have all of the facts at the time.[28]

134.    Disputed to the extent Genser does not provide Mr. Weiss's full statement and takes it out of context.[29]

135.    Admitted that weekly reports were circulated. Disputed to the extent Genser claims these reports provided all timely and pertinent information regarding Black Diamond's operations.[30]

136.    Disputed to the extent described in Response to ¶ 135.

137.    Disputed that the call logs were created to chronicle Black Diamond's efforts to sell coal long-term. *See* ¶ 134 of C/S. Disputed that Genser tried to procure coal supply contracts for 2009-2011. *See* ¶¶ 91-111 of C/S.

138.    Disputed. *See* Resp. to ¶ 40, Indem. MSJ Resp. (DE 165).

139.    Disputed. *See* Resp. to ¶ 40, Indem. MSJ Resp. (DE 165).[31]

140.    Admitted.[32]

141.    Admitted.

142.    The Trustee objects pursuant to FRE 1006 to the graphs displayed in ¶ 142 and complied by A&M's purported expert, Jamie Heller, as the A&M Parties have not supplied the underlying data used to compile this graph.

---

[28] (Holmes 07/09 Depo. 96-97 ("A. Beginning of July. I believe that was a intellectually honest strategy – to be tested. Q. At what point did you believe that that strategy was not a sound strategy? A. Before the end of July."), DE 70).
[29] In context it is clear that Mr. Weiss is simply testifying that he does not recall telling Mr. Genser that this approach was unsound when asked directly whether he recalls doing so.
[30] *See e.g.,* ¶¶ 98, 109 of C/S (discussing Genser's failure to disclose the Koch offer and attempts made to hide Black Diamond management's commentary on the DTE offer).
[31] The citation to Weiss's testimony is actually a citation to a question by counsel, to which an objection was lodged because Genser's counsel misstated prior testimony. (compare Weiss 05/13 Depo. 54-55 to Weiss 05/13 Depo. 50-51, DE 50). The objection was not cured.
[32] Mr. Henry called the market chaotic because there was a coal shortage, driving up demand. (Henry Depo. 38, DE 74). This should have been beneficial to Black Diamond because it had uncommitted coal to sell.

14

143.    Disputed as to Genser's subjective characterization of Henry and Wagner's testimony. *See* Resp. to ¶¶ 48 and 49 of Statement, Indem. MSJ Resp. (DE 165).

144.    Disputed. (Hull 4/26/13 Depo. 328 ("Q. And that would cause – or that did cause customers to question Black Diamond's ability to perform under long-term contracts? A. Well, the prices were such that I don't believe there was near the concern there would have been if prices had been down and we were working on a small margin or whatever because everybody knew we were making a lot of money."), DE 142); (Mullins 4/30/13 Depo. 16 ("Q. And later in that e-mail you state, I asked if they were concerned about our status.  And he said, no, that was hardly a mention."); 168-169 ("Q. And what did Mr. Stiltner say? A. . . . He said that they were satisfied with the way we did business and had no problem with that"), DE 150); (Genser 4/21/09 Depo. 264 ("Q. And you knew that a company in bankruptcy had a harder time making sales than a company outside of bankruptcy, all other things being equal? A. That did not preclude any of these parties from coming and talking to us about looking to do term business."), DE 59); (Dep. Ex. 391 (Bach writes to Mullins: "In the past we have been relatively successful getting a price somewhere near the existing marks. We typically had to discount these numbers a little more when prices were lower, and you guys had just entered bankruptcy. Would call this an 'uneasy discount' as Southern was uncertain what type of performance to expect when BD entered bankruptcy. Think this level of discomfort has improved tremendously based upon the strong performance of BD over the past 6 months."), Exh. 5).

145.    Admitted that DTE submitted an offer.

146.    Disputed. Had Black Diamond accepted DTE's offer, DTE would have honored the deal. (Wagner Depo. 108-109, DE 43). Senior management approval was merely a formality. (Wagner Depo. 71 (Wagner never made an offer to buy coal that DTE's senior management did not approve); 88-89; 96-97, DE 43).

147.    Disputed to the extent Genser implies that the length of time it would have taken to get the paperwork in place would have affected whether a binding deal would have been created had Black Diamond accepted. *See* (Wagner Depo. 97-98 (had Black Diamond accepted it would have been a done deal: "Done – when we're done, we're done."), DE 43).

148.    Disputed. Genser's cites reveal that he made excuses for rejecting DTE's offer.[33]

149.    Disputed to the extent Genser's statement has been altered from its original text.[34]

150.    Disputed as to the subjective characterization of DTE's reasoning for not entering into a deal for 2010 coal with Black Diamond.[35]

151.    Disputed. Genser's citations do not illustrate that an offer other than the DTE offer existed when Genser decided to reject the DTE offer.

152.    Admitted that Oellermann sent an email to the UCC's counsel, among others.[36]

153.    Disputed. (Wagner Depo. 170-171, DE 43 ).

154.    Admitted.[37]

155.    Disputed as to Genser's characterization of Wagner's testimony. [38]

156.    Admitted.

---

[33] Genser took a similar approach with other offers. *See* ¶¶ 91-111 of C/S.

[34] This email actually also contains the **second** set of Genser's "excuses" for rejecting the DTE offer. In an earlier email, Genser states that he is uncomfortable with the offer because "the Q4 price is below what the current market prices are" and "while the 2009 price is around what Evolution is quoting we are giving no credit for any potential premium for shortages of coal." **After Hull addresses Genser's concerns** (telling him that the Q4 pricing for high sulfur coal like that desired by DTE was "competitive" and pointing out that, based on the then-current market prices for 2009 coal, the 2009 piece of the offer was "well within reason") and lists other reasons why Black Diamond should accept DTE's lucrative offer, Genser made another excuse to rationalize not accepting it. (DE 105-3).

[35] Mullins notes that DTE kept their original offer for 2009 coal on the table. (DE 105-4).

[36] Genser omits that this email responded to one from counsel for equity holder Harold Sergent. Counsel noted that Genser had reported that he passed on an opportunity to sell 600,000 tons of coal to DTE in 2009 well **after the fact** in a "confidential" status conference (the UCC was not a party to) for which Sergent's counsel was threatened for allegedly breaching the terms of. Sergent's Counsel asked if the opportunity still existed and whether Genser reconsidered. Sergent's Counsel stated that the equity holders believe that "it will be important for any prospective purchaser and for any refinancing source that the Debtors have a portion of their production committed for 2009 and 2010." (BD-MCK 850-851, Exh. 6).

[37] This is immaterial. Had Black Diamond accepted, the deal would have been done. *See* (Wagner Depo. 97-98, DE 43).

[38] To the extent economic conditions affected DTE's market activities, those came after September 2008. Genser had many chances to enter long term contracts by this time and was warned to do so before prices (and interest) inevitably fell.

157.    Disputed to the extent Genser characterizes the Massey Sept. 15, 2008 letter as anything more than a non-binding letter of intent. (DE 103-11); *see also* (DE 105-11 (Genser calls the letter a "non-binding 2 page letter")).

158.    Disputed. *See* ¶ 113 of C/S.

159.    Disputed. Genser's citation does not support the contention that he sought CIT's buy-in, as it merely shows that Oellermann informed CIT of the AEP meeting.

160.    Admitted that Schroeder made these statements, among others.

161.    Admitted.

162.    Disputed. *See* ¶¶ 116-121 (Genser misrepresented the price of coal to be expected in a deal with AEP to the UCC causing them to unknowingly support an offer that Genser knew AEP would never accept).

163.    Admitted that (DE 105-13 (Ex. 69 to Genser MSJ)) contains an email sent by UCC counsel, which speaks for itself.

164.    Disputed as to Genser's claim that he "engaged" the UCC to assist in drafting a proposal. *See* ¶¶ 112-120 of C/S.

165.    Disputed. *See* ¶ 112-120 of C/S.

166.    Disputed. The UCC agreed to a price of $131 per ton after Genser represented that AEP would be willing to enter a deal at these numbers. *See* ¶¶ 112-120 of C/S.

167.    Admitted that (DE 104-22) was sent to AEP on Sept. 29, 2008.

168.    Admitted that AEP rejected (DE 104-22).

169.    Disputed to the extent Stiltner states in (DE 105-17) "We are still interested in doing something for 2009 . . ."

170.     Disputed as no citations to the record are provided.[39]

171.     Admitted only that Haggard and Morgner testified about economic conditions.

172.     Disputed to the extent Genser misquotes the transcript.

173.     Disputed as no citations to the record are provided.[40]

174.     Disputed.  *See* Resp. to ¶ 173. The DIP Financing Agreement gave CIT the ability to default Black Diamond if Genser was removed, further illustrating that Genser was not a court appointed CRO. [41]

175.     Admitted for the purposes of this Response. Citing the general docket is improper.

176.     Admitted only that the transcripts cited contain the statements quoted.[42]

177.     *See* Resp. to ¶ 176.

178.     *See* Resp. to ¶ 176. Disputed that the Court is referring to Genser instead of  the management team. *See also* Trustee's Response to A&M's Motion for Summary Judgment (DE 191, Response to ¶ 48 of Statement).

179.     *See* Resp. to ¶ 176. Disputed that the UCC is referring to Genser instead of  Miller Buckfire in its statements. *See also* Trustee's Response to A&M's Motion for Summary Judgment (DE 191, Response to ¶ 51 of Statement).

---

[39] Per the Court's Order "Each fact [in the statement of facts] shall be supported by a specific citation to the record." (DE 18, 5-6).

[40] Disputed to the extent Genser implies the UCC or any other party had the authority to replace him. The Engagement Letter provides that "either party" to  the Engagement Letter (Black Diamond and A&M) may terminate the engagement. (BK DE 94, ¶ 3). Genser was at the top of Black Diamond's organizational chart, rendering this provision meaningless. (Dep. Ex. 350, DE 159-1).

[41] The DIP Financing Agreement also provided that:

   (7) the appointment, other than of Ira Genser of Alvarez & Marsal, of an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner in the Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of such Borrower without the Administrative Agent's and Majority Senior Lenders' consent . . . constituted an event of default. (BK DE 354, ¶ 5.01(e)(7).

[42] The statements made also appear to refer to Black Diamond's management and not Genser or Tate.  These statements also were made 20 days after Genser received an offer from Koch to purchase substantially all of Black Diamond's coal at extremely high prices. When the statements were made, Genser had not disclosed that he failed to even respond to this offer. Genser never shared Koch's offer with the UCC during the Bankruptcy.

180.    Admitted that the email speaks for itself.[43]

181.    Admitted that the document speaks for itself.

182.    *See* Resp. to ¶ 181.

183.    Disputed. *See* ¶¶ 130-133 of C/S.

184.    Admitted that the pleadings speak for themselves.

185.    Admitted that a Settlement Agreement was entered into, which speaks for itself.

186.    Admitted that the documents speak for themselves.

187.    Admitted that the document speaks for itself.

188.    Admitted that the document speaks for itself.

189.    Admitted that the document speaks for itself. Disputed to the extent Genser implies that the Trustee's recovery is limited to the D&O Policies.  The Trustee may recover directly from Genser (and A&M since A&M has indemnified Genser) once the jury finds him liable for gross negligence or willful misconduct.

190.    Disputed. A&M's Defense Costs are not reasonable. *See* Resp. to ¶ 29 of Statement, Trustee's Response to Larry Tate's Motion for Summary Judgment ("Tate MSJ Resp."). (DE 159).

191.    Disputed to the extent the allegations conflict with the Settlement Agreement.

## PLAINTIFF'S COUNTER-STATEMENT OF MATERIAL FACTS

1.      In 2007 CIT, lead lender for Black Diamond's syndicate of secured lenders, was "concerned about the ability of the company to meet its financial covenants goin [sic] forward without default." (Dep. Ex. 537, Exh. 7).

---

[43] This email was written just after Genser falsely said that Black Diamond could see prices near $130 per ton from AEP. *See* ¶ 116 of C/S; (DE 105-13); *see also*  Trustee's Response to A&M's Motion for Summary Judgment (DE 191, Response to ¶ 51 of Statement).

2.  CIT approached A&M "with a description of the business, the key players, and these overarching concerns." (*Id.*); (Cohn Depo. 68, DE 41). "The bank [CIT] was looking for an independent third party to develop a 13 week cash flow and to evaluate the business, and the business plan before they would consider putting in additional funding." (Dep. Ex. 537, Exh. 7).

3.  A&M advertises itself as a turnaround management firm, calling its employees "corporate doctors" and itself "the premier independent global professional services firm," (www.alvarezandmarsal.com/about-alvarez-marsal, Exh. 8), and when A&M made their pitch to CIT to work on the Black Diamond Engagement, they advertised A&M's collective industry experience representing that "A&M solves complex problems by supplementing company and/or crisis leadership with hand-son industry expertise." (Cohn Depo. 73-74, 89, 104, DE 41); (A&M Pitch Book, DE 23-9, p. 10).

4.  On March 29, 2007, A&M was engaged to, among other things, help evaluate Black Diamond's business plan and prepare a revised operating plan. (March 29, 2007 Engagement Letter, Ex. A to BK DE 382).

5.  This initial engagement was staffed by Steve Cohn, then a Managing Director of A&M, and Larry Tate, then a Director of A&M. (*Id.*).

6.  Black Diamond founder and Chairman Harold Sergent subsequently removed A&M from working with Black Diamond. (Hull 4/26/13 Depo. 33, 41-42, DE 142).

7.  CIT was upset when it learned that A&M had been dismissed, and insisted that A&M be rehired by Black Diamond. (Hull 4/26/13 Depo. 31, 34, DE 142).

8.  Cohn was unavailable to lead the second engagement. (Dep. Ex. 537, Exh. 7).

9.  CIT wanted Cohn involved because of his coal management experience. (*Id.*).

10.     Cohn introduced Genser to CIT and CIT gave a "grudging nod of approval" for Genser to assist in Cohn's place. Cohn was to be available as a senior advisor to Genser. (*Id.*).

11.     On January 7, 2008, a new engagement letter was entered into between A&M and Black Diamond. (Ex. 344, Jan. 7, 2008 Engagement Letter, Exh. 9).

12.     In January 2008, A&M worked with CIT to help put Black Diamond into bankruptcy. (Hull 4/26/13 Depo. 43-44, DE 142).

13.     Cohn was again approached by the secured creditors about taking on a CRO role in the Black Diamond bankruptcy. (Depo. Ex. 537, Exh. 8). Cohn was still unavailable but recommended that Genser be inserted in that role and Cohn told the creditors that he would be available as a senior adviser to Genser during the bankruptcy.[44] (*Id.*).

14.     Black Diamond retained A&M to provide Genser's services as CRO during the bankruptcy for $550 per hour. (BK DE 94);(BK DE 56, CRO Order providing for the employment of Genser as CRO); (Tran.4/16/08 Hr'g., BK DE 572, at 56-58 (Genser and Tate were not brought in as 11 USC 327 professionals "They were brought in as management of these debtors . . . [Genser] is effectively an employee, he is effectively the management of the company.")); (AP DE 144 at 4-5 and *Sergent v. McKinstry*, 472 B.R. 387, 412-15 (E.D. Ky. 2012) both holding that Genser is not a trustee but instead the equivalent to management of the Debtors).

15.     Genser and A&M selected Tate to serve as Black Diamond's CFO. (Engagement Letter, (BK DE 94 at ¶ 1)).

**Genser's Duties as CRO.**

16.     As CRO, Genser had a duty to maximize the value of the Black Diamond estate for all creditors, including the unsecured creditors. (Genser 4/21/09 Depo, 13, 32, 37, DE 59).

---

[44] As more fully explained in the Trustee's Response to A&M's Motion for Summary Judgment, Cohn's work on the Black Diamond bankruptcy was minimal and A&M failed to sufficiently oversee Genser's work as CRO.

17.     A&M put Genser in charge of working on all bankruptcy related matters. (Genser 4/21/09 Depo. 10, DE 59).

18.     Genser, leaning heavily on Tate, had the final say on all major financial decisions of the company, including long-term contracts. (Hull 4/26/13 Depo. 47-48, 52,  DE 142); (Dep. Ex. 250 (showing Genser on top of the Org Chart, Exh. 10); (Mullins 4/30/13 Depo. 30-31 (Genser "had final approval of anything and everything."), DE 150); (Genser 4/21/09 Depo. 19 ("the ultimate authority on that decision resided with me"), DE 59); (MLB_Alvarez 157396-398 Tate's Nov. 08 – Jul. 09 Performance Evaluation, stating that Genser often depended on Tate in determining what actions to take on behalf of Black Diamond, [filed under seal at DE 161]); (Ogle Depo. 262 (Genser and Tate made up the executive committee that "conferred on all major decisions, including discussions regarding proposals for long-term coal sales."), DE 54).

19.     In addition to his statutory and common law duties, the February 27, 2008 Order permitting Genser's employment as CRO states that the CRO "shall be vested with the powers to investigate, oversee, manage and direct the acts, conduct, assets, liabilities, and financial condition of the Debtors, the operation of the Debtors' business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan . . ." [BK DE 56].

20.     The February 27, 2008 Order also states that Genser's employment with Black Diamond authorized him to, among other things, "direct and manage the Debtor's operations," "oversee financial management and accountability of Debtors," "formulate, evaluate and implement a restructuring plan or strategic alternatives," "represent the Debtors' interest through counsel before the Court," "cause the Debtors to enter into any contract or agreement," "make all other significant decisions affecting Debtors or their business," "terminate the employment of any member of the

Debtor's operational management or other employees of the Debtors," and "cause the Debtors to hire new employees." (BK DE 560).[45]

21.    The Engagement Letter specifically delegated to Genser and Tate the duties of:

i   Performing a financial review of the Company;
i   Identifying cost reduction and operations improvement opportunities;
i   Developing restructuring plans or strategic alternatives for maximizing the enterprise value of the Company's various business lines;
i   Acting as the principal contacts with the Company's creditors with respect to financial and operational matters;

(BK DE 94).

22.    In total, Genser billed 2,383.5 hours working as CRO of Black Diamond, netting A&M over $1.3 million for his services alone over a period of 18 months. (BK DE 457, 514, 592, 651, 743, 804, 868, 907, 1019, 1073, 1173, 1210, 1287, 1408, 1456, 1497, 1586).

**Genser was not qualified to serve as CRO.**

23.    Prior to the Black Diamond bankruptcy, Genser had never held the position of CRO and had never served as a Trustee. (Genser 4/21/09 Depo. 57, DE 59).

24.    Prior to the Black Diamond bankruptcy, Genser had no experience working with coal companies or negotiating deals of any sort with coal companies. (Genser 4/21/09 Depo. 233, DE 59); (Mullins 4/30/13 Depo. 315, DE 150); (MLB_Alvarez 32568-71 (Genser's July 7, 2008 email stating he is not a coal expert, Cohn has more experience than he does, and Black Diamond is his first coal engagement), Exh. 11); (Hull 4/26/13 Depo. 37,  DE 142).

---

[45] The A&M Parties attempt to use this language in the CRO Order delegating certain tasks to Genser to argue that Genser had "ultimate and exclusive authority over the good faith business decisions at issue in this case, and as a corollary, Mr. Tate did not," in an attempt to shield Tate from liability for his failures as CFO of Black Diamond. (DE 172 at 9). As more fully explained in the Tate MSJ Response (DE 159), under the Engagement Letter filed with the Court (BK DE 94), Genser and Tate shared the responsibility of developing restructuring plans or strategic alternatives for maximizing the enterprise value of Black Diamond's business lines. Thus, both Genser and Tate, who shared responsibility for Black Diamond's well-being, must be liable for their mismanagement of the company, as is their employer A&M. .

25.     Genser had no experience hedging coal price risk. (Genser 4/21/09 Depo. 142, DE 59).[46] *See also* ¶ 24 of C/S Response to A&M MSJ (DE 191).

**Although unqualified to serve, Genser and A&M placed Larry Tate as CFO.**

26.     Tate holds a degree in "law and society," has no post-graduate education, and is not a CPA (Tate 3/26/09 Depo. 14, 16, DE 66).

27.     Prior to serving as Black Diamond's CFO, Tate had never before held the position of CFO or any other similar role. (*Id.* at 35-36).

28.     Prior to working with Black Diamond, Tate had no experience working with coal companies or in the coal industry. (DE 159, Exh. U); (Tate 3/26/09 Depo. 15-18, DE 66); (Ogle Depo. 247, DE 54).

29.     Prior to working as CFO of Black Diamond, Tate had no experience with hedging coal, nor did he gain any such experience while there. (Tate 2/8/13 Depo. 97-98, DE 35).

30.     Instead, the Black Diamond CFO position was viewed as a way to increase Tate's standing at A&M. (Cohn Depo. 338-339, DE 41); (Tate 2/8/13 Depo. 192-198, DE 35); (Dep. Ex. 38 (Cohn writes that Tate was looking for the experience and CFO credential to round out his A&M resume), Exh. 12); (Dep. Ex. 559 ("Larry was very keen to have an assignment where he would get the title CFO . . . he viewed it as necessary within A&M to take the next step up the ladder"), Exh. 13); (Dep. Ex. 558 (Cohn congratulates Tate on his promotion and states "Now you have both the A&M Title and the 'C' level work experience to include on the resume"), Exh. 14).

**Genser places Carl Mullins in the position of Vice President of Sales.**

31.     Genser named Mullins VP of Sales. (Genser 4/21/09 Depo. 31, DE 59).

---

[46] A&M's responses to the Trustee's Requests for Admissions establish that A&M did not even care enough to have internal discussions regarding Genser's lack of experience. (A&M's Responses to Trustee's Requests for Admissions Nos. 7, 8, 10-17, Exh. 21).

32.     Prior to being named Vice President of Sales, Mullins held the position of manager of quality control and transportation. (Mullins 4/30/13 Depo. 200, DE 150).

33.     As CRO, Genser had the authority to hire anyone he saw fit to fill the position of Vice President of Sales. (BK DE 56).

34.     Prior to being named the VP of Sales, Mullins had never sold a single ton of coal, let alone negotiated a long term coal sales contract. (Mullin 3/30/09 Depo. 21, DE 64).

35.     Mullins had no formal education or training in the marketing and sale of coal. (*Id*. at 14-16).

36.     Mullins did not consider himself an expert in selling coal. (*Id*. at 72).

37.     Prior to selecting Mullins as the VP of Sales, Genser made no effort to look beyond the Mullins to find someone qualified to sell Black Diamond's coal. (Hull 3/31/09 Depo. 37-38, DE 67); (Hull 4/26/13 Depo. 282, DE 142).

38.     Throughout the bankruptcy, consultants of Black Diamond's creditors expressed concern over Mullins being in charge of the company's sales. (BD/UCC 9977-81 ( "If Carl's not the guy, please consider that possibility."), Exh. 15); (Schwartz Depo. 94-95 ("It seemed to me they were lacking to a certain extent somebody who actually had the experience and the contacts for direct sales to the large customers. That Mr. Mullins' role previously had been, as I say, limited more to scheduling and dealing, really, with the segment of the business through the river docks. And they were, seemed to be starting from scratch in terms of dealing with the utilities who took coal directly by rail."), DE 46).

39.     Tate and Genser realized that Mullins was not "a salesman" and did not "have the connections to move coal." (BDc 53, DE 159-20); (*see also* EVA 506-508, Exh. 16 and Schwartz Depo. 155-157, DE 46 (both stating that Mullins was contacting the incorrect person at DTE with

respect to offering BD's coal and that, just five days after Mullins contacted the correct person - provided by Schwartz - DTE made an offer to purchase 600,000 tons of coal.).

**Genser and Tate undermine and belittle Larry Hull.**

40.     Despite Genser's authority to hire and fire employees of Black Diamond, Genser kept Hull as Black Diamond's CEO. (BK DE 56).

41.     Genser testified to the Bankruptcy Court on June 26, 2008 that Hull brought 30-plus years of experience in the coal industry, management experience, credibility, and stability to the management team. (Tran. 6/26/08 Hr'g p. 17-18, BK DE 739). Genser called Hull the "face of this company." (*Id.* at 39-40).

42.     In spite of this testimony, Genser and Tate by this point already had lost respect for Hull as a CEO and questioned his ability to perform. (Dep. Ex. 346 (in reference to Hull on Apr. 17, 2008, Tate states "I really think you need to take him down a peg or two.  Let's think of how to best accomplish that without destroying our go forward relationship with him."), Exh. 17); (Dep. Ex. 348 (Tate tells Genser on May 16, 2008: "Hull serves no purpose in my opinion I wish he were gone."), Exh. 18); (Dep. Ex. 349 (Genser tells Cohn on June 10, 2008 "Biggest issue I am dealing with right now is a CEO who really needs to be shot, it is getting down right ugly, he wont [sic] even acknowledge me in meetings, is purposefully sucking up to the MB guys, I have lost all respect for him (Tate was there about 2 months ago). . . . The best suggestion you ever had was to include me on top of the org chart, he certainly knows where he stands.  I am really hoping that he shoots himself in the head tomorrow in front of the committee, we don't need him, we can succeed without him, and don't be surprised if I call you in the next few weeks to discuss canning him."), Exh. 19).

**Genser engaged in self-dealing throughout his term as CRO of Black Diamond.**

43.     Genser and Tate's compensation at A&M was linked to the profits A&M made from engagements such as Black Diamond. (A&M's Responses to Plaintiff's Second and Third Set of Interrogatories, Answer to Interog. No. 30, Exh. 20).

44.     A&M awarded its employees up to 15% of collections made off of an engagement if the employee obtained the referral that landed the engagement. (Genser 2/07/13 Depo. 62-64, DE 44). For context, had Genser obtained the referral that landed the Black Diamond engagement, where collected fees approached $3 million, 15% would amount to $450,000.

45.     In a self-evaluation for A&M Managing Directors, Genser placed a priority on re-doubling his efforts in 2008 to obtain referral sources. (Dep. Ex. 2, Exh. 191-11).

46.     CIT was seen as a potential referral source for A&M at the time of A&M's engagement with Black Diamond. (Tate 2/08/13 Depo. 152, DE 35).

47.     In fact, CIT was the referral source that got A&M and Genser involved in the Black Diamond engagement and even made a $272,859.54 payment to A&M the day before CIT instituted the bankruptcy action for payment of A&M's fees in connection with services provided to Black Diamond pre-petition. (BK DE 360 ¶ 15); (BK DE 275).

48.     On March 21, 2008, Genser filed a Declaration with the Bankruptcy Court. (BK DE 241).

49.     Although Genser states in the Declaration that Exhibit B thereto consists of a list of interested parties related to the Black Diamond bankruptcy whom A&M was at the time "performing or has within the past three years provided services," the Declaration does not detail the extent of those engagements. (BK DE 241).

50.     CIT is listed as such a party in Exhibit B, but Genser intentionally omitted that on March 11, 2008 A&M ran an internal conflict check - there were 45 "hits" where CIT was involved

in engagements with A&M and, on multiple occasions, CIT was listed as the referral source for the engagements. (March 11, 2008 email and attachment from Carol Fallacaro to Genser, Exh. 22).

51.     Genser also did not disclose in the Declaration that, at the time of its filing, he was actively seeking referrals from CIT. (CIT-BD-APR13-0001486-89 (Four days prior to submitting the Declaration, Genser emails Schroeder at CIT for a "non BD related" favor. Genser writes that he was "given a heads up that a company in the CIT portfolio is on the lookout for a FA" and states that he "would like to pass the referral on to my colleagues in our credit advisory practice." Genser states, "We would welcome the opportunity to represent CIT as Agent."), Exh. 23).

52.     Genser represented to the Court that A&M would file a supplemental disclosure with the Court as promptly as possible if A&M discovered additional information that required disclosure. (BK DE 241 at ¶ 15).

53.     In September 2011 (over 3 ½ years later), in response to discovery requests from the Trustee, the Trustee learned that A&M was actually retained at the request of CIT to provide advisory services on another matter related to two different loans in April 2008 and March 2009 – while the Black Diamond bankruptcy was pending. (Affidavit of Stephen Wallace, ¶ 5).

54.     In response to discovery, the A&M Parties also disclosed three more occasions on which A&M, its predecessor, or an affiliate was retained after referral or approval by CIT in September 2003, January 2004, and February 2009. (*Id.*, ¶ 4).

55.     Throughout the Black Diamond engagement, Genser and Cohn continued to seek referrals from CIT. (Dep. Ex. 320 (discussing lunch set up between Cohn and Schroeder and Carlson from CIT; Genser states "As to your suggestion about bringing someone else, my view would be to attend as the solo CRO rep, . . . I think both of them could be potentially be referral sources (Harry more than Scott) – I would be leery of inviting someone from NACR who could mooch off the

referral sources, safer with other service lines or going solo."), Exh. 24); (Schroeder 4/23/13 Depo. 217 (acknowledging that Genser or Cohn may have been trying to convince him that he should send additional business to A&M), DE 148); (Carlson 5/16/13 Depo. 283 (Carlson believed that the August 2008 lunch was an attempt to market more business to CIT), DE 138); (Dep. Ex. 305 (Schroeder tells Cohn "Please keep in mind that when we have to go to the bull pen you (and A&M) are always on the short list."), Exh. 25); (Carlson 5/16/13 Depo. 286-287 (Carlson interprets Ex. 305 as Schroeder letting Cohn know that A&M would be considered as a potential referral), DE 138); (MLB_Alvarez 33171 (email from November 2008 where Genser writes Cohn that he wants to make sure that CIT has been happy with A&M's work to date and stating that "Harry and Mike shared with me that they have been given responsibility for the commercial real estate portfolio of CIT in their workout role – that could be a huge opportunity for the firm (REAS/NACR) – not sure how we seize on that opportunity," to which Cohn responds that he thinks Schroeder is also getting a healthcare portfolio and they need to introduce him to another individual at A&M.), Exh. 26).

56.     This is despite the fact that A&M's CFO, Cohn, admitted that it is inappropriate for A&M to pursue business from creditors involved in a bankruptcy in which they are engaged. (Cohn Depo. 375 ("Q. Okay. So, going out and pitching or seeking business, actively pursuing it is improper, in your mind? A. It would be inappropriate . . ."), DE 41).

57.     In contrast to referral source CIT, Genser viewed the Black Diamond's unsecured creditors as "savages," "vultures," "terrorists," "snakes" and "MFers" and compared his meetings with them to "proctology exams." (BD/UCC 9139, Exh. 27); (BD/UCC 8999-9000, Exh. 28); (MLB_Alvarez 31373, Exh. 29).

**A&M seeks to please CIT throughout the bankruptcy – CIT wants a deal with Massey.**

58.     Even during the 2007 engagement, A&M placed an emphasis on doing a "good job" with CIT. (Dep. Ex. 35 (Tate's October 22, 2007 evaluation by Cohn: "overall Larry did an excellent job for both his client – and with this client and CIT"), [filed under seal at DE 162]).

59.     During the Black Diamond bankruptcy, Genser was interested in doing what was best for CIT. (Dep. Ex. 37 (Genser tells Tate that they should "keep [their] eye on the prize – getting the banks out whole"), Exh. 17); (DE 165-32 (Genser tells Cohn "Damn right – the actual quote was 'we are going to sell this thing for $180,000,001 [the amount of secured debt plus $1] – once the banks are paid off we are all going home' . . .")); (Dep. Ex. 320 (Cohn tells Genser "I would be shocked if Harry has anything negative to say about how things are going"), Exh. 24); (MLB_Alvarez 33171 (Genser "want[s] to make sure CIT has been happy with our work to date – cost, value, outcome, etc."), Exh. 26).

60.     Early on, CIT made it clear that they did not favor Black Diamond entering long term contracts, as they were not sure how such contracts would affect a sales scenario.[47] (CIT-B-APR-13-3456-57[48]), Exh. 30); (Dep. Ex. 258 (Schroeder says CIT is not sure that a two year contract with Jacksonville Electric is something that will look good in a sale situation);[49] (Dep. Ex. 160 (Genser tells Cohn "FYI Banks are balking at letting us go after it" in reference to the opportunity with JEA and after Cohn asks why Genser states "No other reason than uncertainty about us locking in anything."), Exh. 31); (MLB_Alvarez 25325 (Aug. 21, 2008 email from Oellermann to Genser,

---

[47] As explained *infra,* Schroeder was incorrect about how long term contracts would affect a sales situation. Virtually every interested potential buyer, except strategic purchaser Massey, wanted Black Diamond to lock in a future revenue stream through long term contracts or financial hedging. There is no evidence that Genser tried steps to correct Schroeder's misconception but instead adhered to Schroeder's ill-conceived strategy to avoid long-term contracts.
[48] This email exchange occurred on the same day that Genser wrote to Tate that they should "keep [their] eye on the prize" which was "getting the banks out whole."
[49] Schroeder's email in response to the opportunity with Jacksonville Energy also came on the same day that Genser received a lucrative offer from Koch to purchase substantially all of Black Diamond's coal for years 2009 through 2011. As explained *infra,* Genser hid the offer.

indicating Schroeder's main concern is the effect of entering into long term contracts on potential purchasers), Exh. 82).

61.     A sale of the company was the quickest way for CIT to obtain their recovery. (Schwartz Depo. 82, DE 46); (Morgner 4/15/13 Depo. 128-129, DE 146).

62.     CIT made clear its desire that Black Diamond be sold. (Mullins 4/30/13 Depo. 245 ("Q. Okay. Do you remember that the banks were very interested in getting a sale of the company accomplished? A. Yeah, that was – I don't think it was any question that was – Q. It wasn't a secret – A. – their interest. Q. – at that meeting? Nobody was making it a secret, they wanted a sale quickly? A. Uh-huh."), DE 150).

63.     By August, 2008 CIT became specifically locked on to the idea of a sale of the company to Massey. (Dep. Ex. 320 (August email from Cohn indicating that Schroeder wants to make sure that Massey stays with the process since he believes them to be the most viable bidder), Exh. 24); (Dep. Ex. 228 ("Banks yelled at Ira to do the Massey deal"), Exh. 32); (Dep. Ex. 229 (Sept. 24, 2008 email from Hull to Black Diamond Management stating: "The attached email from Harry schroeder [sic] to ira [sic] makes it very clear what the banks want to do – sell to Massey."; "The only thing CIT is interested in at this juncture is when an APA with Massey will be (is) signed"), Exh. 33); (CIT 676-77 (Carlson states that he is trying to get Ira to move forward with Massey, putting pressure on him), Exh. 34).

**Massey wants Black Diamond's coal uncommitted.**

64.     Massey also made it clear that it wanted Black Diamond's coal to remain uncommitted. (Dep. Ex. 21, Exh. 35); (Dep. Ex. 27, Exh. 36); (Dep. Ex. 95 ("Massey assumes that BD's coal sales contract for 2009 remains substantially uncommitted"), Exh. 37); (BD/UCC 1351 (entry in Mullins's Day Planner from Aug. 5, 2008 that Massey "likes fact that tons are not

committed;" on the same page there is an indication that Plainfield wanted Black Diamond to lock up 50%), Exh. 38); (Mullins 3/30/09 Depo. 91 ("Well, Massey made it obvious that they preferred that we did not have any of the coal sold, that they had markets for [it] all."), DE 64); (Schawartz Depo. 136-138 (Schroeder may have told him as early as June 2008 that Massey was an interested buyer and that he recalls that Massey wanted Black Diamond's coal to remain substantially uncommitted), DE 46); (Hull 4/26/13 Depo. 143, 145, 305 ("I'm telling you that I remember there was – there was some consternation about the fact that we were trying – we weren't going to be allowed to sell any term stuff because Massey – they wanted to make the deal with Massey.  CIT wanted to make the deal with Massey."), DE 142).

65.     Massey never submitted more than a non-binding indication of interest for Black Diamond. (Dep. Ex. 95, Exh. 37).

66.     Massey's non-binding letter of September 15, 2008 provided that Massey could terminate any deal at its whim, was not required to post collateral or earnest money, imposed no penalty if Massey walked away from the deal, and provided no time limits for when a binding offer was to be submitted. (*Id*.); (Tate 3/26/09 Depo. 130-132, DE 66); (Dep. Ex. 32 (Green email to Genser on 9/23/08 "Your team needs to be prepared for the fact that you have basically delivered a non-binding letter of interest from Massey. We dealt with Massey in Horizon."), Exh. 39).

67.     At all relevant times Massey operated mines in the Central Appalachian region, where Black Diamond was located, and was Black Diamond's competitor. (Mullins 4/30/13 Depo. 271, DE 150).

68.     As Black Diamond's competitor, Massey benefited when Black Diamond did not sell coal.  (Mullins 3/30/09 Depo. 92 (agreeing that Massey could have benefited at the time if Black

Diamond forewent sales that Massey could obtain for itself); 92-93 ("nothing limited Massey's ability to go after Black Diamond's business at the time."), DE 64).

69.     Massey was known for tactics such as these. (Mullins 4/30/13 Depo. 277 ("Q. Okay. And in 2008, though, it did cross your mind that Massey may have had mixed motives about why they wanted Black Diamond to have their coal uncommitted? A. The opinion of Massey in the industry was very low and they were known for such behavior. Q. For gamesmanship? A. (no audible response.). Q. So it did cross your mind, at least? A. Absolutely."), DE 150). (Doyle Year In Interview: 2009, p. 89 ("Don Blankenship might prevail in his strategy of being the 'last man standing in Capp.'"); p. 65 ("MEE [Massey Energy]? Who Knows! Their strategy seems to be to produce as much coal as possible until the rest of Capp capitulates."). *Id.*

70.     On October 20, 2008, after coal prices started to fall and Black Diamond had failed to enter a single long term contract for 2009 and beyond, Massey withdrew its non-binding letter of intent. (JD-BDM 84317, Exh. 40).

**Other Prospective Buyers and Financiers Want Coal Committed.**

71.     Of the two strategic buyers[50] that submitted non-binding indications of interest in July 2008, Massey was the only one that wanted Black Diamond's coal to remain substantially uncommitted.

72.     Four financial buyers[51] expressed interest in purchasing Black Diamond by the July 15, 2008 deadline established by Genser and Tate for such bids. (DE 103-5, slide 3).

---

[50] A strategic buyer is a coal company looking to purchase Black Diamond. (Genser 2/7/13 Depo. 208, DE 34). The two potential strategic buyers were Xinergy and Massey. (DE 103-5, slide 5).
[51] Financial buyers are companies that, instead of desiring to run Black Diamond themselves, were looking "to take the profits the company would have generated." (Genser 2/7/08 Depo. 208-209, DE 34). The four prospective financial buyers were Aurora Resurgence ("Aurora"), Plainfield Asset Management ("Plainfield"), Ares Management ("Ares"), and Energy Capital Partners ("ECP")." (DE 103-5, slide 6).

73. The financial buyers wanted Black Diamond to lock in coal prices through long term contracts. (Dep. Ex. 567 (email from Haggard to Morgner dated July 30, 2008 stating that Aurora "like entering long-term contracts; want to de-risk investment, would like Co. to lock up 75-80% for 2-3 years;" Plainfield "valuation based on DCF and locked in prices is a more firm input to that valuation;" Ares "locking in at high rates is great"), Exh. 41).

74. The 18 financial institutions contacted by Miller Buckfire to potentially provide exit financing for Black Diamond also desired that Black Diamond lock in its production, and secure a future income stream through long term coal contacts. (DE 103-5, slide 11 ("For the lenders that remain interested, the following areas are key diligence topics required to get to a commitment: Long term contracts: ability to lock in 50-70% of revenue in the near term"); (Hull 3/31/09 Depo. 45 (Goldman Sachs and Credit Suisse both told Genser and Tate "in no uncertain terms, that you will not be able to get financing unless you have coal sold in – in, roughly, the percentages I just told you [50-60% in year 1, 40-50% in year 2, 30-40 % in year 4]"), DE 67); (Dep. Ex. 567 (Credit Suisse wanted 50-75% of Black Diamond's production committed for 2009 and 2010 and Lehman Brothers wanted 1.75 million of Black Diamond's coal hedged at $88/ton for 5 years), Exh. 41).

**Black Diamond's Management, The UCC, Industry Professionals, the Bankruptcy Court, Black Diamond's investment bankers, Black Diamond's counsel, and even Cohn Warned Genser to Mitigate Coal Price Risk.**

75. The rising coal market in 2008 gave Black Diamond an "incredible opportunity" and put Black Diamond in a "very unique position to take advantage of this market." (DE 165, Ex. MM). Hull warned Genser and Tate to lock in coal prices for Black Diamond in the summer of 2008 through long term coal contracts. (Hull 3/31/09 Depo. 45, DE 67); (Hull 4/26/13 Depo. 100 (stating that along with the UCC, he and Carl Mullins would also been the biggest proponents of locking in the high price of coal in 2008), DE 142).

76.     Mullins, Black Diamond's VP of Sales, understood it was important to lock in coal prices through long term contracts. (Mullins 3/30/09 Depo. 48-50, DE 64).

77.     The UCC repeatedly instructed Genser to enter into long term contracts or hedging contracts to lock in prices and mitigate against a decline in coal prices. (*Id.* at 169-171 (in meetings and conference calls the UCC made it clear to the Debtors that they favored long-term contracts or coal price hedges using long-term financial contracts so as to lock in value of high coal prices)); (BD/UCC 9739 (July 3, 2008 email from Green to Genser: "As you heard yesterday loud and clear from the committee, when coal prices are at historical highs – you need to start locking in those prices (and our recoveries).  We do not want to hear from the company three months from now that 'you never saw the dip in coal prices coming.'"), Exh. 42).[52]

78.     The UCC's professionals warned Genser to lock in coal prices. (HLHZ Statement of Qualification from May 2, 2008 (cautions that delays in entering into long-term contracts could cause Black Diamond to miss a window of opportunity), Exh. 43); (Buckfire/UCC 5020-21 (Boyd Report from July 6, 2008 stating that coal prices had hit record highs and sustained prices at these levels could give a complete recovery to the UCC), Exh. 44).

79.     Miller Buckfire, Black Diamond's investment banker, recognized the need to lock in long term prices in August 2008. (Buckfire/UCC 5020-5021 (Haggard tells Morgner on August 15, 2008 that "We need to push back. We need to lock some of this in" in response to Genser's refusal to

---

[52] *See also* Holmes 7/15/09 Depo. 111 (Holmes recommends that Genser "accelerate and catch up from what they should have been doing to look at financial products to mitigate the coal price risk."), DE 70); (JD-BDM 15461-66 (Oellermann tells Genser that Green said the UCC is concerned that long term contracts are not being locked in because prices are so favorable), Exh. 84); (MLB_Alvarez 22620-21 (Oellermann forwards emails from Green saying UCC wants to see a report of long term contract bids), Exh. 85); (MLB_Alvarez 22722 (long term contracts have become the loudest drumbeat for the UCC), Exh. 86); (MLB_Alvarez 22864-65 (email from Ellman to Genser and others saying that the long term contract process is the biggest issue for the UCC), Exh. 87); (ED01-394-395 (email from Shapiro to Genser: "As we've discussed previously with you, the Committee is strongly focused on the status of the long-term contracts process and we ask that you provide us with a detailed update on this process, including grid/summary of prospective purchasers, the level of interest, the tonnage being discussed, year of delivery, price, etc."), Exh. 88).

pursue a contract for prices around $120 per ton from Koch Carbon), Exh. 44); (Buckfire/UCC 4458-59 (email where Morgner follows up with Genser on Aug. 18, 2008 telling him they should discuss locking in a smaller percentage with Koch),  Exh. 45).

80.     Black Diamond's counsel, Jones Day, advised Genser that he was taking a huge amount of risk by not locking in long term contracts in the June to September time frame. (Dep. Ex. 521 ("…the company is taking a huge amount of risk not locking in a significant portion of its production (or hedging against price declines) quickly, and based on everything I have heard to date, 25% is a lot lower than what typically would be locked down in the industry."), Exh. 46).

81.     Seth Schwartz, CIT's coal expert, also advised Genser to lock in coal prices through long term contracts in the June to September  2008 timeframe. (Dep. Ex. 241 ("Ira and Harry [Schroeder]: I know that the policy to date has been to keep all coal sales short-term (60 days forward) to provide a potential buyer with the maximum flexibility on volumes. However, the recent price increase could cause you to reconsider this policy, as the opportunity exists to lock in favorable prices for the next 2 years, helping to assure a significant recovery and hedge against the risk of falling prices."), Exh. 47).[53]

82.     Cohn advised Genser to mitigate price risk.  (MLB_Alvarez 32394-96 (Cohn advises that locking in 10-15% of Black Diamond's production in June 2008 with escalators makes sense), Exh. 48); (MLB_Alvarez 33001-03 (Cohn tells Genser "Locking in up to 30% seems sensible to me – it provides upside flexibility and downside protection while locking in a **substantial** profit") (emphasis in original), Exh. 49).

---

[53] (Schwartz Depo. 86-87 (Schwartz believed it was important for Black Diamond to consider locking in favorable coal prices in June 2008 because of the high prices seen at that time; by locking in prices Black Diamond would have been able to mitigate against the risk of prices falling), DE 46); (MLB_Alvarez 33079-80 (Schwartz tells Genser that prices are likely to drop in the world and domestic markets by mid 2009 and he would count on prices below $100/ton by the end of 2009).

83.     Even the Bankruptcy Court warned Genser of the coal market's volatility and the importance of locking in the price of coal during the summer of 2008. (Tran. 8/1/08 Hr'g. p. 20 ("And I'm sure all of the local counsel who've been through these coal bankruptcies before have said, lets hurry up and get this done, because the coal market is so fickle" to which attorney Wise responds "Make hay while the sun shines, Your Honor.").

84.     The A&M Parties themselves, including Genser, recognized the risk in not having any of Black Diamond's coal locked in through long term contracts. (BD-MCK 218-227 (June 10-11, 2008 Presentation to Stakeholders stating that Black Diamond has not locked in any long term contracts at current prices and this was a risk), Exh. 51).

**It is industry practice to hedge against a fall in coal prices.**

85.     It is standard in the coal industry for producers to lock in contracts for their coal for forward years in order to mitigate against declines in coal prices. (Hull 3/31/09 Depo. 46-47; (Bellum Report p. 4 (long-term contracts are the foundation of most coal company sales strategies), DE 159-27);[54] (Doyle Report p. 8 (establishing the optimal mix between spot and term sales and using products in the OTC and Nymex markets (i.e. engaging in financial hedging) allows coal companies to manage their exposure to revenue volatility), DE 159-9); (Bach Depo. 127 (producers like Black Diamond sell their coal to brokers like Koch to mitigate against drops in the price of coal), DE 36); (Schwartz Depo. 87 (one of the ways to mitigate against the fall in coal prices is to lock in long-term

---

[54] In his Reply in support of his Motion for Summary Judgment (DE 171), Tate argues that the testimony of an expert witness cannot be used to support summary judgment. Genser may argue similarly. First, it is notable that the citation to which Tate objects (DE 171, at p. 4) comes from his and Genser's own expert witness, Robert Ogle. Additionally, Tate is wrong. In this Circuit, if a party's expert provides a reliable and reasonable opinion with factual support, summary judgment is inappropriate. *See, e.g. Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005). The case Tate cited holds no differently. *Williams v. Ford Motor Co.*, 187 F.3d 533, 544 (6th Cir. 1998) (explaining that if an expert's affidavit includes the factual basis and process of reasoning which makes their conclusion viable the opinion may defeat a motion for summary judgment). The Trustee's experts meet the standard required to defeat a motion for summary judgment. To the extent Tate argues that his own witness, Robert Ogle's, opinions are "entirely conclusory" and are "unsupported by any specific data," his opinion should be stricken in total and not just with respect to the portions Tate finds detrimental to his defense.

physical coal contracts), DE 46); (Wagner Depo. 180 (hedging is standard in the coal industry), DE 43); (Bauersachs Depo. 154 (hedging limits your downside and is commonplace in the coal industry), DE 37); (Tate 2/8/13 Depo. 96 (entering long-term contracts is a way to manage a coal company's price risk), DE 35).

86.     Being tied to the spot market (not selling coal long term) leaves a coal company vulnerable to price swings. (Mullins 3/30/09 Depo. 50-51, DE 64).

87.     Locking in prices via long term contracts at prices seen in the summer of 2008 would have solidified Black Diamond as a going concern. (Hull 3/31/09 Depo. 54, 45-51, DE 67).

**Genser was warned that coal prices were going to fall.**

88.     Industry participants and experts recognized that the record high coal prices seen in the summer of 2008 were going to fall. (Bach Depo. 115-116 ("Q. In your work at Koch during that time, did you anticipate the – the fall in the market beginning in September 2008? A. Well, you probably knew it was going to come off at some point. I mean, I've been in this business for 20 years, so I've seen a lot of ups and downs, as opposed to some people who might have been new to the business that didn't understand it.  But, I mean, typically in the coal and a – a lot of markets, what goes up will eventually come down.  Sometimes it takes a little longer than you hope."), DE 36); (Schwartz Depo. 29-30 (his company's long-term forecast would have been that prices would decrease in the future from the spot market levels of June 2008 and that they were forecasting a substantial decrease), DE 46).

89.     Genser was explicitly warned that the high coal prices would likely fall. (BD/UCC 9739 (Green tells Genser "We do not want to hear from the company three months from now that 'you never saw the dip in coal prices coming.'") Exh. 42); ¶¶ 80-87 of C/S, *supra*.

90.     Other coal companies took advantage of high market prices in the summer of 2008 and entered into long term contracts for their coal. (BD/UCC 4473 (Aug. 21, 2008 email from Haggard to Genser and others stating: "Attached please find our competitors' contract status for 2008-2010. Median for 09 and 10 is 74% and 40%, respectively."), Exh. 52).[55]

**Genser followed CIT/Massey's wishes and did not enter into any contracts beyond the end of 2009 despite multiple opportunities to do so.**

91.     Genser and Tate had final say on entering coal contracts. (Mullins 4/30/13 Depo. 30-31, 183, DE 150); (Genser 4/21/09 Depo. 19, DE 59); (Ogle Depo. 251, DE 54).

92.     Black Diamond failed to enter any long term contracts in 2008 for the sale of coal into 2009 and beyond, despite multiple opportunities to do so. (Hull 4/26/13 Depo. 414, DE 142).

93.     In 2006 and 2007, coal of the type produced by Black Diamond (Central Appalachian coal) was selling in the range of $55 to $60 per ton. (Bellum Report p. 3, DE 159-27).

94.     In February 2008, Brad Speer of Koch Carbon told Genser that Koch Carbon could "take everything that Black Diamond produces." (DE 129-6).

95.     Genser said that was "great information to have" (though he did not disclose it to the UCC, and never pursued it. (*Id.*).

96.     On June 4, 2008, Koch sent an offer to Genser to purchase substantially all of Black Diamond's coal from 2009 through 2011 at prices ranging from $92 to $100 per ton. (Dep. Ex. 584, Exh. 53); (Speer Depo. 45 (as of June 4, 2008 Koch was looking to purchase all of Black Diamond's production); 55 ("I don't think I would have sent [the term sheet] to him if we did not intend to purchase this coal"; 70-71, 122-123 (the term sheet stated terms at which Koch was willing to deal),

---

[55] *See also* (Genser 4/21/09 Depo. 205 (James River Coal Co. entered a three-year contract at an average selling price of $125 per ton), DE 59); (Bach Depo. 58-59 (Koch was buying coal on a regular basis in 2008), DE 36); (Doyle Year in Interview: 2009 p. 5 (in reference to James River locking in prices "I heard that Peter Socha [James River's CEO] was on the table doing the chicken dance at the New Years Eve party – celebrating the fact that all of those high-priced contracts will start flowing into the 2009 coffers."), (Exh. 83).

DE 49); (Bach Depo. 45-46, 49, 80 (the term sheet was a binding offer that could be accepted), DE 36); (Genser Depo. 169-170 (recalling that Koch made an offer), DE 59); (Cohn Depo. 285-286 (recognizing the term sheet as an offer), DE 41).

97.     Genser forwarded the offer to Cohn exclaiming that it was "CRAZY" that Black Diamond could *get* these prices. (DE 129-8).

98.     Cohn advised Genser to follow up on the offer and to share it with stakeholders, but Genser did neither. (Dep. Ex. 550 ("I think you need to share with Harry and Seth – my feelings, if the Jacksonville Elec. is 250,000 tons/year (about 25 trains, or 2/month), the key question is what percentage of your business does it represent? Also, it may be possible to lock in escalators to a small degree if prices continue to rise which the buyer would probably agree to if he wants domestic coal."), Exh. 54); (Haggard 4/15/13 Depo. 105-106, DE 147; Schroeder 4/23/13 Depo. 314-315, DE 148; Cohn Depo. 287-288, DE 41 (all stating that they are not aware whether the Koch Term Sheet was shared with the constituencies)). [56]

99.     Entering into a contract at the prices offered by Koch would have generated over $500 million in revenue. (Dep. Ex. 550, Ex. 54).[57]

100.    On July 10 2008, AEP also expressed interest in entering into a three-year term deal with Black Diamond, but Genser failed to respond. (July 10, 2008 email from Rusk to Mullins, DE 165-8).

101.    On August 14, 2008, Koch Carbon broker John Bach wrote Mullins that he believed he could put together a deal with Black Diamond's coal, to be delivered to Southern Company, the

---

[56] In his Motion, Genser attempts to claim that he did in fact share the Koch term sheet at the June 10, 2008 meeting. That is not true. (Mullins Affidavit, DE 112-14); (Haggard Depo. 105-106, DE 71); (Schroeder Depo. 314-315, DE 71); and (Cohn Depo. 287-288, DE 41) (all indicating that they are not aware that the Koch term sheet was shared with constituencies).

[57] (750,000 x $99) +(250,000 x $96) + (500,000 x $94) + (1,000,000 x $103) + (350,000 x $100) + (650,000 x $94) + (1,000,000 x $97) + (350,000 x $94) + (650,000 x $92) = $534,050,000

largest utility in the southeast, at prices ranging from $123 per ton to $125.13 per ton for 2009 deliveries and prices ranging from $116 per ton to $117.50 per ton for deliveries in 2010. (BD/UCC 10448-449, Exh. 55); (Bach Depo. 66 (stating that, based on his discussions with Southern, he believed he could put a deal together at these prices), DE 36).

102.    This prospective deal concerned the sale of up to 1 million tons of Black Diamond's coal for delivery in 2009 and in 2010. (BD/UCC 10448-449 (up to 600,000 tons of the 12,350 btu 1.5% sulfur product and up to 400,000 tons of the 12,500 1% sulfur product), Exh. 55). On these terms, Black Diamond stood to generate over $240 million in revenue.[58] (*See also* Buckfire/UCC 3082 (dated Aug. 20, 2008 referencing another potential deal with Koch), Exh. 56).

103.    Although Black Diamond's management was in favor of executing a deal with Koch near these terms, Genser rejected the opportunity stating that the prices "don't get [him] jazzed to do a deal."(Dep. Ex. 417, Exh. 57 These prices are more than double the prices in the contracts executed by Black Diamond prior to entering Bankruptcy and double Black Diamond's cost of production. (Gelber Oct. Supp. Report. Ex. 4 showing prices on Aug. 14, 2008 for the 12,500 btu 1% sulfur product at $123.53 per ton for 2009 and $116.43 per ton for 2010, DE 131-5)); (Mullins 4/30/13 Depo. 296-297 (Mullins states that he would have done a deal at the prices presented by Bach and acknowledges that Genser sent his email that Bach's prices didn't get him "jazzed" the day after a meeting where Genser was told that Massey wanted Black Diamond's coal to remain uncommitted), DE 150).[59]

---

[58] ((600,000 + 400,000) x $125.13) + ((600,000 + 400,000) x $117.50)) = $242,630,000

[59] The fact that Genser failed to pursue the June 4, 2008 offer from Koch to purchase substantially all of Black Diamond's production for 2009 through 2011 or the possibility of later entering into a contract with Koch for 2009 and 2010 in August 2008 belies his excuse for passing on offers such as DTE. Genser claims that he passed on opportunities such as DTE because the offer was for only 2009. Genser claims that he desired to use the fact that buyers were in short supply of coal in 2009 to lever interest in additional years due to the fact that potential buyers and financers desired Black Diamond to have substantial percentages of its coal production locked in for multiple years. Financial buyers were looking for 75-80% of production to be locked up for 2-3 years and financial institutions such as Credit Suisse desired Black Diamond to lock in 50-75% of its production in 2009 and 2010.  Under the terms of the Koch June 4, 2008 offer, Black Diamond

104.    On August 18, 2008, DTE, a Michigan-based utility that had never done business with Black Diamond before, offered to purchase 600,000 tons of Black Diamond's coal for delivery in 2009 at a price of $124 per ton (in addition to coal for delivery in the 4th Quarter 2008 for $136 per ton). (Dep. Ex. 225, Exh. 58); (Wagner Depo. 56, 82, 89 (this was an offer made after considerable thought and discussion by DTE), DE 43).

105.    DTE's Supervisor of Fuel Procurement in 2008, John Wagner, testified that it was also DTE's practice to continue to do business with suppliers in the future who did a good job for DTE on their contracts and DTE was especially interested in Black Diamond's coal because it would supply diversity to their coal portfolio. (Wagner Depo. 84-85), DE 43).

106.    Entering into a contract with DTE under these terms would have netted Black Diamond over $74 million in revenue.[60] (Dep. Ex. 225, Exh. 58); (Schwartz Depo. p. 159-160 (stating that it surprised him to know that Genser rejected the offer and that had they accepted the offer it would have generated substantial profits for Black Diamond), DE 46).

107.    Black Diamond's management team urged Genser to accept DTE's offer. (BD-MCK 876 (Hull tells Genser "I believe we should STRONGLY consider this offer.  This is a chance to put 600,000 tons of high sulfur to bed for 2009 at $124. This is 1.4% sulfur which fits us perfectly. This should help us with all constituencies. We should act quickly."), Exh. 59); (BD-MCK 854-856 (Aug. 25, 2008 Hull tells Genser "I still believe we should consider the DTE business for 09."), Exh. 60); (Mullins 3/30/09 Depo. 19, DE 64); (Mullins 4/30/13 Depo. 301 ("Q. And that – did you agree that this offer should have been accepted and that it should have been accepted quickly. A. That was my opinion"), DE 150).

---

would have locked in nearly 100% of its coal for 2009, 2010, and 2011. The August 2008 opportunity with Koch had the potential to allow Black Diamond to lock in approximately 50% of its production for 2009 and 2010.
[60] 600,000 x $124 = $74,400,000

108.    Hull told Genser that this was a deal that would help them entice prospective financial buyers Aurora and ECP. (Aug. 18, 2008 email from Hull to Genser 8:37 pm, Exh. 61).

109.    The profits from the DTE deal could have been used to increase production or replace some of Black Diamond's contract miners, or face up the mine behind the prep plant and thus eliminate transportation costs. (Hull 4/26/13 Depo. 167-171, DE 142) Genser and Jones Day attempted to hide Hull's emails begging Genser to accept the DTE offer from Black Diamond's stakeholders. (JD-BDM 76782-86 (Attorney Kairis (Jones Day) tells Genser and Oellermann (Jones Day) that equity's counsel has been asking for the "Detroit Edison PO;" Kairis suggests that they only give her the original email "not the entire chain" for fear of being served with discovery requests, in which they might have to turn over "the entire email chain associated with that PO and the various commentary by Hull;" Genser indicates that he will look for the original email not containing Hull's commentary), Exh. 62).

110.    Black Diamond's management and industry professionals recognized Genser's failure to accept DTE's offer as a mistake that cost Black Diamond millions of dollars. (CIT 984 (Hull writes to Schroeder on Nov. 30, 2008 "Last summer I repeatedly said we needed to place 50-60% of our longer term business at then very favorable prices . . . We had a written offer from DTE (Detroit Edison) to purchase 600,000 tons of HIGH sulfur coal in 2009 for $124. I advised Ira IN WRITING that we should take this business."), Exh. 63); (DTE 8 (Mullins emails Wagner at DTE "We missed a great opportunity you gave us – I certainly wanted to take it."), Exh. 64); (DTE 5-6 (Mullins to Wagner "I've thought a million times about the good opportunity you gave us and we blew."), Exh. 65); (Schwartz Depo. 159-160 ("Q. Did you know that Ira Genser rejected this offer from Detroit Edison? A. No. Q. Does it surprise you to know that Ira Genser rejected this offer from Detroit Edison? A. Yes. Q. Do you agree that this offer from Detroit Edison would have been a

substantial profit to Black Diamond at the time if it had entered into, or it had agreed to this offer? MR. INGLE: Objection, foundation. THE WITNESS: *From my knowledge of Black Diamond's production and production costs*, yes, I would agree that this would have generated substantial profit."), DE 46) (emphasis added).

111.    A&M's expert, Doyle, agreed coal producers should have been doing everything possible in 2008 to lock in term business at $100 or more per ton and Doyle stated that the CEO of a company that locked in term business at over $100 per ton would have "been doing a chicken dance" to express "extreme joy" over locking in such great prices. (Doyle Depo. 103-104, DE 55).

**Genser ensures Black Diamond does not enter into a term contract with AEP.**

112.    On September 23, 2008, Genser told counsel for the UCC that his meeting with AEP, another prospective purchaser, on September 19, 2008, went so well that he was "*afraid*" that if he made a verbal offer, AEP would have accepted and Black Diamond would have been obligated to the transaction. (Ex. I to DE 165).

113.    In truth, AEP warned Genser that Black Diamond would have to hit their "sweet spot" in terms of price (i.e. make a significantly below market offer) for a deal to get done. (Henry Depo. [filed under seal] 262-263 (Henry informed producers like Black Diamond that, to do term business, a supplier would have to make an offer significantly lower than market indications); (Mullins 4/26/13 Depo. 359-360, DE 150).

114.    On the following day, Oellermann, legal counsel for Black Diamond, reported to Genser that CIT did not want Black Diamond to submit a bid to AEP. (Ex. W to DE 165).

115.    On September 24, 2008, the market price for 12,500 btu 1% sulfur coal for delivery in 2009, 2010, and 2011 was $112.85 per ton, $106.41 per ton, and $104.41 per ton, respectively. (Gelber Report. Ex. 4, DE 131-15).

116.     Genser falsely reported to the UCC that AEP would agree to prices in the $130 per ton range, which was well above market price. (Ex. X to DE 165 (Green tells Oellermann that someone on Genser's team represented the prior day that prices from AEP could range from $120 to $130).

117.     Private emails between Genser and Tate show that Genser misled the UCC. (Ex. X and Y to DE 165 (Tate emails Genser on Sept. 24, 2008 telling him that he is "concerned about the representation of possibly getting contracts from AEP in the $130s.").

118.     The UCC took Genser at his word that Black Diamond could sell coal to AEP for $130 per ton and accepted his representation that, if AEP did not like the initial price offered, Genser had a good enough relationship with AEP that they could fall back and negotiate, rather than cut off communication. (Holmes 2/26/13 Depo. 246 ("I asked Ira, are you comfortable with your relationship with AEP such that if they do not like this price they will engage in dialogue with you to try to come up with a price that is meaningful and acceptable to all parties. And he assured me in that call with all of these people on the line that if they thought that price was too high then they could fall back and negotiate."), DE 145).

119.     The reality was that Genser had virtually no relationship with AEP. (Hull 4/26/13 Depo. 238 ("I don't think a single person sitting at that AEP table would remember who Ira Genser is."), DE 142); (Henry Depo. 260-261 [filed under seal] ("Q. All right. Do you remember meeting Mr. Genser in person? A. I do not. Q. You have no impression of him? A. No, I do not.  Q. You do not recall speaking to him? A. I do not. Q. I take it you don't remember whether he stood up at this meeting and gave a speech? A. I don't even know what the gentleman looks like.")).

120.     AEP rejected Black Diamond's offer submitted on September 29, 2008 at prices of $131.25 per ton and did not engage in further negotiations, despite Genser's representation that they would do so. (Mullins 4/30/13 Depo. 162, DE 150).

**Black Diamond's VP of Sales expresses frustration over not being allowed to do deals.**

121.     Mullins, Black Diamond's VP of Sales, was often frustrated by the fact that, even when brought potential deals for the sale of Black Diamond's coal to Genser, Genser would not approve them. (Mullins 4/30/13 Depo. 298-299 ("Q. Did you feel like you kept bringing him opportunities and offers and he would just keep rejecting them? A. I frequently expressed being discouraged that we were trying to do the impossible. Q. The impossible was bringing a deal that Ira Genser would approve that was – A. To sell our coal at a very high price."); 314 ("Q. You were just frustrated with the fact that Ira wouldn't let you close a deal, is that correct? A. That's correct."), DE 150).[61]

122.     Genser did not permit Mullins to sell coal forward for 2009 deliveries until November 3, 2008, just days after Massey had fully withdrawn its September 15, 2008 non-binding Letter of Intent on October 20, 2008. (Mullins 4/30/13 Depo. 389-390, DE 150); (Buckfire/UCC 5442-46, Exh. 66); (JD-BDM 84317, Exh. 40).

**Genser failed to hedge Black Diamond's coal production.**

123.     Financial hedging opportunities also were available to Black Diamond during the summer of 2008 as a way to manage coal price risk and lock in Black Diamond's revenue stream as

---

[61] *See also* (Hull 4/26/13 Depo. 184 ("Q. At this same time, in August of 2008, do you remember or were you aware that Carl Mullins was feeling frustrated about the fact that he kept bringing deals to Ira Genser to approve and Ira Genser wouldn't approve them? A. Yes."); 187-188 ("Carl was – Carl was getting to the point where he said, well if I – why in the hell do they make me make offers if they won't let me sell the coal;" "See he was in a precarious position, Carl was, because he was the one dealing directly with the customer. And he was going out and getting offers, and then Ira would tell him no. So he – Carl was in a position, well, what do I do? Do I keep going out and getting more offers if you're not going to approve any of them?"), DE 150); (MLB_Alvarez 8479-81 (following Genser's rejection of the DTE offer Mullins writes "What is the price and term for high sulfur coal that we can accept?" Genser forwards the message to Tate and asks "Can you go talk to him I assume he is freaking out," DE 159-6).

potential buyers and financers desired. (Turnbull 07/17/09 Depo. 130 ("—hedging specifically, which I think you're referring to, was one of the many elements related to coal sales, and hedging, I would expect that if it wasn't in late July, it was by early August, because it was something, when the coal markets were still relatively strong, that was available."), DE 69); (Holmes 7/15/09 Depo. 137-138 (it was believed that Goldman Sachs was willing to seriously consider working on a hedging transaction in July 2008); 131-135 (Sempra was seriously considering a financial hedging deal); 139-142 (Sempra identified specific hedging deals it was willing to enter into), DE 70); (Holmes 2/26/13 Depo. 263-264 (Sempra was willing to enter a financial hedging contract with Black Diamond in July 2008), DE 145).

124.     According to Genser's expert, Doyle, over **270 million tons** of coal were hedged during 2008 through publicly-reported over-the-counter transactions. (Doyle Report, Appendix B, DE 159-9).

125.     Genser was told repeatedly that financial hedging was another way to mitigate the risk of coal prices falling. (Weiss 7/15/09 Depo. 186 (recalling that a number of parties repeatedly indicated there was a need to lock in value through hedging derivatives and otherwise); (Weiss 5/9/13 Depo. 135 (hedging came up repeatedly), DE 68); (Holmes 7/15/09 Depo. 115 (stating that he became vocal about his concern over why efforts were not being made to take advantage of financial hedging products), DE 70).

126.     Neither Genser nor Tate had any experience with financial hedging in the coal industry prior to working at Black Diamond, and Tate testified he gained no experience while working as CFO. (Genser 4/21/09 Depo. 142, DE 59); (Tate 2/8/13 Depo. 15-18, DE 35).

127.     Mullins testified that he was not involved in the process of considering financial hedging as an option for the company and is not aware of who, if anyone, was in charge. (Mullins

4/30/13 Depo. 282 (stating that he was never involved in financial hedging); 285 (stating that he does not know who was), DE 150); *see also* Genser 4/21/09 Depo. 142-143 (Genser is not aware of who, if anyone, advising Black Diamond in the summer of 2008 had any experience hedging coal price risk), DE 59).

128.    Genser never sought advice regarding hedging from coal industry experts involved in the case. (Schwartz Depo. 87 (stating that he does not recall any specific conversations he had with Genser about a financial hedging transaction), DE 46).

129.    During the peak price period in the summer of 2008, Genser did not seriously investigate financial hedging opportunities for Black Diamond. (Morgner 4/29/09 Depo. 224 (stating there were no hedging discussions between Miller Buckfire and Black Diamond in June 2008)); (Morgner 4/15/13 Depo. 89 (no hedging discussions occurred in June 2008); 77 (during the peak period Black Diamond was not investigating third party hedging providers), DE 146); (Turnbull 5/7/13 Depo. 297-298 (based on what he was told, Black Diamond started the process of substantive investigation into long term coal sales and hedging too late; by starting the process so late Black Diamond compromised the ability of financial buyers to effectively compete in the M&A process and the delay in seeking coal sales or a hedging agreement was unnecessary), DE 40).

**Because Genser failed to mitigate price risk, Black Diamond  shuttered operations.**

130.    By the end of 2008, coal prices fell and Genser recognized that Black Diamond no longer had any viable prospects for success. (MB 44896 (Genser forwards current coal prices and states "Stick a fork in this thing"), Exh. 67); (MLB_Alvarez 15649 (Genser forwards coal price to Tate on Oct. 30, 2008 and says "We are so $#@#ed . . . . ."), Exh. 68).

131.    Having sold no coal forward, Black Diamond was eventually forced to shutter operations in the spring of 2009 and liquidate. (Confirmation order, BK DE 1562).

132.    Black Diamond's management, coal industry participants, and even Black Diamond's counsel recognized that Black Diamond's failure was tied to the fact Black Diamond failed to sell its coal forward on a long term basis. (MB 40062-71 (Jan. 28, 2009 email string; Genser writes to Oellermann and others that Brad Speer from Koch called to inquire whether the company was shuttering operations "because he heard nothing was sold for 2009;" Oellermann responds "I think the lack of sales is very damaging;" the chain is then forwarded between Oellermann and individuals at Miller Buckfire and Oellermann states "What we have sold is a big black box to me…I just looked at the e-mails re the Detroit Edison deal back on 8/18/08 . . . it is the same old story . . ." "), Exh. 69); (MB 42914-17 (Oellermann says that Black Diamond's "achilles heel" is that it hasn't sold the bulk of its coal for the 1st half of 2009), Exh. 70); (Hull 3/31/09 Depo. 54 (when asked if Black Diamond had been able to lock in prices in the summer of 2008, "that would have solidified Black Diamond's status as a going concern . . . ?" Hull answers "If we had locked in those prices long term, yes."), DE 67); (MB 20422-27 (Oellermann tells Miller Buckfire, "Chickens come home to roost on coal sales"), Exh. 71).

133.    Both the Trustee's experts and Genser's own expert ties Black Diamond's failure to reorganize to Genser's failure to permit Black Diamond to enter into long term contracts. (Doyle Depo. 116 (stating that he has witnessed the failure of coal companies because they didn't effectively manage coal price risk and it wouldn't surprise him if he at some point told someone that Black Diamond failed because it didn't effectively manage coal price risk); 103-104 (in 2008 coal producers should have done everything possible to lock in coal prices at $100 per ton or more), DE 55); (Bellum Depo. 138-139 ("The fact that [the A&M Parties] did not lock up the contracts and the coal prices fell, that's what caused [Black Diamond's failure to exit from bankruptcy]."), DE 141); (Sharp Report. ¶ 64 ("Genser and Tate's process ignored the commodity price risk involved in

operating Black Diamond and they deliberately ignored the advice of their constituencies, UCC professionals, and other A&M professionals with more coal industry experience."), DE 159-3).

**Genser manufactured evidence and destroyed documents to attempt to cover his gross negligence and willful misconduct.**

134.   By December 2008, Genser was concerned that he would be sued for his gross mismanagement of Black Diamond and began asking Miller Buckfire and Mullins to begin creating call logs to provide him with "air cover." (Buckfire/UCC 5442-5446 ("As you can imagine I am very concerned about a potential lawsuit down the road from anyone regarding my role as steward of the assets and ability to sell coal. You guys could help me out tremendously by combining the two spreadsheets that are attached and appending the information presented in the email below into 1 huge master call log . . . . [H]aving this info in one place will certainly provide a little air cover."), Exh. 66); (BD/UCC 7834-36 (Genser asks Mullins to update the call log and tells him that he is "providing [Genser] a document that can [sic] used to protect [Genser] when the vultures come circling for a piece of [his] hide."), Exh. 72); (BD-MCK 36-41 (Genser tells Hull that the call log "will be a very valuable tool for vindicating any careless or callous accusations that are thrown our way regarding efforts to date – I can see a significant amount of litigation arising at some point down the road – fingers will be pointed squarely at me . . . [T]he call log will be a tremendous asset for me in defending our actions and activities . . . . The more entries the better." Hull forwards the email to Mullins and states "As we suspected, this is more of a case of Ira trying to cover his own tail. I doubt the UCC has had much to do with this. Ira is starting to get jumpier."), Exh. 73).

135.   Genser, Tate and the counsel they hired became focused on doing whatever was necessary to ensure they did not have to account for their gross misconduct. (MLB_Alvarez 31383-85 (Tate states "Here's my opinion: Fuck the UCC, Fuck the Harris', Fuck the banks, and Fuck Fifth Third" to which Oellermann responds "What we all want out of this process is a confirmed plan with

payment of as much of our fees as possible and an exculpatory release."), Exh. 74); (Dep. Ex. 519 (On May 1, 2009, despite his obligation to do what is in the best interest of the Black Diamond estates, Genser writes to Oellermann "My view is we press on ahead – a plan that has a full release for A&M, hopefully the emotions will subside and I find it really hard to believe that the committee queers the deal over this issue and if they do so be it – not my problem – I will be happy to render the estate administratively insolvent from my indemnification on the suit. We on the same page?" Oellermann responds "Yep. I'm there."), Exh. 75); (Dep. Ex. 520 (Oellermann suggests on June 5, 2009 that they get "back into chambers to paint the Committee as the bad guys seeking to blow up the bankruptcy."), Exh. 76).

136.    At 4:48 pm on the day that A&M and the Trust entered into a Settlement Agreement assigning claims against Genser, Tate, and A&M to the Trustee, Tate confirms via email Genser's order to "Shred It All" in an effort to further conceal Genser's misconduct. (July 22, 2009 Shred Email, DE 23-2).

137.    When Genser told Tate to Shred It All, Genser had been given a litigation hold by A&M's in-house counsel directing him to preserve everything. (Litigation Hold Email dated Apr. 20, 2009 (DE 23-21)).

138.    Genser had been deleting emails during the course of the bankruptcy process, notwithstanding a document retention policy that prohibited doing so. (DE 23-1, p. 21-22 and documents cited therein).

139.    Genser took handwritten notes in notebooks throughout the bankruptcy, and the only notes by Genser that the A&M Parties produced came from a half-torn-out legal pad with 38 pages. (DE 23-1, p. 30).

## ARGUMENT

**I.     Genser Cannot Satisfy the Standard for a Summary Judgment in His Favor.**

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage the court is not to weigh the evidence or determine facts, as the court must view the facts and draw all inferences in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994) (citations omitted). Summary judgment should not be granted if both parties offer different accounts of what transpired, and neither is belied by "objective evidence in the record." *Coble v. City of White House*, 634 F.3d 865, 869 (6th Cir. 2011). Summary judgment is rarely apt in any negligence case. *McTavish v. Chesapeake & Ohio R.R. Co.*, 485 F.2d 510, 512-513 (6th Cir. 1973 (citations omitted).[62]

In this Circuit, summary judgment is particularly inapt when a party presents an expert opinion that, if believed, would support a jury verdict in favor of the claim asserted. *See, e.g., Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005). "Competing expert opinions present the 'classic battle of the experts' and it is up to a jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (citations omitted); *see also Cadmus v. Aetna Cas. & Sur. Co.*, No. 9505721, 1996 U.S. App. LEXIS 29443, at *6 (6th Cir. Nov. 7, 1996) (reversing summary judgment premised on lower court's determination of expert witness credibility).

---

[62] Motions for summary judgment are routinely denied by both Kentucky state and federal courts in gross negligence cases. *See, e.g., Fulkerson v. Konecranes*, No. 1:08-CV-00114-JHM, 2011 WL 666341 (W.D. Ky., Feb. 14, 2011); *Anderson v. Old Nat'l Bancorp.*, 675 F. Supp. 2d 701, 719 (W.D. Ky. 2009); *Asher v. Unarco Material Handling, Inc.*, No. 6:06-548-DCR, 2008 WL 2636455 (E.D. Ky. Jun 26, 2008); *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255 (Ky. Ct. App. 2008).

The testimony of the Trustee's experts on industry standards related to the operation of a coal company, the duties of restructuring professionals such as Genser, and the ways in which Genser breached these standards and duties, creates a fact issue for the jury to resolve. Don Bellum, a coal industry veteran with over 45 years of experience in the minerals industries, including 18 years in executive level management positions has determined, based on record evidence (discussed herein), that Genser irrevocably damaged Black Diamond through his marketing and sales strategy which rejected lucrative offers from willing buyers and instead focused on a sale of the company to Massey. (Bellum Report, DE 131-12). According to Mr. Bellum, Genser failed Black Diamond by placing Mullins, who had never before been involved in direct sales to customers in charge of sales, by foregoing long term contracts, ignoring the fact that coal prices would not remain at record highs, and by willfully disregarding the advice of coal industry experts and Black Diamond's CEO. (*Id.*). Brad Sharp, a turnaround management and restructuring expert specializing in crisis management and workout consulting, also has determined, based on record evidence, that Genser did not have the requisite experience to serve as Black Diamond's CRO, was reckless in his placement of Tate in the CFO position, failed to create an effective strategy for Black Diamond's exit of bankruptcy, and willfully and recklessly dismissed the advice of Black Diamond management, members of the UCC, industry experts, and other A&M employees more familiar with the risk inherent in commodities markets in making choices on behalf of the company. (Sharp Report, DE 131-11). Viewing the facts in the light most favorable to the Trustee, including these expert opinions rendered based on record evidence, a reasonable jury could conclude Genser was grossly negligent, warranting denial of summary judgment.[63]

---

[63] Genser's motion for summary judgment also should be denied due to his spoliation of evidence. The Trustee incorporates by reference her Amended Motion for Sanctions Due to Spoliation of Evidence and Reply in support of the same (DE 23 and 112) as well as the arguments made in her Response to Tate's motion for summary judgment related to preclusion of summary judgment due to spoliation of evidence. (DE 159).

## II.    Issues of Material Fact Exist Regarding Genser's Gross Negligence and Willful Misconduct in Acting as Black Diamond's CRO.

### a.    Genser and Tate were unqalified to serve as CRO and CFO, respectivly, of Black Diamond.

A&M and its "professionals," including Genser, are marketed as "corporate doctors" able to assist organizations in "tackl[ing] their toughest business and operational challenges."[64] Genser complains that the Black Diamond bankruptcy was "litigious and contentious from the start" but this was just the type of situation Genser and A&M represented they could handle. When A&M first became involved in advising Black Diamond, it advertised itself as able to solve "complex problems by supplanting company and/or crisis leadership with hands-on industry expertise."[65] Yet, Genser was severely unqualified to deal with the restructuring environment and had no industry experience.

Genser was charged with working on all bankruptcy-related matters.[66] Yet, prior to his involvement with Black Diamond, he had never before held the title of CRO, Trustee, nor had he been the responsible person in a bankruptcy.[67] Genser had no experience working with coal companies or negotiating deals of any sort on behalf of coal companies prior to serving as CRO.[68] He had absolutely no experience hedging coal price risk at the time he was hired as CRO, yet he placed himself in a position where he, leaning on an equally unqualified CFO, had final authority on all major financial decisions of the company, including decisions related to long-term contracts.[69] Genser was unqualified to serve as CRO of Black Diamond and he knew it.[70]

---

[64] (Ex. N to DE 165); (Ex. O to DE 165).

[65] (Dep. Ex. 322, page 10 of the pitch book, Exh. 77).

[66] ¶ 16 of C/S.

[67] ¶ 23 of C/S.

[68] ¶ 24 of C/S.

[69] ¶¶ 24 of C/S.

[70] *See* (Sharp Report, ¶¶ 27-33, DE 127-2);¶ 25 of C/S. Genser incorporates by reference his Rule 16 Motion requesting that this Court find that the Bankruptcy Court's April 22, 2008 Order establishes that he was qualified to serve as CRO (DE 77). As described in the Trustee's Response to the same (DE 136), Genser is wrong. The Bankruptcy Court's Order was not an endorsement of his qualification to serve as CRO and the Trustee incorporates her Response herein by reference.

Not only was Genser unqualified to serve as Black Diamond CRO, he, along with A&M, selected Tate, who was equally unqualified, for the CFO position.[71] ). Genser, who was taking a position he had never held before in an industry he knew nothing about, should have selected a seasoned CFO to work with to provide guidance and serve as a real sounding board. Instead, Genser went in the opposite direction and chose Tate.

Contrary to Genser's contentions, witnesses in this case have identified Tate's failings as CFO. During her deposition, the Trustee provided a laundry list of Tate's failings.[72] Mullins explained during his deposition that Tate had responsibility as CFO for negotiating specific provisions of long term contracts, about which Tate and Genser's expert Ogle both admitted Tate had no clue.[73] Hull testified that both Tate and Genser's lack of coal industry experience was often a topic of conversation among Black Diamond's management.[74] The Trustee's expert examined Tate's qualifications and actions as CFO and found him lacking.[75] Indeed, Genser's own expert pointed to Tate's shortcomings during his deposition.[76]

Tate failed to properly assess whether Black Diamond should enter coal sales contracts, to negotiate coal contract terms, to pursue financial hedging contracts on behalf of the company, and to properly manage commodity price risk.[77] That both Genser and Tate viewed Tate as Genser's "yes man" does nothing to change the fact that he failed the company as CFO, and Genser failed the

---

[71] *See* Response to Tate MSJ (DE 159). The Trustee incorporates by reference her Response to Tate's Motion for Summary Judgment (DE 159) detailing how Tate failed to uphold his duties as CFO of Black Diamond.
[72] *See, e.g.,* (DE 159, at p. 4 n. 5 (providing the long list of failings the Trustee has identified)).
[73] *See* ¶¶ 25, 34 of Tate Resp. C/S.
[74] *See* ¶ 25 of Tate Resp. C/S.
[75] ¶¶ 41-47 of Tate Resp. C/S. Among other things, the Trustee's expert, Brad Sharp, testified that due to inexperience "Tate was unable to lead or properly support the Company with respect to financial management and execution of its business plan," did not have the basic knowledge to deal with long-term coal contract issues that were his task to negotiate as CFO, failed to properly evaluate and structure the management team to compensate for his own deficiencies, willfully disregarded the advice of A&M professionals who did have industry experience, and took actions which "significantly deviated from the practices and standards in the turnaround industry that should be expected" of him. [something is wrong in this – missing quotation mark somewhere]
[76] *See* ¶ 25 of Tate Resp. C/S.
[77] *See* ¶¶ 11-13 of Tate Resp. C/S.

company by selecting Tate for a leadership position despite having no qualifications for the job.[78] Despite A&M's representations that their professionals had the experience necessary to tackle the toughest business and operational challenges and had the specific industry experience necessary to handle complex problems, neither Genser nor Tate were qualified to take on their roles as CRO and CFO, respectively. Instead, the entire purpose of staffing Tate on the Black Diamond engagement in the "C suite" was to boost his resume to help him move up in the ranks internally within A&M.

### b. Mullins was unqualified to serve as VP of Sales; Genser belittled and ignored those individuals with coal industry experience who tried to help him.

Following Black Diamond's entrance into bankruptcy, though he could have hired anyone,[79] Genser named Carl Mullins VP of Sales.[80] In making his selection, Genser made no effort to look beyond the walls of Black Diamond to fill the role, even though a coal salesperson is a key position for a company that sells coal to generate revenue.[81] Mullins lacked the experience to hold this position.[82] He had no formal education or training in marketing or sales and did not consider himself an expert in the marketing or sale of coal.[83] Throughout the bankruptcy, advisors to Black Diamond's stakeholders expressed concern to Genser over Mullins' selection as VP of Sales.[84] Yet Genser failed to take any action to replace Mullins or hire someone else to assist him in his role.

---

[78]  (Aug. 20, 2008 email from Genser to Tate (Tate reports back to Genser on his discussion with Mullins following rejection of the DTE offer and his attempts to make Mullins "feel" like he is part of the process.  Tate says that Mullins is "pretty easy to steer, but the process is important. Genser replies "Agree – it is much easier to deal with you – I just tell you what to do and get it done and you do it no questions asked . . . "), Exh. 78).

[79] ¶ 33 of C/S.

[80]  31 of C/S.

[81] ¶ 37 of C/S.

[82] ¶¶ 32, 34 of C/S.

[83] ¶¶ 35, 36 of C/S.

[84] ¶ 38 of C/S. See also (Schwartz Depo. 94-95, DE 46). (Schwartz, a coal industry expert and advisor to CIT, recognized that Black Diamond was "lacking to a certain extent somebody who actually had the experience and the contacts for direct sales to the large customers . . . they seemed to be starting from scratch in terms of dealing with the utilities who took coal directly by rail.")

Prior to its bankruptcy, Black Diamond had so many contracts the company often had trouble meeting its commitments.[85] After Mullins was placed as VP of Sales in 2008, at a time when utilities were in desperate need of coal due to a shortage,[86] and when other coal companies were able to take advantage of higher market prices and enter long term contracts for their coal,[87] Black Diamond failed to sell a single ton of coal under a long term contract.[88] The fact that sale upon sale was being made by companies surrounding Black Diamond in an environment where customers were desperate for Black Diamond's product underscores the opportunities Black Diamond missed out on. According to Genser's expert, Heller, Genser capitalized on Mullins's inexperience and never permitted Mullins to make a single "firm" or "binding" offer to sell Black Diamond's production.[89]

Instead, Mullins at Genser's behest, sent blast emails asking buyers to submit bids for Black Diamond's coal.[90] Potential customers viewed Black Diamond as trying to "game" them into bidding up the price of coal even higher than the record prices in the market.[91] Although Genser brags that Mullins sent multiple emails and made phone calls to attract customers to Black Diamond, if Genser had the requisite coal industry experience necessary to run Black Diamond during its bankruptcy, he would have known that selling coal is about establishing relationships and developing personal contacts with buyers.[92] During the bankruptcy, Genser and Tate acknowledged that "Carl is not a

---

[85] (Sergent Depo. 32, DE 51).
[86] (Doyle Depo. 98 (a large number of utilities were desperate for coal); ("Short Supply of CAPP Rail Coal a Stressing Situation in Southeast," article from Issue 1711 of U.S. Coal Review Aug. 11, 2008, Exh. 50).
[87] ¶ 90 of C/S.
[88] ¶ 82 of C/S.
[89] (Heller Depo. 336-337 ("Q. Did Carl Mullins make a firm offer at any time while he was the vice president of coal sales for Black Diamond for the sale of coal? A. No.  I don't believe they were binding . . ."), DE 57).
[90] (Genser 2/7/13 Depo. 260, DE 34).
[91] (Henry Depo. 79-80, 89-80, 202, DE 74).
[92] (Schwaartz Depo. 94-95, DE 46); (Bach Depo. 29, 31, DE 36).

salesman and he doesn't have the connections to move coal . . ."[93] Worst of all, as discussed *infra*, when Mullins was able to bring deals to the table, Genser summarily rejected them.[94]

In addition to placing unqualified individuals in the CFO and VP of Sales offices, Genser ignored, undermined and belittled his CEO. Genser represented to the Bankruptcy Court that Hull brought 30-plus years of experience in the coal industry, management experience, credibility, and stability to the management team.[95] Despite referring to Hull as the "face of this company,"[96] Genser ignored this coal industry veteran's advice and plotted with Tate to undermine him.[97]

Hull repeatedly advised Genser to mitigate coal price risk with long term contracts and pleaded with him to accept offers. [98] Instead of taking Hull's advice and leaning on Hull's vast experience (as he represented to the Bankruptcy Court and stakeholders that he would), Genser ignored Hull and refused to enter a single long term contract. Jealous of CIT's belief that Hull was making "shit happen," Genser undermined "the face of [the] company" and schemed of ways to "put him in his place" so that Genser and Tate would get the "credit" from CIT.[99] Genser told Cohn that he had lost all respect for Hull and that he was "really hoping that [Hull] shoots himself in the head tomorrow in front of the committee, we don't need him, we can succeed without him, and don't be surprised if I call you in the next few weeks to discuss canning him."[100]

### c.   Genser failed to consider the advice of industry professionals and experienced stakeholders who advised him to lock in coal contracts.

---

[93] ¶ 39 of C/S.
[94] ¶ 91-111 of C/S.
[95] ¶ 41 of C/S.
[96] (*Id.*).
[97] *See* ¶¶ 40 to 42 of C/S.

[98] ¶ 75, 107, 110 of C/S.
[99] ¶ 42 of C/S.
[100] (Dep. Ex. 349, Exh. 19). Despite Genser's "true feelings" and Genser's ability to hire and fire employees of Black Diamond as he saw fit (BK DE 56), Hull was never removed from his place as CEO of Black Diamond and replaced with someone whose advice Genser would take. The Trustee's expert, Brad Sharp, explained that retaining a CEO that Genser did not respect was a violation of his duty of care. (Sharp Report, ¶ 37, DE 159-3 at ¶ 32-34, 37).

Virtually every prospective buyer and financer that showed interest in purchasing Black Diamond or providing exit financing, except Massey, told Genser that Black Diamond needed to lock in its revenue stream through long term contracts.[101] Industry practice told Genser that Black Diamond, like all coal companies, should lock in its production for future years through long term contracts.[102] Genser committed gross negligence in failing to enter long term contracts on behalf of Black Diamond.

Even more egregious is the fact that Black Diamond's management, the UCC and its advisors, industry professionals, the Bankruptcy Court, the investment bankers hired by Genser, Black Diamond's counsel, and even Steve Cohn[103] implored Genser to enter long-term contracts. In 2006 and 2007, coal of the type produced by Black Diamond sold in the range of $55 to $60 per ton.[104] Coal prices in the summer of 2008 reached record highs, more than double the prices seen by Black Diamond prior to bankruptcy. Industry participants recognized that these record highs would not last.[105] Genser was warned repeatedly that prices were going to fall and that he should lock in the high prices when he could.[106]  In the face of all of these warnings, Genser steered the company into oblivion all in hopes of gaining additional referrals from CIT while everyone around him (except Tate) begged him to change course. Genser cannot claim good faith reliance on advisors when he

---

[101] ¶ 71-74 of C/S.
[102] ¶ 85 of C/S.
[103] ¶ 75-84 of C/S.
[104] ¶ 93 of C/S.
[105] ¶ 89 of C/S.
[106] ¶ 75-84 of C/S. Genser argues that it may be shown that he complied with his duties to act in good faith, on an informed basis, and in the honest belief that he acted in the best interest of the company if it is also shown that he relied on other officers or employees, legal counsel or industry experts who he honestly believed to be reliable and competent on the matters presented. (DE 100-1, at 50). Moreover, Genser brags that he hired "prominent" legal counsel and investment bankers to assist him in restructuring Black Diamond. Discussion of Jones Day and Miller Buckfire's competencies related to management of coal price risk aside, both entities, along with the UCC, industry experts, and Black Diamond management urged Genser to enter long term contracts. Genser flouted this advice.

rejected their advice about the most fundamental issue in a commodity-producer's bankruptcy: the

mitigation of commodity price risk.[107]

> ### d.      Genser had opportunity upon opportunity to enter into long term contracts on behalf of Black Diamond yet he failed to do so; he failed to even seriously consider, let alone pursue, financial hedging deals.

Not only was Genser advised that he should enter into long term contracts, and not only were

other coal companies doing so, Genser had multiple opportunities to enter long term contracts on

behalf of Black Diamond. Genser ignored these opportunities to curry favor with CIT:[108]

> i      On June 4, 2008, Koch Carbon sent Genser an offer to purchase substantially all of Black Diamond's production for 2009 through 2011 at prices ranging from $92 to $100 per ton.[109] Entering a contract under the terms proposed by Koch would have netted Black Diamond over $500 million in revenue. Cohn advised Genser to share the Koch offer with constituencies and to follow up on it. Genser ignored the offer and there is no evidence he ever shared it with Black Diamond's stakeholders.[110]

---

[107] (Sharp Report, ¶¶ 64, 65, DE 127-2).

[108] Genser claims that his contemporaneous communications make plain that it was his goal to maximize the value of the estates for all interested parties. (DE100-1, at 62). The email cited by Genser proves nothing. The email was written by Genser, the same individual that represented to the Bankruptcy Court that Hull brought credibility to the management team and was the "face of the company" on June 26, 2008, just over two weeks after he represented to Steve Cohn that he had lost all respect for Hull and that he really needed to be shot. ¶¶ 41, 42 of C/S. In fact, just 10 days after the June 13, 2008 email Genser cites to support his argument that he sought to do what was best for all stakeholders, Genser wrote to Cohn that they were going to "sell this thing for $180,000,001 [the amount of secured debt plus $1] – once the banks are paid off we are all going home." ¶ 59 of C/S. Just under two months prior to authoring the June 13 email, Genser wrote to Tate that they should "keep [their] eye on the prize – getting the banks out whole." (*Id.*). Moreover, the email cited by Genser is to Hull in reference to the Key Employee Incentive Plan, Hull staunchly advocated for on behalf of Black Diamond's management throughout the bankruptcy. While Genser feigned concern for the management team and this plan designed to reward them for upholding their obligations to Black Diamond during the bankruptcy, private emails show that neither Genser nor Tate truly cared about the outcome of the KEIP or the management team. (DE 159-31).

[109] ¶ 96 of C/S. The Trustee incorporates by reference her Response to the A&M Parties' Rule 16 Motion Requesting that this Court Find that Koch Carbon Did Not "Offer" to Purchase All Black Diamond Coal From 2009 Through 2011 Under Kentucky Law in support of why the Koch term sheet constituted a legal offer capable off acceptance. (DE 129).

[110] ¶¶ 97, 98 of C/S. Genser claims that the information from Koch's indicative proposal was incorporated into a company presentation that was distributed to all stakeholders on or before June 10, 2008 for purposes of the June 10-11 stakeholders meeting in New York City but Black Diamond's management and stakeholders confirm that the Koch offer was never shared at that meeting. (Aff. Carl Mullins, DE 112-14); ¶ 97 of C/S.  Significantly, Genser received the Koch offer on the same day that CIT's Harry Schroeder wrote him that he was not sure that long term contracts would be "good" in a sale situation. (Exh. 30 (Schroeder is not sure a two year contract with Jacksonville Energy is something that will look good in a sale situation)). Genser bemoans in his Motion for Summary Judgment that CIT's consent was necessary for any coal sales contract exceeding a 60-day term but during his examination pursuant to Bankr. R. 2004 Genser practically bragged that he could maneuver around CIT and seek court approval if CIT withheld consent. (Genser 4/21/09 Depo. 320-21, DE 59). The record establishes that Genser dismissed the Koch offer because he wanted to curry favor with CIT.

i   In July 2008, AEP expressed interest in entering into a three year term deal with Black Diamond and Black Diamond failed to even submit an offer in response.[111]

i   In August 2008, Koch once again expressed an interest in entering into a two year term deal for up to 1 million tons per year of Black Diamond's coal at prices ranging from $116.00 to $125.13 per ton.[112] These prices were more than double what Black Diamond saw prior to bankruptcy. In the face of Black Diamond management's pleas to the contrary, Genser dismissed this offer as well.[113]

i   DTE offered to buy $600,000 tons of Black Diamond's coal on August 18, 2008. Black Diamond management pleaded with Genser to accept the offer, believing that it would help with a sale of the company, and once again Genser rejected the offer.[114]

Genser now feigns concern about Black Diamond not being able to produce the tonnage represented in the Koch offer. As of June 2008 Black Diamond had an estimated 91,071,000 tons of total reserves.[115] At the time this estimation was made Black Diamond's average annualized production was estimated to be 2,100,00 tons.[116] Black Diamond's 2009 production was estimated to be 2,250,00 tons.[117] The 2009 production estimate as well as the reserve estimate were reviewed by both Black Diamond's independent engineering firm (Gates Consultants) as well as the UCC's independent engineering firm, (J.T. Boyd) and found reasonable.[118]

Although 2009 production was estimated to be 2,250,00 tons, with millions of tons of coal available, the rate of production, of course, could be materially increased if there was additional

---

[111] ¶ 100 of C/S.

[112] ¶¶ 101, 102 of C/S.

[113] ¶ 103 of C/S. Genser claims he forewent an opportunity with DTE to sell 600,000 tons of Black Diamond's coal in 2009 in order to use 2009 production as a lever to entice buyers to purchase 2010 coal as well. However, while this argument is dubious at best, considering DTE represented only 25% of Black Diamond's coal, leaving plenty of coal to be used as a "lever," Genser cannot explain why he passed on opportunities with AEP and Koch to enter multi-year deals. The only explanation is Genser's staunch adherence to CIT's wishes that coal not be committed.

[114] ¶¶ 104-109 of C/S. After the fact Genser and the counsel he hired to represent Black Diamond attempted to hide emails from Black Diamond's management beseeching him to accept the DTE offer. ¶ 110 of C/S. Black Diamond's management immediately recognized that Genser had made a mistake in not accepting the DTE offer. ¶ 110 of C/S.

[115] (Confidential Information Memorandum reviewed and approved by Genser, p. 4, DE 165-3).

[116] (CIM, p. 20, DE 165-3).

[117] (CIM, p. 21, DE 165-3).

[118] (Gelber Rebuttal Report, p. 9, Exh. 79); (Sept. 4, 2008 Draft of Reasonableness Opinion of Black Diamond Mining Company, LLC Five Year Business Plan and Operating Plans, Exh. 3); (Boyd Report, BD-MCK 879-892, Exh. 80). By Dec. 2, 2008 the A&M Parties were reporting that Black Diamond's production for the year was expected at 104% of the original budget. (Dec. 2, 2008 Weekly status report, p. 10, Exh. 81).

demand for Black Diamond's coal. At the prices Koch was willing to pay for Black Diamond's coal (ranging from $92 to $103 per ton), which were well above Black Diamond's production cost,[119] Black Diamond had the ability to increase production by up to 800,000 tons[120] by expanding production at existing mines and accelerating opening of newly permitted mines, meaning that with the revenue generated by the Koch offer Black Diamond had the capability to produce 3,050,00 tons in 2009, well above the tonnage presented in the 2009 portion of Koch's offer.[121]

Although Genser's expert Steve Doyle has testified that coal producers like Black Diamond should have been doing everything possible in 2008 to lock in term business at $100 or more per ton,[122] Genser did everything he could not to ensure such deals never happened.[123] He rejected offer after offer and went so far as to misrepresent prices Black Diamond could expect to see from AEP in September 2008, causing the UCC to support an offer that had no chance of acceptance by AEP, just days after CIT made clear they did not want Black Diamond to enter into a deal with AEP.[124]

Moreover, while financial hedging opportunities also were available to Genser in 2008, and Genser was told repeatedly that financial hedging was another way to mitigate against coal price risk, Genser failed to even seriously investigate financial hedging opportunities during the peak price

---

[119] *See* (CIM, p. 6, DE 165-3).

[120] (CIM, pp. 9, 30, 31 DE 165-3).

[121] Black Diamond also had the ability to process the 3,050,000 tons of coal.  At 2,250,000 tons, Black Diamond's Spurlock coal processing facility was only estimated to be at 52% capacity. (CIM, p. 23, DE 165-3). Thus, at 3,050,000 tons Spurlock would have only been at 70% capacity.  The tons needed to supply the Koch offer could have easily been processed. Finally, use of the term "ramp-up" is misleading.  For Genser to suggest that Black Diamond "ramped-up" from zero at the beginning of the bankruptcy filing to the 2,100,000 annual rate by June 2008 is misleading.  The production equipment was in place when the bankruptcy filing occurred and simply turned off, not removed. When the miners had the assurances that they would be paid, they simply turned the equipment back on. By June 2008 Genser testified that he was comfortable with Black Diamond's run rate in any event. (Genser 7/17/09 Depo. 138-39, DE 60).

[122] ¶ 111 of C/S.

[123] In his Motion Genser cites to monthly production reports to insinuate that Black Diamond was not able to meet its production forecasts.  However, by the end of 2008 Black Diamond would have naturally slowed production as there were no committed contracts for 2009.

[124] ¶ 112-120 of C/S.

period of 2008.[125] Neither Genser , Tate,[126] nor Mullins had experience with financial hedging.[127] Although Genser claims Black Diamond investigated financial hedging, it is not even clear who, if anyone, was in charge of such an investigation.[128] What is clear is that Black Diamond failed to enter a single long term contract or financial hedging transaction during Genser's tenure as CRO to manage price risk.[129]

During the bankruptcy, Black Diamond's management, coal industry participants, and even Black Diamond's counsel recognized that Black Diamond's failure to reorganize was attributable to Genser's refusal to mitigate coal price risk through long term contracts or financial hedging. In January 2009, rumors spread throughout the coal industry that Black Diamond was shuttering operations because it had sold no coal forward for 2009.[130] Black Diamond counsel, Charles Oellermann, admonished Genser that the "lack of sales is very damaging" and in private emails told investment bankers at Miller Buckfire "what we have sold is a big black box to me . . . I just looked at the e-mail re the Detroit Edison deal back on 8/18/08 . . . it is the same old story . . .," called the lack of coal sales Black Diamond's "achilles heel," and stated "Chickens come home to roost on coal sales."[131] Genser's own expert Steve Doyle links Black Diamond's failure to Genser's refusal to enter long term contracts.[132]

     **e.**    **Genser did not run a dual path process; Instead Genser followed CIT's wishes.**

---

[125] ¶¶123-129 of C/S.
[126] ¶ 126 of C/S.
[127] ¶ 127 of C/S.
[128] (*Id.*).
[129] ¶ 130-131 of C/S.
[130] (Exh. 69).
[131] ¶ 132 of C/S.
[132] ¶ 133 of C/S.

Genser did not engage in a "dual track" process.[133] Instead, Genser locked himself and the company onto the idea of a quick sale without committed contracts in an attempt to follow the wishes of secured lender CIT.

Genser and A&M were conflicted from the very beginning of this case.[134] Both owed their position in the Black Diamond bankruptcy to CIT.[135] A&M and Genser saw CIT as a potential referral source throughout the bankruptcy.[136] From the outset of the bankruptcy, Genser, on a mission to "re-double" his efforts to obtain referrals, sought out referrals from CIT, even though this was inappropriate.[137] A&M's efforts to court CIT paid off, as A&M affiliates were engaged at the request of CIT to provide advisory services to two different loans in April 2008 and March 2009.[138] Genser sought to line his pockets from referrals up to 15% of collections made off of an engagement.[139]

The timeline of events during the Black Diamond bankruptcy illustrates how Genser allowed his desire to please CIT to direct his every move:

i   March 2008 – Genser attempts to obtain referrals from CIT for A&M's credit advisory practice;

i   April 2008 – Genser emails Tate to keep his eye on the prize "getting the banks out whole";

i   June 2008 – CIT tells Genser they do not think entering long term contracts is a good idea; Genser passes on the Koch offer; Genser writes "Damn right – the actual quote was 'we are going to sell this thing for $180,000,001 – once the banks are paid off we are all going home'";

---

[133] (Sharp Report, para. 57, DE 127-2).
[134] In a footnote, Genser asserts that the Trustee has abandoned her claim that Genser had a conflict of interest vis-à-vis CIT because CIT and A&M had a lengthy history of doing business together. She has not. Stephen Wallace's affidavit establishes a pre-existing relationship between A&M and CIT, as does the conflict check ran by A&M in March 2008. *See* ¶¶ 48-56 of C/S. Genser's conflict of interest deepened as he constantly sought referrals from CIT while acting as CRO of Black Diamond.
[135] ¶¶ 1-14, 47 of C/S.
[136] ¶¶ 46, 50 of C/S.
[137] ¶¶ 45, 51, 55, 56 of C/S.
[138] ¶¶ 53, 54 of C/S.
[139] ¶ 44 of C/S.

i    July 2008 – Genser fails to submit an offer in response to AEP's expressed interest in a multiyear deal;

i    August 2008 – Cohn and Genser continue to seek referrals from CIT; CIT expresses interest in Massey and Massey indicates that it doesn't want Black Diamond to enter long term contracts; Genser passes on deals with Koch and DTE;

i    September 2008 – CIT tells Genser they don't want Black Diamond to enter a deal with AEP; Genser falsely represents to the UCC that they could see prices in the $130s from AEP in order to lull them into supporting an offer that has no chance of acceptance

While Genser referred to the members of the UCC as "savages," "vultures," "terrorists," and "MFers" throughout the bankruptcy and disregarded their opinions, Genser sought to make sure that CIT was happy with his work.[140] Genser's "prize" was "getting the banks out whole" and he determined that "once the banks are paid off we are all going home."[141] CIT in turn made it clear to Genser early on in the case that it desired the company to be sold and that it did not desire Black Diamond to enter long term contracts in pursuit of that goal.[142] CIT became locked on the idea of a sale to Massey because it was CIT's desire to get paid as quickly as possible.[143] Massey in turn made it clear that they too desired Black Diamond's coal to remain uncommitted.[144]

Massey, Black Diamond's competitor, benefitted from Black Diamond foregoing sales that it could obtain for itself.[145] In 2008, Black Diamond's management was wary of Massey's reputation

---

[140] ¶ 55, 57, 58 of C/S.

[141] ¶ 59 of C/S.

[142] ¶¶ 60-63 of C/S. As discussed *supra*, CIT was actually mistaken in its belief that long term contracts would be detrimental to a sale of the company. There is no evidence Genser ever corrected CIT's misconception.

[143] ¶ 64 of C/S. There is a dispute of fact as to whether CIT may have actually declared its interest in a sale to Massey well before August 2008. (Schwartz Depo. 136-138 (Schroeder may have told him as early as June 2008 that Massey was an interested buyer and that he recalls that Massey wanted Black Diamond's coal to remain substantially uncommitted", DE 64).

[144] ¶ 64 of C/S.

[145] ¶ 68, 69 of C/S.

for engaging in tactics designed to smother them out.[146] However, Genser staunchly adhered to CIT's wishes that long term contracts be avoided in an effort to court Massey.[147]

When Massey backed out and Genser finally permitted Mullins to begin pursuing contracts into 2009, the damage had been done.  Coal prices fell as predicted and Genser recognized that Black Diamond no longer had a viable option for success - and it was his fault.[148] Having failed to lock in a revenue stream through long term contracts, Black Diamond was forced to shutter. Genser then went on the offensive to attempt to escape liability for his misconduct. As proof of consciousness of his misdeeds, in December 2008, Genser began asking Black Diamond management and Miller Buckfire to create documents to give him "air cover" as even Genser foresaw "a significant amount of litigation arising at some point down the road" with fingers pointed squarely at Genser.[149] By July 22, 2009, when the A&M Parties and the Trust entered into a Settlement Agreement assigning to the Trust Black Diamond's claims against Genser and the A&M Parties, Genser was desperate enough to order evidence of his misconduct shredded.[150]

## III.   Genser Was Not a Court-Appointed Trustee and Does Not Get the Benefit of the "Willful and Deliberate" Standard; the Trustee Will Prove Her Claims Against Genser by Showing Gross Negligence.

### a.   The Bankruptcy Court has already rejected Genser's immunity argument.

Genser attempts once again to cloak himself with the quasi-immunity provided to court-appointed trustees. The Bankruptcy Court rejected this argument and this Court should as well.

In 2011, when the A&M Parties filed their initial motion for summary judgment, Genser argued that he was cloaked in the quasi-judicial immunity afforded by the "willful and deliberate" standard which must be met for trustees and other *court-appointed* officials who have similar rights

---

[146] ¶ 69 of C/S.
[147] ¶¶ 91-111 of C/S.
[148] ¶ 130-133 of C/S.
[149] ¶ 135 of C/S.
[150] ¶ 139 of C/S.

and responsibilities to be found personally liable for their misdeeds. (AP DE 82-1, at 44-46). Just as

he does now, Genser relied on *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461-462 (6th Cir.

1982), to argue that his mistakes in judgment could not be the basis of his liability to the Trustee, but,

instead, he could only be held liable for acts taken "willfully and deliberately in violation of his

fiduciary duties." (*Id.* at 45-46). The Bankruptcy Court flatly rejected these arguments.[151]

     The Bankruptcy Court made plain that Genser was not a trustee and there is no trustee in this

case. (AP DE 144, at 4). Genser now argues that he, as an officer of a debtor-in-possession, owed

fiduciary duties "to the bankruptcy estate akin to the duties owed by a trustee in bankruptcy" and is

thus entitled to quasi-judicial immunity. (DE 100, at 45). This is the exact argument considered and

rejected by the Bankruptcy Court. Although Genser had the duties of a trustee, the Bankruptcy Court

determined that he "did not have the important limitations of a trustee" and, thus, was not entitled to

the benefit of the willful and deliberate standard. (*Id.* at 5).

     This Court similarly found that Genser and Tate derived their powers "from their

employment as corporate officers and not from the Bankruptcy Court's power to supervise over

Chapter 11 trustees *and other court officers.*" *Sergent*, 472 B.R. at 413 (emphasis added). In reaching

this conclusion, this Court considered the fact that bankruptcy trustees and court-appointed officers

who represent the estate "are entitled to absolute quasi-judicial immunity for actions 'within the

scope of the authority conferred upon [them] by statute or the court.'" *Id.* at 414 (citations omitted).

---

[151] The Bankruptcy Court had good reason to reject *Ford Motor* here as it is readily distinguishable. As discussed in the Tate MSJ Response, *Ford Motor* involved the *court appointment* of an individual as a debtor-in-possession. *Ford Motor Credit Co.*, 680 F.2d at 454 (emphasis added). Genser was not appointed by the Bankruptcy Court in any capacity (trustee or debtor-in-possession). *Sergent*, 472 B.R. at 413; (AP DE 144, at 5). Genser was hired by Black Diamond, and his employment was not ordered under the auspices of either 11 USC §§ 327 or 363. While the debtor-in-possession in *Ford Motor* was "at all times subject to the control of the court," *Ford Motor Credit Co.*, 680 F.2d at 461, Genser was not subject to the Bankruptcy Court's control. This Court has agreed that "the Bankruptcy Court could not have used its limited equitable power to craft and oversee Genser's position as CRO and Tate's position as CFO." *Sergent*, 472 B.R. at 415.

This Court cited with approval Judge Scott's holding that the A&M Defendants "are not entitled to quasi-judicial immunity for any of the A&M Claims." *Id.* This argument again should be rejected.

> **b.    Even if the willful and deliberate standard applied, Genser would not be entitled to summary judgment.**

Even if the "willful and deliberate" standard did apply to Genser in order for him to be held personally liable for his misdeeds, which it does not, Genser would not be entitled to summary judgment. At the very least, a genuine issue of material fact exists as to whether Genser acted willfully and deliberately in breaching his obligations to Black Diamond.

The cases cited by Genser for support of his contention that a trustee or a trustee-like court-appointed officer may be held liable only if he "willfully and deliberately violated his fiduciary duties" rely on the Supreme Court's holding in *Mosser v. Darrow*, 341 U.S. 267 (1951).[152] As the cases Genser cites illustrate, there is a circuit split over whether the holding in *Mosser* actually stands for this proposition in the first place. However, what is clear is that the Supreme Court found in *Mosser* that a trustee's self-dealing activities would rise to the level of misconduct required to hold a trustee personally liable for harm to the estate.

In *Mosser,* Darrow was appointed as reorganization trustee for two common-law trusts. 341 U.S. at 268. Darrow employed two people to assist in his trusteeship, who he expressly permitted to continue to trade in securities of the debtors' subsidiaries personally and through a corporation which they owned. *Id.* The Court held that the trustee could be held personally liable for the employees' activities because "that which the trustee had no right to do he had no right to authorize, and that the transactions were forbidden for benefit of others as they would have been on behalf of the trustee himself." *Id.* at 272. As a reorganization trustee, the Court stated that Darrow was the "representative of the court" and "[e]quity tolerates in bankruptcy trustees no interest adverse to the trust. This is not

---

[152] *See* cases cited at (DE 10-1, at 46-46).

because such interests are always corrupt but because they are always corrupting." *Id.* at 271. In the case of Darrow, the Court said that "[t]he motives of man are too complex" for the Court to say whether Darrow hired the two employees and continued to allow them to engage in self-interested activities potentially adverse to the estate because they were able to provide the most "efficient help" to him in the best interest of the estates, or he permitted them to continue in their ways in "anticipation of counterfavors later to come." *Id.* at 271-272. If the trustee's conduct in *Mosser* can be said to be "a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust," thus warranting imposition of personal liability on a trustee, surely Genser's engaging in self-dealing for his own benefit rises to the willful and deliberate standard. *Id.* at 272.[153]

As discussed above, the record is replete with instances where Genser willfully and deliberately refused to sell coal because he favored CIT's wishes over all other stakeholders. Unlike the situation in *Mosser* where it was not clear whether the trustee's actions were taken in the best interest of the estates or because the trustee anticipated counterfavors "later to come" from his two employees, the evidence in this case is clear that Genser catered to CIT because he desired to gain referrals to benefit both A&M and himself personally.[154] Although it was in the best interests of Black Diamond to enter into long term contracts to mitigate coal price risk, attract potential purchasers, secure exit financing, and to generally ensure that it remained a going concern, Genser placed himself in a position adverse to Black Diamond's best interest by catering instead to CIT's wishes in hopes of receiving a *quid pro quo* from CIT in the form of referrals with which he could line his own pockets from origination fees under A&M's compensation system.

---

[153] In *In re: United Equipment Sales Co.*, 47 B.R. 818 (W.D. Mich. 1985) the court noted that a determination of whether a trustee willfully and deliberately violated his fiduciary duty is itself a factual determination. 47 B.R. at 821 n. 2. Thus, in this case, the jury should be permitted to evaluate the evidence and determine for itself whether Genser's self-dealing behavior rose to the level of willful and deliberate breach of his fiduciary duties.

[154] *See* ¶¶ 43-57 of C/S.

Genser had an obligation to act in the best interests of Black Diamond - meaning that he had a duty to act in the best interests of all constituencies. The fact that Genser catered to CIT's wishes over the best interests of Black Diamond, coupled with evidence that he despised the other constituencies to which he owed fiduciary obligations and completely disregarded their opinions and interests,[155] establishes that Genser created a conflict situation. Genser is not exempt from the fact that "[e]quity tolerates no interest adverse to the trust." *Mosser*, 341 U.S. at 271. Such interests "are always corrupting" and in this instance the evidence shows Genser's corrupt motives. *Id.*

c. **The parties have negotiated via the Settlement Agreement the standard of liability applicable to Genser.**

Even if this Court and the Bankruptcy Court had not already rejected Genser's quasi-judicial-immunity argument, Genser is bound by contracts which establish his liability, irrespective of a willful and deliberate standard supplied by common law. The A&M Parties cannot avoid the terms of agreements that establish their liability; the standard of care, as contracted, should apply. *See V&M Centimark Corp.*, 678 F.3d 459, 466 (6th Cir. 2012) (applying standard of care negotiated between the parties in their contract); *Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520, 536 (6th Cir. 2007) (Rogers, J., concurring and dissenting in part) ("one could contract to exercise any of various levels of care, not just the maximum that the government could impose under tort law").

Judge Scott stated in response to Genser's prior assertion of the willful and deliberate standard that "the A&M Parties have already twice negotiated the terms of their limitations of liability and immunity.  First in the Engagement letter and second in the Settlement Agreement [which superseded the Engagement letter]. They cannot now escape those negotiated terms." (AP DE 144, at 5). Pursuant to the Engagement Letter, the A&M Parties are subject to liability for harm done to Black Diamond for "losses, claim, damages, liabilities or expenses [] found in a final judgment by

---

[155] ¶ 57 of C/S.

a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from [their] gross negligence or willful misconduct." (Indemnification Agreement, ¶ A, BK DE 94). This standard was incorporated by reference into the Settlement Agreement. (Settlement Agreement, ¶ 6, DE 85-3). Thus, gross negligence is all that must be shown for Genser and the A&M Parties to held liable for their misconduct.[156]

### d. Under Kentucky law, the Trustee can prove her claims against Genser by showing gross negligence.

If the Court determines that the claims against Genser lie in the nature of breach of fiduciary duties, Genser claims the Trustee cannot establish the "significant burden of proof" required under the Kentucky corporate officer statute. [DE 100-1, at 49].[157] The evidence proves otherwise.

Additionally, in a footnote, Genser questions whether the Trust has standing to bring state law breach of fiduciary duty claims against Genser and the A&M Parties. The Trust has standing. The Third Amended Joint Plan of Liquidation, as approved by the Bankruptcy Court, provided that the Trust "will exclusively retain and may enforce, and the Debtors expressly reserve and preserve …

---

[156] Genser avers that the Trustee's claim for negligence against him is not viable because, per the terms of the Settlement Agreement, the Trustee may only recover from Black Diamond's Director and Officer insurance policies if Genser and the A&M Parties are found negligent (as opposed to grossly negligent) and these insurance policies already have been depleted by their fees and expenses. This is not so. The Settlement Agreement only entitles Genser and the A&M Parties to indemnity for "Defense Costs" which are defined by the Settlement Agreement as "reasonably incurred attorneys' fees and expenses." (Settlement Agreement, ¶¶ 2, 9). Thus, to the extent the A&M Parties have drained the Insurance Policies with unreasonable fees and expenses, the A&M parties are obligated to pay those amounts to the Trustee when she obtains her judgment on negligence. Moreover, even if the A&M Parties had properly exhausted the Insurance Policies with Defense Costs, which they have not, pursuant to the Settlement Agreement, the Trustee can and will pursue her negligence claim and obtain a judgment against the A&M Parties, including Genser, for negligence. The ability of a defendant to pay a judgment, or in this case, the capping of the amount of damages via contract, does not prevent a plaintiff from obtaining a liability verdict against a defendant. *Andonique v. Carmen*, 162 Ky. 154, 156 (Ky. 1915) ("The financial circumstances of either party to litigation is not a matter for consideration . . ."). Liability is a different question from the exact amount of damages to be recovered, as seen when the damages and liability stages of a case are bifurcated. *See Stone v. Glass*, 35 S.W.3d 827, 828 (Ky. Ct. App. 2000) (bifurcating negligence and other claims into liability and damages phase).

[157] As noted in the Tate MSJ Response (DE 159 at 29), Genser and Tate's quibbling about the characterization of the Trustee's cause of action is tilting at windmills. Nothing prevents the Trustee from pursuing claims of gross negligence against Genser and Kentucky courts have allowed gross negligence and breach of fiduciary duty claims to proceed in the same lawsuit. *Jaffee v. Davis*, NO. 2001-CA-000817-MR, 2003 Ky. App. Unpub. LEXIS 700, at *15 (Ky. Ct. App. May 2, 2003) (analyzing a lease management agreement which provided that the manager owed a duty measured by gross negligence or willful misconduct).

any Claims, demands, rights and Causes of Action that are included in the Contributed Assets." (BK

DE 1562, Ex. A at 24). The Plan also provides that "Causes of Action"

> means, with respect to each Debtor individually, all claims, demands, rights, actions,
> causes of action and suits of such Debtor's Estate, of any kind or character
> whatsoever, known or unknown, suspected or unsuspected, whether arising prior to,
> on or after the Petition Date, in contract or in tort, at law or in equity or under any
> theory of law, including, without limitation, the Causes of Actions identified on
> Exhibit IV.D.1 hereto.

(BK DE 1562, Ex. A at 3). Kentucky state law claims for gross negligence and breach of fiduciary

duty fit within those assignments to the Trustee.

The Bankruptcy Appellate Panel for the Sixth Circuit concluded that standing rests as a

general proposition with the Trustee following the institution of bankruptcy as the claim becomes

property of the Debtor's estate. *Bash v. Sun Trust Banks, Inc.* (*In re Ohio Bus. Machs.*), No. 06-8005,

2007 Bankr. LEXIS 133, at *21 (B.A.P. 6th Cir. Jan. 25, 2007) (collecting cases). "Actions for

breach of fiduciary duties. . . accrue to the corporation itself because fiduciary duties are owed to the

corporation and it is the corporation that suffers injury when fiduciary duties are breached." *Id.*  Upon

the filing of bankruptcy, these actions become the property of the estate, which includes "all legal or

equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §

541(a)(1). These interests include causes of action. *Unencumbered Assets, Trust v. JP Morgan Chase

Bank* (*In re Nat'l Century Fin. Enters.*), 617 F. Supp. 2d 700, 711 (S.D. Ohio 2009). Moreover,

actions "that arise after the debtor files for bankruptcy generally become property of the debtor's

estate." *Grubin v. Rattet* (*In re Food Mgmt. Group, LLC*), 380 B.R. 677, 692 (Bankr. S.D.N.Y.

2008). Thus, "[w]hile normally that fiduciary obligation is enforceable directly by the corporation, or

through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation,

enforceable by the trustee." *Pepper v. Litton*, 308 U.S. 295, 307 (1939), *superseded by statute on

other grounds*, 11 U.S.C. § 510, as recognized in *In re: Equipment Equity Holdings, Inc.*, 491 B.R.

792, 840 (N.D. Tex. 2013). The Trustee has standing to bring her claims and those claims are proven by a showing of gross negligence.

> i.    *Genser's self-dealing behavior shifts the burden to him to prove that his actions were fair, honest, and reasonable in all respects.*

Kentucky's corporate officer and director statutes do not "abrogate common law fiduciary duty claims against directors [and officers] in Kentucky but essentially codif[y] a standard of conduct of liability that is derived from business judgment rule principles." *Baptist Physicians Lexington, Inc. v. New Lexington Clinic, P.S.C.*, 2012-SC-000242-DG, 2013 Ky. LEXIS 642, at *2-3 (Ky. Dec. 19, 2013) (analyzing the companion statute applicable to corporate directors).[158] Though the business judgment rule establishes a presumption of good faith, an officer only benefits from the presumption if "the decision in question does not involve self interest." *Marrowbone Pharmacy, Inc. v. Johnson*, No. 2010-CA-0000429-MR, 2011 Ky. App. Unpub. LEXIS 881, at *19-20 (Ky. App. Dec. 2, 2011). If the officer is "interested" in the transaction at issue, then "the burden shifts to them to show that their actions were fair, honest and reasonable in all respects." *Id.* at *20 (citations omitted).

Genser's tenure as CRO was riddled with conflicts of interest from the beginning.  Genser's entire decision-making process was carried out in a fashion designed to promote his and A&M's interests over those of Black Diamond and its stakeholders, including the UCC.[159] Genser and A&M owed their positions in the Black Diamond bankruptcy to CIT, Genser's compensation was linked to his ability to bring in referrals from entities like CIT, and Genser actively sought out such referrals from CIT during the bankruptcy. The true "prize" for Genser was acting in the best interests of CIT

---

[158] Genser makes the same assertion in his motion for summary judgment that Tate made in his: that this Court has already determined that the Trustee's claims sound in breach of fiduciary duty arising under federal law. (DE 100-1, at 44). The Trustee incorporates by reference her refutation of this argument in the Tate MSJ Response. (DE 159, at 29-30).

[159] Thus, even if federal breach of fiduciary duty law did apply to the Trustee's claims against Genser, summary judgment would not be proper. As Genser acknowledges, the duty of care "requires the fiduciary to make good-faith decisions that can be attributed to a rational business purpose" and the duty of loyalty obligates the officer to "refrain from self-dealing, to avoid conflicts of interest and the appearance of impropriety, [and] to treat all parties to the case fairly." (DE 100-1, at 45). Genser's decision to forego opportunity upon opportunity to enter long term contracts on behalf of Black Diamond was not based upon a rational business purpose but was instead motivated by his desire to please referral source CIT.

and achieving referrals as a result, and Genser acted to further CIT's desires and interests over all others. Genser's relationship with CIT thus shifts the burden to Genser to show that his actions taken on behalf of Black Diamond were fair, honest, and reasonable in all respects, *Marrowbone Pharmacy, Inc.*, 2011 Ky. App. Unpub. LEXIS 881, at *20, a burden he cannot meet.

      ii.    *Even if the burden did not shift to Genser to prove his actions were fair, honest and reasonable in all respects, under Kentucky law, the Trustee can prove her claims against Genser by showing gross negligence.*

As explained in the Tate MSJ Response (DE 159, at 29), it is not dispositive whether the Trustee's claims are labeled as "gross negligence or willful misconduct" as defined by the Settlement Agreement or breach of fiduciary duty because the same legal elements will apply, and the same evidence will prove Genser's gross negligence and willful misconduct. Under Kentucky law, the concepts of negligence and breach of fiduciary duty are closely aligned.[160] Claims for negligence (particularly professional negligence) and claims for breach of fiduciary duty often co-exist. *See, e.g., Branham v. Stewart*, 307 S.W.3d 94, 103 (Ky. 2010); *People's Bank of N. Ky., Inc. v. Horwath*, 390 S.W.3d 830 (Ky. Ct. App. 2012). The Kentucky statute governing corporate officers requires a showing of (1) breach of the officer's duties and (2) that the breach constitute "willful misconduct or reckless disregard for the best interests of the corporation or its shareholders" for the officer to be held liable. K.R.S. 271B.8-420(5).[161] "Gross negligence" overlaps with this second element. *See, e.g.*

---

[160] As this Court noted in prior rulings, the Trustee "may be correct that individual instances of Genser and Tate's mismanagement could be described in terms of gross negligence or willful misconduct." *Sergent*, 472 B.R. at 409 (E.D. Ky. 2012).

[161] Genser also argues that the statute's requirement that a plaintiff prove willful misconduct or wanton or reckless disregard for the best interests of the corporation by "clear and convincing evidence" somehow warrants a grant of summary judgment in Genser's favor. It does not. "[T]he plaintiff does not have to show clear and convincing evidence at [the summary judgment] stage, only evidence that could support a reasonable factfinder in their determination . . . by the clear and convincing standard." *James T. Scatuorchio Racing Stables, LLC v. Walmac Stud Mgmt.*, Civil Action No. 5:11-374-DCR, 2014 U.S. Dist. LEXIS 53064, at *17 (E.D. Ky. Apr. 17, 2014). The evidence presented in this brief could certainly support a reasonable fact-finder in their determination that Genser acted with gross negligence by clear and convincing evidence. The Trustee incorporates by reference her Response to A&M's Motion for a Rule 16 Finding that the Trust's Claims are "Indemnifiable Claims" and Summary Judgment on the Defendants' First Counterclaim for Indemnification (DE 165) in response to Genser's contention that his breach of the Kentucky statute must be the legal or proximate cause of Black Diamond's damages.

*Phelps v. Louisville Water Co.*, 103 S.W.3d 46, 51-52 (Ky. 2003). As demonstrated by the evidence presented herein, Genser acted with gross negligence in making decisions on behalf of Black Diamond, preferring the wishes of CIT over the best interests of Black Diamond and its stakeholders.

## **CONCLUSION**

Genser acted in a grossly negligent fashion with reckless disregard for the best interests of Black Diamond. Not only was Genser incompetent to take on the role of CRO, he and A&M selected an equally incompetent CFO. Compounding the situation was the fact that, throughout the bankruptcy, Genser ignored the best interests of the company and its stakeholders by staunchly adhering to the wishes of secured creditor CIT in hopes of lining his and A&M's pockets through additional referrals. Turning down opportunity upon opportunity to sell or hedge coal, Genser solidified the demise of Black Diamond. For the reasons set forth above, Genser's motion should be denied in full.

Respectfully submitted,

DINSMORE & SHOHL LLP

*/s/ Grahmn N. Morgan*
Grahmn N. Morgan, Esq.
Ellen Arvin Kennedy, Esq.
250 West Main Street, Suite 1400
Lexington, KY 40507
Telephone: (859) 425-1000
Facsimile: (859) 425-1099
Email:  ellen.kennedy@dinsmore.com
         grahmn.morgan@dinsmore.com
**ATTORNEYS FOR TAFT A. MCKINSTRY,
TRUSTEE OF THE BD UNSECURED
CREDITORS TRUST**

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing was served this the 23rd day of May 2014,

electronically in accordance with the method established under this Court's CM/ECF Administrative

Procedures upon all parties in the electronic filing system in this case.

*/s/ Grahmn N. Morgan Esq.*
**ATTORNEY FOR TAFT A. MCKINSTRY,
TRUSTEE OF THE BD UNSECURED
CREDITORS TRUST**