UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | |
|---|---|
| *In re* BLACK DIAMOND MINING COMPANY, LLC, et al. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| TAFT A. MCKINSTRY, *Trustee of the BD Unsecured Creditors Trust*, | Civil No. 13-125-ART |
| Plaintiff, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| IRA J. GENSER, et al., | |
| Defendants. | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Like the proverbial horseshoe nail, a single document could cost a party victory in a lawsuit. For this reason, courts must faithfully enforce discovery rules to deter abuses. Courts have broad authority to penalize those who flout the codes of conduct governing modern civil litigation as they see fit. How then should a court respond to allegations that a party destroyed documents they were supposed to turn over to their opponents? Should the wrongdoer be ordered to forfeit an issue? Should it be crippled with a fine? Or should it be forced to surrender entirely, by striking key causes of action from its pleadings?

The spoliation claims before this court provide an opportunity to determine how to calibrate sanctions for parties who fail to preserve key documents in either physical or electronic form. For the reasons discussed below, this Court **GRANTS** the motion for sanctions in part and **DENIES** it in part.

## BACKGROUND

The present dispute over discovery sanctions is the latest battle in a lengthy and bitter conflict between the Trustee of the Black Diamond Mining Company Unsecured Creditors Trust ("Trustee") and turnaround specialists Ira Genser, Larry Tate, and their employer, Alvarez & Marsal North America, LLC ("A&M"). To provide context for this order, a brief discussion of the relevant history of the underlying bankruptcy litigation follows. *See also Sergent v. McKinstry*, 472 B.R. 387, 393–95 (E.D. Ky. 2012).

In February of 2008, Black Diamond Mining Company, LLC ("Black Diamond") sought to remedy its precarious financial position. Faced with gloomy accounting prospects, company advisors engaged A&M to "develop[ ] possible restructuring plans or strategic alternatives for maximizing the . . . value of [Black Diamond's] various business lines . . . ." *See* Ex. 1 at 2 (Engagement Letter dated February 20, 2008). As part of this arrangement, Black Diamond appointed A&M employees Larry Genser and Ira Tate as the Chief Restructuring Officer ("CRO") and the Chief Financial Officer, respectively. *Id.* at 1. Despite assuming these new roles, Genser and Tate remained employees of A&M, still subject to its internal policies. *Id.* at 2. Both officers were granted immunity from any liability to Black Diamond, unless a court determined that their actions or omissions amounted to gross negligence or willful misconduct. *Id.* at 2–3.

This last clause gained significance during the officers' tenure at Black Diamond. Genser and Tate allegedly wanted to sell the company to a competitor. According to the Trustee, they focused single-mindedly on that one possibility, allowing many other profitable opportunities to slip away. *Sergent*, 472 B.R. at 393. Accordingly, relations between the various stakeholders in the bankruptcy soured, and, as Genser testified, their interactions

became very contentious. By April of 2009, litigation seemed almost certain, and A&M's general counsel notified Genser and Tate, among others, to save documents related to the Black Diamond engagement as part of a litigation hold. Ex. 13 at 2 (April 20, 2009 Email from A&M General Counsel to Genser and Tate instructing them to "preserve and retain any and all documents and information . . . in connection with the Black Diamond engagement . . . .").

Soon afterward, both the restructuring efforts and the relations between the unsecured creditors, Genser, Tate, and A&M wholly collapsed. In July of 2009, the Bankruptcy Court confirmed a final liquidation plan. R. 29-7. The plan recognized the appointment of the Trustee and confirmed her authority to bring lawsuits on behalf of the unsecured creditors against Genser, Tate, and A&M under the terms of a Settlement Agreement. R. 29-7 at 15, 24. Genser, Tate, and A&M formally ended their engagements on this note; however, their interactions with the Trustee would continue long after their last day on the job. The Trustee filed a suit in state court in July of 2010 that the A&M parties removed to this Court. *See Sergent*, 472 B.R. at 394. During discovery, the Trustee requested all documents relating to the A&M parties' work on the Black Diamond project. *See, e.g.*, R. 23-25 at 2 (Request for Production of Documents dated August 2011).

Unfortunately, the acrimony in the bankruptcy was not enough; soon, discovery became contentious as well. In his deposition, Genser revealed that he did not recall what he had done with a notebook he had apparently kept during his time at Black Diamond. R. 23-6 at 8 (Genser Deposition, Tr. at 244). Tate stated that he deleted information from his computer and threw away paper notes without informing anybody at A&M. R. 23-7 at 5 (Tate Deposition Tr. 29). Moreover, A&M's production of electronic documents yielded

3

files that could not be opened or located. R. 23-45. And the documents that the A&M parties successfully produced raised suspicions about whether Genser and Tate had improperly destroyed relevant evidence. On July 6, 2009, Genser sent Tate an email void of text except for its subject line, which contained only the words "no emails." R. 23-50. On July 22, 2009, Tate sent Genser an email confirming that Genser wanted "all of the documents, filings etc[.]" on his desk to be shredded. Ex. 16 ("Shred Email"). That same day, the parties signed a Settlement Agreement authorizing suit against the A&M parties. *See* R. 11-2.

Based on these circumstances, the Trustee grew suspicious about the absence of potentially relevant documents from production and moved for sanctions. In support of her motion, she argued that the destroyed and inaccessible documents would have revealed, among other things, that Genser and Tate botched multiple opportunities to sell Black Diamond's coal at favorable prices. R. 23 at 5. The Trustee requested severe sanctions, including dismissal of the A&M parties' counterclaims, a non-rebuttable adverse inference jury instruction, and attorneys' fees.

On June 10, 2014, this Court conducted an evidentiary hearing where the parties examined witnesses and submitted evidence into the record in support of their claims. Based on the testimony collected in the proceeding, the parties' pleadings, and documentary evidence, the Court finds that spoliation sanctions in the form of adverse inference instructions are warranted.

## DISCUSSION

This Court must conduct a two-step inquiry before assessing spoliation sanctions. First, the Court must determine whether the party moving for sanctions demonstrated that

sanctions are warranted at all. This requires an affirmative answer to three questions: (1) whether there was a duty to preserve documents at the time the party with control over the documents destroyed them; (2) whether the party destroyed the documents with a culpable state of mind; and (3) whether a reasonable trier of fact would have found that the lost documents were relevant to a claim or defense in the litigation. *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010).

Second, upon finding that sanctions are warranted, the Court may then use its discretion to fashion an appropriate penalty. *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (en banc). The Court is only limited by the goals of fairness and punishing wrongdoers. *Id.* at 652 (explaining that a proper sanction will "'level[] the evidentiary playing field and . . . sanction[] the improper conduct.'") (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995)).

I. **Genser, Tate, and A&M Each Flouted Their Duty to Preserve Relevant Documents.**

   A. **Genser, Tate, and A&M Violated Separate Duties to Preserve Documents.**

An obligation to preserve evidence arises "when a party should have known that the evidence may be relevant to future litigation." *Beaven*, 622 F.3d at 553 (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). This can, and often does, happen earlier than when the actual lawsuit is filed. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567 (6th Cir. 2009). So when exactly were Genser, Tate, and A&M obligated to save their records related to the Black Diamond project?

5

### 1. The Duty to Preserve Documents Arose At A Different Time for Each Defendant.

The Trustee points to an A&M document retention policy as the source of a blanket duty to preserve documents. Ex. 14. The document specifies that "[w]here it is considered to be reasonably foreseeable that an engagement may involve litigation . . . there should be no destruction of documents/files relevant to that litigation . . . ." *Id.* However, the plain language of the policy simply prevents destruction of documents at the *end* of an engagement if litigation is foreseeable. *Id.* Nowhere does the document say what A&M employees should do with their documents over the course of their engagements. *Id.* True, a fact finder could reasonably assume that there exists a standing duty to retain documents over the course of a project. (Otherwise, what would there be left to preserve at the end of an engagement?) However, reading such a broad obligation into the plain language of this one-page document is a stretch. So could the duty have arisen another way?

Genser and Tate were both ordered to preserve documents pursuant to a litigation hold they received via email on April 20, 2009. Ex. 13. So at least after that date, both Genser and Tate had an obligation to save all of their emails, notes, and other documents related to the project. Since A&M's general counsel issued the hold, a reasonable fact finder could conclude that A&M's duty arose as of that date as well. But was litigation foreseeable before April?

As to Genser, at least, the answer is yes. As early as December, Genser communicated his apprehension about being sued for his role as the steward of Black Diamond's assets. Ex. 8 at 1. As Genser himself was aware of upcoming litigation, he had a duty to preserve relevant documents from then on. *See O'Brien*, 575 F.3d at 587 (finding

that the duty to preserve evidence arises when a party merely "should have known that the evidence may be relevant to future litigation" (quoting *John B. v. Goetz*, 531 F.3d 448, 459 (6th Cir. 2008))). Accordingly, Genser's obligation to preserve documents arose as early as December 2008, while Tate's and A&M's obligation arose in April 2009, when the litigation hold took effect.

### 2. Genser, Tate, and A&M Each Destroyed Documents After Their Respective Obligations to Preserve Documents Attached.

#### a. Genser Destroyed Documents After He Had Reason To Believe Litigation Was Imminent.

Three facts support the conclusion that Genser destroyed evidence. First, Genser testified that he took notes during important meetings and phone conversations as CRO of Black Diamond. However, Genser only produced one notepad of his handwritten notes, which even he appeared to agree was underwhelming for over a year of work involving a highly contentious matter.

Second, Genser maintained that he produced all relevant documents and ordered Tate to shred only the documents on his desk at the time of his departure, which were all publicly available. However, Genser also mentioned that he regularly wrote notes on such documents. Accordingly, there is a strong likelihood that the shredded documents contained handwritten notes. Oddly, Genser could not recall whether he kept multiple notebooks during his time at Black Diamond, but purported to remember precisely the character of the documents on his desk that he ordered Tate to shred. This sort of selective memory suggests that Genser either overstated his certainty about what Tate shredded or understated how much he recalled about where he kept his notes.

7

Third, Genser admitted to deleting emails before he learned of the litigation hold. R. 23-6 at 11 (Genser Deposition Tr. 250). Although the evidence does not clearly establish on which dates before April 2009 Genser deleted emails, a reasonable fact finder could conclude that he deleted at least some after December 2008, when he had reason to believe that litigation was imminent. Accordingly, Genser flouted his obligation to preserve written records by deleting or shredding documents after he knew of or reasonably apprehended the possibility of litigation.

### b. Tate Destroyed Documents After the Litigation Hold Took Effect.

The same goes for Tate. Tate testified that he regularly disposed of notes he took after meetings. Tate also testified that he shredded documents at Genser's instruction, without reviewing whether the litigation hold required him to preserve any of the documents. This raises the likelihood that at least some of the purged documents were relevant to the litigation. More importantly, Genser's testimony establishes that some of the pleadings on his desk may have contained his notes. By destroying the documents after the litigation hold attached and without confirming the contents of each document, Tate, too, violated his duty to preserve documents for discovery.

### c. A&M Failed to Produce Documents After the Litigation Hold Took Effect.

A&M and its agents failed to gather archived attachments while collecting corresponding relevant emails. Ex. 26 (Declaration of Louis Cinquanto). This failure occurred well after the litigation hold was put in place, so A&M, through its agents, disregarded its duty to preserve documents through sheer mismanagement, fulfilling one of the requirements for assessing sanctions.

8

### B. Genser, Tate, and A&M Each Possessed Sufficiently Culpable Mens Rea to Warrant Imposing Spoliation Sanctions.

The "'culpable state of mind' factor is satisfied by a showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to preserve it], or negligently.'" *See Beaven*, 622 F.3d at 554 (quoting *Residential Funding*, 306 F.3d at 108). Assessing the defendant's state of mind is important because the Court can impose different spoliation sanctions, calibrating the severity of the remedy on the party's degree of fault under the circumstances. *See Adkins*, 692 F.3d at 504 (quoting *Beaven*, 622 F.3d at 554). The evidence presented against Genser, Tate, and A&M is sufficient to allow a reasonable finder of fact to conclude that each destroyed evidence with a culpable state of mind.

#### 1. Multiple Communications Reveal That Genser Intended to Destroy Documents.

Taken as a whole, there is sufficient evidence to allow a reasonable fact finder to conclude that Genser destroyed documents intentionally. Several pieces of evidence support this conclusion. First, Genser admitted in an email to deleting a document that pertained to his work at Black Diamond. Ex. 12. This admission occurred on April 2, 2009—before the litigation hold was put into place, but after the December 2008 date on which Genser should have preserved all his documents. Then, on July 6, 2009, Genser sent Tate an email void of text except for the subject line, which simply stated "no emails." R. 23-50. Although the email is not a smoking gun, it raises suspicions about his motives. More damning evidence shows that Genser actually communicated instructions to destroy documents on his desk. Ex. 16. This communication apparently occurred on the very same day that the parties signed a Settlement Agreement authorizing the Trustee to bring a suit against him, and well after the litigation hold attached. Moreover, that Genser wanted the documents on his desk

9

to be shredded is strange, especially when he testified that they were merely publicly available documents with no relevance to the litigation. If so, why not just dump them in the garbage? Finally, Genser's selective memory about the files that he kept and destroyed undermines any claim that he acted without culpability when he ordered Tate to destroy his documents.

Because Genser admits that he destroyed documents and because he ordered the destruction of other documents on his desk after the litigation hold took effect, the Court finds there is sufficient evidence to indicate he intentionally destroyed evidence he was under a duty to preserve.

### 2. Tate Intentionally Destroyed His Personal Notes and Negligently Failed to Inspect Genser's Papers Before He Destroyed Them.

In his testimony, Tate admitted both to disposing of his notes from meetings during his time at Black Diamond and to shredding documents at Genser's direction. Although Tate referred to his notes as "to-do lists," they were still documents related to his work as an officer of Black Diamond. Tate's testimony reveals that he had a practice of destroying notes, which he continued to do after the litigation hold. Although Tate disputes that there was any relevant information in his notes, this is not a conclusion that he can make; Tate should have preserved his notes pursuant to the litigation hold no matter how irrelevant he thought they were. The failure to do so indicates that he intentionally destroyed documents that he had a duty to preserve.

Moreover, Tate's testimony reveals that he failed to check whether any of the documents and pleadings he destroyed at Genser's request contained handwritten notes or were pertinent documents under the litigation hold. He also testified that he did not consult

with anybody to determine whether the documents would, in fact, need to be preserved pursuant to the litigation hold. At the very least, this conduct demonstrates negligence. Tate knew that there was a litigation hold in place that not only applied to him, but also to his coworker. The litigation hold was exceptionally broad, and did not limit each employee's duty to preserve only his own documents. *See* Ex. 13 (instructing employees to preserve "any and all documents and information" that were received or produced "relating to or in connection with the Black Diamond engagement"). Given the real possibility that he could have disposed of relevant documents, Tate's destruction of Genser's documents without even screening them for responsiveness demonstrates a negligent state of mind.

### 3. A&M Negligently Failed to Produce All the Required Documents.

A&M, as a party to the litigation hold, may also be subject to spoliation sanctions. Although the entity itself cannot have a state of mind, the actions of its agents can be imputed to the organization when considering what sanctions to impose. *See Beaven*, 622 F.3d at 553 (finding that an agency acted in a willful manner when its agent willfully failed to preserve evidence that was to be disclosed in discovery).

A&M failed to promptly disclose relevant information, like Genser's notebook. Moreover, within the documents that A&M and its agents produced, many were missing attachments or contained attachments that could not be opened. Louis Cinquanto, who was retained to investigate A&M's email data, testified that this happened because A&M failed to access documents in an archive while gathering the original emails. *See* Ex. 26 (Declaration of Louis Cinquanto). A&M's failure to access properly all the files relevant for a document production is the modern analogue to "the dog ate my homework." The obligation to obtain files from the archive was an important procedure that A&M and its agents failed to follow.

### 4. None of the Parties Demonstrated Bad Faith.

Bad faith can be shown where the party destroys evidence while knowing of its value to the litigation at the time of the destruction. *See, e.g.*, *Fharmacy Records v. Nassar*, 379 F. App'x 522, 524 (6th Cir. 2010) (discussing bad faith warranting dismissal as distinct from "gamesmanship or garden variety discovery abuses" and involving a "campaign of fraud"); *One Beacon Ins. Co. v. Broad. Dev. Grp., Inc.*, 147 F. App'x 535, 541 n.3 (6th Cir. 2005) (characterizing spoliation in bad faith as "the failure to preserve evidence one knows . . . to be relevant to potential litigation"); *Byrd*, 518 F. App'x at 384–85 (finding bad faith when a party should have known that the evidence was important); *United States v. Spalding*, 438 F. App'x 464, 466 (6th Cir. 2011) (Sutton, J.) (finding bad-faith spoliation in the criminal law context where the government destroys evidence while conscious of its exculpatory value).

The Trustee did not elicit testimony that tended to show that any of the parties knew the significance of the missing evidence at the time the evidence was lost. Indeed, Genser and Tate dispute that they destroyed relevant evidence. A&M maintains that the missing "stub" files are not probative of any of the Trustee's claims. The Trustee did not submit affidavits or elicit testimony that showed A&M agents were "aware of the importance of the material." Moreover, A&M did not actively delete the attachments—rather its agents forgot to take steps to preserve the documents before they were deleted from the archive. The evidence as a whole shows that A&M's inability to produce documents was the product of negligent behavior, not intentional or bad-faith conduct. The sheer absence of any evidence indicating that the parties knew they were destroying important evidence for the litigation while they shredded, deleted, or otherwise lost documents counsels against finding bad faith on the part of any of the defendants.

### C. Some Documents That Were Destroyed or Lost Were Relevant to the Trustee's Claims.

To assess sanctions, the Court must find that a reasonable trier of fact could conclude that the destroyed documents were relevant to the non-spoliating party's claim or defense. *See Beaven*, 622 F.3d at 555. A party seeking sanctions may rely on circumstantial evidence to suggest the contents of the destroyed evidence. *Automated Solutions Corp. v. Paragon Data Sys.*, Nos. 13-3025, 13-3058, 2014 WL 2869286, at *6 (6th Cir. Jun. 25, 2014) (citing *Beaven*, 622 F.3d at 555). But "relevance" means something more than "sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence": The party seeking the sanction must show sufficient evidence from which a reasonable trier of fact could infer that the unavailable documents are "of the nature" that the non-spoliating party alleges them to be. *Id.* (citing *One Beacon*, 147 F. App'x at 541)). The nature of the missing documents, according to the Trustee, is evidence that Genser and Tate passed up lucrative opportunities during their tenure at Black Diamond and accordingly engaged in mismanagement. R. 23-1 at 44.

Here, the testimony presented at the hearing indicates that Genser took notes about meetings and calls during his time at Black Diamond, as did Tate when he compiled his to-do lists. Moreover, Genser indicated that he took notes on pleadings and other documents, some of which Tate admits he destroyed. Because notes would convey the impressions and rationales of Genser and Tate in their role as managers of Black Diamond, the destroyed documents with notes could reasonably be "of the nature" alleged by the Trustee—that is, indicative of their wrongful failure to seize lucrative and feasible opportunities.

13

Accordingly, the test for relevance is satisfied as to the documents that Genser and Tate destroyed.

A&M argues that the corrupted email files in its latest production did not contain relevant material. R. 33 at 16. The Trustee provides no evidence—not even the contents of one email that refers to a missing attachment—to show that the destroyed documents relate to her claim that Genser and Tate mishandled coal sales during their tenure at Black Diamond. Instead, the Trustee seems to rest on the fact that A&M and its agents negligently lost email attachments to show that those documents are relevant. *See* R. 23-1 at 44 ("[T]he sheer volume of the emails that were deleted establish the relevance of the missing documents."); *see Automated Solutions Corp.*, 2014 WL 2869286 at *7 (stating that negligence in failing to preserve evidence does not advance a showing of relevance). Because the Trustee wholly failed to produce any evidence suggesting that the missing email attachments related to her claims of mismanagement, a reasonable fact finder could not conclude that the missing email attachments are relevant. Accordingly, sanctions are unwarranted for the negligent loss of email attachment files, even though A&M and its agent acted with a culpable state of mind.

## II. Adverse Inference Instructions Are An Appropriate Sanction for the Conduct At Issue.

This Court's "inherent powers" include "broad discretion to craft proper sanctions for spoliated evidence." *Adkins* 554 F.3d at 651. However, sanctions must be commensurate with the level of culpability associated with each defendant. *See id.* at 652–53 (finding that because failures to produce relevant evidence fall "along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality," the severity of a sanction

should also vary) (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)). Moreover, the sanctions should be limited to what is necessary to punish the defendant and restore the plaintiff to the position she would have been in but for the spoliation. *Adkins*, 554 F.3d at 652.

Governing law generally prefers adverse inference instructions as sanctions for spoliation. An adverse inference instruction tells the jury to assume that the wrongdoing party "fears [producing the evidence]; and this fear is some evidence that the . . . document . . . would have exposed facts unfavorable to the party." *Flagg v. City of Detroit*, 715 F.3d 165, 177 (6th Cir. 2013) (alteration in original) (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995). Generally, a permissive or rebuttable adverse inference instruction is adequate punishment for negligent spoliation. *See Arch Ins. Co. v. Broan-NuTone LLC*, 509 F. App'x 453, 457 (6th Cir. 2012); *One Beacon Ins. Co. v. Broadcast Dev. Grp., Inc.,* 147 F. App'x 535 541 (6th Cir. 2005) (finding a jury instruction allowing jurors to infer that missing evidence would favor the non-spoliating party was appropriate when a party destroyed evidence negligently). A non-rebuttable, mandatory adverse inference jury instruction is considered proper if the Court finds that a party's destruction of evidence was intentional. *See Beaven*, 622 F.3d at 554. However, these are not fixed rules: "Whether an adverse inference should be permissive or mandatory must be determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault." *Automated Solutions Corp.*, 2014 WL 2869286, at *6 (quoting *Flagg*, 715 F.3d at 178 (finding permissive adverse instructions appropriate even where the spoliating party acted intentionally)).

The Trustee seeks severe sanctions, including dismissal of A&M's counterclaims and an elimination of the business judgment rule. R. 23-1 at 50. However, Sixth Circuit law

15

disfavors imposing dismissal sanctions—"the most severe sanction possible." *See Byrd*, 518 F. App'x at 385. Dismissal sanctions are rarely considered appropriate, and are generally only justified in circumstances where the responsible party exhibits bad faith. *Id.* at 386. As discussed *supra*, none of the parties engaged in conduct that rises to the level of bad faith. Although the parties' conduct is not to be condoned, it does not rise to the level to warrant dismissal sanctions.

The Trustee alternatively seeks a mandatory adverse instruction sanction for the jury in the adversary proceeding. A mandatory instruction about the parties' negligent failure to purchase coal or failure to exercise sound business judgment would be "tantamount to the entry of judgment" in favor of the Trustee in the adversary proceeding. *Flagg*, 715 F.3d at 179. This would be akin to issuing the "highest sanction" even though the parties did not demonstrate bad faith.

The Court finds that permissive adverse inference jury instructions are appropriate. Issuing permissive adverse jury instructions is fair to both parties because it leaves the ultimate determination of the merits of each claim to the jury. The jury is equipped to reason whether the absence of documents reveals, more likely than not, that there was a cover-up of mismanagement. The jury can base this on their assessment of other facts that will be presented in the adversary proceeding. However, the adverse inference instruction will also punish Genser and Tate for falling short of their obligations to turn over documents to the Trustee. The sanctions will deter defendants from treating litigation holds cavalierly, and may allow the Trustee to present her case as thoroughly as possible. Issuing adverse inference instructions comports with the punitive and compensatory purposes of spoliation sanctions. *Adkins*, 554 F.3d at 652.

The Trustee also seeks reimbursement of her fees and costs in bringing this motion. She, however, does not cite to any binding authority justifying such an award. R. 23-1 at 51 (citing to one secondary source and two cases from outside of this jurisdiction). Moreover, the only federal case that the Trustee cites is distinguishable: That court awarded attorneys' fees as sanctions for bad faith spoliation—a circumstance distinct from the present case. *See* R. 23-1 at 51 (citing to *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 803 F. Supp. 2d 469 (E.D. Va. 2011)). Thus, the Trustee has not provided the Court with sufficient evidence or authority to justify fees here. *See Ky. Petroleum Operating, Ltd. v. Golden*, Civil No. 12-164-ART, 2014 WL 2441226 (E.D. Ky. May 30, 2014) (quoting *Xue Juan Chen v. Holder*, 737 F.3d 1084, 1085 (7th Cir. 2013)) (advising against placing the Court in an inquisitorial posture because it is anathema to our adversarial system of adjudication).

## CONCLUSION

Accordingly, it is **ORDERED** that the Trustees' motions, R. 23 and R. 89, are **GRANTED IN PART AND DENIED IN PART**. The Court will discuss with the parties an appropriate adverse inference instruction at the final pretrial conference.

This the 22nd day of July, 2014.

Signed By:
*Amul R. Thapar*
United States District Judge